UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF OKLAHOMA

JOHN FITZGERALD HANSON,

*Petitioner*,

v.

CHRISTE QUICK, Warden, Oklahoma State
Penitentiary; STEVEN HARPE, Director of the
Oklahoma Department of Corrections;
DANNON COLBERT, Acting Regional
Director, U.S. Department of Justice, Federal
Bureau of Prisons; and WILLIAM W.
LOTHROP, Acting Director, U.S. Department
of Justice, Federal Bureau of Prisons,

*Respondents*.

District Court No. 25-cv-00081-RAW

CAPITAL CASE

# Oklahoma Respondents' Response in Opposition to Petition for Writ of Habeas Corpus

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................2

    I.   CONGRESS MANDATES TRANSFERS FROM FEDERAL TO STATE PRISON..................2

    II.  PETITIONER MURDERS MARY BOWLES AND IS SENTENCED TO DEATH. ................3

    III.THE BIDEN ADMINISTRATION REFUSES TO TRANSFER PETITIONER TO OKLAHOMA...4

    IV. THE TRUMP ADMINISTRATION TRANSFERS PETITIONER TO OKLAHOMA.................5

ARGUMENTS ....................................................................................................7

    I.   THE PETITION FOR A WRIT OF HABEAS CORPUS IS INVALID................................7

        a.   Petitioner's challenge could be reviewed under 28 U.S.C. § 2241 or § 2254...........9

        b.   Petitioner's opposition to his transfer should have been filed years ago...............10

        c.   Petitioner lacks standing to pursue his habeas petition................................12

        d.   Petitioner lacks any liberty interest in serving a longer federal life sentence......16

        e.   Petitioner's claims are all properly characterized as habeas claims. ...................18

    II.  SECTION 3623 OVERWHELMINGLY FAVORS RESPONDENTS, NOT PETITIONER............19

        a.   Section 3623 contains insurmountable procedural hurdles for Petitioner...........20

        b.   A Section 3623 transfer is mandatory, and its criteria are easily met....................21

        c.   The public interest emphatically favors enforcing Petitioner's
            death sentence. ....................................................................................23

            i.   *Dictionaries and case law confirm the public interest in timely executions.*...................23

            ii.  *The public interest favors punishment for all convictions, not just some.*........................25

            iii. *The broader context of Section 3623 shows that the public interest favors transfers.* ...................26

            iv. *Petitioner's public interest arguments are frivolous.*................................28

            v.  *Justice for Mary Bowles is indisputably in the public's interest.*................................30

         d.   A federal life sentence does not bar Petitioner's transfer to Oklahoma................33

        e.   Petitioner was not entitled to be notified of his transfer under
            Section 3623. ....................................................................................36

    III.OKLAHOMA HAS NOT WAIVED JURISDICTION OVER PETITIONER..................38

CONCLUSION ....................................................................................................41

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Alabama v. Bozeman,*
   533 U.S. 146 (2001) ............................................................................................21

*Allen v. Wright,*
   468 U.S. 737 (1984) ............................................................................................14

*Am. Sch. of Magnetic Healing v. McAnnulty,*
   187 U.S. 94 (1902) ..............................................................................................21

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n,*
   576 U.S. 787 (2015) ............................................................................................14

*Armstrong v. Salinas,*
   No. 6:13-179-KKC, 2014 WL 340399 (E.D. Ky. Jan. 30, 2014) ......................17

*Binford v. United States,*
   436 F.3d 1252 (10th Cir. 2006) .........................................................................10

*Blango v. Thornburgh,*
   942 F.2d 1487 (10th Cir. 1991) ......................................................................40B

*Bowles v. DeSantis,*
   934 F.3d 1230 (11th Cir. 2019) .............................................................19, 24, 25

*Boyce v. United States,*
   52 F. Supp. 115 (M.D. Pa. 1943) .......................................................................17

*Bucklew v. Precythe,*
   587 U.S. 119 (2019) ............................................................................................24

*Bullock v. Mississippi,*
   404 F.2d 75 (5th Cir. 1968) ..........................................................................13, 14

*Burger v. Scott,*
   317 F.3d 1133 (10th Cir. 2003) .........................................................................10

*Calderon v. Ashmus,*
   523 U.S. 740 (1998) ............................................................................................18

*Calderon v. Thompson,*
   523 U.S. 538 (1998) ............................................................................................24

*Causey v. Civiletti,*
   621 F.2d 691 (5th Cir. 1980) .............................................................................17

*Celli v. Shoell,*
   40 F.3d 324 (10th Cir. 1994) .............................................................................15

*Chesteen v. Thaler,*
   No. 1:10CV106, 2010 WL 5830497 (E.D. Tex. Sept. 28, 2010) ......................12

*Delgado–Reynua v. Gonzales,*
   450 F.3d 596 (5th Cir. 2006) .............................................................................18

*DeLong v. United States,*
 474 F.2d 719 (5th Cir. 1973) ................................................................................13

*Dulworth v. Evans,*
 442 F.3d 1265 (10th Cir. 2006) .............................................................................11

*Easom v. US Well Servs., Inc.,*
 37 F.4th 238 (5th Cir. 2022) .................................................................................23

*Engle v. Isaac,*
 456 U.S. 107 (1982) ..............................................................................................27

*Env't Integrity Project v. U.S. Env't Prot. Agency,*
 969 F.3d 529 (5th Cir. 2020) ................................................................................36

*F.A.A. v. Cooper,*
 566 U.S. 284 (2012) ..............................................................................................24

*Fed. Express Corp. v. United States Dep't of Com.,*
 39 F.4th 756 (D.C. Cir. 2022) ..............................................................................21

*Ferry v. Gonzales,*
 457 F.3d 1117 (10th Cir. 2006) .............................................................................10

*Fletcher v. Lengerich,*
 No. 23-1395, 2024 WL 1155260 (10th Cir. Mar. 18, 2024) ........................... 38, 39

*Fresenius Kabi USA, LLC v. Nebraska,*
 No. 4:18CV3109, 2018 WL 3826681 (D. Neb. Aug. 10, 2018) .............................28

*Garrett v. United States,*
 471 U.S. 773 (1985) ..............................................................................................26

*Glossip v. Chandler,*
 No. CIV-14-0665-F, 2022 WL 1997194 (W.D. Okla. June 6, 2022) .......................4

*Glossip v. Gross,*
 576 U.S. 863 (2015) ..............................................................................................19

*Gomez v. Fierro,*
 519 U.S. 918 (1996) ..............................................................................................25

*Gonzales v. Oregon,*
 546 U.S. 243 (2006) ..............................................................................................35

*Gunton v. Squier,*
 185 F.2d 470 (9th Cir. 1950) .................................................................................13

*Hanson v. Drummond,*
 No. 1:25-CV-00102, 2025 WL 819656 (W.D. La. Jan. 31, 2025) ...........................6

*Hanson v. Drummond,*
 No. 25-CV-102, 2025 WL 636319 (W.D. La. Feb. 27, 2025) ........................... 7, 37

*Hanson v. Oklahoma,*
 558 U.S. 1081 (2009) ..............................................................................................3

*Hanson v. Sherrod,*
    797 F.3d 810 (10th Cir. 2015)................................................................... 3, 31

*Hanson v. Sherrod,*
    No. 10-CV-0113-CVE-TLW, 2013 WL 3307111 (N.D. Okla. July 1, 2013) ................... 4

*Hanson v. State,*
    206 P.3d 1020 (Okla. Crim. App. 2009)................................................................3

*Hanson v. State,*
    72 P.3d 40 (Okla. Crim. App. 2003) ...................................................................3

*Harmon v. Sharp,*
    936 F.3d 1044 (10th Cir. 2019)...........................................................................31

*Hereford v. McCaughtry,*
    101 F. Supp. 2d 742 (E.D. Wis. 2000)................................................................12

*Hibbs v. Winn,*
    542 U.S. 88 (2004) ...........................................................................................22

*In re Cline,*
    531 F.3d 1249 (10th Cir. 2008)...........................................................................39

*Kansas v. Garcia,*
    589 U.S. 191 (2020) .........................................................................................27

*Kelley v. Oregon,*
    273 U.S. 589 (1927) .........................................................................................16

*Knapp v. U.S. Dep't. of Agric.,*
    796 F.3d 445, (5th Cir. 2015) ............................................................................21

*Lynch v. Standifird,*
    441 F. App'x 623 (10th Cir. Nov. 29, 2011)...........................................................38

*Main St. Legal Servs., Inc. v. Nat'l Sec. Council,*
    811 F.3d 542 (2d Cir. 2016) ..............................................................................29

*Martel v. Clair,*
    565 U.S. 648 (2012) .........................................................................................24

*Martinez v. Quarterman,*
    No. 02CV718, 2009 WL 10710035 (S.D. Tex. Jan. 28, 2009) ..................................28

*Mason v. Thornburgh,*
    No. CIV-15-1169-M, 2016 WL 7228899 (W.D. Okla. Oct. 24, 2016)..........................10

*McGirt v. Oklahoma,*
    591 U.S. 894 (2020) ...........................................................................................4

*McIntosh v. U.S. Parole Comm'n,*
    115 F.3d 809 (10th Cir. 1997).........................................................................9, 38

*Montez v. McKinna,*
    208 F.3d 862 (10th Cir. 2000)..............................................................................9

*Moody v. Daggett,*
  429 U.S. 78, (1976) ........................................................................................................17

*Moody v. Holman,*
  887 F.3d 1281 (11th Cir. 2018) ..............................................8, 9, 13, 14, 15, 17

*Oklahoma v. Tellez,*
  No. 7:22-CV-00108-O, 2022 WL 17686579 (N.D. Tex. Dec. 13, 2022) ...............5, 20, 29

*Parker v. Champion,*
  148 F.3d 1219 (10th Cir. 1998) .......................................................................40

*Parker v. Reno,*
  No. 00-6171, 2000 WL 1531772 (10th Cir. Oct. 17, 2000) .............................19

*Piper v. Estelle,*
  485 F.2d 245 (5th Cir. 1973) ....................................................................40, 41

*Ponzi v. Fessenden,*
  258 U.S. 254 (1922) ....................................................................................2, 16

*Preiser v. Rodriguez,*
  411 U.S. 475 (1973) ...................................................................................8, 10

*Ramirez v. Collier,*
  595 U.S. 411 (2022) .........................................................................................24

*Reedy v. Werholtz,*
  660 F.3d 1270 (10th Cir. 2011) .......................................................................15

*Reno v. Koray,*
  515 U.S. 50 (1995) ...........................................................................................36

*Rhoades v. Reinke,*
  830 F. Supp. 2d 1046 (D. Idaho 2011) ............................................................25

*Robledo v. Trate,*
  No. 1:23-cv-00995-JLT-SAB-HC, 2024 WL 557009 (E.D. Cal. Feb. 12, 2024) ...............14

*Rutledge v. United States,*
  230 F.3d 1041 (7th Cir. 2000) .........................................................................15

*Schaffer v. Clinton,*
  240 F.3d 878 (10th Cir. 2001) .........................................................................14

*Shields v. Beto,*
  370 F.2d 1003 (5th Cir. 1967) .........................................................................41

*Smith v. Duckworth,*
  824 F.3d 1233 (10th Cir. 2016) .........................................................................8

*Texas v. Biden,*
  No. 2:21CV67, 2021 WL 4552547 (N.D. Tex. July 19, 2021) .........................21

*Thompson v. Wainwright,*
  714 F.2d 1495 (11th Cir. 1983) .......................................................................19

*Trump v. Thompson,*
   20 F.4th 10 (D.C. Cir. 2021) ............................................................................29

*United States ex rel. Buchalter v. Warden of Sing Sing Prison,*
   141 F.2d 259 (2d. Cir. 1944) .................................................................... 15, 17

*United States v. Barfield,*
   396 F.3d 1144 (11th Cir. 2005).......................................................................41

*United States v. Gutierrez,*
   116 F.3d 412 (9th Cir. 1997) ..........................................................................19

*United States v. Hays,*
   515 U.S. 737 (1995) .......................................................................................15

*United States v. Johnson,*
   932 F.3d 965 (6th Cir. 2019) ...........................................................13, 14, 17

*United States v. McCrary,*
   220 F.3d 868 (8th Cir. 2000) ..........................................................................13

*United States v. Miller,*
   15 F. App'x 713 (10th Cir. 2001) .....................................................................3

*United States v. Nelson,*
   465 F.3d 1145 (10th Cir. 2006).......................................................................38

*United States v. Olarte-Morales,*
   992 F.2d 1223 (10th Cir. 1993).......................................................................26

*United States v. Salinas,*
   693 F.2d 348 (5th Cir. 1982) ..........................................................................26

*United States v. Vialva,*
   976 F.3d 458 (5th Cir. 2020) ..........................................................................24

*Vandagriff v. Fed. Bureau of Prisons,*
   No. 10-225-ART, 2010 WL 4867640 (E.D. Ky. Nov. 23, 2010) ....................18

*Walck v. Edmondson,*
   472 F.3d 1227 (10th Cir. 2007) .................................................................. 9, 10

*Warth v. Seldin,*
   422 U.S. 490 (1975) ................................................................................. 14, 18

*Weldon v. Pacheco,*
   715 F. App'x 837 (10th Cir. 2017) .................................................................18

*Williams v. Lakeview Loan Servicing LLC,*
   509 F. Supp. 3d 676 (S.D. Tex. 2020) ............................................................36

*Witman v. Am. Trucking Assns., Inc.,*
   531 U.S. 457 (2001) .......................................................................................35

*Yates v. United States,*
   574 U.S. 528 (2015) ................................................................................. 23, 26

*Yellowbear v. Wyo. Att'y Gen.*,
   525 F.3d 921 (10th Cir. 2008)..................................................................38

*Zavala v. Ridge*,
   310 F. Supp. 2d 1071 (N.D. Cal. 2004) ....................................................18

*Zerbst v. McPike*,
   97 F.2d 253 (5th Cir. 1938) ......................................................................8

## **Statutes**

8 U.S.C. § 1226 .............................................................................................18

18 U.S.C § 3596 .............................................................................................27

18 U.S.C. § 3591 ............................................................................................27

18 U.S.C. § 3622 ................................................................................2, 20, 22, 27

18 U.S.C. § 3623 .................................................1, 2, 3, 15, 19, 20, 22, 23, 33

18 U.S.C. § 3625 ..............................................................................................2

18 U.S.C. § 4085 ..............................................................................................2

28 U.S.C § 2244 ......................................................................10, 11, 28, 38, 39

28 U.S.C. § 2241 ........................................................................................9, 38

28 U.S.C. § 2254 ..............................................................................................9,

28 U.S.C. § 2255 ........................................................................9, 10, 11, 38, 39

42 U.S.C. § 1983 ............................................................................................19

Act of June 25, 1948, ch. 645, 62 Stat. 683, 850 ...........................................2

Act of Oct. 12, 1984, Pub. L. 98-473, 98 Stat. 2006 ......................................2

21 Okla. Stat. § 61.2.......................................................................................3

74 Okla. Stat. § 18....................................................................................22, 33

## **Regulations**

Exec. Order No. 14,164, 90 Fed. Reg. 8463, 8463 (Jan. 20, 2025)................5

## **Constitutional Provisions**

Okla. Const. art. 2, § 34.................................................................................32

U.S. Const. art. III, § 2 ..................................................................................14

## **Other Authorities**

Antonin Scalia and Bryan A. Garner, *Reading Law: The InterprReading Law:*
   *The Interpretation of Legal Texts* 93 (West 2012) .................................36

*Interest*, *Legal Definition*,
   Merriam-Webster Online ...........................................................................24

*Legal Interest*,
   Merriam-Webster's Dictionary of Law (1996) ........................................24

*Missing for a Week: Retired BOK Senior Vice President Found Dead,*
  NEWS ON 6 (Sept. 8, 1999) ............................................................................. 30

*Murder Victim's Family Trying to Cope With Loss,*
  NEWS ON 6 (Sept. 23, 1999) ........................................................................... 32

*Prior,*
  Webster's Ninth New Collegiate Dictionary (9th ed. 1983) ......................... 33-34

*Public Interest,*
  Black's Law Dictionary (11th ed. 2019) ...................................................... 24, 25

*Son Of Man Murdered 13 Years Ago Still Awaiting Closure,*
  NEWS ON 6 (Sept. 14, 2012) ........................................................................... 32

U.S. Sentencing Manual § 3D1.4 ......................................................................... 26

## INTRODUCTION

In 1999, Petitioner kidnapped 77-year-old Mary Bowles from the Promenade Mall in Tulsa, drove her to an isolated area, brutally murdered her, and left her body to rot. An Oklahoma jury sentenced him to death for this heinous crime. Like it did for his trial and sentencing, the federal government has now returned Petitioner to Oklahoma for his execution, which is scheduled for June 12, 2025. Despite this cooperation between the United States and Oklahoma—so that justice can be carried out for an Oklahoma victim of an infamous Oklahoma crime—Petitioner has sued, implausibly feigning confusion over the predictable turn of events. *See* Petition ("Pet.") at 1 (asking this Court to "inquire as to why he is in the physical custody of the Oklahoma Department of Corrections"). In short, he argues that federal law prohibited the United States from transferring him to Oklahoma.

The opposite is true. Congress, with 18 U.S.C. § 3623 ("Section 3623"), has expressly required the transfer of a federal prisoner to state authorities, so long as the Director of the Federal Bureau of Prisons ("BOP") finds the transfer is in the public interest. Here, after finding that allowing Petitioner to avoid punishment for Mary's murder by keeping him in federal custody would "grossly undermine[] the public interest," Docket 2-4 at 1 ("Doc."), the United States ordered Petitioner transferred to Oklahoma expeditiously. Thus, Section 3623 has been satisfied, not violated. Petitioner's argument to the contrary is based on, among other things, a bizarre reading of the phrase "prior to his release" in Section 3623, a reading that would in practice mean that no inmate serving a federal life sentence could ever be transferred to a state. This is absurd, contrary to the plain intent of Congress, and would intrude upon Oklahoma's sovereign interest in seeing justice served for an Oklahoma crime.

Petitioner's claims are also procedurally barred for several reasons, including his lack of standing, the absence of any liberty interest in serving his sentence in federal prison, and the fact that he could have brought a habeas claim opposing his foreseeable transfer to Oklahoma years ago. As a result, this Court should therefore dismiss with prejudice or, alternatively, deny the Petition.

1

## BACKGROUND

### I.    CONGRESS MANDATES TRANSFERS FROM FEDERAL TO STATE PRISON.

Over a century ago, the Supreme Court acknowledged that the U.S. Attorney General has "the power and discretion to practice the comity" of transfers from federal to state authority. *Ponzi v. Fessenden*, 258 U.S. 254, 261–62 (1922). In the 1940s, Congress enacted a statute, ultimately codified as 18 U.S.C. § 4085, that required the transfer of federal inmates to state custody for a pending indictment or information or to serve existing state felony convictions, if certain criteria were met. *See* Act of June 25, 1948, ch. 645, 62 Stat. 683, 850. Congress later repealed this statute and, in 1984, enacted a similar mandate with Section 3623. *See* Act of Oct. 12, 1984, Pub. L. 98-473, 98 Stat. 2006. That statute, which is at the center of this dispute, is entitled "Transfer of a prisoner to State authority," and it provides as follows:

> The Director of the Bureau of Prisons shall order that a prisoner who has been charged in an indictment or information with, or convicted of, a State felony, be transferred to an official detention facility within such State prior to his release from a Federal prison facility if--
>
> > (1) the transfer has been requested by the Governor or other executive authority of the State;
> >
> > (2) the State has presented to the Director a certified copy of the indictment, information, or judgment of conviction; and
> >
> > (3) the Director finds that the transfer would be in the public interest.
>
> If more than one request is presented with respect to a prisoner, the Director shall determine which request should receive preference. The expenses of such transfer shall be borne by the State requesting the transfer.

18 U.S.C. § 3623.

Simultaneously, Congress passed two additional laws relevant here. With 18 U.S.C. § 3625, Congress precluded judicial review of Section 3623 under the Administrative Procedure Act ("APA"). And with 18 U.S.C. § 3622, Congress explained that the BOP "may release a prisoner from the place

of his imprisonment for a limited period" if it is "consistent with the public interest"—the use of "may" in Section 3622 contrasting starkly with Congress' use of the word "shall" in Section 3623.

## II.    PETITIONER MURDERS MARY BOWLES AND IS SENTENCED TO DEATH.

On August 31, 1999, Petitioner embarked on a violent crime spree that culminated in his kidnapping 77-year-old Mary Bowles ("Mary") from the Promenade Mall in Tulsa and mercilessly executing her soon after. *See Hanson v. Sherrod*, 797 F.3d 810, 819 (10th Cir. 2015). Moments before this grotesque murder, Petitioner's accomplice shot and killed Jerald Thurman, a 44-year-old small business owner from Owasso who happened to be nearby. *Id.* An Oklahoma jury convicted Petitioner of Mary's murder in state court and recommended the death penalty. *Id.* at 822. After the Oklahoma Court of Criminal Appeals ("OCCA") remanded the case for resentencing, *Hanson v. State*, 72 P.3d 40, 45 (Okla. Crim. App. 2003), a second Oklahoma jury also sentenced Petitioner to death. This time, the OCCA affirmed the conviction and death sentence. *Hanson v. State*, 206 P.3d 1020, 1036 (Okla. Crim. App. 2009). The Supreme Court denied certiorari. *Hanson v. Oklahoma*, 558 U.S. 1081 (2009).

Meanwhile, the federal government had already convicted Petitioner of a slew of crimes he committed during his 1999 spree, including bank robbery, and a federal jury sentenced him to life imprisonment plus a consecutive 984 months. *United States v. Miller*, 15 F. App'x 713, 714 (10th Cir. 2001) (unpublished). The Tenth Circuit affirmed. *Id.* at 716. Petitioner began serving that life sentence in 2000. Pet. at 3. As Petitioner openly admits, at multiple junctures during his state prosecution and sentencing the federal government voluntarily transferred him to Oklahoma. *See* Pet. at 3. After Petitioner had been sentenced to death for Mary's murder, his counsel asked the state court to order that he be transferred back to federal prison. *See* Exhibit 1, Sentencing Transcript (Feb. 7, 2006) at 4. The court so ordered, *id.*, in compliance with Oklahoma law. *See* 21 OKLA. STAT. § 61.2 ("When a defendant is sentenced in an Oklahoma state court and is also under sentence from a federal court … the court may direct that custody of the defendant be relinquished to the federal … authorities ….").

3

Petitioner has exhausted all state and federal appeals of his state conviction and sentence. In addition to the appeals listed above, Petitioner first filed a federal habeas petition with the U.S. District Court for the Northern District of Oklahoma, challenging his state conviction; the Northern District denied the petition on all grounds. *Hanson v. Sherrod*, No. 10-CV-0113-CVE-TLW, 2013 WL 3307111, at *3–5, 40 (N.D. Okla. July 1, 2013) (Eagan, J.). That decision was affirmed by the Tenth Circuit, 797 F.3d 810, 853 (10th Cir. 2015), and the Supreme Court denied certiorari, 578 U.S. 979 (2016). Petitioner also brought—and lost, definitively—a separate constitutional challenge to Oklahoma's execution protocol in the U.S. District Court for the Western District of Oklahoma, alongside numerous other Oklahoma death row inmates. *Glossip v. Chandler*, No. CIV-14-0665-F, 2022 WL 1997194, at *1, *21 (W.D. Okla. June 6, 2022) (Friot, J.) (holding that the "Oklahoma inmates awaiting execution" "have fallen well short of clearing the bar set by the Supreme Court" for unconstitutionality). Lastly, in state court, Petitioner unsuccessfully challenged Oklahoma's jurisdiction to prosecute him based on *McGirt v. Oklahoma*, 591 U.S. 894 (2020), in a successive petition for post-conviction relief. *See* Opinion Denying Successive Application for Capital Post-Conviction Relief at 3, *Hanson v. Oklahoma*, No. PCD-2020-611 (Okla. Crim. App. Sept. 9, 2021).

Not once—during any of his numerous prior challenges to his Oklahoma conviction and sentence over multiple decades—has Petitioner ever suggested that Oklahoma's prosecution of him was pointless or invalid because the federal government cannot transfer him until his federal life sentence expires when he dies. *Contra* Pet. at 10 ("As he has not been released from those [federal] sentences, and there is no prospect of Mr. Hanson being released from federal custody in the foreseeable future, there could be no lawful transfer.").

### III.    THE BIDEN ADMINISTRATION REFUSES TO TRANSFER PETITIONER TO OKLAHOMA.

In late 2021, after a six-year execution pause as Oklahoma searched for lethal injection drugs and developed a new execution protocol, the State restarted executions. *See Glossip*, 2022 WL 1997194,

at *1. The OCCA then set Petitioner's execution for December 15, 2022. *See* Order Setting Execution Dates, *In re Setting of Execution Dates*, Nos. D-2008-655 *et al.* (Okla. Crim. App. July 1, 2022). But that court's lawful order was thwarted by the Biden Administration's refusal to conduct the transfer process outlined in Section 3623. Despite the death penalty being enshrined in federal law, a Regional BOP Director under President Biden asserted that Petitioner's transfer "to state authorities for state execution is not in the public interest." Doc. 2-1 at 9.

In response, Oklahoma sued the United States, arguing that this decision was *ultra vires*, in that a lawful execution could not legitimately be deemed in conflict with the public interest when bedrock federal law enshrines and supports the death penalty across the board. That court dismissed the claim without addressing the merits, however, holding that it lacked jurisdiction because it had "no authority to review the BOP Director's decision under § 3623." *Oklahoma v. Tellez*, No. 7:22-CV-00108-O, 2022 WL 17686579, at *2 (N.D. Tex. Dec. 13, 2022). The court found that "Congress' withdrawal of APA review in this context is instructive." *Id.* at *3. Because "Congress has explicitly withheld APA review," the court wrote, it would be "illogical" to review the United States' decision even for a rational basis. *Id.* Oklahoma, the court concluded, "invite[s] this Court to engage in a debate about the public interest when Congress has clearly limited such review." *Id.*  "The Court declines that invitation." *Id.*

## IV.    THE TRUMP ADMINISTRATION TRANSFERS PETITIONER TO OKLAHOMA.

On January 20, 2025, President Trump issued an executive order declaring that it is a policy of the United States "to counteract the politicians and judges who subvert the law by obstructing and preventing the execution of capital sentences." Exec. Order No. 14,164, 90 Fed. Reg. 8463, 8463 (Jan. 20, 2025). Soon after, on January 23, Oklahoma Attorney General Gentner Drummond wrote to the U.S. Bureau of Prisons ("BOP") requesting the transfer of Petitioner by March 20, 2025, so that he would be eligible for execution in June. Doc. 2-1. On February 5, 2025, U.S. Attorney General Pam Bondi issued a memo titled "Reviving the Federal Death Penalty and Lifting the Moratorium on

Federal Executions." Exhibit 2, U.S. Att'y Gen. Memo (Feb. 5, 2025). In order to "[a]ssist[] with the Implementation of State and Local Death Sentences," Attorney General Bondi directed

> the Federal Bureau of Prisons ... to work with each state that allows capital punishment to ensure the states have sufficient supplies and resources to impose the death penalty. **<u>This includes transferring federal inmates with state or local death sentences to the appropriate authorities to carry out those sentences</u>**.

*Id.* at 4 (emphasis added). Then, on February 11, 2025, Attorney General Bondi issued a memorandum to the Acting Director of the BOP directing the transfer of Petitioner to Oklahoma authorities. Doc. 2-4. She wrote: "The Department of Justice owes it to the victim and her family—as well as the public—to transfer inmate Hanson so that Oklahoma can carry out this just sentence." *Id.* at 2.

On January 29, 2025, Petitioner sued and moved for emergency injunctive relief in the U.S. District Court for the Western District of Louisiana, seeking—26 years after he murdered Mary—to delay justice yet again. *See Hanson v. Drummond*, No. 1:25-cv-00102-DDD-JPM (W.D. La.). There, he named as defendants Attorney General Drummond and various officials in the Federal Bureau of Prisons, and he brought three "causes of action" that lacked merit. *See* Complaint, *Hanson*, No. 1:25-cv-00102-DDD-JPM. First, he alleged that his transfer violated federal law and the public interest "because it would deprive the federal government of its right to exercise primary jurisdiction over Mr. Hanson and constitute an unwarranted state interference in federal sovereignty." *See id.* ¶ 19. Second, he alleged that the State's "imposition of the death penalty … is a betrayal of a promise made to the Cherokee and Muscogee (Creek) Nations" to not execute tribal members. *Id.* ¶ 25. Third, he alleged that his transfer would violate Section 3623. *Id.* ¶¶ 26–44.

Two days later, before Petitioner served any defendant with process, a federal magistrate judge recommended *ex parte* a Temporary Restraining Order ("TRO") prohibiting Petitioner's transfer. *Hanson v. Drummond*, No. 1:25-CV-00102, 2025 WL 819656, at *3 (W.D. La. Jan. 31, 2025). Several weeks later, having finally been served with process, the state and federal defendants staunchly opposed this recommendation. On February 27, 2025, the district court declined to adopt the

magistrate judge's recommendation. Instead, the court dismissed the entire case without prejudice because it was "not ripe and, therefore, not justiciable." *Hanson v. Drummond*, No. 25-CV-102, 2025 WL 636319, at *2 (W.D. La. Feb. 27, 2025). Specifically, the court found that Section 3623 "clearly places the discretion as to whether a prisoner should be transferred to a state with the BOP Director." *Id.* Because "there is no evidence before us to suggest that the BOP Director has responded to the request from Attorney General Drummond, there is no justiciable action." *Id.* The district court added that, "[e]ven if this claim was justiciable, it is doubtful that the court would grant the requested relief" because "Section 3623 gives the BOP Director, and no one else, the discretion to decide whether an inmate's transfer is within the public interest." *Id.* at *3.

On February 28, 2025, Acting BOP Director William W. Lothrop sent Attorney General Drummond a letter agreeing with Attorney General Bondi's "determination of the public interest in this matter" and directing the appropriate officials "to expeditiously transfer Mr. Hanson to the custody of the State of Oklahoma." Doc. 2-5. The BOP transferred Petitioner to the custody of Oklahoma officials the next day, March 1, 2025, and the Oklahoma Attorney General's Office notified Petitioner's counsel of the transfer the following morning, on March 2, 2025. Doc. 2-6. Petitioner is now housed at the Oklahoma State Penitentiary in McAlester, Oklahoma, and the OCCA has set his execution date for June 12, 2025. *See* Exhibit 9, Order Setting Execution Date (April 1, 2025).

## ARGUMENTS

In the present lawsuit, Petitioner seeks "hybrid habeas corpus, declaratory, and injunctive relief." Pet. at 1. His arguments are frivolous, and this Court should promptly reject relief of any kind and dismiss or deny Petitioner's "hybrid" Petition.

## I.     THE PETITION FOR A WRIT OF HABEAS CORPUS IS INVALID.

Petitioner's habeas argument centers on his being "unlawfully confined in the wrong institution" because he is in Oklahoma state prison rather than federal prison. Pet. at 1 (quoting *Preiser*

*v. Rodriguez*, 411 U.S. 475, 486 (1973)). Conceptually, this argument struggles from the start. If the State were attempting to execute Petitioner for a federal murder conviction, he might have a valid habeas claim. But as it stands, he is indisputably facing the death penalty in an *Oklahoma* prison because he was convicted in an *Oklahoma* court and sentenced by an *Oklahoma* jury for a horrific *Oklahoma* crime. And Petitioner makes no allegation that the Oklahoma Respondents violated any law by merely receiving Petitioner from the United States; rather, his allegations are that the federal government violated federal law in transferring him to Oklahoma. To hold that Petitioner is in the "wrong institution" despite him being validly held in Oklahoma for an indisputably valid Oklahoma conviction makes no sense. At minimum, Petitioner has pointed to no case law permitting such a claim.

Similarly bizarre, Petitioner alleges that the government enjoys primary jurisdiction over him, and he insists that this jurisdiction cannot be altered "without its consent." Pet. at 9 (quoting *Zerbst v. McPike*, 97 F.2d 253, 254 (5th Cir. 1938)). But here, the United States *has* consented, in no uncertain terms, to transferring Petitioner to Oklahoma. *See Moody v. Holman*, 887 F.3d 1281, 1291 (11th Cir. 2018) ("[A] person who has violated the laws of two sovereigns cannot choose (or have a federal court direct) which sentence he serves first, as long as the first sovereign consents to have the second sovereign take custody."). Petitioner's own Petition torpedoes his case.

Even ignoring these foundational issues, Petitioner's habeas attempt fails for multiple procedural reasons. Among other things,[1] Petitioner's bid for a writ of habeas corpus should be dismissed or denied because it is untimely, he has not sufficiently alleged an injury in fact and thus

---

[1] For example, Oklahoma Respondents do *not* waive exhaustion requirements. But given the manifest problems with Petitioner's claims aside from exhaustion, Oklahoma Respondents respectfully submit that relief can be denied without addressing exhaustion. *See Smith v. Duckworth*, 824 F.3d 1233, 1242 (10th Cir. 2016) (bypassing the question of procedural bar because the "claim [wa]s readily resolved on the merits"). Nevertheless, the Court cannot grant relief without addressing the question of exhaustion. *See* 28 U.S.C. § 2254(b)(3) (a state must expressly waive the exhaustion requirement).

lacks standing, and he does not have a liberty interest in continued federal custody. But before addressing those deficiencies, it must be determined what statute applies.

### a.  Petitioner's challenge could be reviewed under 28 U.S.C. § 2241 or § 2254.

Petitioner challenges his transfer from federal to State custody, thus he seemingly challenges the *execution* of his state sentence rather than the validity of it. As a result, this Court could review his habeas effort under 28 U.S.C. § 2241. *See Montez v. McKinna*, 208 F.3d 862, 865 (10th Cir. 2000) ("Such an attack [on the execution of sentence] ... seems to fit better under the rubric of § 2241."); *see also Walck v. Edmondson*, 472 F.3d 1227, 1234 (10th Cir. 2007) ("The deferential standard of review contained within § 22544 is, therefore, only properly invoked when an individual in state custody collaterally attacks the validity of a state conviction and/or sentence.").

That said, Petitioner's habeas claim is arguably a de facto challenge to his Oklahoma death sentence, which would have to be brought under 28 U.S.C. § 2254. *See, e.g.*, *McIntosh v. U.S. Parole Comm'n*, 115 F.3d 809, 811 (10th Cir. 1997) (noting that petitions under Section 2254 "collaterally attack the validity of a conviction and sentence."). This is because Petitioner argues that he should be allowed to serve his federal life sentence until his death, which would nullify his Oklahoma death sentence given that he would never be released from federal prison. Nevertheless, out of an abundance of caution and consistent with how several other federal courts have treated a wrongful transfer claim, *see, e.g.*, *Moody*, 887 F.3d at 1284–92, Oklahoma Respondents respond to this claim primarily under 28 U.S.C. § 2241. (To the extent this Court concludes this is a Section 2254 claim, however, this is an impermissible second or successive habeas petition as discussed in Section IV below.)

Habeas corpus review is available under Section 2241 if one is "in custody in violation of the Constitution or laws or treaties of the United States." *McIntosh*, 115 F.3d at 811 (quoting 28 U.S.C. § 2241(c)(3)). "The fundamental purpose of a § 2241 habeas proceeding is the same as that of § 2254 habeas and § 2255 proceedings: they are an attack by a person in custody upon the legality of that

custody," and "the traditional function of the writ is to secure release from illegal custody." *Id.* (internal quotations omitted) (quoting *Preiser*, 411 U.S. at 484). Furthermore, "Section 2241's applicability greatly affects [this Court's] standard of review in that the deference normally accorded state court judgments under § 2254 does not apply. Instead, [this Court] review[s] habeas claims made pursuant to § 2241 ... de novo." *Walck*, 472 F.3d at 1235 (citing *Ferry v. Gonzales*, 457 F.3d 1117, 1131 (10th Cir. 2006), and *Binford v. United States*, 436 F.3d 1252, 1253 (10th Cir. 2006)); *see also Mason v. Thornburgh*, No. CIV-15-1169-M, 2016 WL 7228899, at *3 (W.D. Okla. Oct. 24, 2016), *report and recommendation adopted*, No. CIV-15-1169-M, 2016 WL 7223461 (W.D. Okla. Dec. 13, 2016) (unpublished) ("Because the proper review is de novo, Petitioner can only obtain habeas relief if he shows a constitutional violation by a preponderance of the evidence.").

### b. Petitioner's opposition to his transfer should have been filed years ago.

The habeas claims presented in the Petition are untimely and should be dismissed. Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), prisoners are given one year to seek a writ of habeas corpus from a federal court, running from the latest of four possible triggers:

> A. the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

> B. the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

> C. the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> D. the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C § 2244(d)(1)(A)-(D). These four timeliness provisions apply to habeas petitions filed under Section 2241 and Section 2254. *See, e.g., Burger v. Scott*, 317 F.3d 1133, 1138 (10th Cir. 2003) (applying

the timeliness provisions of § 2244(d) to a petition filed under § 2241); *Dulworth v. Evans*, 442 F.3d 1265, 1268 (10th Cir. 2006) (similar).

For Petitioner, none of the four triggers occurred in the past year. Indeed, the only one even remotely arguable is subsection (D). But even there, the factual predicate of Petitioner's current habeas claims—that Oklahoma would attempt to get Petitioner transferred for an execution—was known much earlier than one year ago. Although Petitioner attempts to cast his petition as a challenge to the recent decision to transfer him to Oklahoma, it has been known since at least 2022—and in reality, far earlier—that Oklahoma intended to obtain custody of Petitioner for an execution via transfer from the federal government. On top of that, the true crux of the Petition is the claim that Petitioner should be allowed to serve the entirety of his federal sentence before serving his Oklahoma death sentence. For example, Petitioner asks this Court to "prevent Defendants from ending his federal sentence of life imprisonment and putting him to death." Pet. at 1. And in Count One, Petitioner argues he could not be transferred from federal custody until his federal life sentence is completed. Pet. at 9–10. And Count Three seeks a declaration that Defendants violated federal law by transferring Petitioner "before the end of his federal sentence." Pet. at 13. Similarly, Count Four argues the State has forever waived its right to custody of Petitioner and seeks his return to federal custody "to serve his remaining federal sentences." Pet. at 14–15.

Given that Petitioner is serving a federal life sentence, his argument that he must be allowed to complete that sentence before transfer would preclude him from ever being executed pursuant to the Oklahoma death sentence. But Petitioner has been aware that Oklahoma would seek to execute its death warrant since his resentencing on February 7, 2006, or earlier. *See* Ex. 1, Sent. Tr. at 2 (State court: "I will order the punishment [of death] as the jury recommended."). Moreover, years ago Petitioner brought a Section 2254 habeas petition challenging *Oklahoma's future custody* pursuant to his underlying conviction and death sentence. This petition was filed in the U.S. District Court for the

11

Northern District of Oklahoma on December 6, 2010, when he was in federal custody, and it alleged *nine* grounds for granting the Petition—none of which related to his transfer. *See* Exhibit 3, Habeas Petition (Dec. 6, 2010). Petitioner would not have brought that habeas petition if he did not believe that Oklahoma intended to have him transferred to State custody for his execution. He could have brought his claim under Section 3623 then, but did not do so.

The relevant factual predicate should also have been evident on May 17, 2016, when the State notified the OCCA that Petitioner was eligible for an execution date. Exhibit 4, Notice (May 17, 2016). To be sure, the State also indicated it was unable to request a date because of a then-ongoing investigation into its Department of Corrections' execution protocol. *Id.* at 3–4. But that would not have altered Petitioner's knowledge that such a transfer was realistic and that any objection should be raised promptly. Finally, at the absolute *latest*, Petitioner was aware of the State's intent to have him transferred on June 10, 2022, when the State filed its notice in the OCCA seeking an execution date, Exhibit 5, Notice (June 10, 2022) at 1, and on July 1, 2022, when the OCCA set Petitioner's state execution date for December 15, 2022, Exhibit 6, Order Setting Execution Dates (July 1, 2022).

Despite these numerous opportunities, Petitioner waited until his current Petition—26 years after his crime and 19 years after his death sentence—to argue that his transfer would violate federal law. This is the definition of dilatory, and it does not comply with AEDPA. *See, e.g., Hereford v. McCaughtry*, 101 F. Supp. 2d 742, 745 (E.D. Wis. 2000) (rejecting inmate's claim that factual predicate was not available until the return of his case file as a "red herring," and concluding that claim was untimely); *Chesteen v. Thaler*, No. 1:10CV106, 2010 WL 5830497, at *3 (E.D. Tex. Sept. 28, 2010) (unpublished) (deeming petitioner's argument that the factual predicate for his claims was unavailable until May 2009 as "illusory and ... without merit"). The Petition is untimely and should be dismissed.

### c. Petitioner lacks standing to pursue his habeas petition.

A principal question that must be answered before addressing the merits is whether Petitioner

even has standing. *See United States v. Johnson*, 932 F.3d 965, 966 (6th Cir. 2019) (per curiam) ("As an initial matter, we must first ensure that [inmate] has Article III standing to object[.]"); *see also Moody*, 887 F.3d at 1284–85 (first addressing whether inmate had standing to bring Section 2241 habeas petition challenging transfer to state authorities for execution). For Petitioner, the answer is no.

Historically, courts addressing similar claims have concluded that inmates challenging the order in which they were to serve sentences imposed by two different sovereigns do not have standing. The Ninth Circuit so held in *Gunton v. Squier*, 185 F.2d 470 (9th Cir. 1950). There, the court found it a "well recognized rule of law that a person who has violated the criminal statutes of both the Federal and State Government may not complain of the order in which he is tried or punished for such offenses," as "[e]ach is a sentence unto itself." *Id.* at 471. The Fifth Circuit came to a similar conclusion in multiple cases in the 1960s and 1970s, first in *Bullock v. Mississippi*, 404 F.2d 75 (5th Cir. 1968) (per curiam). In *Bullock*, the court held that it is "well established that where state authorities surrender a prisoner to the federal authorities for trial, sentence, and execution of sentence before he is to be returned to state custody," that prisoner "has no standing to contest the agreement between the sovereigns as to the order of prosecution and execution of sentences." *Id.* at 75–76; *see also DeLong v. United States*, 474 F.2d 719, 720 (5th Cir. 1973) (per curiam) (citing *Bullock*, 404 F.2d at 75). More recently, the Eighth Circuit agreed in *United States v. McCrary*, 220 F.3d 868 (8th Cir. 2000). In rejecting a similar claim, that circuit held that "[t]he exercise of jurisdiction over [the defendant] is solely a question to be determined between those two sovereignties, and is not subject to attack by the prisoner." *Id.* at 870. These cases have not been reversed, overruled, or abrogated.

More recently, however, courts have been more open to finding that inmates have standing in similar situations. *See Johnson*, 932 F.3d at 966 (inmate had standing to challenge primary jurisdiction); *Moody*, 887 F.3d at 1285 (inmate had standing to challenge transfer from federal to state custody for execution). In *Moody*, the inmate challenged his incarceration in Alabama after he had been transferred

there, arguing that he should be returned to federal custody to serve the remainder of his federal sentence before execution of his Alabama death sentence. 887 F.3d at 1284. In concluding that the inmate had standing to raise such a challenge—and then firmly rejecting that challenge—the court explained that previous rulings concluding inmates did not have standing confused "weakness on the merits with absence of Article III standing." *Id.* at 1285 (quoting *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015)). Further, the court explained that "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). Accordingly, that court asserted that the reference in prior cases to a lack of standing was "best seen as shorthand for holding that the prisoners in question, as a matter of substantive law, did not have a claim that would entitle them to habeas relief." *Id.* at 1286. Relying on *Moody*, other courts have concluded that inmates have standing. *See Johnson*, 932 F.3d at 966; *see also Robledo v. Trate*, No. 1:23-cv-00995-JLT-SAB-HC, 2024 WL 557009, at *2–3 (E.D. Cal. Feb. 12, 2024) (unpublished) (concluding the respondent's claim regarding lack of standing was better characterized as "shorthand for failure to state a claim that would entitle [the petitioner] to habeas relief").

Oklahoma Respondents believe the "well-established" standing principles embraced by the Fifth, Eighth, and Ninth Circuits should apply here because Petitioner is seeking to assert the right of the federal government to custody and not an injury of his own. *Bullock*, 404 F.2d at 75–76; *see also Warth*, 422 U.S. at 499 (for standing "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"). Nevertheless, even under *Moody*-like cases, Petitioner lacks standing here because he has not alleged an injury in fact. It is well established that the "judicial power of federal courts" reaches only "actual cases and controversies." *Schaffer v. Clinton*, 240 F.3d 878, 882 (10th Cir. 2001) (citing U.S. CONST. art. III, § 2); *see also Allen v. Wright*, 468 U.S. 737, 750 (1984). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."

14

*Warth*, 422 U.S. at 498. A claimant must meet three elements to show standing. First, "the plaintiff must have suffered an injury in fact." *United States v. Hays*, 515 U.S. 737, 742–43 (1995). An injury in fact is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 743. Second, there must be a "causal connection between the injury and the conduct complained of." *Id.* And third, it must be likely that the injury can be "redressed by a favorable decision." *Id.*

Petitioner does not acknowledge—much less address—standing. And his Petition is not entitled to liberal construction. *See Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011) ("[Plaintiffs] are represented by counsel, and we expect attorneys appearing before this court to state the issues on appeal expressly and clearly, with theories adequately identified and supported with proper argument."); *Rutledge v. United States*, 230 F.3d 1041, 1052 (7th Cir. 2000) (similar). By itself, Petitioner's failure to discuss standing could merit dismissal. *See Celli v. Shoell*, 40 F.3d 324, 327 (10th Cir. 1994).

In any event, *Moody* does not aid Petitioner. There, the court concluded the inmate sufficiently showed an injury in fact because he argued that he would be executed if he were forced to stay in Alabama custody. *See Moody*, 887 F.3d at 1286 ("We think it is beyond dispute that the potential loss of life is a cognizable injury for purposes of Article III."); *see also United States ex rel. Buchalter v. Warden of Sing Sing Prison*, 141 F.2d 259, 259 (2d. Cir. 1944) (Learned Hand, J.) (noting that an inmate seeking to avoid transfer from federal to state custody to face execution "has ... the greatest possible interest in serving the remainder of his federal sentence," but ultimately concluding this is not a right that the law recognizes). Here, though, Petitioner does not take that route. Rather, the only injury he appears to allege is simply that he should be allowed to serve his federal sentences first, and that the BOP violated 18 U.S.C. § 3623 by "considering factors other than the public interest," and/or "transferring [him] before the end of his federal sentence." Pet. at 10. By merely claiming that he should be allowed to serve his federal sentence first—and not truly relying on his upcoming execution—Petitioner fails to allege an injury-in-fact that gives him standing to pursue this claim. *Hays*, 515 U.S. at 743.

### d.  Petitioner lacks any liberty interest in serving a longer federal life sentence.

Petitioner's habeas claim should also be dismissed because he has no liberty interest in serving his federal sentence before execution of his Oklahoma death sentence. For more than a century, the Supreme Court has repeatedly concluded that inmates have no liberty interest in where they are incarcerated, or in the order in which they serve sentences. The Court first addressed this issue in *Ponzi v. Fessenden*, 258 U.S. 254 (1922). There, a federal inmate challenged his transfer from federal to state custody to be tried on state charges. *Id.* at 261. The Supreme Court affirmed the denial of habeas relief on this challenge. *Id.* at 260–63. In so holding, the Court reasoned that an inmate "should not be permitted to use the machinery of one sovereignty to obstruct his trial in the courts of the other." *Id.* at 260. According to the Court, an inmate who violated the law of two or more sovereigns "may not complain if one sovereignty waives its strict right to exclusive custody of him ... that the other may also subject him to conviction of [a] crime against it." *Id.* at 260. Moreover, the Court explained that while there was—at that time—no "express authority authorizing the transfer," the Attorney General of the United States could consent to that transfer. *Id.* at 261–63. Thus, the Court held that the federal government could consent to the transfer of an inmate to state custody, and that the inmate had no right to stop such transfer. *Id.* at 260–63.

The Supreme Court reached similar conclusions in *Morse v. United States*, 267 U.S. 80 (1925), and *Kelley v. Oregon*, 273 U.S. 589 (1927). In *Morse*, the petitioners were arrested on federal charges in New York while traveling to Washington, D.C. to face charges in that jurisdiction. 267 U.S. at 81. In rejecting the petitioners' habeas claim, the Supreme Court concluded that "their constitutional rights [were] not affected; and if there was error in any respect, it is not reviewable on habeas." *Id.* at 82. In *Kelley*, the Court concluded that inmates do not have a right to determine the order in which they serve their sentences. *Kelley*, 273 U.S. at 591–93. There, the petitioner claimed he should be able to complete his twenty-year sentence for one crime before serving his death sentence for a different crime in the

same jurisdiction. *Id.* at 591. In rejecting this habeas claim, the Supreme Court explained that a prisoner "has no vested constitutional right to serve out [an] unexpired sentence." *Id.* at 593. That is to say, the Supreme Court has *repeatedly* confirmed that inmates do not have a liberty interest in where they are incarcerated or the order in which they serve their sentences.

Relying on these decisions, numerous lower courts have rejected similar claims to the one Petitioner presents here. *See, e.g.*, *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (prisoners do not have a liberty interest in their placement or classification while incarcerated); *Johnson*, 932 F.3d at 968; *Moody*, 887 F.3d at 1285–87; *Causey v. Civiletti*, 621 F.2d 691, 694 (5th Cir. 1980) ("A person who has violated the criminal statutes of both the Federal and State Governments may not complain of the order in which he is tried or punished for such offenses." (citation omitted)); *Buchalter*, 141 F.2d at 259–60 ("imprisonment is punishment exacted by the state; it gives the convict no asylum ... against his prosecution or punishment for other crimes"); *Boyce v. United States*, 52 F. Supp. 115, 116 (M.D. Pa. 1943) ("The law is well settled that a federal prisoner may, prior to his release, be transferred to a state in which he is wanted for a violation of the state law; such co-operation of state and federal government agencies to vindicate their respective criminal statutes is proper."); *Armstrong v. Salinas*, No. 6:13-179-KKC, 2014 WL 340399, at *8 (E.D. Ky. Jan. 30, 2014) (unpublished) ("Prisoners generally have no liberty interest in their placement or classification while incarcerated, and have no right to be housed in a particular institution[.]").

Petitioner claims, without support, that the federal government erred in transferring him before he served his life sentence. Pet. at 10. But the above cases show beyond doubt that Petitioner has no right to choose which sentence he serves or when, nor does he have a right to choose where he is incarcerated. *See, e.g.*, *Moody*, 887 F.3d at 1289 ("a prisoner does not have a right cognizable in habeas corpus to complain about the order of his prosecutions or sentences"). Thus, even assuming *arguendo* that Petitioner has standing, his claim should still be denied because he has no liberty interest

17

in serving the remainder of his federal life sentence, particularly where that would block execution of his Oklahoma death sentence. The only entity with an interest to have Petitioner serve his federal sentences first is the United States, and Petitioner cannot assert the federal government's interest, particularly where the United States waived this interest in transferring him back to Oklahoma. *See Warth*, 422 U.S. at 499 (noting that to have standing "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").

### e.   Petitioner's claims are all properly characterized as habeas claims.

Although Petitioner claims to be bringing a "hybrid" Petition and Complaint, his claims are all more properly characterized as habeas claims. Take his *ultra vires* claim, for instance. A number of courts have analyzed an inmate's *ultra vires* claims not as separate from habeas, but rather as included within the habeas analysis. *See, e.g.*, *Delgado–Reynua v. Gonzales*, 450 F.3d 596, 598 (5th Cir. 2006) ("Delgado–Reynua filed a petition for writ of habeas corpus … challenging the BIA's order of removal and arguing that the BIA acted *ultra vires* …."); *Vandagriff v. Fed. Bureau of Prisons*, No. 10-225-ART, 2010 WL 4867640, at *2 (E.D. Ky. Nov. 23, 2010) (unpublished) ("Because Vandagriff cannot show that the BOP's decision was arbitrary and capricious or otherwise *ultra vires*, his habeas petition must be dismissed."); *Zavala v. Ridge*, 310 F. Supp. 2d 1071, 1074 (N.D. Cal. 2004) ("Petitioner filed this petition for writ of habeas corpus alleging … that the regulation is *ultra vires* because it exceeds the authority bestowed upon [ICE] by Congress under 8 U.S.C. § 1226(a) ….").

Petitioner also "seeks a declaration [that] his transfer to Oklahoma and continued physical custody within" this State are "in violation of the law." Pet at 13. Fundamentally, "[a]ny claim by a prisoner attacking the validity or duration of his confinement must be brought under the habeas sections of Title 28 of the United States Code." *Calderon v. Ashmus*, 523 U.S. 740, 747 (1998). In other words, "the Declaratory Judgment Act cannot be used as a substitute for habeas." *Weldon v. Pacheco*, 715 F. App'x 837, 844 n.7 (10th Cir. 2017) (unpublished); *see also Parker v. Reno*, No. 00-6171, 2000

WL 1531772, at *2 (10th Cir. Oct. 17, 2000) (unpublished) (same); *United States v. Gutierrez*, 116 F.3d 412, 415 (9th Cir. 1997) ("Other circuits have also dismissed actions by prisoners attempting to challenge the validity of their sentences or convictions under the Declaratory Judgment Act."). As will be explained below, Petitioner's argument that he must be permitted to serve his federal life sentence before transfer is an attempt to nullify his Oklahoma death sentence. *Cf. Glossip v. Gross*, 576 U.S. 863 (2015) (requiring a death row inmate who challenges a state's method of execution to allege an available alternative method because capital punishment is constitutional, thus, states must have a method to employ it); *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994) (holding that a civil claim for damages under 42 U.S.C. § 1983 is not cognizable if it "would necessarily imply the invalidity of his conviction or sentence"); *Bowles v. DeSantis*, 934 F.3d 1230, 1248 (11th Cir. 2019) ("As we have stated many times, '[e]ach delay [of execution], for its span, is a commutation of a death sentence to one of imprisonment.'") (quoting *Thompson v. Wainwright*, 714 F.2d 1495, 1506 (11th Cir. 1983)). Accordingly, Petitioner's claim for declaratory relief is both redundant and improper.

\* \* \*

To summarize, Petitioner lacks standing to pursue his habeas claims because they are untimely, and he has not alleged an injury in fact but rather is seeking to vindicate the United States' interest in having him serve his full federal sentence—an interest the federal government has waived. And even assuming he has standing, Petitioner does not have a liberty interest in serving his federal sentence before execution of his Oklahoma death sentence. To conclude otherwise would allow him to use his federal incarceration as a shield to prevent the lawful execution of his Oklahoma death sentence.

## II. SECTION 3623 OVERWHELMINGLY FAVORS RESPONDENTS, NOT PETITIONER.

The argument central to Petitioner's habeas petition (Count 1), his *ultra vires* claim (Count 2), and his declaratory judgment claim (Count 3) is that the United States' recent transfer of him to Oklahoma violated 18 U.S.C. § 3623. For numerous reasons, Petitioner's Section 3623 arguments fail.

### a.  Section 3623 contains insurmountable procedural hurdles for Petitioner.

Petitioner faces several barriers before getting to the key statutory text of Section 3623. To start, he has not alleged that the State Respondents have violated Section 3623 in any specific way, nor would any such allegation be plausible. Although Section 3623 references the responsibility of a "State" multiple times, those requirements are not ones that the State Respondents are accused of violating. Here, Oklahoma has indisputably "requested" the transfer, "presented to the Director a certified copy of the … judgment of conviction," and "borne" the "expenses of such transfer." 18 U.S.C. § 3623. If the Oklahoma Respondents have not allegedly violated Section 3623, and if Petitioner is in Oklahoma's possession for the carrying out of a just sentence imposed by an Oklahoma jury, then the State cannot be forced to return Petitioner to the federal government, regardless of whether the United States complied with Section 3623. The State Respondents should be dismissed from the case, and without them, there is no possible remedy for the Petitioner.

Moreover, Congress expressly precluded Section 3623 decisions from review under the APA. *See* 18 U.S.C. § 3622. Thus, the Petitioner is forced to push for *ultra vires* review.  But Oklahoma already tried to obtain *ultra vires* review of the federal government's previous Section 3623 decision regarding Petitioner, and a federal district court firmly rejected that attempt (with nary a peep from Petitioner arguing otherwise). What's good for the goose is good for the gander. Nearly three years ago, Oklahoma was told by a federal district court that it would be "illogical" for the court to review the (Regional) BOP Director's "public interest" decision even for a rational basis because "Congress has explicitly withheld APA review" of Section 3623. *Tellez*, 2022 WL 17686579, at *3. And Petitioner was, presumably, perfectly content with that decision. Applying that same approach now, when the shoe is on the other foot, dictates dismissal of the Petition.[2]

---

[2] This is especially so since Petitioner has cited that decision *favorably* without acknowledging just how damaging it is to his Petition. *See* Pet. at 6.

**b.  A Section 3623 transfer is mandatory, and its criteria are easily met.**

Even if this Court were to review the government's decision to transfer under Section 3623, showing an *ultra vires* violation is an impossible proposition for Petitioner here. An executive agency[3] is subject to *ultra vires* remedies only when it "plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory[.]" *Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 763–64 (D.C. Cir. 2022) (citation omitted); *see also Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110–11 (1902) (a "clear mistake of law" is required). "As a result, *ultra vires* claims are confined to extreme agency error where the agency has stepped so plainly beyond the bounds of its statutory authority, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court." *Fed. Express Corp.*, 39 F.4th at 764 (cleaned up and citations omitted). Any idea that Petitioner's meager filing here can meet this incredibly high standard is nonsensical. Petitioner has not pointed to any "specific prohibition in the statute that is clear and mandatory" that the federal government has contravened. To the contrary, the primary "clear and mandatory" instruction in Section 3623 is for the federal government to *transfer* an inmate.

Again, Section 3623 directs that the federal BOP "shall order" a felon's transfer from federal to state custody if certain basic criteria are met. Congressional use of the word "shall" indicates that the transfer to State authorities is presumptive. *See, e.g.*, *Alabama v. Bozeman*, 533 U.S. 146, 153 (2001) ("[T]he word 'shall' is ordinarily the language of command." (citation omitted)). Moreover, when interpreting words in a statute, courts "follow the cardinal rule that statutory language must be read in context [since] a phrase gathers meaning from the words around it." *Knapp v. U.S. Dep't. of Agric.*, 796 F.3d 445, (5th Cir. 2015) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). As flagged above, the statute immediately preceding Section 3623, enacted simultaneously, provides that the BOP "*may* release" a

---

[3] There is some dispute in case law about whether *ultra vires* claims proceed against officials in their official capacity, officials in their individual capacity, or against agencies directly. Here, Petitioner has only sued executive officials in their official capacity.

prisoner "if such release otherwise appears to be consistent with the public interest." 18 U.S.C. § 3622 (emphasis added). This contrast in back-to-back statutes—one using "may" and the next using "shall"—demonstrates that Congress plainly intended for Section 3623 to operate robustly in favor of transfers to state authorities.

The mandatory nature of Section 3623 transfers becomes even clearer when one looks at the limited criteria that Congress included. These criteria are not significant roadblocks, but rather simple boxes to check. Indeed, Petitioner does not contest the first two numbered criteria in Section 3623. And they are easily satisfied. First, the BOP Director "shall order" an inmate's transfer if "the transfer has been requested by the Governor or other executive authority of the State." 18 U.S.C. § 3623(1). Here, Oklahoma Attorney General Drummond requested the transfer in writing, Doc. 2-1, and he is undeniably an "executive authority" in Oklahoma. *See, e.g.,* 74 OKLA. STAT. § 18 ("The Attorney General shall be the chief law officer of the state."). Second, the BOP Director "shall order" an inmate's transfer if the State presents "a certified copy of the indictment, information, or judgment of conviction." 18 U.S.C. § 3623(2). That material was sent along with the letter. *See* Doc. 2-1.

Petitioner also declines to contest the unnumbered indication that the transfer should involve "a prisoner who has been charged in an indictment or information with, or convicted of, a State felony," and that the transfer be "to an official detention facility within such State." 18 U.S.C. § 3623. And prudently so, as it is undeniable that Petitioner was convicted of an Oklahoma felony—First Degree Murder—and that he was transferred directly from federal prison in Louisiana to the Oklahoma State Penitentiary in McAlester, where Oklahoma houses its death-row inmates. Again, none of these criteria places any significant hurdle whatsoever on the carrying out of a transfer.

Petitioner hangs his hat on just two criteria included by Congress in Section 3623. His first argument concerns the third numbered requirement, which is that the BOP Director must "find[] that the transfer would be in the public interest." 18 U.S.C. § 3623(3). His second argument involves the

unnumbered statement that the BOP Director "shall order" that an inmate "be transferred … *prior to his release* from a Federal prison facility." *Id.* § 3623 (emphasis added). The State will address each of these arguments in turn. Neither holds water.

### c. The public interest emphatically favors enforcing Petitioner's death sentence.

Section 3623 requires a finding that the "transfer would be in the public interest," and both the BOP Director and the U.S. Attorney General have found that Petitioner's transfer "is in the public interest under the unique circumstances of this case." Doc. 2-4 (Attorney General); *see also* Doc. 2-5 (BOP Director: "I concur with [Attorney General Bondi's] determination of the public interest in this matter"). Indeed, the U.S. Attorney General explained in detail why declining to transfer Petitioner here would "grossly undermine[] the public interest." Doc. 2-4. "Inmate Hanson viciously murdered an innocent woman" who "experienced indescribable pain and terror before her violent death," the Attorney General explained, "and her family has suffered for decades as a result." *Id.* As a result,

> [t]imely enforcement of inmate Hanson's death sentence will achieve justice and provide a measure of closure to the victim's family and her community for the horrific crime committed by inmate [Hanson]. The Department of Justice owes it to the victim and her family—as well as the public—to transfer inmate Hanson so that Oklahoma can carry out this just sentence.

Doc. 2-4. The United States' conclusion here is plainly correct, for numerous reasons.

### i. Dictionaries and case law confirm the public interest in timely executions.

Dictionaries and case law confirm that the public interest favors the timely completion of capital punishment. Absent a statutory definition of a particular term—here, "public interest"—courts search for the plain or ordinary meaning of the text. *See Easom v. US Well Servs., Inc.*, 37 F.4th 238, 242–43 (5th Cir. 2022). "Ordinarily, a word's usage accords with its dictionary definition." *Yates v. United States*, 574 U.S. 528, 537 (2015). And when confronted with a legal term of art, courts refer to legal dictionaries to define the term. *See F.A.A. v. Cooper*, 566 U.S. 284, 291–92 (2012).

The Merriam-Webster Dictionary confirms that the "public interest" is a term of art, listing the term under its "legal definition" section. *See Interest*, *Legal Definition*, Merriam-Webster Online.[4] That dictionary defines "public interest" as "the general welfare and rights of the public that are to be recognized, protected, and advanced." *Id.*; *see also, e.g.*, *Legal Interest*, Merriam-Webster's Dictionary of Law (1996). Similarly, Black's Law Dictionary provides two further definitions for the "public interest" as a term of art: "[t]he general welfare of a populace considered as warranting recognition and protection" or "[s]omething in which the public as a whole has a stake; esp., an interest that justifies governmental regulation." *Public Interest*, Black's Law Dictionary (11th ed. 2019). Those definitions demonstrate that the public interest supports the carrying out of a validly imposed sentence upon a person who has violated laws prohibiting murder, *i.e.*, the most foundational government regulations that exist to protect the public. To hold otherwise—and let a convicted murderer avoid his justly bestowed sentence—would endanger the public, not protect it.

Unsurprisingly, then, the Supreme Court has time and again indicated that the public interest prioritizes the timely completion of death sentences. *See, e.g.*, *Bucklew v. Precythe*, 587 U.S. 119, 149 (2019) ("Both the State and the victims of crime have an important interest in the timely enforcement of a sentence." (citation omitted)); *Martel v. Clair*, 565 U.S. 648, 662 (2012) ("Protecting against abusive delay *is* an interest of justice"); *Calderon v. Thompson*, 523 U.S. 538, 556 (1998) ("Only with real finality can the victims of crime move forward knowing the moral judgment will be carried out."); *cf. Ramirez v. Collier*, 595 U.S. 411, 434 (2022) (finding injunctive relief was in the public interest in part because the inmate's requested religious accommodation could occur "without delaying or impeding his execution"). Following suit, numerous lower courts have held the same. *See, e.g.*, *United States v. Vialva*, 976 F.3d 458, 462–63 (5th Cir. 2020) (relying on "the public's interest in timely enforcement of the death sentence"); *Bowles*, 934 F.3d at 1248 ("As we have stated many times, '[e]ach delay, for its span,

---

[4] https://www.merriam-webster.com/dictionary/interest#legalDictionary.

is a commutation of a death sentence to one of imprisonment.'" (citations omitted)); *Rhoades v. Reinke*, 830 F. Supp. 2d 1046, 1071 (D. Idaho 2011) ("Continued delay compounds those uncertainties, expenses, and impacts, and therefore is not in the public interest.").

Part of the rationale for this public interest comes from the jury's findings of aggravating factors necessitating the death penalty,[5] which are made on behalf of the public to ensure adequate punishment of heinous crimes and prevention of future murders. As a former Supreme Court Justice put it, "[d]elay in the execution of judgments imposing the death penalty frustrates the public interest in deterrence." *Gomez v. Fierro*, 519 U.S. 918, 918 (1996) (Stevens, J., dissenting). Thus, the public's interest in timely enforcement of the death penalty, "to have such proceedings reach a conclusion," is a "*compelling* interest"—not just a legitimate one—because delay eviscerates deterrence. *Rhoades*, 830 F. Supp. 2d at 1049, 1071 (D. Idaho 2011) (emphasis added). Again, "[f]inality is essential to both the retributive and the deterrent functions of criminal law." *Calderon*, 523 U.S. at 555. After direct appeal and post-conviction remedies are exhausted, any *de facto* commutation of a death sentence to life imprisonment would be contrary to the public interest because of the profound injury it inflicts on the public's ability to punish criminals and discourage future crimes. *Id.* at 556; *Bowles*, 934 F.3d at 1248.

In sum, the public interest is a legal term of art meaning the "protection" of the "general welfare of a populace," *Public Interest*, Black's Law Dictionary (11th ed. 2019), and the United States' decision to transfer Petitioner to be executed for murdering Mary Bowles fits comfortably within the meaning of that term as understood by the public and explained by the Supreme Court.

> ii. *The public interest favors punishment for all convictions, not just some.*

The public's interest is served when the punishment for all valid convictions is carried out, both state and federal. Our criminal justice system operates on the fundamental presumption that

---

[5] Of note here, the jury's determination that death was warranted for Mary's murder included Petitioner's simultaneous participation in Jerald Thurman's murder and the entirety of the evidence surrounding both murders. Petitioner fully earned his death sentence, and then some.

prosecutors seek convictions for crimes that harm the public interest. *See United States v. Salinas*, 693 F.2d 348, 351–352 (5th Cir. 1982). As a result, our system also presumes that all valid convictions are in the public interest because these convictions effectuate the "compelling public interest in punishing crimes." *Garrett v. United States*, 471 U.S. 773, 796 (1985) (O'Connor, J., concurring). The public interest thus insists that "a prisoner is not entitled to escape punishment for a valid conviction." *United States v. Olarte-Morales*, 992 F.2d 1223 (10th Cir. 1993) (unpublished). As such, when properly done, federal sentences prioritize the punishment of severe crimes under the assumption that such punishment will also fulfill lesser sentences. *See, e.g.*, U.S. Sentencing Manual § 3D1.4 (prioritizing the "highest offense level"). Simply put, valid convictions should always result in actual consequences.

In this instance, the public interest in punishing all crimes can only be effectuated through transferring Petitioner to Oklahoma. The federal interest in incarcerating Petitioner until the end of his life is not jeopardized by the transfer because the State is going to end his life, not release him. He will not escape punishment for his robbery through transfer. On the other hand, allowing Petitioner to remain in federal custody would thwart the public interest in punishing Petitioner for his brutal murder of Mary Bowles. The denial of a transfer would directly permit Petitioner to escape punishment for murder, which undermines the public interest in punishing all convicted crimes, whereas transfer would result in punishment for both the federal and state convictions.

### iii. The broader context of Section 3623 shows that the public interest favors transfers.

The context here demonstrates that transfers to state custody are typically going to be in the public's interest. For starters, courts may examine "'[t]he title of a statute and the heading of a section'" in determining the meaning of a statutory provision. *Yates*, 574 U.S. at 540 (citation omitted). And Section 3623 is entitled "Transfer of a prisoner to State authority." Because the statute speaks of transfers *to* another authority, it assumes application when the federal government has primary jurisdiction and the inmate is in federal custody. *See* Pet. at 3 ("Mr. Hanson has been in the primary

custody of the federal government since August 24, 2000."). Accordingly, the statute indicates that the government "shall" yield its primary jurisdiction *to* state custody. The straightforward phrasing of the title alone strongly indicates that the public interest presumption lies in favor of the transfer.

Then there is the additional factor of Section 3622, which was enacted simultaneously and uses "may" for leaves of absence for prisoners instead of "shall," further entrenching that it was the intent of Congress to require transfers with Section 3623. It is apparent from the statutory scheme, then, that Congress has determined that transfers from federal to state custody are necessary to prioritize the public interest in certain punishments *over* the federal interest in retaining particular inmates. This interpretation aligns with our general constitutional structure that considers states to be the primary sovereign in criminal matters. *See, e.g.*, *Kansas v. Garcia*, 589 U.S. 191, 212 (2020) ("From the beginning of our country, criminal law enforcement has been primarily a responsibility of the States, and that remains true today."); *Engle v. Isaac*, 456 U.S. 107, 128 (1982) ("The States possess primary authority for defining and enforcing the criminal law.").

Certainly, it could be argued that Section 3623 cannot be read to say that transfers favor the public interest when the statute requires a finding that any given transfer is in the public interest. But when it comes to the death penalty, Congress has left little doubt that the public interest favors a transfer to a state for a lawfully bestowed execution. This view is clear from the multiple federal statutes implementing the death penalty and making it effective. For example, in 1994, Congress passed the Federal Death Penalty Act, which reinstituted the death penalty for defendants who were convicted of certain federal crimes while creating procedures for its implementation. *See* 18 U.S.C. § 3591 *et seq.* This statute is still in effect today. Congress has also determined that following state execution procedures is in accordance with the public interest. *See id.* § 3596(a). Federal law provides that when a federal sentence of death is to be implemented, "the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise

27

implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed." *Id.* Moreover, if the law of the state does not provide for the implementation of a death sentence, the "court shall designate another State, the law of which does provide for the implementation of a sentence of death." *Id.* Mandatory federal policy, therefore, is to follow state methods of execution to ensure that death sentences are effectuated.

Finally, Congress has confirmed that timely enforcement of the death penalty is in the public interest. The very title of the "Antiterrorism and *Effective* Death Penalty Act" underscores Congress's "overriding consideration" in effective enforcement of the death penalty. *Martinez v. Quarterman*, No. 02CV718, 2009 WL 10710035, at *2 (S.D. Tex. Jan. 28, 2009) (unpublished) (emphasis added). The one-year statute of limitations in AEDPA, *see* 28 U.S.C. §§ 2244(d), 2255(f), confirms that Congress intended to remove barriers to the timely completion of the death penalty. As a result, any argument that delay of the death penalty does not harm the public interest is "laughable." *Fresenius Kabi USA, LLC v. Nebraska*, No. 4:18CV3109, 2018 WL 3826681, at *5 (D. Neb. Aug. 10, 2018) (unpublished). Here, Petitioner's position would not just delay his execution—it would eliminate the death penalty for him entirely. Justice would be both delayed *and* denied.

### iv.   *Petitioner's public interest arguments are frivolous.*

Given this overwhelming evidence of the public's interest in timely executions, it is perhaps unsurprising that Petitioner never directly or positively tries to argue that the public interest would favor his remaining in federal prison and avoiding his punishment for Mary's murder entirely. Instead, Petitioner merely sideswipes at the public interest basis for his transfer, in two ways.

*First*, he complains that the federal government "abruptly and improperly" changed its position on the public interest. Pet. at 9. The Biden Administration, he alleges, "properly established in 2022 that it was not in the 'public interest' to transfer Mr. Hanson to Oklahoma because he had not completed his federal sentence." *Id.* But there is nothing "improper" or "abrupt[]" about a new

presidential administration taking a different position on what constitutes the "public interest" than a prior administration, especially when the underlying issue is discretionary. To be sure, Petitioner retorts that "Section 3623 does not delegate unfettered discretion, and any interpretation that conferred such discretion would change the meaning of the statute." Pet. at 12. This, of course, was Oklahoma's position three years ago, and a federal district court firmly rejected it in Petitioner's favor. *See Tellez*, 2022 WL 17686579, at *3 (declining to review a Section 3623 decision for even a rational basis). That said, ruling for Respondents here does not require a finding of unfettered discretion, as the United States' decision to transfer Petitioner was easily rationally related to the legitimate public interest in seeing a murderer receive justice. Indeed, it is Oklahoma's position that there is a *compelling* public interest favoring the carrying out of lawful state executions, and that a transfer here plainly effectuates that interest. The public has no interest, on the flip side, in allowing a murderer to escape the death penalty because he also happened to commit robberies prosecutable under federal law. The public spoke loud and clear when the jury sentenced Hanson to death for ending Mary's life. Their voice— their interest—is being followed here. *See* Exhibit 7, Declaration of Tim Harris, ¶¶ 7–9.

To hold otherwise and bind the Trump Administration to the Biden Administration's position would allow Petitioner to usurp the federal executive authority and essentially nullify the results of a federal election, at least as it pertains to this issue. *Cf. Trump v. Thompson*, 20 F.4th 10, 35 (D.C. Cir. 2021) ("Article III courts are generally ill-equipped to superintend or second guess the expert judgment of the sitting President about the current needs of the Executive Branch and the best interests of the United States on matters of such gravity and so squarely within the President's Article II discretion."); *Main St. Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542, 558 (2d Cir. 2016) (The President "can revoke a delegation whenever he changes his mind or overrule any exercise with which he disagrees."). Nor is the United States' previous insistence that Petitioner need to "complete[] his federal sentence," Pet. at 9, somehow such a compelling interest that it trumps the public's right to punish a murderer. After

all, even with the transfer, Petitioner will still spend the rest of his life in prison. Again, through transfer, both the state and federal sentences will be fulfilled.

*Second*, Petitioner argues that the United States considered "factors other than the public interest when granting transfer." Pet. at 13; *see also id.* at 10. But Petitioner never alleges facts to support this bald assertion, and it is contradicted by the express writings from the U.S. Attorney General and Acting BOP Director focusing on the public interest. Doc. 2-4, 2-5. And even if the assertion were accepted as true, it is irrelevant. Nothing in Section 3623 prohibits the United States from considering other factors when making a transfer determination; rather, it just states that the BOP Director must find at some point "that the transfer would be in the public interest." Petitioner simultaneously overreads the statute and undercooks his allegations. His public interest objections are frivolous.

### v. *Justice for Mary Bowles is indisputably in the public's interest.*

Mary Bowles "was the daughter of proud Oklahoma homesteaders." Exhibit 8, Declaration of Sara Parker Mooney, ¶ 3. A lifelong resident of Tulsa, Oklahoma, Mary worked as a senior vice president at a bank before she retired. *Id.*; *see also Missing for a Week: Retired BOK Senior Vice President Found Dead*, NEWS ON 6 (Sept. 8, 1999).[6] Mary was an active and passionate volunteer—a "valuable member of the community." Ex. 8, Mooney Decl., ¶ 3. Among other things, she "worked tirelessly in her church for decades," and she volunteered at Saint Francis hospital in Tulsa, at the Tulsa Philharmonic, and at the Speech and Hearing Clinic. *Missing*, NEWS ON 6, *supra*. Her friends considered her a "wonderful person," Ex. 8, Mooney Decl., ¶ 3, and she was a "role model for professional women," *id.* She was also the beloved matriarch of her family. *Id.* Mary "was like a surrogate mother" to her niece Sara Parker Mooney, who has testified on behalf of Mary's family, and she "was very involved in the lives of" numerous other family members. *Id.* ¶ 4.

---

[6] *Available at* https://www.newson6.com/story/5e3686572f69d76f6209bfe4/missing-for-a-week:-retired-bok-senior-vice-president-found-dead.

All that ended horrifically in 1999, when Petitioner kidnapped Mary from the Promenade Mall in Tulsa, drove her to an isolated dirt pit near Owasso, forced her into a ditch, and "shot her multiple times with his 9 mm semiautomatic pistol." *Hanson*, 206 P.3d at 1025; *see also Hanson*, 797 F.3d at 820 ("The state's forensic pathologist testified that [Mary] suffered 'without a doubt four and, likely, six' gunshot wounds."). Petitioner then left Mary's body to rot, such that when it was found later it was extremely difficult to identify; indeed, the situation was so bad that the police advised the family not to view Mary's remains. Ex. 8, Mooney Decl., ¶ 6; Ex. 7, Harris Decl., ¶ 5; *see also Hanson*, 797 F.3d at 820 (describing Mary's body as "significantly decomposed").

With that heinous act, Petitioner irreparably devastated the lives of many. Ex. 7, Harris Decl. ¶ 8. "Mary's murder was terrible for [her] family," and particularly her younger sister, Ora Lee Bowles Parker, who was Mary's only surviving sibling when the murder occurred. Ex. 8, Mooney Decl., ¶¶ 2, 5. In the moment, Mary's family spent several agonizing days searching for her, not knowing that she had been brutally murdered. *Id.* ¶ 5. Then, when she was found, the family had to confront the reality that they could not even view the body. *Id.* ¶ 6. Ora Lee "did not deal well with that. That part was very difficult for her." *Id.* Indeed, the murder "changed the balance of" Ora Lee's "life, to her detriment. She was never the same, afterward." *Id.* Overall, "Mary's murder was indescribably difficult then, and it still is now" for her family. *Id.* ¶ 8. The family has "been worn out by the multiple trials, re-trials, and appeals" over the course of 26 years, as they wait for justice to finally be served. *Id.*

Far too often in cases involving capital punishment, the focus is on the killers rather than the victims and their families. Demonstrating this point, Mary is not mentioned a single time in the Petition. This is wrong. The continued harm that families like Mary's experience every time a justly bestowed sentence is delayed is beyond immense and cannot be ignored.[7] *See, e.g.*, *Harmon v. Sharp*,

---

[7] Here, Jerald Thurman and his family should not be forgotten, either. Although Plaintiff's state sentence is not for Thurman's murder, Plaintiff's accomplice gunned Thurman down in cold blood when Thurman became a potential witness to Mary's abduction. Thurman "always made people

936 F.3d 1044, 1090 (10th Cir. 2019) (Holmes, J., concurring) ("Both the State and the victims of crime have an important interest in the timely enforcement of a sentence." (citation omitted)).

Recognizing this, in response to Attorney General Drummond's request to end the decades-long delay in carrying out Petitioner's sentence, U.S. Attorney General Bondi declared that following BOP's internal policy guidance—which states the "public interest is *typically* not served by transferring an inmate to state custody before a federal sentence is fully served," Doc. 2-4 (emphasis added)— would "grossly undermine[] the public interest" in circumstances "where a state is ready to carry out a lawful death sentence." *Id.* This policy applies to Petitioner's case specifically because Mary "experienced indescribable pain and terror before her violent death, and her family has suffered for decades as a result." *Id.* Therefore, "[t]imely enforcement of inmate Hanson's death sentence will achieve justice and provide a measure of closure to the victim's family and her community for the horrific crime committed by inmate Hanson." *Id.* at 2. This is undeniably correct.

It also dovetails with state law. Oklahoma's Constitution enshrines victims' rights. OKLA. CONST. art. 2, § 34. Those rights "shall be protected by law in a manner no less vigorous than the rights afforded to the accused." *Id.* § 34(A). So Mary's family has a right "to proceedings free from unreasonable delay and a prompt conclusion of the case." *Id.* As "the chief law officer of the state," 74 OKLA. STAT. § 18, Attorney General Drummond must defend and uphold those rights. And Petitioner's interest in avoiding his transfer, an interest for which he has provided no legal justification, certainly does not outweigh the right of the victims and the public in Oklahoma for justice.

---

laugh," and he dreamed with his wife "about expanding their Owasso trucking and excavating company that employs several family members." *Murder Victim's Family Trying to Cope With Loss*, NEWS ON 6 (Sept. 23, 1999), *available at* https://www.newson6.com/story/5e3686502f69d76f6209bf53 /murder-victims-family-trying-to-cope-with-loss. Among other things, Thurman's murder forced his son to drop out of college to run the family business. *Son Of Man Murdered 13 Years Ago Still Awaiting Closure*, NEWS ON 6 (Sept. 14, 2012), *available at* https://www.newson6.com/ story/5e36483d2f69d76f62061f64/son-of-man-murdered-13-years-ago-still-awaiting-closure.

Mary's family has suffered through an excruciatingly long delay and onslaught of litigation that has stretched the promise of justice to its breaking point. "It has been over 25 years of drama," and the family is "ready to be done with this matter." Ex. 8, Mooney Decl., ¶ 8. They are understandably "disappointed and angry with the machinations of the judicial system and the political aspects of the last years." *Id.* Once this matter comes to an end, everyone will be able to "move forward." *Id.* ¶ 9. Mary's family has a right to see this case come to an end, a right that is certainly not outweighed by Petitioner's frivolous objection to his transfer. This Court should deny the Petition. It is Mary's family who deserves relief here, not her murderer.

### d. A federal life sentence does not bar Petitioner's transfer to Oklahoma.

Section 3623 provides that, if the three numbered criteria are met, the BOP Director "shall order that a prisoner who has been charged in an indictment or information with, or convicted of, a State felony, be transferred to an official detention facility within such State *prior to his release* from a Federal prison facility." 18 U.S.C. § 3623 (emphasis added). Petitioner argues that "prior to his release" (the so-called "temporal clause") "makes clear that even where the conditions are met, Congress did not contemplate (much less require) that BOP immediately transfer the prisoner to state custody." Pet. at 9–10. Going further, Petitioner then claims that this phrase *prohibits* his transfer. Loosely speaking, Petitioner provides two reasons for this. One, he points out that BOP guidance indicates that a "transfer should occur within a reasonable period of time before the inmate's release from the Federal sentence, ordinarily within the last 90 days." *Id.* at 10. Two, he contends that "prior to release" cannot be fulfilled when "there is no prospect" of him "being released from federal custody in the foreseeable future." *Id.* Petitioner is mistaken on all counts.

Petitioner's argument is not supported by the text or context of Section 3623. Textually, Petitioner *was* transferred "prior to his release." There is no other possibility, as he was not transferred at or during his release, and he could not logically be transferred after a release. *See Prior*, Merriam-

33

Webster Online (defining "prior" as "earlier in time or order");[8] *see also, e.g.*, *Prior*, Webster's Ninth New Collegiate Dictionary (9th ed. 1983). To be sure, Petitioner would probably retort that he will never be released from federal prison, ergo he cannot be transferred. A person cannot be transferred, that is, "prior to [a] release" that will never happen. But this ignores that *every* relevant release is hypothetical. That is the intrinsic nature of the phrase "prior to"—it means a release is being discussed that has not happened yet and therefore may not happen for any number of reasons. (A prisoner could commit another crime before release, he could die before release, etc.) In addition, once the transfer occurs that is contemplated by Section 3623, the relevant release *will never happen*. The whole point of the Section 3623 enterprise is to transfer an inmate instead of release him. And even Petitioner implicitly admits that his own federal release was hypothetically possible; he just claims it was not "foreseeable." Pet. at 10. Petitioner, for example, could have received a pardon or commutation in the future. For all these reasons, Petitioner's transfer plainly occurred "prior to his release."

Contextually, the entirety of Section 3623 indicates that the phrase "prior to his release" refers to when the statutory criteria apply and is not a loophole around them. Section 3623 has two parts that are relevant here: a prefatory phrase, and a list of numbered criteria. The prefatory phrase commands that federal government "*shall*" transfer an inmate "prior to his release" "if" certain conditions are met. The list of numbered criteria provides the primary conditions on which the "shall" command applies, with references to "*the* transfer" that indicate the criteria assess a particular request. Once the "shall" command attaches to a request for transfer prior to release, the prefatory paragraph cannot be used to ignore the terms of the actual transfer request on review. That is to say, if a State asks for a transfer so that a punishment can be carried out at a certain time or in a certain time period, and the criteria in the statute are otherwise met, it would violate the statute and its use of the word "shall" to delay the transfer in such a way that the punishment cannot be carried out.

---

[8] https://www.merriam-webster.com/dictionary/prior.

Put differently, as should be clear from a simple read-through of the statute, the term "prior to his release" in Section 3623 is a commonsense description of when the statute applies that encourages the federal government to act promptly, not a tool to frustrate transfers otherwise commanded or approved by the statute. Had Congress wanted to place the weight on that phrase that Petitioner demands—weight that would allow a court to override both the United States and Oklahoma's positions—Congress would have included it as a numbered criteria and spelled out that "prior to release" means that no federal prisoner under a life sentence can ever be transferred. Congress, though, "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (quoting *Witman v. Am. Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001)). But that is exactly what Petitioner's position entails. According to him, tucked away in the passing phrase "prior to release," in a statute entitled "Transfer of a prisoner to State authority" that makes transfers mandatory, Congress banned the federal government from ever transferring a prisoner serving a life sentence for a federal crime, even when a state death sentence would be nullified as a result. This cannot possibly be the correct reading of Section 3623. Among other things, this reading would reward Petitioner for committing additional crimes that could be charged by the federal authorities. Under his logic, that is, the other murderous inmates on Oklahoma's death row should also have committed armed bank robberies in order to avoid Oklahoma's death penalty.[9]

The BOP's guidance does not improve Petitioner's case. Again, Petitioner alleges that internal BOP guidance indicated a "transfer should occur within a reasonable period of time before the inmate's release from the Federal sentence, ordinarily within the last 90 days." Pet. at 10; *see also* Doc.

---

[9] Even if it were found that "prior to his transfer" meant the statute could not apply to an inmate serving a life sentence, this *still* would not prohibit the transfer. It would just mean that Section 3623 does not cover inmates with life sentences, and that transfers of those persons would be in the complete discretion of the Attorney General, as they were originally. *See supra* Background, Section I.

2-4 (Attorney General Bondi: "Consistent with the BOP's internal policy guidance, the public interest is typically not served by transferring an inmate to state custody before a federal sentence is fully served."). The linchpin of this alleged guidance is obviously "reasonable[ness]"—and *not* the "last 90 days," which is prefaced by the adverb "ordinarily." It may be "ordinarily" (or "typically") reasonable for the federal government to wait until 90 days before an inmate's scheduled release to transfer him, but the guidance's phrasing indicates that there might be times where this is unreasonable, or it is reasonable to do otherwise. This is one of those times. To its immense credit, the United States now recognizes that woodenly following its internal policy "where a state is ready to carry out a lawful death sentence grossly undermines the public interest." Doc. 2-4.

In any event, it is unclear on what basis this guidance would control here, even if it was phrased in a more absolute way. There is no express statutory provision authorizing them to promulgate rules for the transfer under Section 3623, and even if there was, the BOP's interpretation could not be considered valid unless it was a permissible and reasonable construction of the statute. *See, e.g.*, *Reno v. Koray*, 515 U.S. 50, 61 (1995) (BOP program statement must be a permissible construction of the statute to receive any deference). The BOP cannot alter the timing by regulation because of the canon *casus omissus pro omisso habendus est*—"a statute should not be read to include matter it does not include." *Env't Integrity Project v. U.S. Env't Prot. Agency*, 969 F.3d 529, 541 (5th Cir. 2020). Put another way, "[n]othing is to be added to what the text states or reasonably implies." *Williams v. Lakeview Loan Servicing LLC*, 509 F. Supp. 3d 676, 680 (S.D. Tex. 2020) (quoting Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (West 2012)).

### e.  Petitioner was not entitled to be notified of his transfer under Section 3623.

Petitioner complains that the United States violated his right to "due process of law under the Fifth and Eighth and Fourteenth Amendments" when he was transferred to Oklahoma without being

given "notice or opportunity to be heard." Pet. at 12. Petitioner styles this as a "further ultra vires act in contravention of law." *Id.* This argument is meritless.

Section 3623 contains no requirement that a prisoner be notified of a transfer, and Petitioner cites no precedent that is on point, or even close. Moreover, Petitioner *was* fully aware that the United States and Oklahoma were looking to act quickly. And, acting on that knowledge, he temporarily delayed his transfer by filing suit in a federal district court in Louisiana. Thus, he cannot possibly argue that when that court dismissed his lawsuit as unripe, he somehow did not know that a transfer was imminent. Yet, despite this knowledge, he made no subsequent legal filing of any kind—no appeal, notice of appeal, motion for a stay, emergency filing, or new lawsuit. Thus, there was no conceivable legal impediment to the expeditious transfer of Petitioner and no requirement that he or his counsel be given advance notice. *Contra* Pet. at 8-9 ("Without notice to counsel for Mr. Hanson …").[10]

Weakly, Petitioner protests that the district court's dismissal in Louisiana "contemplated that if and when the BOP Director did so decide (thereby making the matter ripe), Mr. Hanson would have notice and opportunity to be heard and to re-urge his complaint seeking injunctive and declaratory relief enjoining his transfer." *Id.* at 12. But the district court neither said nor contemplated any such thing, despite it being easy for the court to do so. Instead of dismissing the case, for example, that court could have held the case in abeyance and instructed the parties to update the court with any developments. It chose not to say or do any of this; instead, the court openly indicated that it was "doubtful" that it would grant any relief because "Section 3623 give the BOP director, and no one else, the discretion to decide whether an inmate's transfer is within the public interest." *Drummond*, 2025 WL 636319, at *2. Petitioner cannot invent court instructions where none were given.

---

[10] As an aside, it should not take much reflection to understand why a government would not notify a death-row inmate prior to his transfer and subsequent travel across multiple states and hundreds of miles. No prisoner transport, no matter how well staffed and secured, is as secure as a prison itself, and thus the increased level of risk requires as rapid and clandestine of a transfer as possible.

### III.    OKLAHOMA HAS NOT WAIVED JURISDICTION OVER PETITIONER.

For his fourth claim, Petitioner alleges that "Oklahoma has waived jurisdiction over [him] due to a lack of pursuit and inaction." Pet. at 13. Specifically, he claims that "[f]or over sixteen years, from 2006 until 2022, the State of Oklahoma neglected to take any action to acquire primary or physical custody of [him]." *Id.* at 14. This alleged "lack of interest" between his resentencing in 2006 and his first scheduled execution in 2022 "was equivalent to a pardon or commutation of his sentence and a waiver of jurisdiction." *Id.* This claim, brought under the Fourteenth Amendment's due process clause, is clearly a challenge to the validity of Petitioner's Oklahoma judgment and sentence, and as such it should be construed as a second or successive habeas petition under 28 U.S.C. § 2254. Consequently, Count Four must be dismissed for lack of jurisdiction pursuant to 28 U.S.C. § 2244(b)(3)(A) and Rule 12(b)(1) of the Federal Rules of Civil Procedure.

*First*, because Petitioner is attacking the validity of his death sentence in Count Four, it is an application for habeas relief under 28 U.S.C. § 2254—not 28 U.S.C. § 2241. *See Yellowbear v. Wyo. Att'y Gen.*, 525 F.3d 921, 924 (10th Cir. 2008); *McIntosh*, 115 F.3d at 811. With this claim, it is obvious that Petitioner is attempting to dodge his Oklahoma death sentence altogether, rather than merely challenging his transfer. *See United States v. Nelson*, 465 F.3d 1145, 1149 (10th Cir. 2006) (nature of a pleading is determined by the relief sought, not the title). Therefore, this Court should construe Count Four as an application under Section 2254.

The Tenth Circuit addressed a similar situation in *Fletcher v. Lengerich*, No. 23-1395, 2024 WL 1155260, at *2 (10th Cir. Mar. 18, 2024) (unpublished). Fletcher, a Colorado prisoner, filed a Section 2241 petition alleging that his arrest "was really an illegal kidnapping" because the state court lacked jurisdiction over him. *Id.* The Court found that the district court properly construed the petition as an unauthorized second Section 2254 petition, despite its label, because the claim was a challenge to the validity of the conviction and sentence. *Id.* This result is warranted here. *See also Lynch v. Standifird*, 441

38

F. App'x 623, 624 (10th Cir. Nov. 29, 2011) (unpublished) ("Because Mr. Lynch attacked the validity of his habitual-offender sentence, rather than the manner in which the sentence is being executed, the district court correctly considered the application to be under § 2254 ….").

*Second*, because Petitioner's claim is a Section 2254 claim, it is a successive petition. This is the second time that Petitioner has filed a Section 2254 habeas petition attacking his conviction in Tulsa County Case No. CF-1999-4583. As discussed above, in 2010 Petitioner unsuccessfully sought federal habeas corpus relief in the Northern District of Oklahoma. *See Hanson*, 2013 WL 3307111. On August 13, 2015, the Tenth Circuit affirmed the district court's denial of habeas relief. *Hanson*, 797 F.3d at 853. On May 16, 2016, the Supreme Court denied Petitioner's petition for a writ of certiorari. *Hanson*, 578 U.S. 979. Thus, Count Four is a second or successive habeas petition under AEDPA.

*Third*, second or successive habeas petitions must be authorized by the Tenth Circuit before they are filed, and this Petition was not so authorized. "Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A). Without the required authorization, a district court lacks jurisdiction to address the merits of such an application. *See In re Cline*, 531 F.3d 1249, 1251 (10th Cir. 2008). Thus, the Tenth Circuit has explained:

> When a second or successive § 2254 or § 2255 claim is filed in the district court without the required authorization from this court, the district court may transfer the matter to this court if it determines it is in the interest of justice to do so under § 1631, or it may dismiss the motion or petition for lack of jurisdiction.

*Id.* at 1252.

There is no indication that Petitioner sought authorization to file a second habeas petition. And this Court should elect dismissal, as a transfer will not further the interests of justice. In considering whether a transfer is warranted, this Court must consider, "among other factors, whether 'the claims alleged are likely to have merit.'" *Fletcher*, No. 23-1395, 2024 WL 1155260, at *2 (quoting

*Cline*, 531 F.3d at 1252). The wheels fall off for Petitioner at this point. Not only is the premise of his claim unexhausted because it has never been presented to any state court, but it arises from the very circumstances he created when he asked a state court to be transferred to federal custody. In short, Petitioner's claim about Oklahoma's alleged inaction ignores that he was returned to federal custody after his sentencing in Oklahoma at his own request, *see supra* p.3, and Oklahoma had no reason to "acquire primary or physical custody" of Petitioner until his execution was imminent, Pet. at 14. Because Petitioner orchestrated the circumstances of which he is now complaining, the doctrine of invited error precludes habeas relief. *See Parker v. Champion*, 148 F.3d 1219, 1221 (10th Cir. 1998).

The claim is also ridiculous. Petitioner alleges that "Oklahoma willfully showed no interest in the return of Plaintiff from 2006 until 2022" by "any … affirmative action." Pet. at 14. But during that 16-year stretch, attorneys for the State of Oklahoma—including the undersigned—spent countless hours actively litigating against Petitioner's numerous attempts to overturn his state conviction and avoid his death sentence, in state and federal court. *See supra* p.4. And Oklahoma indisputably requested Petitioner's transfer as soon as his original execution date was set in 2022. Even Petitioner admits that "[a]fter the federal district judge's execution protocol and method of execution ruling, the OCCA scheduled Mr. Hanson's execution." Pet. at 5. This is the exact opposite of showing gross negligence or a complete lack of interest in Petitioner.

Moreover, the cases Petitioner cites do not help him. In *Piper v. Estelle*, the Fifth Circuit ruled *against* the inmate, even where Texas waited nearly two years to file a detainer with the federal authorities, and it emphasized that the due process doctrine Petitioner relies on "was not intended to constitute a trap for unwary state officials." 485 F.2d 245, 246 (5th Cir. 1973); *see also id.* ("There was no reason to file a detainer until Piper's release from federal custody was imminent."). Similarly, in *Blango v. Thornburgh* the Tenth Circuit held that there was "no merit" in an inmate's argument that the District of Columbia waived jurisdiction over him when it surrendered him to the federal government.

942 F.2d 1487, 1491 (10th Cir. 1991) (per curiam). And in *United States v. Barfield*, the Eleventh Circuit held that an eight-year delay in enforcing Barfield's sentence for cocaine possession was not "so affirmatively wrong" or "so grossly negligent" as to violate due process, in large part because the "Government was acting under the belief, based on representations by Barfield, that her death was imminent." 396 F.3d 1144, 1149 (11th Cir. 2005); *see also id.* n.8 (collecting cases with no due process violation). The only case Petitioner cites where an actual due process violation was found is *Shields v. Beto*, but there the Fifth Circuit found that Texas waited 18 years after the inmate was released from Louisiana prison—and 28 years after he served his original time in Texas prison—to force him to finish his Texas sentence. 370 F.2d 1003, 1005 (5th Cir. 1967). Had Oklahoma waited nearly two decades after Petitioner's release from federal prison to attempt to acquire him, then he might have an argument. The current situation, however, does not remotely resemble *Shields*.

Under the circumstances here, transfer to the Tenth Circuit would serve no purpose. The claim in Count Four is not properly before this court, and even if it were, it is legally frivolous. Oklahoma's actions were not "grossly negligent" or "unequivocally inconsistent with 'fundamental principles of liberty and justice.'" Pet. at 14 (quoting *Piper*, 485 F.2d at 246). Therefore, this portion of Petitioner's habeas petition should be dismissed for lack of jurisdiction.

## CONCLUSION

For the foregoing reasons, Petitioner's habeas Petition should be denied. Alternatively, his Complaint should be dismissed.

Respectfully submitted,

s/ *Zach West*
_____
GARRY M. GASKINS, II, OBA #20212
  *Solicitor General*
ZACH WEST, OBA # 30768
  *Director of Special Litigation*
CULLEN D. SWEENEY, OBA # 30269
WILL FLANAGAN, OBA #35110
  *Assistant Solicitors General*

CAROLINE HUNT, OBA # 32635
  *Deputy Attorney General*
MICHEL A. TRAPASSO, OBA # 35298
  *Assistant Attorney General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Cullen.Sweeney@oag.ok.gov
William.Flanagan@oag.ok.gov
Caroline.Hunt@oag.ok.gov
Michel.Trapasso@oag.ok.gov

*Counsel for Respondents*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day April, 2025, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all counsel of record who are registered participants.

 s/ *Zach West*

Zᴀᴄʜ Wᴇsᴛ