# Exhibit 3

Prisoner's Name:                              JOHN FITZGERALD HANSON
Prisoner's Reg. Number:                 08585-062
Place of Confinement:                     United States Penitentiary, USP Pollock
                                                         Pollock, Louisiana

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **JOHN FITZGERALD HANSON,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 10-CV-113-CVE-TLW** |
| | ) | |
| **WILLIAM A. SHERROD\*, Warden,** | ) | |
| **U.S. Penitentiary, USP Pollock,** | ) | |
| **Pollock, Louisiana;** | ) | |
| **W.A. DREW EDMONDSON,** | ) | |
| **Attorney General of Oklahoma,** | ) | |
| | ) | |
| **Respondents.** | ) | |

---

## 28 U.S.C. § 2254 PETITION FOR A WRIT OF
## HABEAS CORPUS BY A PERSON IN CUSTODY
## PURSUANT THE JUDGMENT OF A STATE COURT

---

ROBERT S. JACKSON
T. KENNETH LEE
Assistant Federal Public Defenders
215 Dean A. McGee, Suite 707
Oklahoma City, Oklahoma 73102
(405) 609-5975 telephone
(405) 609-5976 facsimile
bob_jackson@fd.org
ken_lee@fd.org
COUNSEL FOR PETITIONER,
JOHN FITZGERALD HANSON

DATE: December 6, 2010

\*William A. Sherrod is the current Warden of U.S. Penitentiary, USP Pollock and he is
substituted for Respondent, Joe Keffer, pursuant Fed. R. Civ. P. 25(d).

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PRIOR PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF THE FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

GROUND ONE
     MR. HANSON WAS DENIED AN ADEQUATE OPPORTUNITY TO
     CONFRONT THE WITNESSES AGAINST HIM BY THE TRIAL COURT'S
     ADMISSION OF THE TESTIMONIAL HEARSAY OF RASHAD BARNES. . . . . . . 11

     I.     In Light of Material Impeachment Evidence Not Available at the Time of
          Rashad Barnes' Original Testimony, Mr. Hanson Was Denied an Adequate
          Opportunity to Confront the Witness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     II.    Mr. Hanson Was Harmed as a Result of the Trial Court's Erroneous
          Admission of the Testimonial Hearsay. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

GROUND TWO
     MR. HANSON'S RIGHT TO DUE PROCESS OF LAW WAS VIOLATED BY
     THE OKLAHOMA COURT OF CRIMINAL APPEALS' REVERSAL OF THE
     DISTRICT COURT'S GRANT OF A NEW TRIAL ON THE BASIS OF NEWLY
     DISCOVERED EVIDENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

     I.     The State Court Did Not Have Jurisdiction to Reverse the Trial Court's Grant
          of a New Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

     II.    There Is a Reasonable Probability That Co-defendant Miller's Confession
          Would Have Changed the Outcome at the Guilt and Sentencing Stages of
          Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

i

GROUND THREE

    MR. HANSON RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT
    TRIAL AND ON APPEAL THEREBY VIOLATING HIS RIGHTS UNDER THE
    SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES
    CONSTITUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

I.    Trial Counsel Failed to Call Critical Witness, Ahmod Henry, in its
    Case in Chief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

II.    Trial Counsel Failed to Raise Available Grounds in Objecting to the
    Introduction of Rashad Barnes' Transcript Testimony. . . . . . . . . . . . . . . . . . . . . 43

III.    Trial Counsel Failed to Object to Instances of Prosecutorial
    Misconduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

IV.    Trial Counsel Failed to Investigate and Present Available Mitigation
    Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

V.    Appellate Counsel Was Ineffective for Failing to Raise Trial Counsel's
    Ineffectiveness in Neglecting to Present Evidence of Mental Illness and Brain
    Damage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

GROUND FOUR

    MR. HANSON'S TRIAL WAS RIFE WITH PROSECUTORIAL MISCONDUCT
    SUCH THAT HE WAS DENIED A FAIR TRIAL AND A RELIABLE SENTENCE
    IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH
    AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

I.    Guilt or Innocence – The Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

    a.    Inflaming The Passions And Prejudice Of The Jury And
        Garnering Sympathy For Mary Bowles. . . . . . . . . . . . . . . . . . . . . . . . 61
    b.    Tipping The Scales – Garnering More Sympathy By Name
        Calling. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
    c.    Trouble – The Need to Vouch And Garner Sympathy For
        The State's Key Witness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
    d.    Smoke and Mirrors - When All Else Fails Ridicule The
        Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
    e.    End Game – Closing Arguments, A Play On Juror Fears. . . . . . . . . . . . 73
    f.    Tipping The Scales – The Cumulative Effect. . . . . . . . . . . . . . . . . . . . . 75

II.    Re-Sentencing – Seeking Death. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

    a.    Inflaming The Passions And Prejudice Of The Jury And
        Garnering Sympathy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

b. Punishment – Death Is The Only Choice. . . . . . . . . . . . . . . . . . . . . . . . . . 80

c. If All Else Fails – Argue Facts Not In Evidence. . . . . . . . . . . . . . . . . . . . 82

d. Trouble – The Need to Vouch For The State's Key Witness. . . . . . . . . . 87

e. Improper Argument – What Constitutes Great Risk of Death. . . . . . . . . 87

f. A Play On Jurors Fears – Part II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

g. Tipping The Scales – The Cumulative Effect. . . . . . . . . . . . . . . . . . . . . . 90

III. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

GROUND FIVE

INVALIDATION OF THE GREAT RISK OF DEATH AGGRAVATING
CIRCUMSTANCE REQUIRED INVALIDATION OF THE DEATH SENTENCE

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

GROUND SIX

ERRORS INVOLVING THE "MURDER TO AVOID LAWFUL ARREST OR
PROSECUTION" AGGRAVATING CIRCUMSTANCE VIOLATED MR.
HANSON'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

I. Re-presentment of this Aggravator Violated the Double
Jeopardy Clause. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

a. The Basis for The Supreme Court's Decision in *Poland* v. *Arizona*
Has Been Rejected by the Court in Subsequent Decisions. . . . . . . . . . . . .

b. The Failure of the First Sentencing Jury to Check the Avoiding
Lawful Arrest Aggravating Circumstance must Be Treated As a
Unanimous Rejection and "Acquittal" of That Aggravator . . . . . . . . . 103

II. The Avoiding Lawful Arrest Aggravator is Unconstitutionally
Overbroad . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

III. The Evidence Was Insufficient to Support This Aggravator. . . . . . . . . . . . . . . . 111

IV. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

iii

GROUND SEVEN

      THE STATE'S FAILURE TO ALLEGE WITH SPECIFICITY THE PREDICATE CRIME FOR WHICH MARY BOWLES' MURDER WAS COMMITTED IN ORDER TO AVOID ARREST OR PROSECUTION VIOLATED MR. HANSON'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

GROUND EIGHT

      THE DEFINITION OF MITIGATING CIRCUMSTANCES CONTAINED IN OKLAHOMA'S UNIFORM JURY INSTRUCTIONS IMPERMISSIBLY LIMITS CONSIDERATION OF MITIGATION EVIDENCE, AND MOREOVER THE PROSECUTORS IN THIS CASE EXPLOITED THE INSTRUCTION IMPROPERLY TO DEADEN OR ELIMINATE THE JURY'S CONSIDERATION OF IMPORTANT MITIGATION EVIDENCE IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . 121

    I.      Oklahoma's Struggle with OUJI-CR 4-78. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

    II.     The Significance of the Subsequent Remedial Instruction . . . . . . . . . . . . . . . 126

    III.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

GROUND NINE

      THE CUMULATIVE EFFECT OF ERRORS AT BOTH PHASES OF TRIAL DEPRIVED MR. HANSON OF HIS CONSTITUTIONAL RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS.. . . . . . . . . . . . . . . . . . . . . . . . . . 130

Preliminary Statement Concerning Procedural Default. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

Motion for Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

Motion for Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

Index of Attachments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

# TABLE OF AUTHORITIES

## SUPREME COURT CASES

*Abdul-Kabir v. Quarterman*,
  550 U.S. 233 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Ake v. Oklahoma*,
  470 U.S. 68 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 133

*Apprendi v. New Jersey*,
  530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Arizona v. Fulminante*,
  499 U.S. 279 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Barber v. Page*,
  390 U.S. 719 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Bates v. United States*,
  522 U.S. 23 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Beck v. Alabama*,
  447 U.S. 625 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

*Berger v. U.S.*,
  295 U.S. 78 (1935). . . . . . . . . . . . . . . . . . . . . . 61, 71, 73, 75, 76, 80, 81, 85, 88, 89, 91, 92

*Boyde v. California*,
  494 U.S. 370 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

*Bracy v. Gramley*,
  520 U.S. 899 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

*Brown v. Sanders*,
  546 U.S. 212 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92, 94, 95, 96, 120

*Bruton v. United States*,
  391 U.S. 123 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 68

*Bullington v. Missouri*,
  451 U.S. 430 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99, 100

*Burger v. Kemp*,
  483 U.S. 776 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

v

*Caldwell v. Mississippi,*
 472 U.S. 320 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*California v. Green,*
 399 U.S. 149 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Clemons v. Mississippi,*
 494 U.S. 738 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*Coleman v. Thompson,*
 501 U.S. 722 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Crawford v. Washington,*
 541 U.S. 36 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15, 16, 17, 19

*Cuyler v. Sullivan,*
 446 U.S. 335 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Darden v. Wainwright,*
 477 U.S. 168 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61, 66, 67, 70, 75, 76, 80, 85, 89, 91

*Davis v. Washington,*
 547 U.S. 813 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Delaware v. Van Arsdall,*
 475 U.S. 673 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Donnelly v. DeChristoforo,*
 416 U.S. 637 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 67, 75, 76, 90, 128

*Douglas v. Alabama,*
 380 U.S. 415 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Dutton v. Evans,*
 400 U.S. 74 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Eddings v. Oklahoma,*
 455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 78, 81, 85, 89, 123

*Evitts v. Lucey,*
    469 U.S. 387 (1985) ... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

*Furman v. Georgia,*
    408 U.S. 238 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

*Gardner v. Florida,*
    430 U.S. 349 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 76, 85, 89

*Godfrey v. Georgia,*
    446 U.S. 420 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

*Green v. United States,*
    355 U.S. 184 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105, 106

*Harris v. Nelson,*
    394 U.S. 286 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

*Hicks v. Oklahoma,*
    447 U.S. 343 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35, 113, 116

*Hitchcock v. Dugger,*
    481 U.S. 393 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

*Jackson v. Virginia,*
    443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

*Johnson v. Louisiana,*
    406 U.S. 356 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

*Kimmelman v. Morrison,*
    477 U.S. 365 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Kirby v. United States,*
    174 U.S. 47 (1899) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Lilly v. Virginia,*
    527 U.S. 116 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Lockett v. Ohio,*
    438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 81, 129, 138

*Mancusi v. Stubbs*,
  408 U.S. 204 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Matson Nav. Co. v. U.S.*,
  284 U.S. 352 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Mattox v. United States*,
  156 U.S. 237 (1895) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Maynard v. Cartwright*,
  486 U.S. 356 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*McCleskey v. Kemp*,
  481 U.S. 279 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

*Mills v. Maryland*,
  486 U.S. 367 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

*Monge v. California*,
  524 U.S. 721(1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

*Motes v. United States*,
  178 U.S. 458 (1900).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Murray v. Carrier*,
  477 U.S. 478 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Napue v. Illinois*,
  360 U.S. 264 (1959).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*Payne v. Tennessee*,
  501 U.S. 808 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 65, 66, 67, 70

*Penry v. Johnson*,
  532 U.S. 782 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81, 127, 129

*Penry v. Lynaugh*,
  536 U.S. 304 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123, 128

*Pointer v. Texas*,
  380 U.S. 400 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Poland v. Arizona*,
  476 U.S. 147 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97, 98, 99, 100, 103

*Porter v. McCollum*,
    558 U.S. __, 130 S. Ct. 447 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 54

*Price v. Georgia*,
    398 U.S. 323 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

*Ring v. Arizona*,
    536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98, 100, 113, 114, 127

*Roberts v. Russell*,
    392 U.S. 293 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Rompilla v. Beard*,
    545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Sandstrom v. Montana*,
    442 U.S. 510 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

*Sattazahn v. Pennsylvania*,
    537 U.S. 101 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98, 99,101, 102, 105

*Schad v. Arizona*,
    501 U.S. 624 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

*Sears v. Upton*,
    561 U.S. __, 130 S. Ct. 3259 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 53, 54

*Skipper  v. South Carolina*,
    476 U.S. 1 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*Smith v. Texas*,
    543 U.S. 37 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*Smith v. Texas*,
    550 U.S. 297 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*Strickland v. Washington*,
    466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . 37, 38, 40, 42, 45, 46, 48, 52, 54, 66, 120

*Stringer v. Black*,
    503 U.S. 222 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*Sumner v. Shuman*,
    483 U.S. 66 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

ix

*Townsend v. Sain*,
    372 U.S. 293 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134, 135

*Tuilaepa v. California*,
    512 U.S. 967 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*United States v. Young*,
    470 U.S. 1 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61, 70, 87

*Viereck v. United States*,
    318 U.S. 236 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75, 81, 90

*Wade v. Hunter*,
    336 U.S. 684 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

*Walton v. Arizona*,
    497 U.S. 639 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99, 100

*Wiggins v. Smith*,
    539 U.S. 510 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 48

*Williams v. Taylor*,
    529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 46, 48, 54

*Wood v. Allen*,
    558 U.S. _, 130 S. Ct. 841 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Woodson v. North Carolina*,
    428 U.S. 280 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 76, 85, 89, 138

## FEDERAL CASES

*Anderson v. Sirmons*,
    476 F.3d 1131 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 59

*Andrews v. Deland*,
    943 F.2d 1162 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

*Ballard v. Estelle*,
    937 F.2d 453 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Banks v. Reynolds*,
    54 F.3d 1508 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

x

*Barkell v. Crouse,*
    468 F.3d 684 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

*Brecheen v. Reynolds,*
    41 F.3d 1343 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

*Bruno v. Rushen,*
    721 F.2d 1193 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Cannon v. Gibson,*
    259 F.3d 1253 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Cannon v. Mullin,*
    383 F.3d 1152 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Cargle v. Mullin,*
    317 F.3d 1196 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 14, 71, 72, 87, 120 130, 131

*Darks v. Mullin,*
    327 F.3d 1001 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*Douglas v. Workman,*
    560 F.3d 1156 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 71, 87

*Duckett v. Mullin,*
    306 F.3d 982 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 65, 78

*English v. Cody,*
    146 F.3d 1257 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 57

*Fisher v. Gibson,*
    282 F.3d 1283 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Freeman v. Lane,*
    962 F.2d 1252 (7th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

*Gilbert v. Mullin,*
    302 F.3d 1166 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

*Gonzales v. McKune,*
    247 F.3d 1066 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*Hamilton v. Mullin,*
    436 F.3d 1181 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

*Hance v. Zant,*
   696 F.2d 940 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*Hooper v. Mullin,*
   314 F.3d 1162 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Jones v. Gibson,*
   206 F.3d 946 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*LaFevers v. Gibson,*
   182 F.3d 705 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

*Malicoat v. Mullin,*
   426 F.3d 1241 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Mason v. United States,*
   719 F.2d 1485 (10th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Mayes v. Gibson,*
   210 F.3d 1284 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*McMullen v. Tennis,*
   562 F.3d 231 (3d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

*Moore v. Gibson,*
   195 F.3d 1152 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 76

*Moore v. Reynolds,*
   153 F.3d 1086 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

*Neill v. Gibson,*
   278 F.3d 1044 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

*Paxton v. Ward,*
   199 F.3d 1197 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*Ramah Navajo Chapter v. Lujan,*
   112 F.3d 1455 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Richie v. Sirmons,*
   563 F. Supp. 2d 1250 (N.D. Okla. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Romano v. Gibson,*
   239 F.3d 1156 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 77

*Ross v. Ward*,
    165 F.3d 793 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

*Spears v. Mullin*,
    343 F.3d 1215 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 65, 76

*Thomas v. Gibson*,
    218 F.3d 1213 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

*Thornburg v. Mullin*,
    422 F.3d 1113 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*United States v. Goff*,
    847 F.2d 149 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*United States v. Holmes*,
    413 F.3d 770 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 73, 74

*United States v. Magallanez*,
    408 F.3d 672 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 71, 87

*United States v. Rivera*,
    900 F.2d 1462 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*United States v. Swafford*,
    766 F.2d 426 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 87

*Wilson v. Sirmons*,
    536 F.3d 1064 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 75

*Workman v. Mullin*,
    342 F.3d 1100 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

**STATE CASES**

*Alverson v. State*,
    983 P.2d 498 (Okla. Crim. App. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Barnett v. State*,
    853 P.2d 226 (Okla. Crim. App. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

*Booker v. State*,
    851 P.2d 544 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

*Carpenter v. State*,
  929 P.2d 988 (Okla. Crim. App. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Carter v. State*,
  879 P.2d 1234 (Okla. Crim. App. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

*Coulter v. State*,
  734 P.2d 295 (Okla. Crim. App. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 73

*Cummings v. State*,
  968 P.2d 821 (Okla. Crim. App. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

*Davis v. State*,
  845 P.2d 194 (Okla. Crim. App. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Duvall v. State*,
  871 P.2d 1386 (Okla. Crim. App. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Ellis v State*,
  867 P.2d 1289 (Okla. Crim. App. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*Fisher v. State*,
  206 P.3d 607 (Okla. Crim. App. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Frederick v. State*,
  37 P.3d 908 (Okla. Crim. App. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

*Harris v. State*,
  164 P.3d 1103 (Okla. Crim. App. 2007) . . . . . . . . . . . . . . . . . . . . . . . . 125, 126, 127, 128

*Hogan v. State*,
  139 P.3d 907 (Okla. Crim. App. 2006) . . . . . . . . . . . . . . . 97, 98, 101, 102, 103, 104, 107

xiv

*Jones v. State,*
    201 P.3d 869 (Okla. Crim. App. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126, 128

*Jones v. State,*
    610 P.2d 818 (Okla. Crim. App. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 81, 90

*Lay v. State,*
    179 P.3d 615 (Okla. Crim. App. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

*Le v. State,*
    947 P.2d 535 (Okla. Crim. App. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

*Lott v. State,*
    98 P.3d 318 (Okla. Crim. App. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108, 109

*Malicoat v. State of Oklahoma,*
    137 P.3d 1234 (Okla Crim App 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

*Martinez v. State,*
    984 P.2d 813 (Okla. Crim. App. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*McCarty v. State,*
    765 P.2d 1215 (Okla. Crim. App. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 81, 90

*McGregor v. State,*
    885 P.2d 1366 (Okla. Crim. App. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 109, 111

*Miller v. State,*
    98 P.3d 738 (Okla. Crim. App. 2004) . . . . . . . . . . . . . . . . . . . 12, 17, 18, 20, 21, 44

*Mitchell v. State,*
    136 P.3d 671 (Okla. Crim. App. 2006)    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

*Mollett v. State,*
    939 P.2d 1 (Okla. Crim. App. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

*Pennington v. State,*
    913 P.2d 1356 (Okla. Crim. App. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Powell v. State,*
    906 P.2d 765 (Okla. Crim. App. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

*Ramono v. State,*
    909 P.2d 92 (Okla. Crim. App. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

xv

*Rojem v. State,*
    888 P.2d 528 (Okla. Crim. App. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Scott v. State,*
    891 P.2d 1283 (Okla. Crim. App. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108, 114

*Simpson v. State,*
    876 P.2d 690 (Okla. Crim. App. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Slaughter v. State of Oklahoma,*
    108 P.3d 1052 (Okla. Crim. App. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

*Snow v. State,*
    876 P.2d 291 (Okla. Crim. App. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

*State v. Davenport,*
    256 P. 340 (Okla. 1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Thornburg v. State,*
    985 P.2d 1234 (Okla. Crim. App. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

*Torres v. State,*
    120 P.3d 1184 (Okla. Crim. App. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

*Valdez v. State of Oklahoma,*
    46 P.3d 703 (Okla. Crim. App. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

*Wackerly v. State,*
    12 P.3d 1 (Okla. Crim. App. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

*Williams v. State,*
    22 P.3d 702 (Okla. Crim. App. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

**DOCKETED CASES**

*Hanson v. State,*
    72 P.3d 40 (Okla. Crim. App. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 21, 23, 66, 71, 76

*Hanson v. State,*
    206 P.3d 1020 (Okla. Crim. App. 2009) . . . . . . . . . . . . . . . . . 4, 8, 13, 19, 29, 40, 41, 45,
                                                                    46, 48, 73, 75, 79, 82, 86, 87, 88,
                                                                    90, 92, 94, 96, 120, 124, 132, 136

*Hanson v. Oklahoma,*
    130 S. Ct. 808 (Dec. 7, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

*Hanson v. State,*
>    No. PCD-02-628 (Okla. Crim. App. June 17, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Hanson v. State*,
>    No. PCD-2006-614 (Okla. Crim. App. Jun 2, 2009) . . . . . . . . . . . . . . . . 5, 8, 29, 116, 132

## FEDERAL STATUTES

28 U.S.C. § 2254  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 13, 19, 34, 35, 36, 40, 41,  43, 45, 48,
>                                        71, 80, 82, 86, 87, 89, 91, 96, 117, 124, 138

## STATE STATUTES

Okla. Stat. tit. 12, §2804 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Okla. Stat. tit. 12, § 2805 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Okla. Stat. tit. 20, § 40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Okla. Stat. tit. 20, § 44 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Okla. Stat. tit. 21 § 701.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Okla. Stat. tit. 21 § 701.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Okla. Stat. tit. 21, § 701.12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

Okla. Stat. tit. 21, § 701.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Okla. Stat. tit. 22, § 1066 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Okla. Stat. tit. 22 § 1080 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 32, 33

Okla. Stat. tit. 22, § 1089 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

## MISCELLANEOUS

Rules Governing Section 2254 Cases in the United States District Courts

      Rule 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 25

      Rule 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136, 138, 139

      Rule 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

Rules of the Oklahoma Court of Criminal Appeals

      Rule 2.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      Rule 3.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

      Rule 9.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

      Rule 9.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 33

ABA Standards for Criminal Justice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Prisoner's Name:                     JOHN FITZGERALD HANSON
Prisoner's Reg. Number:              08585-062
Place of Confinement:                United States Penitentiary, USP Pollock
                                     Pollock, Louisiana

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **JOHN FITZGERALD HANSON,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 10-CV-113-CVE-TLW** |
| | ) | |
| **WILLIAM A. SHERROD, Warden,** | ) | |
| **U.S. Penitentiary, USP Pollock,** | ) | |
| **Pollock, Louisiana;** | ) | |
| **W.A. DREW EDMONDSON,** | ) | |
| **Attorney General of Oklahoma,** | ) | |
| | ) | |
| **Respondents.** | ) | |

## 28 U.S.C. § 2254 PETITION FOR A WRIT OF
## HABEAS CORPUS BY A PERSON IN CUSTODY
## PURSUANT THE JUDGMENT OF A STATE COURT

ROBERT S. JACKSON
T. KENNETH LEE
Assistant Federal Public Defenders
215 Dean A. McGee, Suite 707
Oklahoma City, Oklahoma 73102
(405) 609-5975 telephone
(405) 609-5976 facsimile
bob_jackson@fd.org
ken_lee@fd.org
COUNSEL FOR PETITIONER,
JOHN FITZGERALD HANSON

DATE: December 6, 2010

## INTRODUCTION

Petitioner John Fitzgerald Hanson is incarcerated at the United States Penitentiary, Pollock, Louisiana, where he is serving a federal sentence of life + 82 years. *See* Case No. CR-99-125 (N.D. Okla.). Pursuant 28 U.S.C. § 2254, Mr. Hanson specifically petitions for habeas relief from his conviction and the resulting death sentence he received in the District Court of Tulsa County, Oklahoma. The warden of USP Pollock, William A. Sherrod, and the Attorney General of the State of Oklahoma, W. A. Drew Edmondson, are named as Respondents pursuant Rule 2(b) of the *Rules Governing Section 2254 Cases. See also* Doc. 3, Order Appointing Counsel (March 1, 2010). Mr. Hanson was convicted of first degree murder and received a sentence of death in violation of his rights under the United States Constitution. Because of these Constitutional violations, he is entitled to have the Writ of Habeas Corpus issue on his behalf. This is Mr. Hanson's first Petition for Writ of Habeas Corpus.

Mr. Hanson presents a compelling habeas case. A few aspects of Mr. Hanson's case should be mentioned from the outset. Just days before a re-sentencing trial was set to begin, new evidence surfaced which a state district court judge thought was significant enough to order an entire new trial, including guilt and sentencing, for Mr. Hanson. Then the Oklahoma Court of Criminal Appeals in a Constitutionally questionable manner vacated the trial judge's order and instructed her to proceed with re-sentencing only. At re-sentencing Mr. Hanson received ineffective assistance of counsel. Given only sentencing was at issue,

1

counsel should have been squarely focused on presenting Mr. Hanson's case for life. Instead prior counsel failed to conduct reasonable mitigation investigations that would have provided powerful evidence, including *inter alia* that Mr. Hanson suffers from mental illness and cognitive disorder, which would have weighed in favor of a sentence less than death. Numerous additional Constitutional violations occurred in the various proceedings below. Mr. Hanson prays that this Court will grant him relief.

**PRIOR PROCEEDINGS**

A.    **Conviction:**

Court:        District court of Tulsa County, State of Oklahoma, Judge Linda G. Morrissey.

Case No.:     CF-1999-4583.

Charges:      Count I: Malice or in the alternative felony murder of Mary Bowles.
              Count II: Malice or in the alternative felony murder of Jerald Thurman.

Plea:         Not guilty to Counts I and II.

Trial:        Jury Trial, conducted May 7 through 23, 2001.

Verdict:      Guilty of malice murder on Count I; Guilty of felony murder on Count II.

Sentence:     Count I - death.
              Count II - life without the possibility of parole.

Counsel:      Jack E. Gordon, Jr.
              111 South Muskogee
              Claremore, OK 74017

B.    **Direct Appeal:**

Court:        Oklahoma Court of Criminal Appeals.

Case No.:      D-2001-717.

Opinion:       *Hanson v. State*, 72 P.3d 40 (Okla. Crim. App. 2003).

Result:        Count I - Conviction affirmed, remanded for re-sentencing.
               Count II - Conviction and sentence affirmed.

Counsel:       James Lockard                      Jamie D. Pybas
               OIDS - Capital Direct Appeal       OIDS - Capital Direct Appeal
               P.O. Box 926                       P.O. Box 926
               Norman, OK 73071                   Norman, OK 73071

### C.    **Application for Post Conviction Relief:**

Court:         Oklahoma Court of Criminal Appeals.

Case No.:      PCD-2002-628.

Opinion:       *Hanson v. State*, No. PCD-02-628, slip op. (Okla. Crim. App. June 17, 2003).
               Attached hereto as Att. 12.

Result:        *Mooted* and dismissed as result of granting sentencing relief on appeal.

Counsel:       Laura Marble Arledge
               OIDS - Capital Post-Conviction
               P.O. Box 926
               Norman, OK 73070

### D.    **Re-sentencing Trial on Count I:**

Court:         District Court of Tulsa County, State of Oklahoma, Judge Caroline E. Wall.

Case No.:      CF-1999-4583.

Charges:       Re-sentencing on Count I.

Pleas:         Not guilty to aggravating circumstances alleged by State.

Trial:         Jury trial, conducted January 9 through 24, 2006.

3

Sentence:        Death.

Counsel:         Jack E. Gordon, Jr.                    Steve Hightower
                 111 South Muskogee                     P.O. Box 10431
                 Claremore, OK 74017                    Tulsa, Ok 74159

     **E.**     **Motion for Extraordinary Writ/State's Appeal from District Court's Grant of a New Trial on Basis of Newly Discovered Evidence:**

Court:           Oklahoma Court of Criminal Appeals.

Case No.:        PR-2005-350, both matters consolidated in single case number.

Opinion:         *Order Granting Petition for Writ of Prohibition*, No. PR-2005-350 (April 26, 2005).

Result:          District Court's grant of new trial vacated as void.

Counsel:         Jack E. Gordon, Jr.                    Steve Hightower
                 111 South Muskogee                     P.O. Box 10431
                 Claremore, OK 74017                    Tulsa, Ok 74159

     **F.**     **Direct Appeal after Resentencing:**

Court:           Oklahoma Court of Criminal Appeals.

Case No.:        D-2006-614.

Opinion:         *Hanson v. State*, 206 P.3d 1020 (Okla. Crim. App. 2009).

Result:          Death Sentence Affirmed.

Certiorari:      Denied; *Hanson v. Oklahoma*, 130 S.Ct. 808 (Dec. 7, 2009).

Counsel:         Jamie D. Pybas                         Kathleen Smith
                 OIDS - Capital Direct Appeal           OIDS - Capital Direct Appeal
                 P.O. Box 926                           P.O. Box 926
                 Norman, OK 73071                       Norman, OK 73071

     **G.**     **Application for Post Conviction Relief:**

Court:          Oklahoma Court of Criminal Appeals.

Case No.:       PCD-2006-614.

Opinion:        *Hanson v. State*, No. PCD-2006-614, slip op. (Okla. Crim. App. Jun 2, 2009).
                Attached hereto as Att. 13.

Result:         Denied.

Counsel:        Robert W. Jackson              Anastasia Cesario
                OIDS - Capital Post-Conviction  OIDS - Capital Post-Conviction
                P.O. Box 926                   P.O. Box 926
                Norman, Ok 73070               Norman, Ok 73070

Mr. Hanson has no other matters currently pending in any other court.   Transcript
references from the 2001 trial will be referred to as "2001 TR" followed by the volume and
page number.  The 11 volume consecutively paginated transcripts from the 2006 re-sentencing
trial will be referred to as "TR" followed by the page number.  Motion and Sentencing hearing
transcripts will be referred to as "Mot. TR" and "Sent. TR," respectively, followed by the
month/date/year and then the page number.  The 9 volume consecutively paginated original
record covers both the 2001 and 2006 trials and will be referenced as "O.R." followed by the
page number.

## STATEMENT OF THE CASE

Mr. Hanson was charged by information in the District Court of Tulsa County with the
murders of Mary Bowles and Jerald Thurman.  Mr. Hanson was charged jointly with co-
defendant Victor Miller.  The two counts were charged alternatively as malice aforethought
or felony murder.  O.R. 53-58; 95-101.  Mr. Hanson and co-defendant Miller's cases were

5

severed for trial.  The Honorable Linda G. Morrissey, District Judge, presided over Mr. Hanson's original trial, which was held from May 7 through 23, 2001.  Mr. Hanson was convicted of both counts. O.R. 523, 524, 525.  In Count I, Mr. Hanson was sentenced to death for the malice aforethought murder of Mary Bowles.[1]  O.R. 544.  Also, with respect to Count I, the jury found the following aggravating factors: (1) Mr. Hanson was previously convicted of a felony involving use or threat of force; (2) that there existed a probability that Mr. Hanson would pose a continuing threat to society; and (3) that Mr. Hanson knowingly created a great risk of death to more than one person. O.R. 542.  In Count II, Mr. Hanson was sentenced to life without the possibility of parole for the felony murder of Jerald Thurman.  O.R. 548.  Despite finding Mr. Thurman's death was aggravated by two factors, prior violent felony convictions and continuing threat, the jury still imposed a non-death sentence.  O.R. 544.

The Oklahoma Court of Criminal Appeals ("OCCA") affirmed Mr. Hanson's conviction and sentence for Count II; however, while affirming his conviction on Count I, it reversed the death sentence and remanded for a new sentencing trial.  *See Hanson v. State*, 72 P.3d 40 (Okla. Crim. App. 2003).  Mr. Hanson's death sentence was reversed for a host of reasons, including, *inter alia,* trial court error in excluding expert witness testimony; trial court error in not allowing the defense to *voir dire* jurors on whether death penalty would be

---

[1] Mr. Hanson's jury was given specific verdict forms with respect to each count and each theory of murder.  As for Count I, the jury found Mr. Hanson guilty of both malice murder and felony murder. O.R. 523, 525.  In this circumstance, the conviction is construed as being for malice murder. *Alverson v. State*, 983 P.2d 498, 521 (Okla. Crim. App. 1999).

6

automatically imposed; trial court error in not removing a juror for cause; the jury was not instructed on the continuing threat aggravating circumstance; the trial court refused to instruct the jury on Mr. Hanson's proffered list of mitigating circumstances; and improper victim impact evidence was admitted. *Id*.

At the time of the OCCA's reversal of his death sentence, Mr. Hanson was engaged in state collateral proceedings and had a pending Application for Post-Conviction relief on file with the OCCA. This application was dismissed by the OCCA as being *mooted* by its disposition of the direct appeal case. O.R. 1270-71, *Order*, No. PCD-02-628 (June 17, 2003).

Just before the re-sentencing was set to begin, the State disclosed new evidence that co-defendant Miller had confessed to shooting victim Mary Bowles. In response to the new evidence, trial counsel filed an *Application for Post Conviction relief* and *Brief in Support of New Trial*, which resulted in Mr. Hanson being granted a new trial. O.R. 1252-64, 1352-53. The State appealed and moved for a writ of prohibition against the trial court's grant of a new trial, and the OCCA vacated the trial court's order as void for lacking jurisdiction. O.R. 1418-20. The trial court then commenced the re-sentencing hearing, and Mr. Hanson was sentenced to death on Count I. O.R. 1560. The re-sentencing jury found the existence of the following aggravating factors: (1) Mr. Hanson was previously convicted of a violent felony; (2) Mr. Hanson created a great risk of death to more than one person; and (3) the murder was committed for purpose of avoiding arrest or prosecution. O.R. 1563.

Mr. Hanson appealed his death sentence to the OCCA, which struck the jury's finding

of the great risk of death aggravating circumstance but affirmed his sentence nonetheless. *See Hanson v. State*, 206 P.3d 1020 (Okla. Crim. App. 2009). Mr. Hanson then sought certiorari in the United States Supreme Court, which was denied. *Hanson v. Oklahoma*, 130 S.Ct. 808 (Dec. 7, 2009) (cert. denied).

Mr. Hanson additionally sought state collateral relief by filing an Application for Post Conviction Relief in the OCCA, which it denied in an unpublished opinion. *Hanson v. State*, No. PCD-2006-614 (Okla. Crim. App. June 2, 2009).

Mr. Hanson began the instant proceedings with his motion for the appointment of counsel. Doc. 1. This Petition for Writ of Habeas Corpus is submitted pursuant the Court's scheduling order. Doc. 12.

## STATEMENT OF THE FACTS

On Tuesday, August 31, 1999 at 3:51 p.m., Mary Bowles left her job as a volunteer at St. Francis Hospital in Tulsa, Oklahoma. TR. 1244. Ms. Bowles was last observed by another hospital worker, Lucille Neville, at approximately 4:10 or 4:15 p.m. on a freeway service road as Ms. Bowles was presumably driving home. TR. 1233. Ms. Bowles kept a regular routine and would often get exercise by walking inside the Promenade Mall in the evenings after going home from work. TR. 1238-39.

On August 31, 1999, Jerald Thurman placed a cell phone call at 5:50 p.m. to his

nephew and employee James Moseby.[2]  TR. 1261.  Mr. Thurman owned and operated a trucking business that would deliver dirt from his dirt pit in Owasso, Oklahoma.  TR. 1260. Mr. Thurman called his nephew to report that a vehicle was inside the dirt pit.  TR. 1261. Mr. Moseby arrived at the dirt pit about 10 minutes after the phone conversation and observed Mr. Thurman to be unconscious having sustained multiple gunshot wounds.  TR. 1262, 1268.  Mr. Thurman never regained consciousness and died 14 days later.  O.R. 1272.   James Lavendusky lived across the road from the entrance to Mr. Thurman's dirt pit.  TR. 1249.  At about 5:45 p.m. while working outside on his boat, Mr. Lavendusky heard gunshots coming from the dirt pit and then observed a dark grey or silver car exiting the dirt pit.  TR. 1250, 1253.

On September 7, 1999, Tim Hayhurst was driving down "Peanut Road," which is not far from Mr. Thurman's dirt pit, and observed what he thought to be a person along the side of the road.  TR. 1279-81.  Mr. Hayhurst reported the body to the Owasso Police Department. TR. 1281.  The body was identified as Mary Bowles.  TR. 1298.  Ms. Bowles' body was in an advanced state of decomposition and the cause of death was determined to be multiple gunshot wounds.  TR. 1565-66, 1585.

The State's theory of the case was predicated upon the testimony of Rashad Barnes. Barnes testified at Mr. Hanson's first trial; however, by the time of Mr. Hanson's re-

---

[2] Mr. Moseby's name is improperly spelled as "Moseley" in the trial transcripts.  *See* TR. 1259.

sentencing, Barnes had been killed in an unrelated incident. *See* 2001 TR. Vol VII, 1153-87.

*See also* Ground 1, i*nfra*. Barnes' 2001 trial testimony was read into the record at the re-

sentencing trial via a question and answer format. TR. 1338-76. According to Barnes,

sometime in late August or early September 1999, Mr. Hanson showed up in Barnes' yard

acting nervous and talking about how something went "bad." TR. 1342, 1346. Mr. Hanson

allegedly told Barnes in detail how he and co-defendant Victor Miller had carjacked a lady

at Promenade Mall; drove her out to North Tulsa to let her out, but were confronted by Jerald

Thurman, who co-defendant Miller shot; after which Miller instructed Mr. Hanson that "You

know what you have to do;" and Miller drove a short distance from the dirt pit where Mr.

Hanson shot Mary Bowles. TR. 1347-50. Barnes further testified he was told that Mr.

Hanson and co-defendant Miller then drove Bowles' car to the Oasis Motel where it broke

down. TR. 1350. Bowles' vehicle was later recovered from that motel by police. TR. 1381,

1388. The parties stipulated that Mr. Hanson had checked into the Oasis Motel between 6:05

and 6:30 p.m. on August 31, 1999. TR. 1483, 1485. Mr. Hanson's fingerprint was found on

the driver's seatbelt latch of Ms. Bowles' vehicle. TR. 1486-87, 1595-96.

Mr. Hanson and co-defendant Miller were apprehended at the Econolodge Hotel in

Muskogee, Oklahoma on September 9, 1999. TR. 1443. Phyllis Miller, the wife of co-

defendant Miller, had called authorities and reported that Mr. Hanson and co-defendant Miller

had robbed a credit union on September 8 and were at the Econolodge. TR 1426. Co-

defendant Miller was no stranger to criminal activity having been previously convicted of

murder in 1982. TR. 1832. The Federal Bureau of Investigation, the Tulsa Police Department, and the Muskogee Police Department all converged on the hotel and eventually arrested co-defendant Miller and Mr. Hanson. TR. 1430-33, 1434, 1443. Guns consistent with those used in the murders of Jerald Thurman and Mary Bowles, a five-shot .38 caliber revolver and a 9 millimeter semiautomatic pistol, were found inside of the Muskogee hotel room. TR. 1451-54, 1462, 1594-95.

Specific facts pertaining to particular grounds for relief raised in this Petition will be discussed in the grounds for relief to which they relate.

## <u>GROUND ONE</u>

### MR. HANSON WAS DENIED AN ADEQUATE OPPORTUNITY TO CONFRONT THE WITNESSES AGAINST HIM BY THE TRIAL COURT'S ADMISSION OF THE TESTIMONIAL HEARSAY OF RASHAD BARNES.

The State's key witness, Rashad Barnes, testified at Mr. Hanson's first trial; however, by the time of re-sentencing, Barnes was dead. Over vigorous defense objections and argument, the trial court admitted Barnes' prior testimony from the original trial. In reversing co-defendant Miller's case, the OCCA aptly described Barnes' testimony:

> ***Hanson's confession to Barnes was the most critical evidence in the State's case***. It not only was the only evidence directly connecting [Victor Miller] with the carjacking and subsequent murders, it was also the only evidence implicating [Victor Miller] as the controller of the events, the decision maker, and the evidence which placed responsibility for the incidents beyond the carjacking upon [Victor Miller]. From the record before us, ***we cannot conclude that Hanson's statement to Barnes was so inherently reliable that cross-examination would have been superfluous***. Under the facts presented here, we find the admission into evidence of Hanson's statement to Barnes

11

violated [Victor Miller's] Sixth Amendment right to confrontation.

*Miller v. State*, 98 P.3d 738, 748 (Okla. Crim. App. 2004) (emphasis added).  While Mr. Hanson does not present an identical claim to that presented in *Miller*, the OCCA's reversal in that case underscores the magnitude of Rashad Barnes' testimony.  Barnes' testimony implicated Mr. Hanson in the murders and specifically as the shooter of Ms. Bowles.

In the early morning hours of Dec. 26, 2003, Barnes was shot in the back of the head outside Curly's Bar in Tulsa, Oklahoma, later dying as result of the wound.[3]  With their most critical witness unavailable, the State decided to introduce Barnes' prior recorded testimony from Petitioner's first trial.  O.R. 1480-82; M.Tr. 1-4-06 19, 22; TR. 1337.  Defense counsel objected to the admission and reading of Mr. Barnes' prior testimony into the record because there was no prior opportunity for full and fair cross-examination.  M.Tr. 1-4-06 18, 21; TR. 1098, 1344-46.  Specifically, trial counsel did not have a "meaningful" opportunity to cross-examine Barnes in light of a confession by co-defendant Miller to shooting Mary Bowles, which surfaced only days prior to the start of Mr. Hanson's re-sentencing trial.[4]  *Id.*

The trial court ultimately ruled Barnes' prior testimony admissible; however, it did express some concerns about Mr. Hanson's right to confrontation:

---

[3] The death of Mr. Barnes was wholly unrelated to this case, and the State has never alleged or insinuated that Petitioner procured the unavailability of Mr. Barnes for the re-sentencing trial.

[4] In addition to the newly discovered Miller confession, Victor Miller's testimony at his own trial served as another basis to conclude Mr. Hanson's prior opportunity to cross-examine Barnes was Constitutionally inadequate.  *See also* Ground Three, *infra*.

12

> . . . I will note that in some of the readings of these death penalty cases, **the right to confront witnesses under the constitution is paramount** and certainly if Rashad Barnes is stated in one of the opinions by the Court of Criminal Appeals that **his testimony was the most important piece of evidence in the case**, and if he is now dead and not available to be cross-examined on newly discovered evidence, that could impact the Defendant's right of confrontation in this trial.

* * *

> When you switch it to Rashad Barnes, his transcript is coming in, but now with the newly discovered statement that Ahmad Henry gave to Detective Nance, **the right of confrontation that existed in the first trial is not fully available here because we don't have the witness, all we have is a transcript**. And in order to impeach that witness' testimony, that's not fully possible here because all we have is the transcript.

TR. 1115, 1117 (emphasis added).   Despite the trial court's concerns, the State was permitted to present Barnes' prior testimony in a question and answer format utilizing a mock witness. TR. 1338-76.   Mr. Hanson's Sixth Amendment right to confront the witnesses against him was violated by the reading of Barnes' testimony absent a prior opportunity for full and fair cross examination.

On direct appeal, the OCCA identified the correct legal standard, namely *Crawford v. Washington*, 541 U.S. 36 (2004); however, the OCCA's application of *Crawford* violated Mr. Hanson's constitutional rights. *Hanson*, 206 P.3d at 1026-27; 28 U.S.C. § 2254 (d)(1), (d)(2).   The OCCA divided this claim into two parts and rejected both.   First, as to co-defendant Miller's confession to Ahmod Henry, the OCCA failed to actually determine whether the prior opportunity for cross-examination was adequate, and instead focused on what evidence was presented at the re-sentencing trial. *Hanson*, 206 P.3d at 1026.   Second,

13

as to Victor Miller's testimony at his own trial,  the OCCA held, "[b]ecause Hanson failed to object to the admission of Barnes's testimony on this basis, we review only for plain error and find none."[5]  *Id*. at 1026-27.

The OCCA's second rationale will be addressed first.  The Tenth Circuit has addressed the ramifications of a state court *plain error* determination on habeas review:

> A state court may deny relief for a federal claim on plain-error review because it finds the claim lacks merit under federal law. In such a case, there is no independent state ground of decision and, thus, no basis for procedural bar. Consistent with that conclusion, the state court's disposition would be entitled to § 2254(d) deference because it was a form of merits review. On the other hand, a state court could deny relief for what it recognizes or assumes to be federal error, because of the petitioner's failure to satisfy some independent state law predicate. In such a case, that non-merits predicate would constitute an independent state ground for decision which would warrant application of procedural-bar principles on federal habeas.  If the state procedural bar were then excused for some reason, the federal court would be left to resolve the substantive claim de novo, unconstrained by § 2254(d).

*Cargle v. Mullin*, 317 F.3d 1196, 1206 (10th Cir. 2003) (internal citations omitted).

Assuming the OCCA's plain error review equated to a merits review, the state court decision is unreasonable because Mr. Hanson's Sixth Amendment right to confrontation was violated.  This argument will be fully borne out below.  Next, if the state court's plain error review constitutes an independent state ground, and therefore, operates as a procedural bar,

---

[5] Strangely, after finding no plain error, the OCCA found trial counsel's failure to object was strategic.  Whether tactical considerations are implicated here is not dispositive of the question whether a prior opportunity for cross-examination was adequate. *See Fisher v. Gibson*, 282 F.3d 1283, 1296 (10th Cir. 2002) (finding attorney conduct not insulated from review by labeling as strategic).

that bar is excused through the ineffective assistance of counsel.[6]    Trial counsel's

ineffectiveness in failing to preserve this aspect of the confrontation violation and the

resulting prejudice overcomes any procedural default and establishes an independent basis

for relief. *See* Ground Three, *infra*.

>   **I.    In Light of Material Impeachment Evidence Not Available at the
>   Time of Rashad Barnes' Original Testimony, Mr. Hanson Was
>   Denied an Adequate Opportunity to Confront the Witness**.

Supreme Court law on this topic is clear; testimonial hearsay may not be admitted

against a criminal defendant absent a showing of (1) unavailability of the witness and (2) an

adequate prior opportunity to cross-examine the witness.  *Crawford*, 541 U.S. 36; *Davis v.*

*Washington*, 547 U.S. 813 (2006).  Justice Stevens described the tension between the Sixth

Amendment and admitting hearsay against the accused:

> When the government seeks to offer a declarant's out-of-court statements
> against the accused, and, as in this case, the declarant is unavailable, courts
> must decide whether the Clause permits the government to deny the accused
> his usual right to force the declarant to submit to cross-examination, the
> greatest legal engine ever invented for discovery of the truth.

*Lilly v. Virginia*, 527 U.S. 116, 124 (1999) (footnotes and internal citations omitted).

The Supreme Court in *Crawford* detailed both the historical extent and practical

necessity of a prior opportunity for cross-examination before admission of testimonial

---

[6] There is yet another view on plain error.  Plain error and fundamental error are
synonymous.  *Simpson v. State*, 876 P.2d 690, 692-93 (Okla. Crim. App. 1994).  The
Supreme Court has reviewed the merits of a similar claim under the rationale that the
procedural default cannot operate independent of federal law where the state court has
reviewed for fundamental error.  *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985).

15

hearsay. 541 U.S. 36, 53-60. As a prerequisite to admission, the prior opportunity must not

merely have existed, but must have been *adequate*:

> Our later cases conform to *Mattox*'s holding that **prior trial or preliminary hearing testimony is admissible only if the defendant had an adequate opportunity to cross-examine**. See *Mancusi v. Stubbs,* 408 U.S. 204, 213-216, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *California v. Green,* 399 U.S. 149, 165-168, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *Pointer v. Texas,* 380 U.S., at 406-408, 85 S.Ct. 1065; cf. *Kirby v. United States,* 174 U.S. 47, 55-61, 19 S.Ct. 574, 43 L.Ed. 890 (1899). Even where the defendant had such an opportunity, we excluded the testimony where the government had not established unavailability of the witness. See *Barber v. Page,* 390 U.S. 719, 722-725, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); cf. *Motes v. United States,* 178 U.S. 458, 470-471, 20 S.Ct. 993, 44 L.Ed. 1150 (1900). We similarly excluded accomplice confessions where the defendant had no opportunity to cross-examine. See *Roberts v. Russell,* 392 U.S. 293, 294-295, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968) *(per curiam); Bruton v. United States,* 391 U.S. 123, 126-128, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Douglas v. Alabama,* 380 U.S. 415, 418-420, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). In contrast, we considered reliability factors beyond prior opportunity for cross-examination when the hearsay statement at issue was not testimonial. See *Dutton v. Evans,* 400 U.S., at 87-89, 91 S.Ct. 210 (plurality opinion).

*Id.* at 57 (emphasis added). Further, the Supreme Court has discussed what circumstances

may render a prior opportunity for cross-examination inadequate:

> No one defense counsel will ever develop precisely the same lines of inquiry or frame his questions in exactly the words of another, but from this record counsel at the retrial did not in his proffer show any **new and significantly material line of cross-examination** that was not at least touched upon in the first trial.

*Mancusi v. Stubbs*, 408 U.S. 204, 215 (1972) (emphasis added). *See also California v.*

*Green*, 399 U.S. 149, 159 (holding confrontation clause not violated as long as defendant "is

assured of full and effective cross-examination at the time of trial").

16

Barnes' prior trial testimony is covered by *Crawford's* definition of testimonial hearsay. 541 U.S. at 68 ("Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a formal trial ."). Second, new and significantly material lines of cross-examination developed prior to Mr. Hanson's re-sentencing trial, thereby rendering the prior cross-examination Constitutionally inadequate.

The extent of questioning during the first trial concerning Barnes' involvement in the murder of Mary Bowles occurred in the State's direct examination when the prosecutor asked, "Mr. Barnes, did you have anything to do with the death of this old lady?" To which, Barnes responded in the negative. TR. 1364. Barnes testified he didn't personally know Victor Miller, and the only time Miller had come to his house was two months prior to the crimes. TR. 1368. He testified he didn't see Victor Miller or Miller's wife the day after Mr. Hanson allegedly confessed. TR. 1375.

When Victor Miller testified at his own trial in April 2002, he implicated Rashad Barnes as a direct participant in the killings of Jerald Thurman and Mary Bowles, as well as refuted much of Barnes' testimony at Mr. Hanson's original trial. Miller had been to Barnes' house several times and the weapons were kept there. *Miller*, 98 P.3d at 742 n. 11. Miller and his wife went to Barnes' house and retrieved keys for Mary Bowles' Buick. *Id*. Miller wiped down the vehicle at the request of Mr. Hanson and Barnes, "because I was doing something for my friends and getting paid for it." *Id*. Miller denied participating in the carjacking and murders. *Id*. While the silver revolver was obtained by Miller in a robbery,

the black automatic used to kill Mary Bowles belonged to Barnes who also "kept the guns." The overall thrust of Miller's testimony was that Mr. Hanson and Barnes were responsible for the homicides.[7]

At Mr. Hanson's original trial, counsel could not have had any knowledge of what co-defendant Miller's testimony would be at his subsequent trial. Miller's testimony proved crucial and provided powerful evidence to impeach Barnes. This impeachment material implicated Barnes in the offenses, which provided a possible motive that Barnes testified in order to conceal his own criminal liability. Additionally, trial counsel was unable to cross-examine Barnes about co-defendant Miller's confession to shooting Mary Bowles. Barnes' testimony was the strongest evidence indicating that Mr. Hanson shot Mary Bowles. Cross-examination on this point was indispensable and could have convinced a jury that Mr. Hanson was not the triggerman. This point alone could have meant the difference between life and death for Mr. Hanson, given the jury at his original trial imposed a non-death sentence for his felony murder conviction for victim, Jerald Thurman. Because of these new and material lines of questioning, Mr. Hanson's prior opportunity to cross-examine Barnes was not Constitutionally adequate.

---

[7] Miller also utilized two jailhouse snitches, Gregory Malone and Alton White, to bolster his testimony. Malone claimed Barnes and Mr. Hanson were mad at Miller's wife for telling on them so they put Victor Miller in the picture and took Barnes out. *Miller*, 98 P.3d at 743. White, although facing capital murder charges himself, claimed Mr. Hanson told him Barnes took "hisself [sic] out of the place of the murder and put Mr. Miller in it." *Id.*

Alternatively, the OCCA's rationale that Mr. Hanson's prior opportunity was not "constitutionally inadequate" is entirely at odds with federal law. *Hanson*, 206 P.3d at 1026; 28 U.S.C. § 2254 (d)(2). *Crawford* and its predecessors explain the importance of cross-examination as a mechanism to test the veracity of witnesses. The Sixth Amendment "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford*, 541 U.S. at 61. Instead of assessing whether Mr. Hanson's prior opportunity was Constitutionally adequate, the OCCA considered the evidence presented at the re-sentencing in contrast to Barnes testimonial hearsay. "Hanson's resentencing jury had the evidence of Miller's purported admission to the inmate and the circumstances surrounding that statement to consider and weigh against Barnes' testimony about Hanson's alleged confession to him." *Hanson*, 206 P.3d at 1026. This is simply not the inquiry mandated by *Crawford*. The state court made a backwards looking determination rather that making a contemporaneous assessment whether Hanson's opportunity for cross-examination was Constitutionally adequate at the actual time of Barnes' testimony.

The OCCA's opinion in co-defendant Miller's case demonstrates the necessity for cross-examination subsequent to Miller's testimony and discovery of Miller's confession to Ahmod Henry:

> We note that every time Barnes spoke of his conversation with Hanson, his statements or testimony about what Hanson said became more detailed. Is a statement consistent when it is more or less detailed? Cross-examination of Hanson was crucial to test the accuracy and reliability of what Barnes said

Hanson said.

*Miller*, 98 P.3d 738, 746 (2004).  Cross-examination of Barnes at Hanson's first trial was not

adequate to test the accuracy and reliability of Barnes' tale after the various impeachment

evidence became available. Further, Barnes' demeanor and believability was of great

significance in this case although Mr. Hanson's re-sentencing jury never got to observe

either.  Petitioner was deprived of his opportunity to compel Barnes "to stand face to face

with the jury in order that they may look at him, and judge by his demeanor upon the stand

and the manner in which he gives his testimony whether he is worthy of belief."  *Mattox v.*

*United States*, 156 U.S. 237, 242-43 (1895).

The admission of Barnes' testimonial hearsay violated Mr. Hanson's rights under the

Sixth Amendment as well as his Eighth Amendment right to a fair and reliable sentencing

proceeding.

## II.    Mr. Hanson Was Harmed as a Result of the Trial Court's Erroneous Admission of the Testimonial Hearsay.

Confrontation clause violations are subject to harmless error analysis.  *Delaware v.*

*Van Arsdall*, 475 U.S. 673, 680-84 (1986).  Factors to be considered in this analysis include

"the importance of the witness' testimony in the prosecution's case, whether the testimony

was cumulative, the presence or absence of evidence corroborating or contradicting the

testimony of the witness on material points, the extent of cross-examination otherwise

permitted, and, of course, the overall strength of the prosecution's case."  *Id*. at 684.

Considering these factors compels the conclusion that Mr. Hanson was harmed as a result

of the confrontation violation.

The OCCA has acknowledged the importance and non-cumulative nature of Barnes' testimony. "The whole of the evidence in both stages supports Hanson's claim that Rashad Barnes gave the only testimony that Hanson ever pulled the trigger on any gun the day of the murders." *Hanson v. State*, 72 P.3d 40, 53 n. 41 (Okla. Crim. App. 2003).

Taking out of order the fourth *Van Arsdell* factor, the overall strength of the State's case was largely predicated upon Barnes' testimony.  The prosecutor argued in closing:

> Here's what they can't tell you.  Rashad Barnes doesn't have a criminal history.  Rashad Barnes hasn't been impeached.  Rashad Barnes hasn't been shown to tell a lie.  None of that stuff.  They have previous transcripts. You've heard the previous transcript. Rashad has consistently told the truth and has never been impeached.  Rashad Barnes' story is corroborated at every angle.

TR. 1902-1903.  Barnes testimony wasn't as bullet-proof as the State argued.  In fact, the OCCA found it to be unreliable in *Miller*.  98 P.3d at 747-48.  As for the testimony being "corroborated at every angle," that doesn't appear to be the case.  Trial counsel demonstrated many of the inconsistencies in Barnes' testimony.  TR. 1873-78.  Notably, Barnes testified Mr. Hanson was in the back of the car at all times, but his finger print was found on the latch of the driver's seat belt buckle. TR. 1486-87. Barnes testified Mary Bowles was shot while in the back seat; however, state's witness Dr. Snow testified she was shot while laying on the ground. TR. 1729.  And Barnes' recollection of what day and at what time Mr. Hanson had the alleged conversation with him is belied by the rest of the evidence in the record.

Petitioner was harmed as a result of these Constitutional violations and respectfully

requests this Court grant the Writ.

## GROUND TWO

**MR. HANSON'S RIGHT TO DUE PROCESS OF LAW WAS VIOLATED BY THE OKLAHOMA COURT OF CRIMINAL APPEALS' REVERSAL OF THE DISTRICT COURT'S GRANT OF A NEW TRIAL ON THE BASIS OF NEWLY DISCOVERED EVIDENCE.**

Just prior to beginning Mr. Hanson's re-sentencing trial, the State disclosed that co-defendant Victor Miller had confessed to the murder of Mary Bowles. This confession contradicted the State's theory of the case and seriously undermined the validity of Mr. Hanson's malice murder conviction for the death of Mary Bowles. Tulsa County District Court Judge Caroline Wall found co-defendant Miller's confession significant enough that she ordered an entire new trial covering both guilt and sentencing. Judge Wall made the following findings of fact and conclusions of law:

1.   Pursuant to Rule 2.1.A(4), Rules of the Oklahoma Court of Criminal Appeals and Title 22 O.S. § 1080 et seq., this Court has jurisdiction to hear this matter and to make appropriate orders.

2.   Five (5) days before the re-sentencing trial in this case was to have begun, the State found a transcription of a conversation between Detective Mike Nance of the Tulsa Police Department and Ahmod Henry, an inmate at the David Moss Correctional Center. *That conversation indicated that Victor Miller, a Co-Defendant of your Petitioner, was the person who actually killed Mary Agnes Bowles. That evidence was exculpatory to the Petitioner.*

3.   That conversation between Detective Nance and Ahmod Henry occurred on August 26, 2003, after the decision of the Court of Criminal Appeals in Petitioner's case had been rendered and the mandate issued.

22

4.       *The evidence was a material fact that had not previously been presented and heard.  It could not have been discovered with reasonable diligence by the Petitioner or his lawyer before trial.  The evidence is not cumulative.  The evidence creates a reasonable probability that, had it been introduced at trial, it would have changed the outcome.  The newly discovered evidence entitles the Petitioner to a new trial.*

*Order Granting Application for Post-Conviction Relief*, O.R. 1353 (March 14, 2005) (emphasis added); Mot. TR. 3-14-2005, 6-7. Judge Wall's order followed an interesting time line of events and much debate amongst the parties.

Mr. Hanson's re-sentencing trial was set to begin on January 10, 2005, and just five days prior, the State faxed defense counsel a police report.  The report was a transcription of a conversation between Tulsa Police Detective Michael Nance and Ahmod Henry.  Henry had been incarcerated in the David L. Moss Correctional Center in Tulsa in 2001 along with Mr. Hanson's co-defendant Victor Miller.  Henry's conversation with detective Nance occurred on August 26, 2003, approximately 3 months after the OCCA reversed Mr. Hanson's sentence on direct appeal.  *Hanson v. State*, 72 P.3d 40 (Okla. Crim. App. 2003). During his conversation with Detective Nance, Henry related co-defendant Miller's confession to the murder of Mary Bowles:

Detective Nance:      O.K. What did your conversations [with Victor Miller] consist of?

Ahmod Henry:        Shit, we was just talking about things that happen in the lifetime, and he started telling me something about some robberies, how he was making money out there, saying he did a lot of robberies, and he ... him and his friend was at a motel, and they got busted,

23

|                   |                                                                                                                                                      |
|-------------------|------------------------------------------------------------------------------------------------------------------------------------------------------|
|                   | and he said he was running around killing people doing [sic] the robbery.  He said he killed a bitch.  That's all he said, "I killed ... I killed a bitch." |
| Detective Nance:  | O.K.  Did he ... was he any more specific about who he killed or ... or ... or ... how he killed her or ... or anything like that?                      |
| Ahmod Henry:      | He (inaudible) shot her.                                                                                                                              |
| Detective Nance:  | You say he shot her?                                                                                                                                  |
| Ahmod Henry:      | He killed a bitch.                                                                                                                                    |
| Detective Nance:  | O.K.  Did he tell you who he was with?  You said he was with a friend.                                                                                |
| Ahmod Henry:      | Yeah, he was with a friend.  He never said his friend [sic] name.  Whoever the friend was is the one that got caught at the motel with him.           |
| Detective Nance:  | O.K.  And is there anymore information that you know about this that ... that I haven't asked you?                                                     |
| Ahmod Henry:      | No, sir.                                                                                                                                              |
| Detective Nance:  | O.K.  So ... so you were in segregation at David L. Moss with him in 2001, and during that time he told you that he was caught in a motel with a friend of his, that they'd been pulling robberies and killing people, and that he'd ... he'd shot and killed a bitch. |
| Ahmod Henry:      | Yes.                                                                                                                                                  |
| Detective Nance:  | O.K.  Well then, it's 1310 hours, and I'll conclude the tape at this time.                                                                            |

O.R. 1258-59.

Trial counsel, in reaction to this newly discovered evidence, filed in the district court

an *Application for Post Conviction Relief* and *Brief in Support of New Trial* on January 14th,

24

2005.  O.R. 1252-1260, 1261-64.  Mr. Hanson properly filed his pleadings in the district

court as required by Rule 2.1 (A)(4) of the Rules of the Oklahoma Court of Criminal

Appeals, and Okla. Stat. tit. 22 § 1080 (d), (f).  Rule 2.1 provides the procedures for filing

a motion for new trial. Subsection (A)(4) specifically provides "if the appeal has been

decided, the opinion has been rendered and the mandate has been issued by this Court, then

in all other cases of newly discovered evidence, a petitioner must proceed under the

provisions of the Post-Conviction Procedure Act, Section 1080 to 1089 of Title 22."  And

in turn, section 1080 provides:

> Any person who has been convicted of, or sentenced for, a crime and who
> claims: (d) that there exists evidence of material facts, not previously presented
> and heard, that requires vacation of the conviction or sentence in the interest
> of justice . . . *may institute a proceeding under this act in the court in which
> the judgment and sentence on conviction was imposed* to secure the
> appropriate relief.

(emphasis added).  Mr. Hanson's Application alleged the newly discovered evidence was

material to whether Mr. Hanson was guilty of malice murder; the evidence could not have

been discovered with due diligence; the evidence was not cumulative; and the evidence

created a reasonable probability that had it been introduced at trial, it would have changed

the outcome.  O.R. 1253-54.

Shortly thereafter, the State responded with its *Motion to Dismiss Defendant's

Applications for Post-Conviction Relief.* O.R. 1265-72.  The basis for the Motion to Dismiss

was the OCCA's June 17, 2003 order dismissing Mr. Hanson's Original Post Conviction

Application, which stated:

> Hanson may re-file his Application for Post-Conviction Relief, along with any
> appropriate accompanying motions, after the resentencing hearing is
> concluded.  At that time Hanson may raise all post-conviction issues allowed
> under the Post-Conviction Procedure Act, including issues resulting from the
> guilt-innocence, or conviction, phase of trial as well as those raised in the
> resentencing hearing.

O.R. 1271.  The OCCA's order did not contemplate the situation of newly discovered
evidence, which came to light after its dismissal of Mr. Hanson's Original Post-Conviction
Application.

The state district court held a hearing on March 3, 2005, regarding co-defendant
Miller's newly discovered confession and the parties' pleadings.  On March 14, the court
entered its order granting Mr. Hanson a new trial and sentencing.  In addition to the position
taken in its *Motion to Dismiss*, the State argued that even though Mr. Hanson's death
sentence had been vacated, the case remained a capital case and only the Oklahoma Court
of Criminal Appeals could hear Capital Post-Conviction Applications pursuant Rule 9.7
(A)(2) of the  Rules of the Oklahoma Court of Criminal Appeals. Mot. TR. 3-14-05, 5-6.
Trial counsel responded that Rule 9.7 ***only applies to cases in which the death penalty has
been imposed***, and not Mr. Hanson's case where no death penalty was currently imposed.
*Id*. at 6. (emphasis added).

After the district court granted relief, the State appealed to the Oklahoma Court of
Criminal Appeals through two avenues.  On April 12, 2005,  the State filed (1) an *Emergency
Application to Assume Original Jurisdiction and Petition for Writ of Prohibition or in the
Alternative a Petition for Writ of Mandamus and Brief in Support* in Case No. PR-2005-350;

and (2) a *Petition in Error* appealing from Judge Wall's order granting Mr. Hanson's

Application for Post Conviction Relief in Case No. PCD-2005-351.  On April 26, 2005, the

OCCA issued its *Order Consolidating Appeals* and *Granting Petition for Writ of Prohibition*

under Case No. PR-2005-350, in which it consolidated the State's pleadings finding they

should be treated as a motion for extraordinary writ.  O.R.1418-20.  The OCCA found that

Judge Wall had no jurisdiction to grant Mr. Hanson's Post-Conviction Application and

vacated her order granting a new trial as void.  *Id*.  The OCCA specifically held:

> The State correctly argues that Judge Wall had no jurisdiction over Hanson's
> Application for Post-Conviction Relief.  The capital post-conviction statute
> clearly gives this Court, and only this Court, original jurisdiction over all
> applications for post-conviction filed in capital cases.  Hanson has been
> convicted of first degree murder, and through a Bill of Particulars filed in his
> case the State is requesting the death penalty.  This Court has ordered a
> resentencing hearing, which may result in imposition of the death penalty.
> This is a textbook definition of a capital case.  As long as Hanson may still
> receive a death sentence in the course of proceedings ordered by this Court,
> this case remains a capital case even though Hanson's original death sentence
> was vacated.

O.R. 1419.  Despite the adverse ruling from the OCCA, trial counsel continued to object to

the re-sentencing going forward in light of the new evidence.  O.R. 1440-43; TR 1112; Sent.

TR. 2-7-2006, 2.  Because of the OCCA's order reversing Judge Wall, she had no choice but

to overrule trial counsel's motions.  Even after the re-sentencing and Mr. Hanson's resulting

death sentence, Judge Wall still expressed strong reservations about the new evidence as well

as the propriety of a death sentence in the case.

In Oklahoma, a capital trial judge is statutorily required to submit a trial judge's report

27

to the OCCA after a sentence of death has been imposed.  Okla. Stat. tit. 21, § 701.13; O.R.

1710-17.  Judge Wall opined:

> Concerning the procedure, facts and law in this case, there were some
> complications in this sentencing re-trial that raised concerns in my mind as to
> whether all relevant facts and law were made available to the sentencing jury
> for consideration of the punishment.
>
>                 * * *
>
> It was significant to me that the first juries did in fact appear to weight each
> Defendant's individual level of participation when each first jury determined
> punishment.  Although both Miller and Hanson were convicted of Malice
> Murder in count one, only Hanson was sentenced to death on count one, while
> Miller was sentenced to Life without Parole.
>
>                 * * *
>
> [T]o sentence Hanson to death where there was newly discovered evidence
> (Miller's alleged confession to Ahmad Henry) that was not presented to the
> trier of fact on the guilt and innocence (first stage) was troubling to me.

*Capital Felony Report of the Trial Judge*, O.R. 1712, 1716.  Additionally, Judge Wall

questioned the appropriateness of the death sentence and recommended Mr. Hanson's

sentence be life without the possibility of parole.  O.R. 1712.

Mr. Hanson raised the instant claim on direct appeal arguing his due process rights

were violated by the OCCA's granting of the State's Writ of Prohibition reversing the district

court's grant of a new trial.  However, the OCCA declined to entertain the claim finding (1)

that the 'law of the case doctrine' prevented review of the jurisdictional issue and (2) it

would not "consider in this appeal whether discovery of Miller's alleged confession to

shooting Bowles entitles Hanson to a new trial for his murder conviction based on her death.

This appeal is for reviewing errors, if any, that occurred during Hanson's resentencing trial." *Hanson*, 206 P.3d at 1027-28.

Mr. Hanson again raised the issue in state collateral proceedings with his Application for Post-Conviction Relief. There the OCCA again declined to revisit whether the district court had jurisdiction to grant a new trial because of the "law of the case" doctrine. *Hanson v. State*, No. PCD-2006-614, slip op. at 3-4 (Okla. Crim. App. June 2, 2009). The state court did, however, reach the merits of whether Mr. Hanson was entitled to a new trial because of the newly discovered evidence, i.e. co-defendant Miller's confession. In direct contravention of Judge Wall's finding, the OCCA said there was "no reasonable probability that, had Miller's statement been introduced in the first stage of Hanson's trial, the outcome would have been any different." *Id*. at pp. 8-9. The OCCA also said the newly discovered evidence did not impact the sentencing determination. *Id*. Both of these determinations violated Mr. Hanson's Constitutional right to Due Process of law under the Fourteenth Amendment.

I.     **The State Court Did Not Have Jurisdiction to Reverse The Trial Court's Grant Of A New Trial**.

The OCCA applied the "law of the case" doctrine to bar review of this issue. *Hanson*, 206 P.3d at 1027-28. A state procedural rule must be independent of federal law and adequately applied in order to bar federal review. *Coleman v. Thompson*, 501 U.S. 722, 729. (1991). Mr. Hanson does not challenge the independence of the law of the case doctrine; however, the doctrine is inadequate to bar this Court's review of the instant claim. A state

29

rule is considered adequate if it is applied "evenhandedly to all similar claims." *Richie v. Sirmons*, 563 F.Supp. 2d. 1250 (N.D. Okla. 2008), *affirmed* 599 F.3d 1131 (10th Cir. 2010). *See also English v. Cody*, 146 F.3d 1257 (10th Cir. 1998).

Until Mr. Hanson's case, the OCCA had never observed the law of the case doctrine. When previously confronted with the issue, the Oklahoma Court held:

> [Gilberto Martinez] has not cited to any decision of this Court which adopts the "law of the case" doctrine. . . . Even if the "law of the case" doctrine were applicable to criminal trials in Oklahoma, we find it is not applicable to this factual scenario.

*Martinez v. State*, 984 P.2d 813, 821 (Okla. Crim. App. 1999). In addition to *Martinez*, the OCCA clearly has not followed the law of the case doctrine in other matters. *See Davis v. State*, 845 P.2d 194, 196 (Okla. Crim. App. 1993) (granting relief on direct appeal after acknowledging that its previous order on a extraordinary writ was incorrect). Here, the OCCA's application of the law of the case doctrine cannot bar federal review of the instant claim; the procedural rule is certainly inadequate given its virtual non-use and resulting lack of guidance on when and where it will be applied.

Because the OCCA declined to address the merits of the claim, instead barring review by operation of the law of the case doctrine, the State court ruling is entitled no deference under the AEDPA.[8] The plain language of the Oklahoma Statutes and court rules provide

---

[8]   Mr. Hanson acknowledges the OCCA's order granting the State's writ or prohibition; however, the order lacks in-depth analysis of the court rules and statutes at issue, as well as being arrived at without the aid of responsive pleadings by Mr. Hanson. O.R. 1418-1420.

that the state district court had proper jurisdiction to grant Mr. Hanson a new trial.

The OCCA is a court of special and limited jurisdiction; it has exclusive appellate jurisdiction in criminal appeals and can only issue writs in the exercise of its appellate jurisdiction.  Okla. Stat. tit. 20, § 40; Okla. Const. art. 7, § 4.  The jurisdiction of the OCCA exists via the state constitution; however, it was created by statute and it can only exercise its jurisdiction pursuant statutory authority:

> *It must be borne in mind that the Criminal Court of Appeals was created by statute, and is not a Constitutional Court*. However, it is not such a court as was referred to in section 1 of said article 7, wherein such other courts, commissions, or boards inferior to the Supreme Court might be established by law.

> This court recognizes that under said section 1, art. 7, the Legislature might create courts inferior to the Supreme Court, and give such courts power to issue writs of habeas corpus and other extraordinary and remedial writs, *but the Criminal Court of Appeals is not such a court as is referred to in the said section 1, but section 2 makes it a special court, with a special and a limited jurisdiction. That jurisdiction is by the Constitution itself fixed as purely appellate in criminal cases*.

*State v. Davenport*, 256 P. 340, 343 (Okla. 1927) (emphasis added).

The OCCA's powers to adjudicate appeals and the procedure for disposition of cases is set out in Okla. Stat. tit. 22, § 1066.  The state court has the authority to reverse, affirm, modify, or order a new trial or re-sentencing, and after exercising that authority, the case is remanded to the trial court to execute on the OCCA's mandate.  *Id*.  Upon issuance of its mandate, the OCCA's jurisdiction in a particular case is extinguished.  *See* Okla. Stat. tit. 20, § 44.  The mandate in Mr. Hanson's case issued on August 6, 2003, in effect restoring

31

jurisdiction in the Tulsa County District Court.

It is of note that prior to issuing its mandate, the OCCA dismissed Mr. Hanson's Original Application for Post Conviction Relief because the application was "mooted by the disposition of his direct appeal." O.R. 1021. It appears, although through a semantic misstep, the OCCA acknowledged that it had lost jurisdiction over Mr. Hanson's Original Capital Post-Conviction Application upon rendering its opinion in *Hanson I*. The issues in Mr. Hanson's Original Application for Post Conviction Relief were not technically *mooted*.[9] Moot is defined as having no practical significance. BLACK'S LAW DICTIONARY, 1024 (7th ed. 1999). Mr. Hanson's application did not technically become moot, but rather, the OCCA lost its jurisdiction to consider the matter once Mr. Hanson's death sentence was reversed.

The mechanisms and procedures for filing post conviction applications in criminal cases are created by the Post Conviction Procedure Act, Okla. Stat. tit. 22, § 1080, *et. seq*. Section 1080 provides that persons situated such as Mr. Hanson "may institute a proceeding under this act *in the court in which the judgment and sentence on conviction was imposed* to secure the appropriate relief." (emphasis added). Okla. Stat. tit. 22, § 1089 (2001) deals specifically with post conviction procedures in capital cases. Section 1089 provides the OCCA with original jurisdiction to review applications in capital cases, however, applying

_____

[9] The application contained guilt-innocence styled claims that were not *mooted* by the OCCA's grant of a re-sentencing hearing. *See* Original Application for Post Conviction Relief, Propositions II & III, No. PCD-2002-628. (involving improper admission of handwriting evidence at guilt stage and trial court error for refusing to instruct the jury on second degree murder, respectively).

only to "*a defendant who is under the sentence of death* in one or more counts and whose death sentence has been affirmed or is being reviewed by the Court of Criminal Appeals." (emphasis added). Mr. Hanson was not *under the sentence of death* at the time of the district court granting a new trial. Also, in the absence of a specific provision, the general provisions of Section 1080 control. Okla. Stat. tit. 22, § 1089 (D); *Rojem v. State*, 888 P.2d 528, 529 (Okla. Crim. App. 1995); *Duvall v. State*, 871 P.2d 1386, 1389 (Okla. Crim. App. 1994). The plain language of the Post Conviction Procedure Act makes clear the trial court had proper jurisdiction to grant Mr. Hanson a new trial.

The Rules of the Court of Criminal Appeals are in line with the statutes. Section IX of the rules deals specifically with appeals in capital cases. Okla. Stat. tit. 22, Ch. 18 Appx., Rules of the Court of Criminal Appeals. Rule 9.1 defines capital cases as those "in which the death penalty has been imposed." Rule 9.7 sets out the procedures to be followed in *capital* post-conviction cases, noting that applications shall be filed in accordance with Okla. Stat. tit. 22, § 1080, *et. seq*. Given the absence of a death sentence, the Oklahoma Court's rules, and the plain language of the statutes, it was appropriate for trial counsel to file a post conviction application requesting a new trial in the state district court. The OCCA lacked jurisdiction to grant a writ of prohibition, as well as being inconsistent with the plain language of the statutes and its rules. *See Bates v. United States*, 522 U.S. 23, 29 (1997) ("[w]e ordinarily resist reading words or elements into a statute that do not appear on its face."); *Matson Nav. Co. v. U.S.*, 284 U.S. 352, 356 (1932) ("As the words of the section are

33

plain, we are not at liberty to add to or alter them to effect a purpose which does not appear on its face or from its legislative history."); *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997) ("When the terms of the statute are clear and unambiguous, that language is controlling absent rare and exceptional circumstances.").

Mr. Hanson's Constitutional right to Due Process was violated by the OCCA's granting of the State's Writ of Prohibition. The misapplication of state law, which results in the deprivation of a liberty interest, violates the Fourteenth Amendment and is, therefore, cognizable in habeas corpus. *See Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980); *Ballard v. Estelle*, 937 F.2d 453, 456 (9th Cir. 1991). The Tulsa County District Court properly granted Mr. Hanson a new trial. Mr. Hanson respectfully requests this Court grant the Writ, reversing his conviction and sentence.

**II.  There Is a Reasonable Probability That Co-defendant Miller's Confession Would Have Changed the Outcome at the Guilt and Sentencing Stages of Trial**.

Although utilizing the incorrect standard of review, the OCCA reached the merits of this issue in denying Mr. Hanson's Application for Post Conviction Relief. *Hanson v. State*, No. PCD-2006-614, p. 5. Based on its incorrect determination that the trial court was without jurisdiction to grant a new trial, the OCCA conducted *de novo* review to determine whether the newly discovered evidence of co-defendant Miller's confession to the Bowles murder warranted granting Mr. Hanson a new trial. *Id*. Because the trial court had proper jurisdiction to grant a new trial, the OCCA's review should have been constrained by an

abuse of discretion standard of review.  *See Fisher v. State,* 206 P.3d 607, 610 (Okla. Crim. App. 2009) (noting trial court's findings reviewed only for an abuse of discretion).  Mr. Hanson's Constitutional right to Due Process was violated by the OCCA's application of the wrong standard of review.  *See Hicks v. Oklahoma*, 447 U.S. 343.  Further, under either standard, Mr. Hanson should have received a new trial.

In Oklahoma, in order to determine if a criminal defendant is entitled to a new trial, a court considers the following factors "(1) whether the evidence is material; (2) whether the evidence could not have been discovered before trial with reasonable diligence; (3) whether the evidence is cumulative; and (4) whether the evidence creates a reasonable probability that, had it been introduced at trial, it would have changed the outcome." *Hanson v. State*, No. PCD-2006-614, p. 5 (citing *Ellis v State*, 867 P.2d 1289, 1303 (Okla. Crim. App. 1992)).  Trial Judge Wall considered exactly these factors when ordering Mr. Hanson receive a new trial:

> The evidence was a material fact that had not previously been presented and heard.  It could not have been discovered with reasonable diligence by the Petitioner or his lawyer before trial.  The evidence is not cumulative.  The evidence creates a reasonable probability that, had it been introduced at trial, it would have changed the outcome.  The newly discovered evidence entitles the Petitioner to a new trial.

O.R. 1353, *Order Granting Application for Post-Conviction Relief.*  Judge's Wall's findings were not unreasonable, and if the OCCA had reviewed for an abuse of discretion, her grant of a new trial should have been affirmed.

The OCCA agreed that the second and third *Ellis* factors were satisfied by the

discovery of co-defendant Miller's confession, therefore limiting its review to whether the confession was material and if there was a reasonable probability it would have changed the outcome of Mr. Hanson's original trial. *Hanson v. State*, No. PCD-2006-614, p. 5-6. The OCCA did not specifically address the materiality of the evidence, but must have implicitly found Miller's confession material because it proceeded with some semblance of analysis as to whether the fourth *Ellis* factor was satisfied.

After construing the evidence to support a malice murder conviction for Mr. Hanson even if co-defendant Miller was Bowles' triggerman, the OCCA held "no reasonable jury would find Hanson guilty of anything other than First Degree Malice Aforethought murder for the death of Mary Bowles." *Hanson v. State*, No. PCD-2006-614, p. 8. The OCCA's bold statement is simply not supported. Instead of considering what weight and significance a jury may have given to Miller's confession, thereby answering the inquiry of whether there was a reasonable probability of a different outcome, the state court usurped the jury's role. If Hanson wasn't Bowles' triggerman, the possibility of a malice murder conviction is not ruled out; however, if Miller was the shooter, as he himself proclaimed, then there must be a reasonable probability that a jury could have found Mr. Hanson guilty of felony murder.

Given the jury's conviction and sentencing determinations at Mr. Hanson's original trial, Trial Judge Wall was quite understandably concerned by the import of co-defendant Miller's confession. *See* O.R. 1716, *Capital Felony Report of the Trial Judge*. At the original trial, Mr. Hanson was found guilty of the felony murder of Jerald Thurman and

36

received a life without parole sentence for that crime.  It reasonably follows that Mr. Hanson would have received a non-death sentence for the felony murder of Mary Bowles.

Under state law, Mr. Hanson was entitled to a new trial when he learned of co-defendant Miller's confession.  Mr. Hanson's rights to Due Process and a fundamentally fair trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments have been violated and he respectfully requests this Court grant the Writ.

## **GROUND THREE**

### **MR. HANSON RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL AND ON APPEAL, THEREBY VIOLATING HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

Mr. Hanson is guaranteed the right to the effective assistance of counsel by the Sixth Amendment to the United States Constitution as incorporated against the States through the Fourteenth Amendment.  *Strickland v. Washington*, 466 U.S. 668 (1984).  The venerable framework by which Petitioner must demonstrate his ineffective assistance of counsel claims is: (1) defense counsel's performance was deficient; and (2) Petitioner was prejudiced as result of the deficient performance.  *Id*. at 687.  Mr. Hanson makes both showings.  In this case, counsel made several errors, thus calling into question the reliability of the resulting death sentence.  Counsel's performance was deficient for failing to call a crucial witness who could have undermined the State's theory of the case; failing to adequately preserve the confrontation clause claim discussed in Ground One, *supra*; failing to object to instances of prosecutorial misconduct; failing to investigate and present available mitigation witnesses;

and failing to present evidence of serious mental illnesses and brain damage.[10]   As will be borne out below, but for prior counsel's unprofessional errors, there is a reasonable probability that Mr. Hanson would not have been sentenced to death.  *Strickland*, 466 U.S. at 694.

I.   **Trial Counsel Failed to Call Critical Witness, Ahmod Henry, in its Case in Chief.**

While incarcerated together at David L. Moss Correctional Facility, co-defendant Victor Miller revealed to Ahmod Henry that Miller had in fact "shot the bitch."  TR. 1492-93.  Henry further explained that Miller told him "I shot *her*."  *Id*. at 1493.  Henry's statements were revealed during cross-examination of State's witness Detective Michael Nance.

Prior to Detective Nance's testimony, there had been much argument by the parties as to whether Ahmod Henry's statement was inadmissable as hearsay and whether Detective Nance could testify as to the content of the statement.  The trial court ultimately ruled that Miller's confession to Ahmod Henry met the statutory requirements of Okla. Stat. tit. 12, § 2804 (B)(3) (2001) as a "statement against interest."  The court specifically ruled:

> Certainly, he was facing his own interests at that point, and the making of that statement would be against his interests.  Since the statement is coming from the government's own investigators and I have no reason to indicate that it's not trustworthy, because of the specific facts that are involved and especially the facts surrounding the eliciting of the statement and the taking of the

---

[10]  Appellate counsel was additionally ineffective for failing to raise trial counsel's ineffectiveness for failing to investigate and present significant mental health evidence.

statement and the follow-up investigation on the statement, I will find it is admissible in this case.

TR. 1143. The fight was still on as to whether Henry's statement could be elicited during the cross-examination of Detective Nance as meeting the corroboration requirements of Okla. Stat. tit. 12, § 2805 (2001) for "hearsay within hearsay." *Id*. at 1145-46. However, this issue was mooted when Detective Nance stated he had not received any information in August of 2003 that someone other than Mr. Hanson had killed Marry Bowles. TR. 1489-90. Detective Nance thereby opened the door to be impeached with contents of his report detailing Miller's confession to Ahmod Henry that Miller had killed Mary Bowles.

In order to attack Ahmod Henry's credibility, Detective Nance called him a liar and claimed that a "murder case" had been dismissed as result of Henry's "work." *Id*. at 1493, 1495. Despite these accusations, trial counsel did not call Ahmod Henry as a witness during the defense's case-in-chief. In addition to the trial court's finding Henry's statement to be credible and corroborated, trial counsel was aware that Henry had been re-interviewed by the District Attorney's Office and had continued to maintain his original position. TR. 1138, 1141-43. Strangely, trial counsel made the bold assertion that he preferred Henry's statement to come in through Detective Nance because "there's no telling what [Ahmod Henry] will do. He's a long-time crook and known for getting funny notions." TR. 1467-68. Even though Henry was readily accessible and in-custody at the Tulsa County Jail, trial counsel never even interviewed him to ascertain whether Henry would testify consistently with his previous statements. TR. 1146, 1149.

39

In addressing this claim, the OCCA held:

> Introducing Henry's statement through Detective Nance allowed the defense
> to introduce evidence of Miller's statement to Henry without Henry being
> subject to cross-examination.  Arguably this was the best of all possibilities for
> Hanson since Henry had credibility problems and was known for being
> unreliable.  Defense counsel made a sound strategy decision not to call Henry
> and we will not second guess it.

*Hanson v. State*, 206 P.3d 1020,1032 (Okla. Crim. App. 2009).  The OCCA's determination

is both an unreasonable application of clearly established federal law, and is an unreasonable

determination of the facts in light of the evidence presented at Mr. Hanson's re-sentencing.

*See* 28 U.S.C. § 2254 (d)(1), (d)(2).  The Supreme Court has recognized that both prongs of

section 2254 can be offended when a state court makes the determination some act or

omission of counsel was sound strategy.  *Wood v. Allen*, 558 U.S. _, 130 S.Ct. 841, 851

(2010).  "Whether the state court reasonably determined that there was a strategic decision

under § 2254 (d)(2) is a ***different*** question from whether the strategic decision itself was a

reasonable exercise of professional judgment under *Strickland* or whether the application of

*Strickland* was reasonable under § 2254 (d) (1)."  *Id.* (emphasis added).

The state court decision is unreasonable in light of clearly established law.  While the

OCCA identified the correct legal standard in denying Petitioner's claim, that standard was

unreasonably applied to the facts of this case.  *See Williams v. Taylor*, 529 U.S. 362, 406

(2000).  It is true that counsel is generally afforded wide latitude in making tactical decisions,

and there is a presumption that such tactical decisions be considered sound trial strategy.

*Strickland,* 466 U.S. at 689-90.  However, trial counsel's so-called strategy could have been

40

by no means a reasonable exercise of professional judgment. *See Wilson v. Sirmons*, 536 F.3d 1064, 1132 (10th Cir. 2008) (citing *Fisher v. Gibson*, 282 F.3d 1283, 1296 (10th Cir. 2002) (holding strategic judgments are not reasonable unless backed by a reasonable investigation); *accord Hooper v. Mullin*, 314 F.3d 1162, 1170-71 (10th Cir. 2002). Trial counsel failed to even interview Ahmod Henry. There was no basis to conclude one way or the other if Henry was going to be a dangerous witness who was not worth calling in the defense case-in-chief.

The OCCA's factual finding that "counsel made a sound strategy decision" is an unreasonable determination of the facts. *Hanson*, 206 P.3d at 1032; 28 U.S.C. § 2254 (d)(2). Here, the record supports the finding that trial counsel did not call Ahmod Henry to the stand; however, the record does not support the fact that this decision was the product of strategy or tactical considerations. The Supreme Court has counseled that a strategic decision must be the result of deliberation, investigation, a reasoned choice between alternatives, and the like. The Court explained in *Wiggins v. Smith*:

> The record of the actual sentencing proceedings underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment.
>
> * * *
>
> When viewed in this light, the "strategic decision" the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing.

539 U.S. 510, 526-27 (2003). *See also Strickland,* 466 U.S. at 690-691; *Anderson v. Sirmons*, 476 F.3d 1131, 1145-46 (10th Cir. 2007).

Here, trial counsel neglected to interview Ahmod Henry before deciding not to present him as a witness. Trial counsel had in front of him a transcribed recording of a police interview in which Henry reported Miller's confession, a report of a follow-up interview conducted by Tulsa Co. District Attorney Tim Harris in which Henry maintained his position about Miller's confession, and lastly Detective Nance's testimony that Henry was a "liar." Despite knowing Henry gave the same statement on two separate occasions during law-enforcement questioning, apparently without being promised any recompense, and the trial court's determination that the statement appeared reliable, counsel did not interview him. Surely a reasonable investigation would have included interviewing Henry at least as to Detective Nance's allegations when he was conveniently available in the county jail at the time of trial. TR. 1138, 1141-43. There simply was no strategic decision not to call Ahmod Henry as a witness so that his statement could have been admitted as substantive evidence.

Without conducting any investigation, counsel's decision not to call Henry could not have been strategic, nor could this decision be considered reasonable. Henry was a critical mitigation witness. The outcome here hinged largely on which informant was more credible, Ahmod Henry or Rashad Barnes.[11]  Henry's testimony would have discredited Rashad

---

[11] Given the jury's imposition of a non-death sentence for the felony murder of Gerald Thurman, it reasonably follows that Mr. Hanson would not have been re-sentenced to death if his jury had doubts as to whether Mr. Hanson actually shot Mary Bowles.

Barnes' story as well as countered Detective Nance's assertions that he was a liar.  But for counsel's failure to call Ahmod Henry, there exists a reasonable probability that Mr. Hanson would not have been sentenced to death.

The OCCA's rationale conflicts with clearly established federal law as well as the record at trial.  Petitioner respectfully requests the Writ issue.

**II.    Trial Counsel Failed to Raise Available Grounds in Objecting
to the Introduction of  Rashad Barnes' Transcript Testimony.**

The admission of Rashad Barnes transcript testimony violated Mr. Hanson's rights under the Confrontation Clause of the Sixth Amendment.  *See* Ground One, *supra*.  When making his argument to the court that his prior opportunity to cross examine Barnes at Mr. Hanson's original trial was inadequate, trial counsel inexplicably failed to inform the court that co-defendant Miller's testimony at Miller's own trial served as an additional basis to question the reliability of Barnes' prior testimony.   Trial counsel vehemently argued that the newly discovered statement from Ahmod Henry prevented admission of Barnes' prior testimony; however, trial counsel specifically stated there was no additional basis for his objection.  Mot. TR. 1-4-06, 18, 21; TR.1344-46.

On direct appeal, the OCCA held "[d]efense counsel's decision against presenting evidence of Miller's trial testimony appears reasonable and strategic."  *Hanson*, 206 P.3d at 1032.  Habeas relief is warranted because the state court's rationale was based on an unreasonable determination of the facts.  *See* 28 U.S.C. §2254 (d)(2).  There was no strategy on the part of trial counsel in failing to object on this basis at trial.  Att. 1, Affidavit of Jack

43

E. Gordon, Jr.

Victor Miller's testimony at his 2002 trial provided ample impeachment material not known at the time of Petitioner's original opportunity for cross-examination.  However, trial counsel was unable to apprise the court of co-defendant Miller's testimony and how it contradicted Barnes' testimony.  Trial counsel explains his omission:

> I did not inform the trial court of co-defendant Miller's testimony as a basis for objecting to the admission of Mr. Barnes' prior testimony.  I had no strategic reason for this omission.  I was not aware of the content of Mr. Miller's testimony, nor had I reviewed the transcripts from his trial.

Att. 1, ¶ 12.  At a minimum, had trial counsel been familiar with Miller's testimony, he would have been aware that Miller had been to Barnes' house several times; weapons used in the robberies belonged to Barnes and were kept at Barnes' house; and Miller claimed it was Barnes who participated in the homicides at issue.  *Miller*, 98 P.3d at 742.  In fact, in describing Barnes' testimony, the OCCA stated, "Hanson's confession to Barnes was the most critical evidence in the State's case."  *Id*. at 748.  Trial counsel would have informed the trial court of co-defendant Miller's testimony had he been aware of it.  Att. 1, ¶ 13.  There is a reasonable probability had Barnes' prior testimony not been admitted, Mr. Hanson would not have been sentenced to death.

Given his aggressive presentation of the issue, it doesn't follow that Mr. Gordon would simply decline to advise the trial court of extremely significant impeachment material that implicated Barnes in the commission of the offenses at issue.  Constitutionally adequate counsel would have been aware of a co-defendant's statements and would certainly have

44

gone to the trouble of at least reviewing the trial transcripts of the co-defendant's testimony.

Rashad Barnes testimony was critical and the strongest piece of evidence inculpating Mr. Hanson as the shooter of Mary Bowles. But for counsel's failure to apprise the court of co-defendant Miller's testimony, which called into question the story of Rashad Barnes, there is a reasonable probability that Barnes' transcript testimony would not have been admitted as evidence and Mr. Hanson would not have been sentenced to death. Petitioner respectfully requests the Writ issue.

### III.   Trial Counsel Failed to Object to Instances of Prosecutorial Misconduct.

Counsel failed to lodge objections to numerous instances of prosecutorial misconduct. As discussed in Ground Four, the prosecution engaged in gross acts of misconduct, most notably during closing arguments. The State improperly invoked sympathy for the victims, argued facts not in evidence, inappropriately vouched for the credibility of Rashad Barnes, misled the jury about the proof necessary to establish the great risk of death aggravating circumstance, and made improper appeals for civic justice.

On direct appeal, the OCCA held as to the un-objected comments "Hanson was not prejudiced by any of them. Clearly then, he cannot show that the outcome of his re-sentencing trial would have been different had counsel objected." *Hanson*, 206 P.3d at 1032. First, as demonstrated in Ground Four, *infra*, Mr. Hanson was in fact prejudiced by the State's misconduct. Second, the state court's holding is contrary to clearly established federal law in that it does not comport with *Strickland*. *See* 28 U.S.C. § 2254 (d)(1).

Mr. Hanson need not affirmatively "show that the outcome of his resentencing trial would have been different." *Hanson*, 206 P.3d at 1032. Instead, the Constitutional inquiry is whether a reasonable probability exists that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. This precise analytical error made by the OCCA was contemplated by the Supreme Court:

> A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. Take, for example, our decision in *Strickland v. Washington*. If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be "diametrically different," "opposite in character or nature," and "mutually opposed" to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a "reasonable probability that ... the result of the proceeding would have been different."

*Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (internal citations omitted). Here, the OCCA has triggered the *contrary to* provision of AEDPA by doing what the *Williams* Court envisioned, applying a standard diametrically opposed to that articulated by the Supreme Court.

Trial counsel's performance was deficient in failing to object to the misconduct, and Mr. Hanson was prejudiced as result of counsel's omission. Petitioner respectfully requests the Writ issue.

**IV.    Trial Counsel Failed to Investigate and Present Available Mitigation Witnesses.**

Trial counsel's mitigation presentation was shockingly brief.[12]  Counsel seemingly put

all of his eggs in one basket by presenting Dr. Jeanne Russell solely for the purpose of

rebutting the continuing threat aggravating circumstance.  As demonstrated by appellate

counsel, there was a wealth of mitigating evidence from multiple relatives and acquaintances

who could have testified on Mr. Hanson's behalf.  *See Application for Evidentiary Hearing

on Sixth Amendment Claim*, Case No. D-2006-126 (Aug. 28, 2007).

Trial counsel's mitigation presentation consisted of only calling three of Mr. Hanson's

in-laws and his 10 year-old son.  The scope of these witnesses' testimony was that Mr.

Hanson was a good person, a good father, they loved him, and hoped he would be spared

from execution.  While this presentation was somewhat mitigating, trial counsel failed to

humanize Mr. Hanson by demonstrating that he was an individual separate and apart from

his crimes.  Had counsel conducted a thorough and adequate mitigation investigation, he

would have had a compelling mitigation case to present on Mr. Hanson's behalf, which could

have persuaded the jury to impose a non-death sentence.

On direct appeal, the OCCA declined to grant relief on the basis of trial counsel's

inadequate mitigation presentation.  The OCCA's rationale was:

> We cannot find a strong possibility that trial counsel was ineffective for failing
> to use these witnesses.  Nor are we persuaded that presenting additional
> character evidence of the same type would have changed the outcome of the

---

[12] With the exception of expert Dr. Jeanne Russell, only 4 mitigation witnesses were
presented during Mr. Hanson's case-in-chief, totaling 35 transcript pages.  O.R. 1778-1813.

trial. Hanson's application for an evidentiary hearing is denied and his claim
of ineffective assistance of counsel is rejected.

*Hanson*, 206 P.3d 1020, 1032. The state court's disposition is an unreasonable application

of and contrary to clearly established federal law. 28 U.S.C. § 2254 (d)(1), (d)(2). As an

initial matter, it appears the OCCA required Mr. Hanson to affirmatively prove that

additional mitigating evidence "would have changed the outcome of the trial." *Hanson*, 206

P.3d at 1032. However, the Constitutional inquiry is whether a more thorough mitigation

investigation and presentation would have created a reasonable possibility that Mr. Hanson

would have received a sentence less than death. *Strickland*, 466 U.S. 668, 687 (1984).

The Supreme Court has recognized time and again the importance and necessity of

adequate mitigating evidence in capital cases. *See Eddings v. Oklahoma*, 455 U.S. 104

(1982); *Lockett v. Ohio*, 438 U.S. 586 (1978); *see also Romano v. Gibson*, 239 F.3d 1156,

1180 (10th Cir. 2001). Likewise, the Court has held that capital trial counsel is expected to

thoroughly investigate and present a mitigation case. *Williams v. Taylor*, 529 U.S. 362, 396-

99 (holding trial counsel's failure to present and explain all of the available evidence

constituted deficient performance); *Wiggins v. Smith*, 539 U.S. 510, 527-28 (2005)

(determining trial attorney rendered ineffective assistance where he had conducted some

investigation, but not a thorough and adequate mitigation investigation); *Rompilla v. Beard*,

545 U.S. 374, (2005) (noting deficient performance where defense counsel failed to review

prosecutor's file that would have led to discovery of sources of significant mitigation);

*Porter v. McCollum*, 558 U.S. __ , 130 S.Ct. 447, 452-53 (2009) (reversing death sentence

48

where penalty phase counsel failed to investigate character and background of defendant); *Sears v. Upton*, 561 U.S. __, 130 S.Ct. 3259 (2010) (holding defendant prejudiced as result of facially inadequate mitigation investigation).

Here, trial counsel's mitigation investigation was severely deficient because he failed to investigate and ultimately present powerful mitigating evidence. Of the four mitigation witnesses who testified on Mr. Hanson's behalf, only his son Marquelle was an immediate family member. Certainly, the jury as well as Mr. Hanson could have benefitted from hearing some of his blood relatives and acquaintances describe his character and background. In his *Application for Evidentiary Hearing on Sixth Amendment Claim*, Mr. Hanson provided the OCCA with thirteen (13) affidavits of family members, relatives, and acquaintances who could have testified on his behalf. Most notable were the powerful affidavits from immediate family members: Charlotte Ward (mother), Stephen Hanson (brother), and Charmyn Clariett (sister). It is inexplicable why trial counsel did not include these people who knew Mr. Hanson best in his mitigation presentation. This available mitigation could have compelled a jury to spare Mr. Hanson's life.

Mr. Hanson is aware that counsel is not Constitutionally required to present all available mitigating evidence; however, counsel must humanize and individualize his client by presenting the "fullest information possible" such that this Court must "scrutinize carefully any decision by counsel which deprives a capital defendant of all mitigation evidence." *Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir. 2000). Here, counsel had no

reasonable basis for failing to present and/or adequately investigate Mr. Hanson's case in mitigation.  Powerful and compelling mitigation evidence was readily accessible.

For example, Mr. Hanson's older brother, Stephen, could have explained how John was his younger brother, a follower, and how he looked up to Stephen.  Att. 2, Affidavit of Stephen Hanson (Nov. 5, 2010).  Mr. Hanson's parents were often not around and left Stephen, as the oldest, in charge.  *Id.* at ¶ 2.  Father Elmer Hanson was a long distance truck driver and Mother Charlotte Hanson worked full time.  *Id.*  Mr. Hanson and his brother were both devastated by their father's death.  *Id.* at ¶ 6.  Stephen could have also explained how co-defendant Miller was once his cellmate, how Miller was dangerous, and how John was susceptible to being misled by people like Miller.  *Id.* at ¶ 8.

Mr. Hanson's cousin could have confirmed what Stephen Hanson had to say and importantly revealed that Stephen was himself a poor role model who shaped Mr. Hanson's life for the worst.  Att. 3, Declaration of Marsha Hollingsworth (Nov. 14, 2010).  Mrs. Hollingsworth relates:

> Watching John grow up, I realized he was a follower and not a leader.  Others, especially his brother Steve, could get him to do things he wouldn't have done on his own.  Sometimes I'd have to tell John not to be listening to Steve - he didn't have any business running anybody.
>
> * * *
>
> Steve had gone out to California in the early 1980's and found out about the Crips gang.  When Steve came back to Tulsa he had blue bandanna tied around his head, and started the Crips gang there.
>
> * * *

50

> Uncle Elmer took care of everything for John and Steve.  When Elmer died, they had no idea how to fend for themselves or even how to put in a day's work.  I think John and Steve got caught up in crime because they had no skills or other means of supporting themselves.

Att. 3, ¶¶ 10, 14, 12.  This is exactly the sort of information that could have humanized and explained Mr. Hanson to his jury.

Mr. Hanson's mother's best friend, Marilyn Wright, could have explained the difficult circumstances inside the Hanson household.  Att. 4, Affidavit of Marilyn Wright (Nov. 5, 2010).  John had a very difficult time with his parent's divorce about the time he was ten (10) years old.  *Id.* at ¶ 3.  John bore the brunt of a heated rift between his mother and paternal grandmother, Flossie Hanson.  *Id.* at ¶ 4.  Flossie would treat John poorly and made up stories about how he wasn't really his father's child.  *Id.*  With Elmer Hanson often on the road with his work, Charlotte was at a loss when it came to parenting, often having Marilyn Wright come over to resolve mundane situations.  *Id.* at ¶ 5.  Because of the various troubles at home, John felt unloved.  *Id.* at ¶ 7.  Another cousin, Sylvia Ann Waldon, could have also explained and given examples of the dynamic in the Hanson Family, including John's poor treatment by his grandmother and the devastating effect Elmer's death had on John.  Att. 5, Declaration of Sylvia Ann Waldon (Oct. 28, 2010).

In the context of this case, a re-sentencing trial, counsel's greatest concern should have been presenting Mr. Hanson's case for life.  Counsel should have presented the strongest mitigation case possible, yet failed to do so.  Mr. Hanson was prejudiced as a result.

Petitioner respectfully requests this Court issue the Writ.

### V.   Appellate Counsel Was Ineffective for Failing to Raise Trial Counsel's Ineffectiveness in Neglecting to Present Evidence of Mental Illness and Brain Damage.

Mr. Hanson suffers from multiple mental illnesses and brain dysfunction; however, his jury was never able to weigh any of these factors in mitigation because of the ineffective assistance of trial counsel, direct appeal counsel, and ostensibly post-conviction counsel.[13] Under the bi-pronged *Strickland* analysis, prior counsels' performance was both professionally unreasonable and prejudicial. 466 U.S. 668. Counsels' failures to raise this issue was not reasonable or strategic.

Mr. Hanson has been diagnosed with four types of major mental illness and a personality disorder: Dysthymia, Major Depressive Disorder, Post Traumatic Stress Disorder, Cognitive (brain) Disorder, and Paranoid Personality Disorder, respectively. Att.6, pp. 1, 10-11, Psychiatric Evaluation Conduced by Dr. Donna Schwartz-Watts; Att. 7, Curriculum Vitae of Dr. Schwartz-Watts. Dr. Schwartz-Watts diagnoses are compelling mitigation evidence that could have been presented at the time of re-sentencing if appropriate experts had been consulted. Id. at 7, 14. A psychiatrist such as Dr. Watts could have explained to Mr. Hanson's jury how he is genetically predisposed to developing mental

---

[13] In addition to counsels' deficiencies being independent constitutional violations, assuming *arguendo* Respondent claims procedural default or some variant thereof bars presentation of this claim, counsels' ineffective assistance below may serve as cause to overcome any default. *See Murray v. Carrier*, 477 U.S. 478, 488-89 (1986); *see also* Preliminary Statement Concerning Procedural Default, *infra*.

illness, and how:

> Mr. Hanson was suffering from depression at the time of his offenses. He was homeless and had no social supports. Persons with depression can be irritable, impulsive, and use poor judgment. His cognitive disorder was also present at the time of his offense and would have contributed to his impulsivity and poor judgment.

*Id.* at 1, 11, 14. In addition to Dr. Schwarts -Watts, long-time friend and roommate Tremaine Wright confirms Mr. Hanson's conditions including depression:

> John got really depressed. He would talk about suicide and how he felt no one cared about him. John slept a lot, sometimes for two days straight. I can remember him getting up, going to the bathroom, taking a shower, then going right back to sleep.

Att. 8, ¶ 9, Affidavit of Tremaine Wright (Nov. 5, 2010). Mr. Wright also observed Mr. Hanson's chronic headaches which are signs of cognitive dysfunction. *Id.* at ¶ 11. Despite the availability of this powerful mitigating material that could have humanized Mr. Hanson and reduced his level of culpability in the eyes of the jury, it was not presented at his re-sentencing.

The United States Supreme Court in its last term addressed a strikingly similar situation in finding attorneys Constitutionally ineffective for failing to adequately investigate a capital client's mental health and cognitive impairments. *See Sears v. Upton*, 561 U.S. __, 130 S.Ct. 3259 (2010). In addition to cognitive impairments, Mr. Sears shares similar traits with Mr. Hanson: "grandiose self-conception and . . . magical thinking;" "Sear's brother . . . introduced Sears to a life of crime"; and "diminished judgement and reasoning skills." *Id.*, 130 S.Ct. at 3263-64. Unfortunately, like Mr. Hanson, Mr. Sears trial and appellate

attorneys failed to investigate his mental health and cognitive issues.

In finding Sears' counsel ineffective, the Supreme Court re-emphasized that Constitutionally adequate counsel must conduct such investigations in a capital case:

> This point is plain in *Williams*: We rejected any suggestion that a decision to focus on one potentially reasonable trial strategy [] was "justified by a tactical decision" when "counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background."  529 U.S., at 396.

> \* \* \*

> Moreover, the reasonableness of the theory is not relevant when evaluating the impact of evidence that would have been available and likely introduced, had counsel completed a constitutionally adequate investigation before settling on a particular mitigation theory.

*Sears*, 130 S.Ct. at 3265 n. 10.  The Court in *Sears* further explained that when conducting *Strickland's* prejudice inquiry in instances such as Mr. Hanson's a reviewing court must "consider the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – and reweig[h] it against the evidence in aggravation."  *Id*. at 3266 (citing *Porter v. McCollum*, 130 S.Ct. 447, 453-54).  Mr. Hanson's mental illnesses and cognitive disorder are powerful mitigating evidence of which his jury should have been apprised.

Trial counsel was ineffective for failing to conduct an adequate mental health investigation.  While Dr. Jeanne Russell Ed.D. was retained for the limited purpose of rebutting the continuing threat aggravating circumstance alleged by the State, her services did not obviate the need for additional mental health investigation.  In fact, Dr. Russell's

*Social History - Risk Assessment* report completed on December 31, 2004, raised multiple

red flags that trial counsel should have noticed.  See Att. 9, Report of Dr. Jeanne Russell.

Dr. Russell's report was filled with strong indicators of mental health disorders:

> . . . [Mr. Hanson] has difficulty staying on tasks with circumstantial speech.
> Mr. Hanson's content of thought focuses on global problems rather than those
> of immediate concern such as his case.  He spends a good deal of time testing
> this examiner to ensure she understands his concerns and point of view in
> relation to the world.  ***He is guarded and acknowledges he trusts no one,
> believing most people mean him harm or fail to understand the world as it
> really is.***
>
> . . . ***At the very least he exhibits paranoid thoughts which impair his ability
> to trust anyone***.  He denies homicidal or suicidal ideation and there is no
> evidence of hallucinations.  ***Judgment and insight are poor*** as evidenced by
> his unwillingness or difficulty in focusing on his defense in this case.
>
> \* \* \*
>
> ***He endorsed a number of extreme and bizarre thoughts, suggesting the
> presence of delusions and/or hallucination***.  He apparently believes that ***he
> has special mystical powers or a special "mission" in life*** that others do not
> understand or accept.
>
> \* \* \*
>
> ***Mr. Hanson recalls feeling depressed and wanting to die for several years
> following his father's death***.  The Wards believe he was mistreated
> emotionally by his father and his paternal grandmother as they believe his
> older brother was clearly favored.
>
> \* \* \*
>
> . . . These results suggest he has the ability to use his intellectual reasoning to
> problem solve ***unless impaired by psychological problems***.  Psychological
> testing suggests he is experiencing low morale and a depressed mood.  It
> further suggests he feels estranged and alienated from people and is suspicious
> of the actions of others.

> It is important to note that Mr. Hanson has not been previously diagnosed with a mental illness nor does he believe he suffers from any such illness. ***This cannot be ruled out at this time*** and if present does not rise to the level of impairing his ability to appreciate the serious nature of his charge or to work with his attorney in mounting a defense.

Att. 9, pp. 5, 6, 10, 11 (emphasis added).  Trial counsel failed to recognize the above red flags.  Att. 1, Affidavit of Jack E. Gordon, Jr., ¶ 5.

After receiving Dr. Russell's report, Mr. Gordon did not pursue "additional testing or retain another expert to conduct a general psychological/psychiatric examination or a neuropsychological examination." *Id*. at ¶ 6.  Further, Mr. Gordon had no strategic reason for not conducting additional mental health investigation.  *Id*.  Mr. Gordon recognizes the significance of presenting mental health evidence as part of a mitigation case and would have certainly presented such evidence to Mr. Hanson's jury had he conducted an adequate investigation.  *Id*. at ¶¶ 7, 8.

Appellate counsel was ineffective for failing to recognize trial counsel's ineffectiveness and ultimately failing to raise an appropriate claim in Mr. Hanson's direct appeal proceedings.  Attorney Jamie D. Pybas prepared both of Mr. Hanson's direct appeals.  Att. 10, ¶ 1, Affidavit of Jamie D. Pybas.   Ms. Pybas considered retaining a neuropsychologist to examine Mr. Hanson during the course of preparing his appeal in *Hanson I*.  *Id*. at ¶ 2.

The process for retaining experts at the Oklahoma Indigent Defense System ("OIDS") is somewhat complex and likely contributed to counsels' failures to ever retain an appropriate

professional or otherwise adequately investigate Mr. Hanson's mental health issues. *See Id.* at ¶¶ 3-8. While preparing the appeal in *Hanson I*, Attorney Pybas consulted OIDS in-house Head of Psychological Services, Kathy LaFortune, Ph.D. Ms. LaFortune declined to approve the use of a neuropsychologist in Mr. Hanson's case. *Id.* at ¶ 6. Ms. LaFortune's negative recommendation was based upon a "screening" examination of Mr. Hanson, which she conducted prior to his 2001 trial at the request of trial attorney, Jack Gordon. *Id.* at ¶¶ 3, 6.

Because Ms. LaFortune was involved in Mr. Hanson's case at both the trial and direct appeal levels, Mr. Hanson did not have independent appellate counsel who was in a position to raise a trial counsel ineffectiveness claim for not investigating and presenting this strong mental health evidence. Functionally, with respect to this issue, Mr. Hanson's trial and appellate counsel were the same. The Supreme Court and the Tenth Circuit Court of Appeals have both recognized the practical problems created when trial and appeal counsel are not independent. *See Kimmelman v. Morrison*, 477 U.S. 365 (1986); *Cannon v. Mullin*, 383 F.3d 1152, 1173 (10th Cir. 2004). *English v. Cody*, 146 F.3d 1257 (10th Cir. 1998). Here, Attorney Pybas did not have the ability to independently evaluate trial counsel's performance because of OIDS's procedures for retaining professional experts where she had to consult the same "screening" psychologist that had previously advised trial counsel.

An intervening event occurred prior to Attorney Pybas preparing the appeal in *Hanson II*; Dr. Russell prepared her *Social History - Risk Assessment* report, which contained the numerous red flags, discussed above, indicating significant mental illness and brain

dysfunction.  Att. 9.  Trial Attorney Gordon failed to catch these red flags and then Attorney

Pybas was stymied from conducting an adequate mental health investigation because of her

previous experiences in this case.  Attorney Pybas relates, "after pursuing the issue in *Hanson*

*I*, I did not again request to retain a neuropsychologist in *Hanson II* after already being

denied on one occasion."  Att. 10, ¶ 8.  Numerous difficulties plague the expert retention

process at OIDS:

> In my experience, a negative recommendation from Psychological Services
> [Kathy LaFortune] generally results in an attorney dropping their Request for
> Professional Services. . . .  ***I am unaware of any attorney at OIDS***
> ***successfully disputing a negative recommendation from Ms. LaFortune***.
>
> \* \* \*
>
> The process of retaining an expert has traditionally been one of the most
> frustrating parts of my job.  In fact, during the tenure of the past Executive
> Director, ***I am aware of attorneys being terminated from employment with***
> ***OIDS due in part to disputes over the retention of professional experts***.

Att. 10, at ¶¶ 4-5 (emphasis added).  Given her prior experiences with the retention of

experts, Attorney Pybas was implicitly prevented from conducting an adequate investigation

and/or retaining an appropriate mental health professional while preparing the appeal in

*Hanson II.  See Cuyler v. Sullivan*, 446 U.S. 335, 342-45 (1980).

Post-conviction counsel[14] was ostensibly ineffective[15] for failing to raise an appellate

and trial ineffectiveness proposition relating to the inadequate mental health investigation in

---

[14] Post-conviction counsel, Robert W. Jackson, and undersigned Habeas Counsel,
Robert S. Jackson are unrelated; their sharing of similar names is merely a coincidence.

[15] *See* Preliminary Statement Concerning Procedural Default, *infra*.

Mr. Hanson's Application for Post-Conviction Relief.  Post-conviction counsel should have been able to independently evaluate trial and appellate counsels' performance.  However, he relied on the work his colleagues below instead of conducting his own investigation of Mr. Hanson's psychological impairments.  *See* Att. 11, Affidavit of Robert W. Jackson (Nov. 17, 2010).  Post-Conviction Counsel's "thought process was that previous defense teams had already investigated those issues."  *Id*. at ¶ 4.  This was a costly misperception for Mr. Hanson because an adequate investigation of his mental impairments, including retention of appropriate professionals, was never conducted by trial or appellate  counsel.  While a "Doctor" had been involved in the case, Dr. Russell's work was specifically limited to rebutting the continuing threat aggravating circumstance.  Additional professionals were necessary to assess Mr. Hanson's mental health issues.  *See* Att. 11 at ¶ 5.  Mr. Hanson has been prejudiced as result of post-conviction counsel's failure to investigate Mr. Hanson's mental health and raise a related legal proposition.  In effect, Mr. Hanson was represented by the same law firm on direct appeal and post-conviction, and because of Ms. LaFortune, the taint extended back to trial as well.  *See Anderson v. Sirmons*, 476 F.3d 1131, 1140-41(10th Cir. 2007).  This calls into question the adequacy of any procedural default that might arise on a return to state court and provides uniquely compelling cause.

Prior counsels' investigations were Constitutionally deficient. Had Mr. Hanson's jury been given the opportunity to consider his significant mental illnesses and cognitive impairment, there is a reasonable probability he would not have been sentenced to death.

59

Petitioner respectfully requests this Court grant the Writ.

## GROUND FOUR

**MR. HANSON'S TRIAL WAS RIFE WITH PROSECUTORIAL MISCONDUCT SUCH THAT HE WAS DENIED A FAIR TRIAL AND A RELIABLE SENTENCE IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

The prosecutors in Mr. Hanson's case acting on behalf of the State of Oklahoma engaged in misconduct that denied Mr. Hanson his Due Process rights to a fair trial and a fair sentencing proceeding. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 643-48 (1974) (finding misconduct that does not infringe upon a specific constitutional right still violates Due Process as it denies the accused a fundamentally fair trial); *Duckett v. Mullin*, 306 F.3d 982, 988 (10th Cir. 2002). This type of misconduct creates issues of unreliability and warrants this Court granting Mr. Hanson relief. *See Woodson v. North Carolina*, 428 U.S. 280 (1976); *Gardner v. Florida*, 430 U.S. 349 (1977). The misconduct began at the guilt stage and extended through the prosecutors' closing arguments at Mr. Hanson's re-sentencing hearing.

### I.   Guilt or Innocence – The Evidence.

There is absolutely no question that Mary Bowles and Jerald Thurman were shot, killed, and their bodies left in secluded areas. However, the identity of the person(s) responsible for these two murders remained to be discovered until the State "found" its key witness, Rashad Barnes. *See* 2001 TR.Vol. VII, 1154-65.

Barnes was the linchpin of the State's case that John Hanson shot and killed Bowles.

60

Without Barnes' testimony, the State had no direct evidence that Mr. Hanson shot and killed Bowles. At best, the State would have been left with the following circumstantial evidence: Mr. Hanson's fingerprint on the driver's seatbelt latch; his co-defendant's fingerprint on the front passenger's seatbelt latch; the guns used for the Bowles' and Thurman's murders found in the motel room occupied by Mr. Hanson and his co-defendant from which no fingerprints were recovered; and various witnesses who had seen Mr. Hanson and his co-defendant carry a gun similar to the one used to kill Bowles. Without direct evidence to prove Mr. Hanson killed Bowles, the State pursued "justice" with a "win at all cost" attitude. *See Berger v. U.S.*, 295 U.S. 78, 88 (1935).

> **a.     Inflaming the Passions and Prejudice of the Jury and Garnering Sympathy for Mary Bowles.**

Throughout the first stage of Mr. Hanson's trial, the prosecutors made concerted efforts to inflame the passions and prejudice of the jury and garner sympathy for Bowles by stressing her saintly life, sympathetic character, and the heinous, atrocious, and cruel facts of her murder, even though the "heinous, atrocious or cruel" aggravating circumstance was not charged. *See Darden v. Wainwright*, 477 U.S. 168, 191-92 (1986) ("The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than guilt or innocence ... [and] should not use arguments calculated to inflame the passions or prejudices of the jury"); *United States v. Young*, 470 U.S. 1, 8 n.5 (1985) (discussing *ABA Standards for Criminal Justice* 3-5.8(c) – "The prosecutor should not use arguments calculated to inflame the passions or prejudices

of the jury);  *Spears v. Mullins*, 343 F.3d 1215, 1226-30 (10th Cir. 2003) (finding the introduction of evidence not relevant to aggravating circumstance deprived petitioner of fair trial);  *Moore v. Gibson*, 195 F.3d 1152,  1172 (10th Cir. 1999) ("This court does not condone prosecutorial remarks encouraging the jury to allow sympathy to influence its decision.").

Bowles' sympathetic character and life as a volunteer permeated the entire trial. During *voir dire* and opening statements, prosecutors informed the perspective jurors that Bowles was old and frail, but "was a very active volunteer in the community [and] spent years volunteering at St. Francis Hospital." 2001 TR.Vol. II, 181; 2001 TR. Vol. III,  288;  2001 TR. Vol. VI,  1003, 1027.  At trial, approximately one-third of the total testimony provided by the  prosecutors' first five witnesses concerned Bowles' life as a volunteer. *See e.g.* 2001 TR. Vol. VI, 1037-1066. These witnesses informed the jury that Bowles had been a volunteer in the critically ill newborn unit at St. Francis Hospital for about twelve years (2001 TR. Vol. VI, 1037-38, 1050-51, 1060, 1062, 1064); was an officer in the auxiliary, a volunteer organization (2001 TR.Vol. VI, 1037, 1044); was "someone that wanted to do good for other people" (2001 TR. Vol. VI, p. 1044); was a volunteer for the philharmonic (*Id*.); and was a volunteer at the Quota Club, which helped deaf children learn to read and did fundraising for deaf children (2001 TR. Vol. VI, 1060).  Finally, during first-stage closing arguments, the prosecutor emphasized Bowles' defenseless and sympathetic character to garner sympathy.  Samples of the prosecution's rhetoric include telling the jury that:

- volunteer Bowles "had no idea what that gun-totin', trigger pullin' carjacker had in store for her;"

- two grown men with firearms took this seventy-seven year old lady;

- "[t]hey got her because she was old and weak;" and

- Hanson "st[ood] over an old lady [] pump[ing] smoking rounds into her chest."

2001 TR. Vol. X, 1711-12, 1721, 1747. The prosecution concluded by telling the jury that

Bowles was a "little, sweet old lady" and giving an emotionally embellished accounting.

> [Barnes] told you what he remembered...but they don't like it because it puts [Hanson] in the place of standing with this pistol over a little old lady that he laid on top of. [Hanson] felt her frail little body under his....

> [T]wo people are dead, because they wanted to take something else.... They were going to take and they were going to take and whoever they had to burn they was [sic.] going to burn, because this is their world. It's a world where jackals reign. They travel in packs and they drag down the weak.... And two people paid the ultimate price with their lives.

> And after they did that, they drove down to the Oasis and something intervened. Think about it. Five miles from where they just killed this little old lady, the volunteer in her church, the volunteer at St. Francis.

*Id.* at 1748-49. The prosecutor also introduced impermissible victim impact evidence, by

means of an uncharged "heinous, atrocious or cruel" aggravating circumstance to generate

sympathy for Bowles. *See Payne v. Tennessee*, 501 U.S. 808 (1991) (holding victim impact

evidence is proper only for sentencing determination).

The prosecutor presented evidence during Mr. Hanson's guilt-stage that Bowles'

murder was heinous, atrocious, and cruel even though it never charged Mr. Hanson with this

aggravating circumstance. The prosecutor knew that this evidence would inflame the passions and prejudices of the jury and garner sympathy for Bowles. *See* OUJI-CR 4-73.[16] In particular, the jury heard how Hanson, wielding a gun, "jacked" Bowles and threw her onto the backseat of her car and then laid on top of her to prevent her from escaping; how Hanson punched her and told her to shut up when Bowles was reaching out in love; how Bowles knew Hanson was going to kill her; how Hanson pulled Bowles out of the car, took her to a ditch on a secluded road, shot her at least five times, and then covered her with brush; and how Bowles was laying on the ground immobile with fear when she was shot. 2001 TR. Vol. VI, 1005-07, 1008-10, 1016-17, 1020; 2001 TR. Vol. VII, 1128, 1131, 1160-61, 1163, 1207, 1236-37; 2001 TR. Vol. VIII, 1511-22; 2001 TR. Vol. IX, 1635; 2001 TR., Vol. X 1712–14, 1716, 1748. The prosecutor summed up its heinous, atrocious, and cruel evidence as follows:

> What did she see? From her back laying beside the road, she saw his face – that face – looking down the end of his gun as he popped at least six rounds into her body. That's what she saw. That's the last thing she saw was him standing over her with this gun.

2001 TR. Vol. X, 1745. This misconduct was wholly irrelevant to Mr. Hanson's guilt for the charged offense. In reality, the prosecutor's repeated references to how Bowles suffered, knew she was going to be killed, and begged for her life was improper aggravating

---

[16] The heinous, atrocious, and cruel aggravator is directed to those crimes where the death of the victim was preceded by torture or serious physical abuse of the victim. *See* OUJI-CR 4-73.

circumstance evidence, which should not be presented in the guilt-stage of a capital trial.  *See Payne v. Tennessee*, 501 U.S. 808 (noting victim impact evidence is proper only for sentencing determination); *Thornburg  v. Mullin*, 422 F.3d 1113  (10th Cir. 2005) (holding argument during guilt-stage closing that victims were good people and would never be able to be with their families for Christmas was improper); *Spears v. Mullin*, 343 F.3d 1215, 1226-30 (10th Cir. 2003) (finding the introduction of evidence not relevant to aggravating circumstance deprived petitioner of fair trial); *Duckett v. Mullin*, 306 F.3d 982, 991-92 (10th Cir. 2002) (condemning prosecutor's guilt-stage closing argument was condemned because it sought sympathy for a victim).

Mr. Hanson was prejudiced by the prosecutor's improper victim impact evidence.  It is hard to imagine a more sympathetic victim than a little old lady, such as Bowles, who volunteered her time to help those who are less fortunate than herself.  The prosecutor exploited the fact that the crime involved a sympathetic victim by injecting improper arguments and evidence to emphasize the victim's characteristics. Because the evidence of Mr. Hanson's guilt was circumstantial and weak, these improper tactics led to his conviction, a conviction based upon the status of the victim rather than the facts and circumstances of the offense.

The OCCA's decision that the prosecutor's descriptions "accurately describe[d] the evidence, or are within the wide latitude afforded in argument" ignores the principles that the prosecution should not inflame the passions and prejudice of the jury and submit victim

65

impact evidence during the guilt stage. *See Hanson v. State*, 72 P.3d 40, 49-50 (Okla. Crim

App. 2003). *See also  Payne v. Tennessee*, 501 U.S. 808; *Darden v. Wainwright*, 477 U.S.

168, 191-94 (1986). This Court must issue the Writ and order a new trial because the

OCCA's decision is an unreasonable application of clearly established law and involved an

unreasonable determination of the facts. *See* 28 U.S.C. § 2254 (d).

      **b.**    **Tipping the Scales – Garnering More Sympathy By Name Calling.**

      Mr. Hanson's trial attorney failed to object to the prosecution's repeated instances of

name-calling. As a result, Mr. Hanson was denied his right to a fair trial.  *See Strickland v.*

*Washington*, 466 U.S. 668 (1984); *Malicoat v. Mullin*, 426 F.3d 1241, 1256 (10th Cir. 2005)

(noting prosecutor attempted to inflame the passions and prejudice of the jury by name-

calling); Ground Three, *supra*.

      During first-stage closing arguments, the prosecutor emphasized Bowles' saintly life

and the value of her life by name-calling. 2001 TR.Vol. X, 1711-12. The prosecutor called

Mr. Hanson a "two-time, cold-blooded murderer" and jackal. *Id.* at 1744, 1746, 1749.  This

name-calling was wholly irrelevant and provided additional means to garner more sympathy

and heighten the value of  Bowles' life while de-valuing and dehumanizing Mr. Hanson.

      In resolving this claim the OCCA noted it disfavored name-calling, but nonetheless

found "the evidence showed Hanson was a carjacker who carried a gun and committed at

least one murder...."  *See Hanson v. State*, 72 P.3d 40, 50 (Okla. Crim. App. 2003).

However, this finding ignores that calling Mr. Hanson a "jackal" was just another means for

the prosecution to garner sympathy for Bowles, to inject improper victim impact evidence, to inflame the passions and prejudices of the jury, and to deprive Mr. Hanson of his right to a fair trial. *See Payne v. Tennessee*, 501 U.S. 808; *Darden v. Wainwright*, 477 U.S. 168, 191-94 (1986) ("The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than guilt or innocence ... [and] should not use arguments calculated to inflame the passions or prejudices of the jury"); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643-48 (1974). As such, this Court must issue the Writ and order a new trial because the OCCA's decision is an unreasonable application of clearly established law and involved an unreasonable determination of the facts. *See* 28 U.S.C. §2254(d).

### c.  Trouble – The Need to Vouch and Garner Sympathy for the State's Key Witness.

Rashad Barnes was the linchpin of the State's case that Mr. Hanson was the one who shot and killed Bowles. *See* 2001 TR. Vol. VII, 1160-65. According to Barnes, Mr. Hanson confessed to shooting and killing Bowles during a backyard conversation. 2001 TR. Vol. VII, 1156-57, 1159-64. *See Arizona v. Fulminante*, 499 U.S. 279, 295 (1991).[17] Without

---

[17] In *Fulminante*, the United States Supreme Court reasoned:

A confession is like no other evidence. Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.... [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of

Barnes' testimony, the State had no direct evidence to link Mr. Hanson to the murder of
Bowles and the need to bolster Barnes' credibility was of tantamount importance.

From start to finish, the prosecution bolstered Barnes' credibility, his altruistic
motivation for testifying, and garnered sympathy for him.  During direct examination, the
prosecution first elicited that Barnes did not come forward and tell law enforcement about
Mr. Hanson's "confession" until he was subpoenaed to testify in front of the grand jury. 2001
TR. Vol. VII, 1168.  The jury then heard:

> **Q.** (Prosecutor)      Can you tell the ladies and gentlemen of the jury if you know
> what the word snitch means?
>
> **A.** (Barnes)          Yes.
>
> **Q.**    What does it mean?
>
> **A.**    Just what – what people call you when you testify against somebody
> that you call your friend or a family member, or just testify against
> anyone basically.
>
> **Q.**    And being a snitch, does that have what I'll call repercussions, to your
> understanding?
>
> **A.**    Yes.... You can be killed.... You can be – people beat you up, talk about
> you.  There's a number of things that comes with being a snitch.

* * *

---

mind even if told to do so." *Bruton v. United States*, 391 U.S. 123, 139-40
(1968) (White, J., dissenting).

Q.  Mr. Barnes, do you enjoy being here and testifying today?

A.  No.

Q.  Why not?

A.  'Cause for two years I've been called a snitch, and I don't feel I'm a snitch.

Q.  Why is it that you don't think you're being a snitch?

A.  He told me he killed an old lady.  That's not – that's not what we call something that's suppose to be just okay with everybody.... I mean, she couldn't defend herself.   There's a number of reasons.

Q.  I'm asking you to tell us what the number of reasons are.

A.  She couldn't defend herself.  She was a elderly lady.  They took advantage of her, overpowered her.  That's not something I see as being a man, having respect for anyone.  Call me what you want.

2001 TR. Vol. VII, 1168-72.  *See also* O.R. 1716 (*Capital Felony Report of the Trial Judge -*

Barnes' credibility questioned based on the fact that defense counsel was not able to cross-

examine Barnes with newly discovered evidence (Miller's confession) and the original jury

was not instructed on the law regarding confessions).  During closing arguments, the

prosecution once again bolstered Barnes' credibility.

What stakes does Rashad have in this?  None.  For his testimony he's been labeled a snitch.  He told you he was scared to testify.  He has nothing in this except to tell what he knows of what happened and what the defendant told him.

* * *

[Barnes] got up there and he raised that hand, and he didn't just tell you the truth, he became the third victim in all this.  There's two in the ground.

69

He's out there in north Tulsa with the label of snitch around his neck and with them trying to convince you he was involved.

* * *

They got [Bowles] because she was old and weak, and that's where even Rashad Barnes has to draw the line.  He's not a man that comes forward to give it up on people.  But he's got a line that says, I can't take that.  ***That's what he told you, because that's what's true***.

He let this guy live in his car behind his house where his Momma was, where his sisters were.  This guy that could stand over an old lady and pump smoking rounds into her chest lived right outside his house.  Could have been his Momma.  That's where he drew the line.  And he came in here with more guts that a lot of people I know that folks stand in line to shake their hands.  ***And he told you the truth, and he told you what he told you***.

2001 TR. Vol. X, 1724, 1747-48 (emphasis added).  This was not only impermissible vouching, but also a personal opinion that a witness was truthful.  The comment calling Barnes a "victim" injected impermissible sympathy for a "victim" in the guilt stage of trial.  *See Payne v. Tennessee*, 501 U.S. 808 (holding victim impact evidence is proper only for sentencing determination); *Darden v. Wainwright*, 477 U.S. 168, 191-94; *United States v. Young*, 470 U.S. 1, 7-9 (noting prosecutors must refrain from interjecting personal beliefs into the presentation of his case);  *Douglas v. Workman*, 560 F.3d 1156, 1179 (10th Cir. 2009) ("[V]ouching for the credibility of witnesses is equally as improper as other methods of offering unsolicited personal views on the evidence"); *United States v. Magallanez*, 408 F.3d 672, 680 (10th Cir. 2005) ("Argument or evidence is impermissible vouching only if the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit personal assurances of the witness' veracity or

70

by implicitly indicating that information not presented to the jury supports the witness' testimony"). Such personal expressions that Barnes was truthful are present here. *Cargle v. Mullin*, 317 F.3d 1196, 1219-21 (10th Cir. 2003); *United States v. Swafford*, 766 F.2d 426, 428 (10th Cir. 1985) ("We continue to hold that vouching by an attorney to the veracity of a witness is improper conduct and an error which this court will carefully review.").

In resolving this claim, the OCCA found that the prosecution's arguments were "a reasonable characterization of [the] case" because Mr. Hanson tried "to accuse Barnes to save himself." *See Hanson v. State*, 72 P.3d 40, 50 (Okla. Crim. App. 2003). However, this finding is unreasonable for three reasons. First, it ignores that the prosecution began to improperly vouch for Barnes well before closing argument. *See Douglas*, 560 F.3d at 1179-80; *Magallanez*, 408 F.3d at 680. Second, it is incorrect because the defense never accused Barnes of killing Bowles. Finally, it ignores that the prosecution argued that Barnes was a "victim" who deserves sympathy and admiration for being brave enough to testify against Mr. Hanson. *See e.g.* 2001 TR. Vol. VII, 1168-72; 2001TR.Vol. X, 1724, 1747-48. As such, this Court must issue the Writ and order a new trial because the OCCA's decision is an unreasonable application of clearly established law and involved an unreasonable determination of the facts. *See* 28 U.S.C. §2254(d).

### d.    Smoke and Mirrors - When All Else Fails Ridicule the Defense.

With a "win at all cost" attitude the prosecution continued its misconduct by deliberately casting aspersions upon defense counsel and ridiculing the defense. *See Berger*

*v. U.S.*, 295 U.S. 78, 88 (1935); *United States v. Holmes*, 413 F.3d 770 (8th Cir. 2005);

*Cargle v. Mullin*, 317 F.3d 1196, 1222 (10th Cir. 2003) (identifying personal attacks on

petitioner and his counsel as part of a "wide range of improper argument."); *United States*

*v. Goff*, 847 F.2d 149 (5th Cir. 1988); *Bruno v. Rushen*, 721 F.2d 1193, 1194-95 (9th Cir.

1983); *Coulter v. State*, 734 P.2d 295, 302 (Okla. Crim. App. 1987) (holding "[c]ounsel

should refrain from casting aspersions upon opposing counsel"). Here, the prosecution began

by telling the jury:

> Many times there's what I call the ***ink defense***.  An octopus has no self-
> defense except an ink bag.  When it's in danger of a predator –

2001TR.Vol. X, 1726 (emphasis added).   Defense counsel objected, the prosecution

responded that it did not think the comment was inappropriate, and without ruling the trial

court told the prosecutor to proceed.  *Id.*   The prosecution picked up where he left off and

told the jury that the defense was "***[h]iding from the facts***." *Id.* (emphasis added).  Defense

counsel promptly objected, but the court overruled the objection.  *Id.*  Undeterred, the

prosecution continued casting aspersions. "Let's look at the facts and ***let's look to see if the***

***screen can keep us from seeing the guilt*** of this defendant." *Id.*  (emphasis added).  After

the defense's closing argument, undeterred and unrestrained, the prosecution picked up

where it left off:

> I've got to point something out, folks.  ***What he just stood up here and put***
> ***forward as a theory is not a theory; it's theater***.  *A theory requires facts, not*
> *I think and maybe this and what if they had talked to so and so.  That's not*
> *a theory; that's theater.*

The only thing you've heard in here about Rashad Barnes or anybody else has come out of their mouths.  And, folks, he told you right up front, our statement of the case, our information is not evidence.  You know why?  Because that's just what we say and ***talk is cheap.  Don't sing it, bring it***.  And we brought it.  We brought the case that proved that he's a two-time, cold-blooded killer.  And ***their X-Files rendition does not change the facts***.

* * *

Standing back here with a witness on the stand that's put theirself on the line and taken that oath and withstood what they've got to withstand to come up here and tell what they know, that's evidence.  ***Standing out here waving documents at them and trying to make them tell you something that's not in the document, that's not evidence; that's theater***.

*Id.* at 1744-45. (emphasis added).  These aspersions were improper and the prosecution knew it. *See Berger*, 295 U.S. at 88; *Holmes*, 413 F.3d 770; *Coulter*, 734 P.2d at 302.

In resolving this claim the OCCA found the prosecution's comments were "inappropriate, but do not require relief." *See Hanson*, 72 P.3d at 49.  However, this finding is unreasonable because the prosecution's arguments improperly encouraged the jury to focus on the conduct and role of Mr. Hanson's attorney rather than on the evidence. *See  Holmes*, 413 F.3d at 775.  The prosecution's "suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight ... when they should properly carry none." *Berger*, 295 U.S. at 88.  Prejudice in making statements of this kind can easily be determined to be reversible error, and this Court should grant Mr. Hanson relief on this claim.  *See Mason v. United States*, 719 F.2d 1485, 1489 (10th Cir. 1983).

> **e.    End Game – Closing Arguments, A Play On Juror Fears.**

73

During closing argument, the prosecution improperly evoked societal alarm:

It wasn't going to stop with a car.  It wasn't going to stop with their lives.  They were going to take and they were going to take and whoever they had to burn was going to burn, because this is their world.  It's a world where jackals reign.  They travel in packs and they drag down the weak, and ***we pay the price***.

\* \* \*

What happens if that car doesn't break down?  Who knows?  ***Maybe they're still out there***.  ***Maybe we've got a file of dead bodies***.

\* \* \*

[A]fter they killed two people..., they went and did a robbery with the same guns that had killed two people.... These people matter.  And it's your vote that matters.

This is your moment. Make it matter.  He's guilty, and ***we all*** know it.

2001 TR., Vol. X, 1749-50. (emphasis added).

The prosecution's remarks imposed on the jury the idea that they were bound to support the prosecution and convict in the name of justice, and if they did not, they would be remiss in their duty because Mr. Hanson would be "out there ... [with] a file of dead bodies." *Id*.  This sort of urging is error.  *See Viereck v. United States*, 318 U.S. 236, 247-48 (1943);  *McCarty v. State*, 765 P.2d 1215, 1221 (Okla. Crim. App. 1988).  *See also Jones v. State*, 610 P.2d 818, 820 (Okla. Crim. App. 1983).

Although the OCCA concluded that the comments complained of "are within the wide latitude afforded in argument," existing case law supports a different conclusion.  As such, this Court should grant Mr. Hanson relief on this claim. *See Viereck*, 318 U.S. at 247-48;

74

*Berger*, 295 U.S. at 88.

### f.      Tipping The Scales – The Cumulative Effect.

The prosecution engaged in pervasive misconduct despite being admonished several times throughout Mr. Hanson's trial.  However, "where the misconduct of the prosecuting attorney [is not] slight or confined to a single instance, but one where [the] misconduct [is] pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential[,] a new trial must be awarded." *Berger*, 295 U.S. at 89; *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  *See also Donnelly*, 416 U.S. at 646 ("The 'consistent and repeated misrepresentations' ... may profoundly impress a jury and may have significant impact on the jury's deliberations").

Here, the OCCA failed to address the cumulative impact of prosecutorial misconduct, which is a separate and distinct cumulative error inquiry as argued by direct appeal counsel. *See Brief of Appellant*, pp. 46-47 (July 2, 2002) ("[T]he abuses and excuses of the prosecutors so infected the trial with unfairness as to make the resulting convictions...unreliable, and Mr. Hanson's convictions...should be vacated) (citing to *Donnelly*).  Despite this argument, the OCCA failed to note that it also found error within Mr. Hanson's prosecutorial misconduct claim when conducting its all encompassing cumulative error inquiry. *Hanson*, 72 P.3d at 55. As such, this Court reviews this claim *de novo* and no presumption of correctness is afforded.  *See Wilson v. Sirmons*, 536 F.3d 1064, 1082 (10th Cir. 2008); *Cannon v. Gibson*, 259 F.3d 1253, 1272-73 (10th Cir. 2001).

75

Considering the pervasiveness of the prosecutorial misconduct, this Court should find that the cumulative impact of the misconduct deprived Mr. Hanson of his right to a fair trial and should grant him relief.

## II.      Re-Sentencing – Seeking Death.

On June 11, 2003, the OCCA reversed and remanded Mr. Hanson's death sentence in Count I (the murder of Bowles) for a new sentencing hearing. *See Hanson v. State*, 72 P.3d 40 (Okla. Crim. App. 2003).    During this re-sentencing, the prosecutors once again demonstrated a "win at all cost" attitude. *See Berger v. U.S.*, 295 U.S. 78, 88 (1935).  This pursuit led prosecutors to engage in misconduct designed to deprive Mr. Hanson of his right to a fair sentencing hearing and reliable sentence.  It warrants relief. *See Donnelly*, 416 U.S. at 643-48; *Woodson v. North Carolina*, 428 U.S. 280 (1976); *Gardner v. Florida*, 430 U.S. 349 (1977).   *See also Hance v. Zant*, 696 F.2d 940, 951 (11th Cir. 1983) (noting importantance that the sentencing phase of the [capital] trial not be influenced by passion, prejudice, or any other arbitrary factor).

### a.      Inflaming the Passions and Prejudice of the Jury and
          Garnering Sympathy.

Having not been admonished for their inappropriate conduct the first time around, the prosecutors once again made a concerted effort to inflame the passions and prejudices of the jury and garner sympathy for the victims. *See Darden v. Wainwright*, 477 U.S. 168, 181, 192-94;  *Eddings v. Oklahoma,* 455 U.S. 104; *Berger v. United States*, 295 U.S. 78, 88-89; *Spears v. Mullins*, 343 F.3d 1215, 1246-47 (10th Cir. 2003);  *Moore v. Gibson*, 195 F.3d

76

1152, 1172 (10th Cir. 1999).

Bowles' sympathetic character and her life as a volunteer was one of the State's themes designed to ensure the jury based its decision on emotions rather than the evidence. During opening statements, prosecutors informed the jurors that Bowles was seventy-seven years-old and a volunteer, which the prosecutor mentioned fourteen times in the first few moments of his opening statement. TR. 1170-74. During closing arguments, the prosecutor again emphasized Bowles' defenseless and sympathetic character to garner sympathy. *See e.g.* TR.1835-37,1840, 1890. Defense counsel objected to the State's attempt to garner sympathy, and the trial court sustained the objection. *Id.* at 1890-91. Undeterred, the prosecutor continued to garner sympathy for Bowles despite repeated objections and the trial court sustaining the objections. *Id.* at 1891-92, 1894. After defense counsel's third objection and the trial court sustaining the objection, the prosecutor finally moved on to another topic. *Id.* at 1895-96. However, by this time the sympathy bell had been rung too many times. *See also id.* at 1903 (during rebuttal argument the prosecutor speculated that Bowles begged and pleaded for her life).

In addition to garnering sympathy for Bowles, the prosecutors sought to focus the jury's attention on the mental torture she suffered at Mr. Hanson's hands despite the fact that the State had not alleged the heinous, atrocious, or cruel aggravating circumstance. *See e.g. Romano v. Gibson*, 239 F.3d 1156 (10th Cir. 2001); *Jones v. Gibson*, 206 F.3d 946, 954 (10th Cir. 2000). In an emotional plea, the prosecutor told the jury to imagine what Bowles

was feeling as she was being driven to her death, how she begged for her life, and what she felt as each bullet entered her body.   TR.1837-1840.   The prosecutors tipped the scales further in their favor by introducing the mental state of two other victims.

The prosecutor began by asking the jury to focus on the mental state of Jerald Thurman, the victim of the crime for which Mr. Hanson had already been convicted and sentenced. *Id.* at 1839.   The prosecutor then asked the jury to focus on the mental state of Jolanda Beesley, a teller at the Tulsa Federal Employees Credit Union when it was robbed by Mr. Hanson and Mr. Miller.   *Id.* at 1844.

The prosecutor's highly improper argument, elicited sympathy and introduced elements of an uncharged aggravating circumstance. It inflamed the passions and prejudices of the jury.   As the prosecutor constantly pointed out, despite defense counsel's repeated objections, Bowles was a seventy-seven year old volunteer who was "vunerable" and "weak." *Id.* at 1835-37, 1890-92, 1894.   On top of this, the prosecutor focused the jury's attention on the mental suffering of Bowles, Thurman, and Beesley.   *Id.* at 1837-1840, 1844. It is unrealistic to believe the jury was not affected by the prosecutor's improper and highly prejudicial arguments, which were designed to inflame their passions and prejudices against Mr. Hanson.   *See Eddings v. Oklahoma,* 455 U.S. 104 (The United States Constitution will not tolerate a death sentence imposed as a result of whim, passion, prejudice, mistake, or other improper influence.);   *Duckett v. Mullin*, 306 F.3d 982, 991-92 (10th Cir. 2002) (condemning prosecutor's guilt-stage closing argument was condemned because it sought

sympathy for a victim).

In resolving this claim, the OCCA found:

Hanson objected only to three of the remarks he now challenges on appeal. The trial court sustained Hanson's objections each time, curing any error.

* * *

Hanson maintains that the prosecutor's appeals to the jury to consider Bowles' mental state in her final moments was irrelevant because the State had not alleged her murder was especially heinous, atrocious or cruel.  It is indeed error for a prosecutor to encourage jurors to impose the death penalty solely out of sympathy for the victims.  The prosecutors here ... argued Hanson's callous treatment of [] Bowles was relevant to assessing his culpability. Because this was a resentencing trial, this jury had not made a finding of guilt. If the prosecutor went too far in his argument about Bowles' mental agony in her final moments, Hanson cannot show that this argument affected the outcome.... We are not convinced that the prosecutor's argument [] rendered Hanson's resentencing trial unfair.

*Hanson v. State,* 206 P.3d 1020, 1028-29.  The OCCA's analysis of this misconduct is completely unpersuasive, counterintuitive, and unreasonable for three reasons. First, it is unreasonable to believe the trial court sustaining defense counsel's objections cured any error. *See id.* at 1028.  The fact is, despite the trial court sustaining defense counsel's numerous objections, the prosecutor continued on the same objectionable path. TR. 1890-92, 1894-96.   Second, it is nonsensical that Bowles' mental anguish was necessary to demonstrate Mr. Hanson's culpability especially since the re-sentencing jury had been told Mr. Hanson had already been convicted of Bowles' murder.  *Hanson*, 206 P.3d at 1028. Further, "[a] person's criminal culpability requires a showing that he acted purposefully, knowingly, recklessly or negligently ...." BLACK'S LAW DICTIONARY 379 (6th ed. 1990).

79

Mental anguish of the victim does not demonstrate that someone acted purposefully, knowingly, recklessly, or negligently.  Finally, the OCCA's decision ignores the special weight jurors afford a prosecutor's arguments.  *See Berger v. United States*, 295 U.S. 78, 88.  *See also, Darden v. Wainwright*, 477 U.S. 168, 181, 192-94 (1986). The OCCA's decision is contrary to clearly established law and is unreasonable in the application of clearly established law and determination of the facts. *See* 28 U.S.C. §2254(d).  As such, this Court must issue the Writ.

### b.    Punishment – Death is the Only Choice.

During closing, the prosecutor argued that if the jury did not sentence Mr. Hanson to death for the murder of Bowles, then Mr. Hanson would in essence be getting a "freebie," given Mr. Hanson had already been sentenced to a life sentence in federal prison.  TR. 1860-61, 1863.  Defense counsel objected to this argument and the trial court sustained the objection. *Id.* at 1860-61. Undeterred the prosecutor began where he left off.

> Ladies and gentlemen, two things are clear based on the evidence.  That life with parole is not acceptable under the facts of this crime.  It shouldn't be an option.  The evidence is also clear that life without parole is not enough accountability for this defendant.

*Id*. at 1863.  Defense counsel objected again – that the State was arguing death is the only choice; however, the trial court "didn't hear it that way" and just noted the objection for the record.  *Id.* at 1863-64.  This type of  argument is  highly improper for two reasons.

First, the prosecutor told the jury that death is mandatory if justice is to be done. *Id.* at 1860-61, 1863.  This type of argument is inappropriate because death is not mandatory and

because the remarks imposed on the jury the idea that they were bound to support the prosecution and convict in the name of justice, and if they did not, they would be remiss in their duty. *See Sumner v. Shuman*, 483 U.S. 66 (1987); *See Viereck v. United States*, 318 U.S. 236, 247-48 (1943); *McCarty v. State*, 765 P.2d 1215, 1220 (Okla. Crim. App. 1988). *See also Jones v. State*, 610 P.2d 818, 820 (Okla. Crim. App. 1980).

Second, the prosecutor's argument directly undermines the jury's ability to give meaningful consideration to Mr. Hanson's mitigation because it directs the jury to impose death on the basis that Mr. Hanson is already serving a life sentence and that he needs to be punished for the murder of Bowles. *See* TR. 1861, 1863, 1917 (Prosecutors told the jurors that if they did not give Mr. Hanson death, he would not be punished for Bowles' murder). Here, the weight of the prosecution's arguments, like an improper jury instruction or statute, prevented the jury from considering and giving effect to Mr. Hanson's mitigation evidence. *See Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007); *Penry v. Johnson*, 532 U.S. 782, 797 (2001) (noting that the sentencer must be able to "consider and give effect to [a defendant's mitigating evidence] in imposing sentence."); *Eddings v. Oklahoma*, 455 U.S. 104, 113 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978); *Berger*, 295 U.S. 88 ("It is fair to say that the average jury...has confidence...[in] the prosecuting attorney.... Consequently, improper suggestions, insinuations, and, especially, assertions...are apt to carry much weight against the accused when they should properly carry none.")

In resolving this claim, the OCCA found:

> the trial court [did not] abuse it's discretion in overruling Hanson's objection
> to the [] argument that 'life without parole is not enough accountability for this
> defendant.' ... [And that] the prosecutor ... argued the facts and Hanson's
> record justify a death sentence.  Such argument was proper and we find no
> error.

*Hanson*, 206 P.3d at 1029. The OCCA's analysis of this misconduct is objectively unreasonable. While the OCCA "agreed that it is improper for a prosecutor to argue that a sentence less than death is meaningless and would not hold a defendant accountable for a victim's death when he is already serving a life sentence," it failed to apply that principle to Mr. Hanson's case when the prosecutor made that argument.  *Id., see also* TR 1863.  The OCCA's decision is contrary to clearly established law and is an unreasonable application of clearly established law and determination of the facts.  *See* 28 U.S.C. §2254(d). As such, this Court must issue the Writ.

### c.      If All Else Fails – Argue Facts Not in Evidence.

During closing, the prosecutor repeatedly argued facts not in evidence when he referenced Bowles' ordeal in her car, the reliability of Ahmod Henry, and Mr. Hanson's prior convictions.  *See e.g.* TR. 1494-95; TR. 1837, 1892-93, 1904-06, 1909-12.

When garnering sympathy for Bowles, the prosecutor argued that Mr. Hanson had "laid on top" of Bowles for thirteen to fourteen miles, smelled her hair, and felt her frail bones beneath him. TR. 1837, 1892-94, 1901. Defense counsel objected to the prosecution's argument that Mr. Hanson "laid on top" of Bowles, but the objection was overruled.  *Id.* at 1901.  The State's argument is unfounded.  The State's key witness, Barnes, did not support

this argument.

> **Q**. (Prosecutor)    What did he tell you?
>
> **A**. (Barnes)    Said they were looking for someone to carjack and they seen an old lady. They approached the old lady. ***He put her in the backseat and he got in the backseat with her***, and they drove to a back road where they were going to let her out and someone seen them while he was trying to get her out of the car.

TR. 1347. *See also* O.R. 689-91, 693-95, 698, 704-06. Further, the State's physical evidence indicates Mr. Hanson was driving Bowles' car, and therefore, could not be in the backseat "laying on top" of her. TR. 1413-15, 1476-81, 1486-87.

Unfortunately for Mr. Hanson, the prosecutor continued to make up facts – especially in regards to the credibility of Ahmod Henry. Henry was a critical witness for Mr. Hanson. Mr. Hanson's co-defendant admitted to Henry that he (Miller) killed Bowles. TR.1466-67, 1489-93. Because Henry did not testify,[18] the prosecutor questioned Henry's credibility by arguing that he had a "deal," when there was absolutely no evidence Henry was offered a deal or asked for one. *See* TR. 1495-96. The prosecution argued:

> Detective Nance testified and he said that there was a guy – some four years after the crime occurred, a guy that was in jail on some pretty serious felonies who called the detectives over – the homicide detectives and said, "I want to give you information about a bunch of cases because I want a deal." That's [] Henry.

---

[18] Defense counsel did not call Henry to testify, but the Court allowed Detective Nance to testify as to what Henry told him because Detective Nance opened the door when he testified that there were no other suspects for Bowles' murder. TR. 1465-70, 1489-91.

*Id*. at 1905. Defense counsel promptly objected, and the trial court sustained the objection.

*Id*. at 1905-07.  Undeterred, the prosecutor once again continued down this path:

> When – you heard Detective Nance testify.  When he received information []
> Henry wanted to talk to him about a bunch of different cases and Detective
> Nance told you [Henry] wanted a deal.  There was no deal given.  And
> Detective Nance told you [Henry] was never given a deal.... [Henry], four
> years after the fact, wanting a deal, getting in touch with the police–

*Id*. at 1907.  Defense counsel objected once again, and the trial court sustained the objection.

*Id*.  However, by this time, the damage had already been done.

Undeterred by the trial court's admonitions about arguing facts not in evidence, the

prosecutor argued:

> What they didn't mention in their closing argument – and you recall the
> testimony when asked by [] Mr. Drummond of the expert, "Let's talk about the
> escape because he has an escape conviction, right?"  He was convicted for
> robbery, robbery and assault with intent to kill[], and he escaped.  And she
> acknowledged he was convicted of escape.

*Id*. at 1909. Defense counsel objected because the  prosecutor was once again arguing facts

not in evidence. *Id*. at 1909-10.  At the sidebar, the trial court noted

> [t]he expert testified that the escape charge is based on not an escape from an
> incarcerated facility but that when a person's out on parole and then re-
> offends, they get filed a charge of escape.  So I think it's unreasonable to argue
> that he – to imply that he escaped from a ... locked facility.

*Id*. at 1910. *See also* TR. 1745 ("[Hanson] failed to make his appointment with his parole

officer, as a result they filed escape on him.") The prosecutor claimed that he had made this

argument because he did not want to tell the jurors that serious violent offenders end up in

halfway houses, in a case where life with parole was an option. TR. 1910-11.  The court

84

sustained the objection and admonished the jury. *Id.* at 1912.

Despite repeated admonitions by the trial court,  the prosecutor, using the influence of his office, continued his campaign to interject non-supported evidence designed to inflame the passions and prejudices of the jury. *See Berger*, 295 U.S. at 88 ("It is fair to say that the average jury...has confidence...[in] the prosecuting attorney.... Consequently, improper suggestions, insinuations, and, especially, assertions...are apt to carry much weight against the accused when they should properly carry none.") The prosecutor's misconduct rendered Mr. Hanson's re-sentencing trial fundamentally unfair and the resulting sentence is thus unreliable.  *See Eddings v. Oklahoma,* 455 U.S. 104 (1982) (The United States Constitution will not tolerate a death sentence imposed as a result of whim, passion, prejudice, mistake, or other improper influence); *Woodson v. North Carolina*, 428 U.S. 280; *Gardner v. Florida*, 430 U.S. 349; *Darden v. Wainwright*, 477 U.S. 168 (irrelevant and prejudicial evidence may result in a fundamentally unfair trial in violation of Federal due process); *Berger*, 296 U.S. 78.

In resolving this claim, the OCCA found that the prosecutor's argument about Mr. Hanson laying on top of Bowles was supported by the record; that there exists a reasonable inference that Henry sought preferential treatment for his information, and that any error was cured by the trial court sustaining Mr. Hanson's objections; that the prosecutor's misleading argument about the escape charge was cured by the trial court sustaining the objection; and there was no harm because the jury rejected the continuing threat aggravator. *Hanson*, 206

P.3d at 1030.

The OCCA's analysis of this misconduct is an unreasonable determination of the facts for three reasons. First, there is no evidence that Mr. Hanson laid on top of Bowles. TR. 1347. *See also* O.R. 689-91, 693-95, 698, 704-06.   Further, there exists a reasonable inference that Mr. Hanson did not even restrain Bowles when she was in the car because Mr. Hanson's fingerprints were on the driver's seatbelt latch. TR. 1413-15, 1476-81, 1486-87. Second, the evidence presented demonstrated that Henry, although incarcerated, did not ask for a deal or preferential treatment when he contacted and gave the police his information. *See* TR. 1495-96.   Further, it is nonsensical to believe the trial court sustaining defense counsel's objections cured any error. *See id*. at 1028.   The fact is, despite the trial court sustaining defense counsel's objection, the prosecutor continued the same objectionable argument. TR. 1905-07.   Finally, the OCCA failed to understand the dual implication of the prosecutor's unfounded argument about the "escape."   While the argument implicates issues regarding continuing threat, it also suggests the argument that death is the only option. *See id.* at 1910-11.   Further, the prosecutor's rationale for overstating the "escape" charge is irrational because Mr. Hanson had already been convicted in Oklahoma of first degree murder and was unlikely to be paroled and placed in a halfway house, as he was serving life plus 82 years in the federal penitentiary.   The OCCA's decision is contrary to clearly established law, and is unreasonable in the application of clearly established law and determination of the facts. *See* 28 U.S.C. §2254(d).   As such, this Court must issue the Writ.

### d.    The Need to Vouch for the State's Key Witness.

Rashad Barnes was the linchpin of the State's case that Mr. Hanson shot and killed Bowles. *See* TR. 1346-1350.  As such, his credibility was of great importance to the State, and the prosecution sought to bolster his credibility during rebuttal closing argument.  The prosecutor began by telling the jury that Barnes had never been impeached and constantly told the truth. TR 1902.  The prosecutor then followed this up by asking the jury – "why would he make that up?" *Id.* at 1904.  *See* Ground One, addressing Barnes' credibility, fully incorporated  herein.

The prosecutor's argument was impermissible vouching designed to ensure the jury found Barnes credible. *See United States v. Young*, 470 U.S. 1, 7-8; *Douglas v. Workman*, 560 F.3d 1156, 1179-80; *United States v. Magallanez*, 408 F.3d 672, 680; *Cargle v. Mullin*, 317 F.3d 1196, 1219-20; *United States v. Swafford*, 766 F.2d 426, 428.

In resolving this claim, the OCCA found that the "prosecutor's argument concerning the veracity of Barnes did not constitute impermissible vouching." *Hanson v. State,* 206 P.3d at 1030.  However, this finding is an objectively unreasonable application of clearly established law and involved an unreasonable determination of the facts.  As such, this Court must issue the Writ. *See* 28 U.S.C. §2254(d).

### e.    Improper Argument – What Constitutes Great Risk of Death.

During closing arguments, the prosecution continuously pulled out all the stops in its effort to have Mr. Hanson sentenced to death.  To ensure such an outcome, the prosecutor

purposefully misstated the law as to what constitutes the great risk of death aggravator. The

prosecutor told the jury that since Thurman and Bowles were both killed within minutes of

each other, there is "[n]o question that [Mr. Hanson] created a risk of death to more than one

person, according to the evidence." TR. 1854.   The prosecutor concluded by assuring the

jury:

> [t]he aggravating circumstances have been met.... We've alleged great risk of
> death to more than one person.   There is two people dead.   That's how
> dangerous this crime spree was.

*Id.* at 1905.  The jury subsequently found this aggravating circumstance. *Id.* at 1920-21, O.R.

1563.

　　In resolving this claim the OCCA found that it "need not discuss this claim given [its]

holding invalidating [the great risk of death to more than one person] aggravating

circumstance other than to say that the argument  ... did not render Hanson's re-sentencing

trial unfair." *Hanson*, 206 P.3d at 1034.  However, this finding is unreasonable and contrary

to clearly established federal law. The OCCA's finding ignores the premise that while

prosecutors are allowed to "strike hard blows, he is not at liberty to strike foul ones." *Berger*,

295 U.S. at 88.  Here, the prosecutor struck plenty of foul blows, including knowingly

misstating the law in his effort to place "a thumb [on] death's side of the scale." *Stringer v.*

*Black*, 503 U.S. 222, 232 (1992); *Clemons v. Mississippi*, 494 U.S. 738, 752 (1990). *See also*

*Hanson*, 206 P.3d at 1033 ("As we have so often said, 'it is not the death of more than one

person which supports [the aggravator], but the defendant's acts that create the risk of death

to another which are in close proximity....'"). Given the integrated nature of Oklahoma's death penalty sentencing scheme, it is impossible to reliably suggest this error had no effect. Rather, it resulted in the finding of a aggravating circumstance, leading to the imposition of the death penalty. As such, this Court must issue the writ. *See* 28 U.S.C. §2254(d).

###    f.    A Play On Jurors' Fears – Part II.

During closing argument, the prosecution improperly evoked societal alarm, which deprived Mr. Hanson of a fair and reliable sentencing hearing. *See Eddings v. Oklahoma,* 455 U.S. 104 (1982) (The United States Constitution will not tolerate a death sentence imposed as a result of whim, passion, prejudice, mistake, or other improper influence); *Woodson v. North Carolina*, 428 U.S. 280 (1976); *Gardner v. Florida*, 430 U.S. 349 (1977); *Darden v. Wainwright*, 477 U.S. 168 (1986) (irrelevant and prejudicial evidence may result in a fundamentally unfair trial in violation of Federal due process); *Berger*, 296 U.S. 78. The prosecutor told the jury "[m]ake this about truth, make this about accountability, and make this about justice." TR. 1834, 1863. Then, in an impassioned plea, the prosecutor told the jury:

> And now, we're seven years down the road and you ladies and gentlemen are going to write the final chapter. I want to ask you, is it going to be about justice? Is it going to be about accountability? ... And ladies and gentlemen, when you knock on that door – when you knock on that door, you're going to be telling this court what justice is about in this case. You will be doing that, you twelve.

*Id*. at 1865-66.

The prosecution's remarks imposed on the jury the idea that they were bound to

support the prosecution and impose the death sentence in the name of justice, and if they did

not, they would be remiss in their duty.  This sort of argument is error because it urges jurors

to render a verdict out of a sense of vengeance. *See Viereck v. United States*, 318 U.S. 236,

247-48 (1943);  *McCarty v. State*, 765 P.2d 1215, 1220 (Okla. Crim. App. 1988). *See also

Jones v. State*, 610 P.2d 818, 820 (Okla. Crim. App. 1980).

Although the OCCA concluded that the comments complained of  "were within the

bounds of acceptable argument," existing case law supports a different conclusion. *Hanson*,

206 P.3d at 1031. *See Viereck*, 318 U.S. at 247-48; *Berger*, 295 U.S. at 88.  As such, this

Court should grant Mr. Hanson relief on this claim.

### g.      Tipping the Scales – The Cumulative Effect.

The prosecution engaged in pervasive misconduct, despite being admonished several

times throughout Mr. Hanson's re-sentencing hearing.  However, even if none of the multiple

instances of misconduct outlined above, viewed in isolation, necessitate reversal of Mr.

Hanson's sentence, the combined effect of these errors deprived him of a fair and reliable

sentence. *See Donnelly*, 416 U.S. at 646 ("The 'consistent and repeated misrepresentations'

... may profoundly impress a jury and may have significant impact on the jury's

deliberations.").

Before resolving this claim, the OCCA noted that it would "evaluate the alleged

misconduct within the context of the entire trial...." *Hanson*, 206 P.3d at 1028.[19]  However, at no point does the OCCA evaluate the aggregate impact of the prosecutorial misconduct and the effect it had on Mr. Hanson's rights to a fair sentencing hearing and reliable sentence.  This failure is unreasonable. *Berger*, 295 U.S. at 89*; Darden v. Wainwright*, 477 U.S. at 181 ("The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'").

Considering the pervasiveness of the prosecutorial misconduct, this Court should find that the cumulative impact of the misconduct deprived Mr. Hanson of his right to a fair sentencing hearing and a reliable sentence. Thus, Mr. Hanson is deserving of habeas relief.

### III.    Conclusion.

From the guilt stage until re-sentencing, the prosecution committed repeated acts of misconduct despite being admonished numerous times in his effort to win by any means necessary.  This misconduct, individually and cumulatively, deprived Mr. Hanson of his rights under the Sixth, Eighth, and Fourteenth Amendments.  This Court should grant Mr. Hanson relief.

## GROUND FIVE

## INVALIDATION OF THE GREAT RISK OF DEATH AGGRAVATING CIRCUMSTANCE REQUIRED INVALIDATION OF THE DEATH SENTENCE.

---

[19] While the OCCA recognized the cumulative impact of prosecutorial misconduct as a separate and distinct inquiry, it nonetheless failed to address it.

The Oklahoma Court of Criminal Appeals found the great risk of death to another person aggravating circumstance was unsupported because the two homicides in this case were separated by time, distance, and order of events.  *Hanson v. State*, 206 P.3d 1020, 1033 (Okla. Crim. App. 2009).  In particular, the OCCA  found that when Ms. Bowles was shot, "Thurman was not in jeopardy from that act." *Id*.  Consequently, the OCCA invalidated this aggravating factor.

In *Brown v. Sanders,* 546 U.S. 212 (2006), the Supreme Court hoped to simplify the analysis to be used in determining when an invalidated aggravating circumstance invalidates the death sentence.  The Court held:

> An invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances.

*Brown*, 546 U.S. at 220.

In *Brown*, an omnibus "circumstances of the crime" sentencing factor allowed the jury to give aggravating weight to the evidence offered in support of invalid special circumstances.  *Id*. at 222-23.  Therefore, the defendant Sanders was not entitled to relief.

The OCCA discussed the impact of *Brown* on this case.  *Hanson*, 206 P.3d at 1033-34.  But Oklahoma does not have a comparable sentencing provision.  The question was thus whether the evidence adduced in support for the "great  risk" aggravating factor could be given aggravating weight under another aggravating factor.  The OCCA found the evidence

was "properly admitted to support the separate and valid aggravating factor that the murder

was committed for the purpose of avoiding or preventing a lawful arrest or prosecution." *Id*.

at 1034.

This determination is undermined first by the prosecutor's own arguments reflecting

the evidence was adduced to establish the great risk of death  aggravating circumstance.  In

opening arguments, the prosecutor detailed the evidence supporting the circumstance:

> Another aggravating circumstance the State is alleging is that the Defendant
> knowingly created a great risk of death to more than one person.  You're going
> to learn from the evidence what I have discussed with you, that there were two
> people that were murdered within that short time period.  Both Mary Bowles
> and Jerald Thurman lost their lives within minutes.

> The acts that this Defendant did cause a great risk of death to more than one
> person, in fact, it did cause the death of more than one person.

> * * *

> Evidence of great risk of death to more than one person, as I discussed, Jerald
> Thurman and Mary Bowles lost their lives . . . .

TR. 1196-97; 1199.  During the direct examination of the State's witness Dr. DiStefano, the

medical examiner, Mr. Hanson, objected as to the relevance of Jerald Thurman's cause of

death.  The prosecutor responded:

> The relevance is, it goes directly to come [sic] of the aggravators, particularly
> death to more than one person.  Jerald Thurman was murdered.  And even Mr.
> Gordon talked in voir dire about the fact that he was responsible, first degree
> felony murder, for the death of Jerald Thurman.  So it's part of our case.  Not
> only does this support that I'm entitled to put on all the evidence of the first
> days, this also goes directly to the aggravating circumstances, such as great
> risk of death to more than one person.

TR. 1554-55.  Finally during closing argument, the prosecutor summarized the evidence

supporting the great risk of death aggravating factor: "We've alleged great risk of death to

more than one person.  There is [sic] two people dead.  That's how dangerous this crime

spree was."  TR. 1908.

The "avoid arrest" aggravating circumstance itself should be deemed invalid for a

variety of reasons advanced in Grounds Six and Seven.  If the "avoid arrest" circumstance

fails, so too does the rationale for withholding relief for invalidity of the "great risk"

aggravating circumstance.  This complex of error would surely require the Writ issue.

Moreover, the Oklahoma court asked itself whether the evidence was "properly

admitted" in support of the "avoid arrest" circumstance, not the question mandated by

*Brown*, *i.e.* whether it could be given "aggravating weight" thereunder.  *Id*. at 1034; *Brown*,

546 U.S. at 220.  In *Brown*, the evidence could be given full aggravating effect under the

omnibus circumstance of the crime factor.  Here, the OCCA is asserting that the evidence

supports inferentially the finding of something else that is aggravating: Mr. Hanson's alleged

attempt to avoid arrest.  But, the OCCA is not even suggesting that Mr. Hanson purportedly

shot Ms. Bowles to avoid arrest for the  shooting of Mr. Thurman.  Rather, the OCCA

offered that both were killed to cover up the kidnaping of Ms. Bowles and the theft of her

car.  "Miller killed Thurman to eliminate him as a witness and minutes later Hanson killed

Bowles for the same reason."  206 P.3d at 1034.  The Thurman homicide was, even in the

hindsight perception of the OCCA, just inferential evidence of an "avoid arrest" motive, not

something to be accorded aggravating weight in and of itself.   *Brown* holds that is not

enough to satisfy the escape clause:

> This test is not, as Justice BREYER describes it, "an inquiry based solely on
> the admissibility of the underlying evidence."  *Post*, at 903-904 (dissenting
> opinion).  If the presence of the invalid sentencing factor allowed the sentencer
> to consider evidence that would not otherwise have been before it, due process
> would mandate reversal without regard to the rule we apply here.  See *supra*,
> at 891; see also n. 6, *supra*.  The issue we confront is the skewing that could
> result from the jury's considering *as aggravation* properly admitted evidence
> that should not have weighed in favor of the death penalty.  See, *e.g., Stringer*,
> 503 U.S., at 232, 112 S.Ct. 1130 ("[W]hen the sentencing body is told to
> weigh an invalid factor in its decision, a reviewing court may not assume it
> would have made no difference if the thumb had been removed from death's
> side of the scale").  As we have explained, such skewing will occur, and give
> rise to constitutional error, only where the jury could not have given
> aggravating weight to the same facts and circumstances under the rubric of
> some other, valid sentencing factor.

546 U.S. at 220-21 (emphasis in original).

For all the foregoing reasons, the OCCA determination was contrary to *Brown* or, at

the least, an unreasonable application thereof.  This Court should issue the Writ.

## GROUND SIX

**ERRORS INVOLVING THE "MURDER TO AVOID LAWFUL
ARREST OR PROSECUTION" AGGRAVATING CIRCUMSTANCE
VIOLATED MR. HANSON'S RIGHTS UNDER THE FIFTH, SIXTH,
EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED
STATES CONSTITUTION.**

Mr. Hanson's death sentence is based in large part on the jury's finding that the

murder of Mary Bowles was committed for the purpose of avoiding or preventing a lawful

arrest and/or prosecution.  Indeed, as previously discussed, in invalidating the "great risk of

95

death to another person" aggravating circumstance, the OCCA refrained from vacating Hanson's death sentence only because it found that evidence presented in support of that aggravator was "properly admitted to support the separate and valid aggravating factor that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution." *Hanson,* 206 P.3d at 1034.

The "avoiding lawful arrest" aggravator itself is invalid as demonstrated below.  The one beleaguered aggravator left, prior conviction of a felony involving the use or threat of violence, cannot sustain the viability of Mr. Hanson's death sentence by itself.  *See Brown v. Sanders*, 546 U.S. 212 (2006); Ground Five, *supra.*  The "avoiding lawful arrest" aggravating circumstance is invalid for a number of reasons, and Mr. Hanson's death sentence must be reversed.

The OCCA flatly rejected Petitioner's claims centered on the "avoiding lawful arrest" aggravator.  *Hanson v. State*, 206 P.3d 1020, 1034 (Okla. Crim. App. 2009). Its determinations involved both unreasonable application of clearly established federal law and unreasonable determination of facts in light of the evidence presented at Mr. Hanson's re-sentencing.  *See* 28 U.S.C. § 2254 (d)(1), (d)(2).

## I.      Re-presentment of this Aggravator Violated the Double Jeopardy Clause.

In Mr. Hanson's original sentencing proceeding, the State requested that the jury find as an aggravating circumstance that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution.  Although the jury found three other aggravating

circumstances and issued a death sentence, it rejected the avoiding lawful arrest aggravator.

O.R. 542.

Allowed the opportunity by the trial court to learn from its unsuccessful first attempt and try again, the State at the re-sentencing proceeding was able to obtain a finding by the jury that the murder was committed for the purpose of avoiding unlawful arrest. Such was fundamentally unfair and a violation of the Double Jeopardy Clause.

There are two things Petitioner must do, and can do, to prevail on the instant double jeopardy claim. First, he must convince the Court that Judge Chapel of the Oklahoma Court of Criminal Appeals was correct when he stated "that the United States Supreme Court, through the still-unfolding *Apprendi/Ring* Revolution, has rejected the doctrinal basis for its decision in *Poland* [*v. Arizona,* 476 U.S. 147 (1986).]" *Hogan v. State,* 139 P.3d 907, 948 (Okla. Crim. App. 2006) (Chapel J., dissenting). Second, Petitioner must convince the Court Judge Chapel was correct when he concluded "the most reasonable way to deal with an Oklahoma jury's failure to check an aggravating circumstance, at least in the short term, is to treat it as a unanimous rejection of that aggravator, which operates as an 'acquittal' on that aggravator." *Id.* at 950 (Chapel J., dissenting). In this regard, Petitioner submits that treating an Oklahoma jury's failure to check an aggravator as a unanimous rejection of the aggravator is not only the most reasonable way to deal with it, it is required under federal Constitutional law.

    a.    **The Basis for the Supreme Court's Decision in *Poland v. Arizona* Has Been Rejected by the Court in Subsequent Decisions.**

97

In *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court held that any fact finding about the presence of aggravating circumstances necessary for imposition of the death penalty is constitutionally reserved to a jury and must be found not by a mere preponderance of the evidence but beyond a reasonable doubt.   In so ruling, the Court extended into the capital-punishment arena the groundbreaking shift in Sixth Amendment jurisprudence the Court set off two years earlier in *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

The vast significance of *Ring* and *Apprendi* is well documented.  From Justice Scalia's demarcation of a pre and "post-*Ring* world," *Sattazahn v. Pennsylvania,* 537 U.S. 101, 112 (2003), to Judge Chapel's reference to the "still-unfolding *Apprendi/Ring* Revolution," to Scalia's reference to "*Apprendi*-land" in *Ring* itself, it is clear that the law must be viewed in the context of the sea change that *Ring/Apprendi* wrought.  In the "post-*Ring* world," aggravating circumstances are:

> the "functional equivalent" of "elements of a greater offense," where the lesser offense is simply first-degree murder or "murder simpliciter," for which the death penalty is not an authorized punishment, and the greater offense is "murder plus one or more aggravating circumstances," for which the death penalty is an authorized punishment. While this shift might seem mere semantics to some, in fact, the change is fundamental and quite significant.

*Hogan,* 139 P.3d at 948 (Chapel J., dissenting) (quoting *Sattazahn v. Pennsylvania,* 537 U.S. at 111-112).

The state of the law was very different prior to the *Ring/Apprendi* Revolution, and in particular, the law was very different back in 1986 when *Poland* was decided.  As Justice Scalia has noted, to the *Poland* Court, "sentencing proceedings were understood to be just

that: *sentencing proceedings*."  *Sattazahn,* 537 U.S. at 110 (emphasis in original).  Indeed,

to the *Poland* Court, aggravating circumstances were not elements of separate offenses at all,

but mere "'standards to guide the making of [the] choice' between the alternative verdicts

of death and life imprisonment." *Poland,* 476 U.S. at 156 (quoting *Bullington v. Missouri*,

451 U.S. 430, 438 (1981); *see also Walton v. Arizona*, 497 U.S. 639, 648 (1990)).

In *Poland*, the defendants were convicted of first degree murder. At the capital

sentencing proceeding, the prosecution sought the death penalty based on two statutory

aggravating factors: that the defendants committed the offense in consideration for something

of pecuniary value and that the offense was especially heinous, cruel, or depraved. The trial

court found that the "heinous, cruel, or depraved" factor was present, but that the "pecuniary

value" factor only applied to killings for hire, and thus, did not apply. 476 U.S. at 149. On

appeal, the Arizona Supreme Court held that the evidence was insufficient to sustain the

"heinous, cruel, or depraved" aggravating circumstance and that the "pecuniary value"

aggravating circumstance was not limited to cases involving a contract killing. On retrial,

defendants were again found guilty of first degree murder and were sentenced to death, this

time on the basis of the "heinous, cruel, or depraved" and "pecuniary value" aggravating

factors.

The defendants argued that the Arizona Supreme Court's finding that the evidence

was insufficient to support the "heinous, cruel, or depraved" aggravating factor amounted

to an "acquittal" of the death penalty within the meaning of *Bullington*. The Supreme Court

99

rejected what it called the "fundamental premise of petitioners' argument, namely, that a capital sentencer's failure to find a particular aggravating circumstance alleged by the prosecution always constitutes an 'acquittal' of that circumstance for double jeopardy purposes." *Poland*, 476 U.S. at 155. Back when *Poland* was decided, the Supreme Court was simply "not prepared to ... view the capital sentencing hearing as a set of minitrials on the existence of each aggravating circumstance." *Id.* at 155-56.

The *Poland* case, however, was issued almost twenty-five years ago, long before the *Ring/Apprendi* Revolution. It was also issued seventeen years prior to *Sattazahn v. Pennsylvania,* a case vital to a proper understanding of the current state of law in this area. Indeed, both the majority and dissent in *Hogan* recommend a "careful" review of *Sattazahn*. 139 P.3d at 929, 949, 950.

Judge Chapel's dissent in *Hogan* discusses *Poland*'s place in history, and the *Sattazahn* case in the *Ring/Apprendi* Revolution. As noted by Judge Chapel, *Sattazahn* simply applied the same rule to capital-stage "hung juries" that the Court had consistently applied to hung juries in the guilt stage. However, from *Sattazahn,* it can be seen that a strong majority of the Court fundamentally disagrees with the doctrinal basis for *Poland* and would surely overturn it if directly presented with the issue.

Justice Scalia is the architect of *Sattazahn's* plurality decision. As noted by Judge Chapel, Justice Scalia begins the crucial Section III of the plurality opinion by noting that:

> "[w]hen *Bullington*, *Rumsey*, and *Poland* were decided, capital-sentencing proceedings were understood to be just that: *sentencing proceedings.*" As such,

> "sentencing proceedings" were understood as different from trials "in a respect crucial for purposes of the Double Jeopardy Clause: They dealt only with the *sentence* to be imposed for the 'offence' of capital murder." Hence the Court in this earlier era "continually tripped over the text of the Double Jeopardy Clause."

*Hogan*, 139 P.3d at 949 (quoting *Sattazahn,* 537 U.S. at 110)  (emphasis in original).

Judge Chapel further noted Scalia's recognition that *Ring/Apprendi* changed the jurisprudential landscape and "illuminated this part of our jurisprudence." *Id.* (quoting *Sattazahn* at 111).   He then emphasized this important point from Scalia:

> We can think of no principled reason to distinguish, in this context, between what constitutes an offense for purposes of the Sixth Amendment's jury-trial guarantee and what constitutes an "offence" for purposes of the Fifth Amendment's Double Jeopardy Clause ... In the post-*Ring* world, the Double Jeopardy Clause can, and must, apply to some capital-sentencing proceedings consistent with the text of the Fifth Amendment.

*Id.* (quoting *Sattazahn* at 111-112).

In accordance with the plurality opinion of Justice Scalia, Judge Chapel concluded that aggravating circumstances *are* like minitrials on separate offenses. *Id.*  Moreover, the dissenters in *Sattazahn* did not disagree, but rather:

> agreed with Section III of Scalia's opinion that, in the post-*Ring* world, when a jury "acquits" a defendant on an aggravating circumstance, that aggravating circumstance cannot be pursued in any retrial or resentencing in the same case. The *Sattazahn* dissenters note: "This Court has determined ... that for purposes of the Double Jeopardy Clause, capital sentencing proceedings involving proof of one or more aggravating factors are to be treated as trials of separate offenses, not mere sentencing proceedings."

*Hogan*, 139 P.3d at 948-50 (footnotes omitted).[20]

Judge Chapel's sharp analysis in *Hogan* should resonate with this Court.  Adherence to constitutional ideals is especially important in capital cases, and here the "constitutional handwriting is on the wall." *Id.* at 951.  *See also Burger v. Kemp*, 483 U.S. 776, 785 (1987) ("'Our duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.'" (internal citation omitted)).

The pronouncement in *Sattazahn* is clear:

> We can think of no principled reason to distinguish, in this context, between what constitutes an offense for purposes of the Sixth Amendment's jury-trial guarantee and what constitutes an "offence" for purposes of the Fifth Amendment's Double Jeopardy Clause. Cf. *Monge v. California*, 524 U.S. 721, 738, 118 S.Ct. 2246, 141 L.Ed.2d 615 (1998) (SCALIA, J., dissenting) ("The fundamental distinction between facts that are elements of a criminal offense and facts that go only to the sentence " not only "delimits the boundaries of ... important constitutional rights, like the Sixth Amendment right to trial by jury," but also "provides the foundation for our entire double jeopardy jurisprudence"). In the post- *Ring* world, the Double Jeopardy Clause can, and must, apply to some capital-sentencing proceedings consistent with the text of the Fifth Amendment.

*Sattazahn v. Pennsylvania,* 537 U.S. at 111-112.  Aggravating circumstances must be given the same treatment in the Fifth Amendment context as they are given in the Sixth Amendment context.  As such, a jury's findings on aggravating circumstances *are* like

---

[20] It should be noted the facts of the instant case are more egregious than the facts in *Hogan,* as *Hogan* only concerned the *presentment* of an aggravator that had previously been rejected.  There was an implicit acquittal of the continuing threat aggravator in *both* of Hogan's sentencing proceedings.  The instant case presents an acquittal of murder-plus-avoiding-lawful-arrest followed by a *conviction* of murder-plus-avoiding-lawful-arrest, in full violation of the Double Jeopardy Clause.

minitrials on separate offenses, and in the instant case, the jury rejected "murder plus avoiding lawful arrest." It was unreasonable for the OCCA not to recognize these Constitutional developments and that Supreme Court law renders Mr. Hanson's position inevitably correct.

If an accused has successfully run the gauntlet as to one aggravator, there is no "principled" reason he should thereafter be sentenced to death based on that aggravator. *Apprendi/Ring* was a revolution, and in the post-*Ring* world, "findings on aggravating circumstances *are* like minitrials on separate offenses." *Hogan,* at 949 (Chapel J., dissenting) (emphasis in original). *Poland* should hold no sway.

> **b.    The Failure of the First Sentencing Jury to Check the Avoiding Lawful Arrest Aggravating Circumstance Must Be Treated As a Unanimous Rejection and "Acquittal" of That Aggravator.**

The verdict form for death penalty aggravators in regard to the death of Mary Bowles was the same at both Mr. Hanson's sentencing proceedings.  The form was taken from OUJI-CR 4-84, and stated as follows:

> We, the jury, empaneled and sworn in the above entitled cause, do upon our oaths unanimously find the following statutory aggravating circumstance[] or circumstances as shown by the circumstance or circumstances checked:
>
> ___ The defendant, prior to the murder, was convicted of a felony involving the use or threat of violence to the person;
>
> ___ During the commission of the murder, the defendant knowingly created a great risk of death to more than one person;
>
> ___ The murder was committed for the purpose of avoiding or preventing a

lawful arrest or prosecution;

_____ At the present time there exists a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society.

O.R. at 542, 1563.

In the first sentencing proceeding, the jury did not place a mark by the aggravator that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution, thus indicating its rejection of that aggravator as a basis for Hanson's death sentence. In the instructions for this verdict form, the jury was ordered to state "specifically what aggravating circumstance(s) existed, if any." OUJI 4-81, O.R. at 537.

In regard to the "form" of the jury's rejection of the aggravator under Oklahoma's uniform instruction scheme, Judge Chapel had this to say:

> It could be argued that Oklahoma's current, capital-stage verdict forms-which instruct juries to simply check any aggravating circumstance(s) upon which the jurors unanimously agree-do not allow us to determine whether a jury's failure to find a particular aggravator was a unanimous rejection of that aggravator or not. Yet this Court has consistently described verdicts where an aggravator is unchecked as a "rejection" of the unchecked aggravator(s). ... And ... without specific notice from a jury that it is "deadlocked," we have no basis for assuming that such is the case. I conclude that the most reasonable way to deal with an Oklahoma jury's failure to check an aggravating circumstance, at least in the short term, is to treat it as a unanimous rejection of that aggravator, which operates as an "acquittal" on that aggravator.

*Hogan,* 139 P.3d at 950 n. 94. This only makes sense in light of the Supreme Court's handling of greater/lesser-included-offense double jeopardy cases and the analogy of capital cases being murder plus aggravator versus murder *simpliciter.*

In this regard, the case of *Green v. United States,* 355 U.S. 184 (1957)[21] is instructive. In *Green*, the defendant was indicted on one count of arson and one count of murder in the first degree. 355 U.S. at 185. A jury found the defendant guilty of arson and of the lesser-included offense of second degree murder. *Id*. at 186. The jury "did not find [the defendant] guilty on the charge of murder in the first degree[,]" and "[i]ts verdict was silent on that charge." *Id*. On appeal, the District of Columbia Circuit Court of Appeals reversed the conviction for second degree murder because it was not supported by sufficient evidence, and the case was remanded for a new trial. *Id*.

On remand, the defendant was "tried again for first degree murder under the original indictment." *Id*. He raised the defense of former jeopardy "based [not] on his previous conviction for second degree murder but instead on the original jury's refusal to convict him of first degree murder." *Id*. at 190 n. 11. The defendant's double jeopardy defense was rejected by the trial court, and "a new jury found [the defendant] guilty of first degree murder[.]" *Id*. at 186. On appeal, the Court of Appeals "rejected his defense of former jeopardy ... and affirmed the conviction." *Id*. The United States Supreme Court granted certiorari and "conclude[d] that this second trial for first degree murder placed [the defendant] in jeopardy twice for the same offense in violation of the Constitution." *Id*. at 190.

*Green* is based on two rationales. First, the Court presumed that in finding the

---

[21] While *Green* is admittedly over fifty years old, it is still good law and was cited multiple times by Justice Scalia for the plurality and Justice Ginsburg for the dissent in *Sattazahn v. Pennsylvania,* 537 U.S. 101 (2003).

Case 4:10-cv-00113-CVE-TLW   Document 13   Filed in USDC ND/OK on 12/06/10   Page 126 of
6:25-cv-00081-RAW-JAR      Document 7-3   162
                                    Filed in ED/OK on 04/04/25     Page 127 of 244

defendant guilty of the lesser offense, the jury implicitly acquitted him of first degree murder;

second, and more broadly, the Court reasoned that jeopardy terminated on the greater charge

when the first jury "was given a full opportunity to return a verdict" on that charge and

instead reached a verdict on the lesser charge.  *Price v. Georgia*, 398 U.S. 323, 328-29

(1970) (quoting *Green*, 355 U.S. at 191) (jury impliedly acquitted defendant of murder by

convicting of lesser included manslaughter offense).

> In discussing these rationales, the Supreme Court stated:

> Green was in direct peril of being convicted and punished for first degree
> murder at his first trial. He was forced to run the gantlet once on that charge
> and the jury refused to convict him.... Therefore it seems clear, under
> established principles of former jeopardy, that Green's jeopardy for first degree
> murder came to an end when the jury was discharged so that he could not be
> retried for that offense. *Wade v. Hunter*, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed.
> 974. In brief, we believe this case can be treated no differently, for purposes
> of former jeopardy, than if the jury had returned a verdict which expressly
> read: 'We find the defendant not guilty of murder in the first degree but guilty
> of murder in the second degree.'

*Green,* 355 U.S. at 190-91.  The same can and should be said about the "avoiding lawful

arrest" aggravator in the instant case.  Though there was no "express verdict," there

nevertheless was an "implicit acquittal" which can be treated no differently than if the jury

had specifically stated "we find the defendant not guilty of" the statutory aggravating

circumstance Murder Committed for the Purpose of Avoiding or Preventing Lawful Arrest

or Prosecution.

    This conclusion rests on a foundation of fairness as well.  It is only fair after all that

a government with all of its "resource and power" should be restrained from wearing down

a defendant with "repeated attempts," or repeated bites of the aggravator apple. *Green,* 355 U.S. at 187. Indeed, it is concerns such as these that form the core of the Double Jeopardy Clause. *See e.g., McMullen v. Tennis,* 562 F.3d 231,238 (3d Cir. 2009) ("In the end, the Double Jeopardy Clause bars the prosecution from taking the proverbial second bite at the apple.").

It is also only fair not to penalize Petitioner for the Oklahoma Uniform Jury Instruction's lack of clarity. That lack of clarity is no reason to create a finding of a deadlocked jury where no such determination was made. *See also Hogan,* 139 P.3d at 950 n. 94 (Chapel J., dissenting) ("without specific notice from a jury that it is 'deadlocked,' we have no basis for assuming that such is the case."). For all the above reasons, the Court should deem the jury's determination a unanimous rejection and acquittal of the "avoiding lawful arrest" aggravator. The application of this aggravating circumstance at Petitioner's re-sentencing proceeding violated the Double Jeopardy Clause.

## II.    The Avoiding Lawful Arrest Aggravator is Unconstitutionally Overbroad.

The State may not use sentencing procedures that create a substantial risk that the death penalty will be imposed in an arbitrary and capricious manner. *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980). The Eighth Amendment's "guided discretion" doctrine requires that objective, standardized limitations be placed upon any aggravating circumstance that will serve as a basis for imposing the death penalty. *Furman v. Georgia*, 408 U.S. 238 (1972). An aggravating circumstance does not meet Eighth Amendment standards if it is vague or

could be applied to every defendant convicted of murder. The aggravating circumstance must narrow the class of those eligible for death. *Tuilaepa v. California*, 512 U.S. 967, 972 (1994).

Oklahoma's avoiding lawful arrest aggravator fails to narrow the class of offenders eligible for the death penalty. For example, in operation this aggravator applies to virtually all defendants guilty of felony murder. *See* Okla. Stat. tit. 21, § 701.12(5).

Uniform jury instructions and decisions by the OCCA purport to limit the aggravator to cases in which the State proves beyond a reasonable doubt (1) a predicate crime and (2) the defendant's intent to eliminate a witness regarding this separate crime. *Scott v. State*, 891 P.2d 1283, 1294-95 (Okla. Crim. App. 1995). The OCCA has claimed a defendant's intent is "critical" to the proof required, *Lott v. State,* 98 P.3d 318, 348 (Okla. Crim. App. 2004), but in practice, essentially  no evidence regarding intent is required by juries or the state courts to narrow or substantiate this aggravating circumstance.

The OCCA has upheld the aggravator when it was supported by nothing more than the occurrence of another crime committed in conjunction with the homicide, and the resulting speculation that witness elimination could  have been the motive. *See Carpenter v. State*, 929 P.2d 988, 995-96 (Okla. Crim. App. 1996); *Pennington v. State*, 913 P.2d 1356, 1371 (Okla. Crim. App. 1995).

The OCCA held that when the defendant and victim were acquaintances a rational jury could find from this fact alone that the victim was killed to avoid arrest for a preceding

rape. *Mollett v. State*, 939 P.2d 1, 13 (Okla. Crim. App. 1997). Familiarity between the victim and the perpetrator as a criterion for this aggravator, however, does not sufficiently limit application of this circumstance to survive constitutional muster. According to a study of homicides by victim/offender relationship published in 2007 by the United States Department of Justice, in only 14% of all murder cases were the victim and the assailant strangers.[22] Thus, in 86% of homicide cases, the victim and perpetrator knew each other.

Regarding the remaining 14%, the OCCA has also held that the mere fact the defendant did not try to hide his identity is evident enough of intent. When the non-identity-hiding cases are added in, it is obvious that the purported narrowing is illusory. *See e.g.*, *Lott v. State,* 98 P.3d 318, 348; *Wackerly v. State,* 12 P.3d 1, 15 (Okla. Crim. App. 2000).

Indeed, of the dozens upon dozens of cases in which the OCCA has reviewed the jury's finding of this aggravator, it found it invalid in only seven cases. In all seven cases, the aggravator failed because the predicate crime was not established.[23] In no case has the aggravator been found to be invalid in Oklahoma due to the failure to establish the intent element.

As such, the claim that narrowing of this aggravator has been accomplished rings

---

[22] *See* J. A. Fox and M. W. Zawitz, *Homicide Trends in the U.S.,* Bureau of Justice Statistics, www.ojp.usdoj.gov/bjs/.

[23] *See Mitchell v. State,* 136 P.3d 671, 681 (Okla. Crim. App. 2006); *Williams v. State*, 22 P.3d 702, 723 (Okla. Crim. App. 2001); *Thornburg v. State*, 985 P.2d 1234, 1247 (Okla. Crim. App. 1999); *Snow v. State*, 876 P.2d 291, 299 (Okla. Crim. App. 1994); *McGregor v. State*, 885 P.2d 1366, 1385 (Okla. Crim. App. 1994); *Cummings v. State,* 968 P.2d 821, 836 (Okla. Crim. App. 1998); *Barnett v. State*, 853 P.2d 226, 233-34 (Okla. Crim. App. 1993).

hollow. *See e.g.*, *Ramono v. State,* 909 P.2d 92, 119 (Okla. Crim. App. 1995).   No appreciable narrowing of this broad-based aggravator exists.

With application of the intent element ignored, what is left is the requirement of a predicate crime, which hardly qualifies as a limitation.  For example, all defendants convicted of felony murder are eligible for the death penalty.  Okla. Stat. tit. 21, §§ 701.7, 701.9.  The "avoiding lawful arrest" aggravator, as presently applied in Oklahoma, violates both the Eighth and Fourteenth Amendments.

The Supreme Court has stated it looks beyond the face of a statute, to the application of an aggravating circumstance in the case before it, to determine whether a state court's application is "so broad as to vitiate the role of the aggravating circumstance in guiding the jury's discretion." *McCleskey v. Kemp,* 481 U.S. 279, 305 (1987).  As presently applied, this aggravating circumstance is far too broad.  *See Ross v. Ward*, 165 F.3d 793, 800 (10th Cir. 1999) (citing *Brecheen v. Reynolds*, 41 F.3d 1343, 1360 (10th Cir. 1994)) ("This aggravator cannot reasonably be said to apply to every defendant convicted of murder – it only applies to a defined and limited subclass of murders, namely, those where the defendant's conduct, not only resulted in murder, but also posed a significant risk of death to other individuals."). Not only is such an application overly broad,  it also creates a presumption of guilt, which places a burden on the defendant to prove his innocence.  Since it is theoretically possible that everyone convicted of a murder coupled with a felony may have killed to eliminate a witness, the defendant must prove this was not his motive.  A  presumption  in a criminal

case that shifts the burden of proof to the defendant is a violation of due process.  *See*

*Sandstrom v. Montana*,  442 U.S. 510, 523-24 (1979).  As can be seen, the "avoiding lawful

arrest" aggravating circumstance fails to appreciably narrow the class of those eligible for

death and succeeds at unconstitutionally forcing defendants to prove a negative.   It fails to

pass constitutional muster both in theory and in practice.

### III.    The Evidence Was Insufficient to Support This Aggravator.

As discussed above, Oklahoma courts examine two factors when addressing

sufficiency challenges to this aggravating circumstance.  First, the court must determine a

predicate crime separate from the murder exists.  *McGregor v. State*, 885 P.2d 1366 (Okla.

Crim. App. 1994).  Second, the court must determine the defendant possessed the requisite

intent to kill the victim to avoid arrest or lawful prosecution for the predicate crime.  *Carter*

*v. State*, 879 P.2d 1234 (Okla. Crim. App. 1994).   The issue of intent is purportedly

"critical."  *Powell v. State*, 906 P.2d 765, 781 (Okla. Crim. App. 1995).  Sufficient evidence

must be presented to prove each aggravating circumstance alleged beyond a reasonable

doubt.  *Booker  v.  State*,  851  P.2d  544   (1993).   The  Constitution  imposes  the  same

requirement.  *Gilbert v. Mullin*, 302 F.3d 1166, 1182 (10th Cir. 2002).

The only evidence pertaining to this aggravator comes from the testimony of Rashad

Barnes, who claimed that Mr. Hanson spoke to him after the crime.  According to Rashad

Barnes, Petitioner told him he planned to let Mary Bowles go, but as he was trying to get her

out of the car, they were seen by a witness.   Victor Miller said he would handle it, shot the

witness dead, and then told Hanson "he knew what he had to do."  Thereafter Hanson shot

Bowles.  Tr. 1347-49. Petitioner incorporates and reurges here all the arguments made in

Ground One as to extreme unreliability and ultimate inadmissibility of Rashad Barnes'

testimony.  And even if admissible, Petitioner submits, Rashad Barnes' testimony is not

substantial or convincing enough to prove the "avoiding lawful arrest" aggravator beyond

a reasonable doubt.

    A real life demonstration of this is the fact that the *first* sentencing jury *acquitted*

Petitioner on this aggravator. The first jury could easily have found Barnes' testimony too

unreliable on this issue.  Or it could have plausibly reasoned that in the aftershock of just

witnessing Victor Miller ruthlessly gun a man down, Hanson was purely motivated by fear

of Miller, not fear of arrest or prosecution.  Evidence of Hanson's intent was not presented

and such is as plausible a hypothesis as any.  Victor Miller's influence and perhaps Victor

Miller's intent may be hypothesized from evidence of his actions and statements.  John

Hanson's intent cannot be so divined. The State's evidence to support this aggravator was

indirect and insufficient, both at the first sentencing proceeding as well as the second.

    The evidence on intent is circumstantial.  To the extent he ever had any murderous

intent at all, the hypothesis that Mr. Hanson's intent was based on fear rather than witness

elimination is eminently reasonable.  Oklahoma law is strict when evaluating aggravating

circumstances based on circumstantial evidence:

> when the State relies in part, as here, on circumstantial evidence to prove the
> existence of the aggravating circumstances, "all of the facts and circumstances,

> taken together, must be inconsistent with any reasonable theory or conclusion
> other than the existence of the aggravating circumstances." ... the "reasonable
> hypothesis" instruction is still the required jury instruction for aggravating
> circumstances proven, entirely or in part, by circumstantial evidence.

*Lay v. State*, 179 P.3d 615, 623 (Okla. Crim. App. 2008).  Hanson has a due process right to this standard.  *See e.g.*, *Hicks v. Oklahoma*, 447 U.S. at 346.  Considering that no direct evidence was presented bearing on Mr. Hanson's intent, it is only appropriate for the "reasonable hypothesis" standard to be applied to the instant claim.  It is reasonable to believe based on the limited facts and circumstances presented that Hanson, who the evidence shows did not plan on murdering Mary Bowles, acted, if at all, based on fear of Victor Miller not fear of arrest or prosecution.

In any event, an unreasonable inference, such as the leap the State took regarding Mr. Hanson's intent, cannot support the finding of a capital aggravating circumstance.  *Thomas v. Gibson*, 218 F.3d 1213, 1228-29 (10th Cir. 2000).  No reasonable jury could have found the evidence sufficient to prove that Mr. Hanson had the requisite intent to "murder to avoid arrest" beyond a reasonable doubt.  The evidence alleged in support of the avoiding arrest aggravating circumstance does not even meet the standard of *Jackson v. Virginia*, 443 U.S. 307 (1979).  Mr. Hanson is entitled to habeas relief.

## IV.    Conclusion

In this "*post-Ring* world," Mr. Hanson's Double Jeopardy Clause rights were violated when the state unfairly received a second chance at the "avoiding lawful arrest" aggravating circumstance after his first jury rejected it.  In addition, the overbroad application of this

aggravator resulted in an arbitrary application of the death penalty. *See Maynard v. Cartwright*, 486 U.S. 356, 362 (1988) ("the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action") Finally, the evidence in support of the "avoiding lawful arrest" aggravating circumstance was insufficient under the law. *See also* Ground Seven (evidence additionally insufficient because State failed to clearly allege predicate crime). The application of this invalid aggravator to Mr. Hanson requires reversal of his death sentence.

## GROUND SEVEN

**THE STATE'S FAILURE TO ALLEGE WITH SPECIFICITY THE PREDICATE CRIME FOR WHICH MARY BOWLES' MURDER WAS COMMITTED IN ORDER TO AVOID ARREST OR PROSECUTION VIOLATED MR. HANSON'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

In Oklahoma, one of the statutorily defined aggravating circumstances is that "the murder was committed for the purpose of avoiding lawful arrest or prosecution." Okla. Stat. tit. 21, § 701.12 (5). The elements of the murder-to-avoid-arrest circumstance are (1) there was a crime separate and distinct from the murder and (2) the defendant committed the murder with the intent to avoid being arrested or prosecuted for that other crime. Oklahoma Uniform Jury Instruction (OUJI), CR 2d 4-75; O.R. 1582. *See also Scott v. State*, 891 P.2d 1283, 1294-95 (Okla. Crim. App. 1995). Both of these elements must be proven beyond a reasonable doubt in order to sustain a capital sentence. *See Ring v. Arizona*, 536 U.S. 584

114

(2002).   The State alleged this circumstance against Mr. Hanson at his re-sentencing trial, and in turn, the jury found the existence of the circumstance.

Prior to Mr. Hanson's trial, the State filed a *Notice of Evidence in Support of Aggravating Circumstances*.  O.R. 340-350.  In its Notice, the State alleged four (4) theories of how the aggravating circumstance was satisfied: (1) "The Defendant had the purpose of avoiding or preventing lawful arrest or prosecution while committing the crime of Robbery With a Firearm of Mary Bowles by assaulting her and robbing her of her automobile;" (2) "Robbery With a Firearm is separate and distinct from the murders of Jerald Thurman and Mary Bowles:" (3) Mary Bowles was murdered to avoid arrest and prosecution for the murder of Jerald Thurman and the crime of "Robbery With a Firearm of Mary Bowles' Automobile;" and (4) "The murders of Jerald Thurman and Mary Bowles were also committed for the purpose of avoiding or preventing a lawful arrest or prosecution for the aforesaid criminal act of possession of a firearm after former conviction of a felony." Because the State failed to allege a distinct predicate felony, it is not clear which crime the jury chose as the predicate, or if the jurors unanimously agreed as to which crime was the predicate.

Mr. Hanson is aware that the Supreme Court has not imposed a jury unanimity requirement on the states.  *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972).  However, in Oklahoma a jury must make a unanimous finding as to the existence of an aggravating circumstance.  OUJI CR 2d 4-76; O.R. 1583.  The State of Oklahoma has chosen to afford

capital defendants the structural protection of requiring juror unanimity with respect to the finding of aggravating circumstances. Here, Oklahoma has failed to afford Mr. Hanson those protections thereby violating his rights under the Due Process Clause of the United States constitution. *Evitts v. Lucey*, 469 U.S. 387, 400-01 (1985). *See also Hicks v. Oklahoma*, 447 U.S. 343, 345-47 (1980).

There are instances in which multiple theories of guilt are advanced and the lack of juror unanimity with respect to an individual theory is unobjectionable. *See Schad v. Arizona*, 501 U.S. 624 (1991) (general verdict finding both felony and malice theories of murder Constitutionally permissible as long as both theories supported by the evidence). However, this is not such an instance. Some of the predicate crimes alleged by the State to support this aggravating circumstance lack evidentiary support such that Mr. Hanson's jury could not have found the elements of the murder-to-avoid-arrest circumstance beyond a reasonable doubt.

The OCCA addressed this issue during post conviction proceedings. *Hanson v. State*, No. PCD-2006-614, slip op. at 9 (Okla. Crim. App. June 2, 2009). The state court held:

> At Hanson's resentencing trial, the State argued that Hanson murdered Bowles to avoid a lawful arrest or prosecution for his involvement in the murder of the dirt pit owner *only*. Therefore, contrary to Hanson's claim, the State did not rely on more than one predicate crime to support this aggravating circumstance. For this reason, he can show that neither trial nor appellate counsel were ineffective for failing to challenge the aggravator on this basis.

*Id*. (emphasis added). The factual finding that the State only supported the aggravating circumstance with the murder of Jerald Thurman is an unreasonable determination of the

facts in light of the evidence presented at Mr. Hanson's trial. 28 U.S.C. 2254 (d)(2). The

State alledged multiple theories as the predicate crime to support this aggravator including,

*inter alia*, robbery with a firearm of Mary Bowles, robbery of her automobile, carjacking,

murder of Jerald Thurman, felon in possession of a firearm, and kidnaping.

Prior to the start of trial, while discussing the matter with the court, the State didn't

even allege that Jerald Thurman's death would serve as the predicate crime.

> COURT:    [I]f that is going to be part of this case, and it seems to me that
> it's important to - - for the jury to know that there was an
> allegation of this robbery - - murder in the commission of the
> robbery, what other arrests are they going to think that he was
> avoiding?

> STATE:    Well, they'll know from the evidence that the - - that Ms.
> Bowles was kidnapped. I mean, I think that's clear, based on
> the evidence, and I think that will bear itself out in the record.
> And, again, this is just evidence that we think there is sufficient
> evidence to set it before a jury. We don't know what a jury is
> going to do with it, but we think there's evidence to support it.
> So I think there's evidence to support it. So I think there's
> going to be evidence that she was carjacked, she was taken out
> there, and I think that they can conclude that this happened. Of
> course, we'll make our argument and the evidence is there.

TR. 1130-31. During opening argument, the State obliquely described the crimes that would

serve as the predicate for the aggravating circumstance:

> I will expect as the evidence unfolds, as the testimony comes in, you're going
> to learn that the reason Jerald Thurman was killed is because he saw what was
> going on with Mary Bowles. The reason Mary Bowles was killed is because
> she saw what was going on with Jerald Thurman. When you determine from
> the evidence that they were, in fact, killing people who witnessed their
> homicides, **State submits that there will be proof that those murders were, in
> some part, to carry on so that they could avoid arrest and prosecution and**

117

*responsibility for the crimes in which they were involved*.

TR. 1198 (emphasis added).  In closing arguments, the State argued that Mr. Hanson and co-defendant Miller intended to kill Mary Bowles from the time they took her car because they could have let her go at any time but did not.

> Aggravator three.  Murder to avoid arrest and prosecution.  there was another crime separate and distinct from the murder and the Defendant to - - that Defendant committed the murder with the intent to avoid being arrested or prosecuted for another crime.

> Next.

> Here's the evidence.  Defendant Hanson and Miller kidnapped, carjacked Mary Bowles.  Jerald Thurman sees them.  They wanted to eliminate Thurman as a witness to their crime of carjacking and kidnaping.  Once Ms. Bowles knew Thurman was murdered, she too had to be eliminated.  Ladies and gentlemen, it's a reasonable inference based on the evidence that both men had no intention of allowing Mary Bowles to live because she could identify them to police.

> And again, there are choices being made by this defendant and Vic Miller.  They could have took the car at Promenade and left Mary Bowles.  They could have done that, decided not to.  Between the dirt pit and Promenade, they could have let her out.  Decided not to.

> So pretty much every step of this journey from Promenade to the dirt pit to Peanut Road, the Defendant and Vic Miller had a choice.  They had a choice to let her out.  To let her live.  They did not do that.  They didn't do that.

TR. 1854-55.  And, finally during closing rebuttal, the State again did not argue Jerald Thurman's murder was the *only* evidence supporting the aggravating circumstance:

> So what this aggravating circumstance deals with, murder to avoid arrest or prosecution in this situation.  "You know what you got to do now."  That's what the evidence the State tells you or suggests to you, is shown by that sequence.  Because now part of the decision-making process, as the State

would argue based upon the evidence, is that that drive now to Peanut Road
to kill Mary Bowles is ***in large part*** due to what she just witnessed.

TR. 1900 (emphasis added).

As demonstrated above, the State did not *only* allege the murder of Jerald Thurman as the predicate crime for the aggravating circumstance. Ultimately, this inquiry becomes whether there was sufficient evidence to support the jury's finding beyond a reasonable doubt of the aggravating circumstance. There was insufficient evidence to support the State's allegations.

"Kidnaping" could not possibly have served as the predicate crime. Mr. Hanson was never charged with the kidnaping of Mary Bowles, and likewise there has never been a jury finding that Mr. Hanson was guilty of kidnaping. The only reference in the record to kidnaping is in the State's argument. Just because the prosecutors claimed Mary Bowles was kidnapped doesn't equate to a finding beyond a reasonable doubt that Mr. Hanson committed the crime of kidnaping separate and distinct from the murder of Mary Bowles. *See* OUJI CR 2d 4-75.

Additionally, there is no evidence in the record that Mr. Hanson intended to kill Mary Bowles in order to avoid arrest and prosecution for the crime of robbing Mrs. Bowles. The evidence actually speaks otherwise; Rashad Barnes testimony was that Mr. Hanson intended to "let her out" on a back road in North Tulsa. O.R. 1347. Essentially, there was no evidence to allow the jury to find beyond a reasonable doubt that Mary Bowles was killed to prevent arrest and prosecution for the robbery.

119

Mr. Hanson's jury found three aggravators to exist in his case: (1) previous conviction of a violent felony; (2) the murder was committed to avoid arrest or prosecution; and (3) that Mr. Hanson created a great risk of death to more than one person. The great risk of death circumstance was struck by the OCCA on direct appeal. *Hanson*, 206 P.3d 1020, 1032-33; *see also* Ground Five, *supra*. This Court should strike the murder to avoid arrest circumstance, which would render Mr. Hanson's sentence Constitutionally impermissible. *See Brown v. Sanders*, 546 U.S. 212 (2006).

When raised during post conviction proceedings, the instant claim was styled as an issue of ineffective assistance of appellate counsel for the failure raise the claim on appeal. As argued above, this is a meritorious claim, which creates a reasonable probability that, but for counsel's unprofessional error, had it been raised on appeal Mr. Hanson's death sentence would have been reversed and/or modified. *See Strickland v. Washington*, 466 U.S. 668. *See also Cargle v. Mullin*, 317 F.3d 1196, 1202-1203 (10th Cir. 2003).

The various errors presented here have violated Mr. Hanson's Constitutional rights to Due Process, a fair and reliable sentencing, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Petitioner respectfully request this Court issue the Writ.

<u>**GROUND EIGHT**</u>

**THE DEFINITION OF MITIGATING CIRCUMSTANCES CONTAINED IN OKLAHOMA'S UNIFORM JURY INSTRUCTIONS IMPERMISSIBLY LIMITS CONSIDERATION OF MITIGATION EVIDENCE, AND MOREOVER THE PROSECUTORS IN THIS CASE EXPLOITED THE INSTRUCTION IMPROPERLY TO DEADEN OR ELIMINATE THE JURY'S CONSIDERATION OF IMPORTANT MITIGATION EVIDENCE IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

At re-sentencing, the following eleven mitigators were presented on Mr. Hanson's

behalf:

1.    The defendant's emotional history.

2.    The defendant's family history.

3.    The defendant's history while incarcerated.

4.    The defendant has an eleven year old son.

5.    The defendant has never taken another person's life.

6.    No direct evidence other than Rashad Barnes has been presented that the defendant ever pulled the trigger on any gun the day that Mrs. Bowles was killed.

7.    Direct evidence has been presented that Victor Miller was the person who shot Mrs. Bowles and not the defendant.

8.    The defendant is presently serving a life sentence in federal prison.

9.    Sentence of life without parole is a significant punishment.

10.   The defendant was dominated by Victor Miller.

11.   The defendant was a follower.

121

O.R. 1586.  Sadly, few of these eleven mitigating circumstances, if any, were considered by the jurors pursuant to the instructions given them.

The  trial court issued oral and written jury instructions that mitigating circumstances are circumstances "which in fairness, sympathy, and mercy, may extenuate or reduce the degree of culpability or blame." TR. 1833; OR. 1585; OUJI-CR (2d) 4-78.  This is the only definition of "mitigating circumstances" known to the lay people on the jury.

Before beginning its deliberations, the jury heard closing argument from the prosecution that zeroed in on this definition and argued that Mr. Hanson's proffered evidence did not qualify as proper mitigation as it did not reduce his moral culpability or blame.

First,  the prosecutor restated the instruction:

> Mitigating circumstances are those which in fairness, sympathy, and mercy, may extenuate or reduce the degree of culpability or blame.  The determination of what circumstances are mitigating is for you to resolve....

TR. 1857-58.  Then, using the terms of the jury instruction, the prosecutor questioned whether any of the eleven proffered mitigating circumstances met that definition.

> I invite you to go back and discuss these mitigating circumstances with this question in mind: do any of these *really* extenuate or reduce his degree of culpability or blame in this case? That's the question I want you to talk about. Share your views with that. Do any of them *really* reduce or extenuate blame?

TR. 1858 (emphasis added). The prosecutor listed some of the mitigating circumstances and then reinforced the instruction's limiting definition in the context of the three sentencing options.

> These are choices that you have, life without parole, life with parole, and the

> death penalty. The instructions indicate you should consider the moral
> culpability and blame of the Defendant and the circumstances and the facts of
> the case. Pretty much common sense, consider what happened. Consider
> culpability and blame of the Defendant.  And you have these three choices.

TR. 1859.  As he was wrapping up his first closing argument, the prosecutor again instructed

the jury how the State wanted it to consider the mitigating evidence.

> You need to discuss moral culpability. And ladies and gentleman, it's hard to
> imagine a set of circumstance (sic) where moral culpability could be any
> higher that the evidence you heard today.   But again, I invite you to go back
> and talk about that.  Talk about moral culpability and blame for this defendant.
> And talk about the mitigating evidence.  ***Does it really mitigate?*** It's your
> decision.  It's your decision.

TR. 1865 (emphasis added). And in his final closing remarks, the prosecutor encapsulated

the narrowness of the judgment the State wished the jury to make, "... it's that man's moral

culpability that's being judged here ...."  TR.1917.

The Eighth and Fourteenth Amendments require that the sentencer in a capital case

not be precluded from considering *any* aspect of a defendant's character or record and any

circumstance regarding the offense that the defendant proffers as a basis for a sentence less

than death.  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (footnotes omitted).  *See also Skipper*

*v. South Carolina,* 476 U.S. 1 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982).

A capital sentencing jury must consider and give effect to all mitigating evidence and nothing

should interfere with a defendant's ability to present any and all mitigating evidence in an

attempt to save his life.  *See Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *overruled on other*

*grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *Smith v. Texas,* 550 U.S. 297 (2007).

Mr. Hanson's jury was clearly restricted from considering and giving effect to all of the mitigating evidence presented. Indeed, most of the eleven circumstances were eliminated from the jurors' consideration pursuant the jury instruction and argument by the prosecution.

Petitioner submits the term "mitigating circumstance" means nothing to the average juror. To a lay juror, the definition of "mitigating circumstance" is whatever the Court tells him or her it is. The operative language of the subject jury instruction is incomplete. It unconstitutionally *limits* mitigation to material that extenuates moral culpability or blame.[24] Under the given definition, only a fraction of the eleven submitted mitigators would be interpreted by the average juror as having any tendency to "extenuate or reduce" Mr. Hanson's moral culpability or blame for the murder of Mary Bowles.

Nevertheless, the OCCA upheld the validity of the instruction and found that "the prosecutor did not unfairly limit the jurors' consideration of the evidence offered in mitigation in this case." *Hanson v. State*, 206 P.3d 1020, 1035. The OCCA's determination is both an unreasonable application of clearly established federal law and an unreasonable determination of the facts in light of the evidence presented at Mr. Hanson's re-sentencing. *See* 28 U.S.C. § 2254(d)(1), (d)(2). How the OCCA was able to come to such a discordant decision is more easily understood after reviewing its efforts to come to terms with

---

[24] The words "in fairness, sympathy, and mercy," may evoke core mitigation concepts, but in the context of the instruction they do not inform the jurors of categories of mitigation. Rather, they apply only to circumstances that "may extenuate or reduce the degree of moral culpability or blame."

Oklahoma's defective mitigation instructions.

## I.    Oklahoma's Struggle with OUJI-CR 4-78.

The OCCA has struggled with this instruction in the past.   In *Harris v. State*, 164

P.3d 1103, 1113-14 (Okla. Crim. App. 2007), for example, it declined to find the subject

instruction erroneous, but did find prosecution argument "misusing" the statutory language

improper.

> One prosecutor did consistently argue in closing that jurors should not consider
> Harris's second stage evidence as mitigating, since it did not extenuate or reduce his
> guilt or moral culpability.  This argument improperly told jurors not to consider
> Harris's mitigating evidence.

*Id*. at 1113.  The OCCA found the argument in *Harris* was harmless in part because another

prosecutor "invited jurors to consider all Harris's mitigating evidence, weigh it against the

aggravating circumstances, and find that the death penalty was appropriate." *Id*.  The OCCA

also found the jury was properly instructed on the definition of mitigating evidence and its

duties.   Since the exploited instruction was the one defining mitigating evidence, this

determination was a *non sequitur*.

The OCCA noted, moreover, it was "troubled, however, by the consistent misuse of

the language in this instruction in the State's closing arguments." *Harris,* 164 P.3d at 1114.

The OCCA observed it had previously allowed a limited form of such argument, but it had

never intended to permit the abuse that was consistently occurring:

> However, we did not intend to suggest that prosecutors could further argue that
> evidence of a defendant's history, characteristics or propensities should not be
> considered as mitigating simply because it does not go to his moral culpability or

125

extenuate his guilt.  This would be an egregious misstatement of the law on mitigating evidence.

*Harris,* 164 P.3d at 1114.

Again, the *non sequitur* nature of the decision stands out.  The OCCA states that it would be an "egregious misstatement of the law on mitigating evidence" to say evidence should not be considered mitigating if it does not go to moral culpability or extenuate guilt.  *Id.*  Yet prosecutors around the state have been able to state or infer just that.  *See e.g. Id.*; *Jones v. State*, 201 P.3d 869, 888 (Okla. Crim. App. 2009); *Le v. State,* 947 P.2d 535 (Okla. Crim. App. 1997); *Frederick v. State,* 37 P.3d 908 (Okla. Crim. App. 2001) to name just a few.  Unfortunately this was bound to continue, so long as the instruction was in effect, because such argument complies with the language of OUJI-CR 4-78.

The instruction is improper and unworkable.  The OCCA would not call the instruction unconstitutional, but saw that it had to get rid of it just the same.

## II.    The Significance of the Subsequent Remedial Instruction.

In an effort to "clarify" the instruction and "discourage improper argument," the court referred the matter to the Oklahoma Uniform Jury Instruction Committee (Criminal) "for promulgation of a modified jury instruction defining mitigating circumstances in capital cases."  *Id.*  The court did not stop there.  It suggested revisions squarely directed to solve the problem identified above.  *Id.*  The Committee proceeded to produce a uniform instruction precisely along the remedial lines suggested by the Court.  It provides, in pertinent part:

Mitigating circumstances are 1) circumstances that may extenuate or reduce the

degree of moral culpability or blame, or 2) circumstances which in fairness, sympathy or mercy may lead you as jurors individually or collectively to decide against imposing the death penalty.

OUJI-CR 4-78 (Supp. 2008).  Of course, Mr. Hanson did not receive the benefit of a proper jury instruction such as this one with no unconstitutional language limiting in the jury's minds the concept of mitigating circumstances.

The OCCA was at pains to contend that despite the repeated abuse of this instruction that "troubled" the court the prior instruction was not legally inaccurate, inadequate, or unconstitutional.  *Harris*, 164 P.3d at 1114.  In this regard, however, it is important to remember the United States Supreme Court's recognition that the labels a state court uses are not necessarily dispositive.  *See Ring v. Arizona*, 536 U.S. 584, 602.

Conversely, the Supreme Court has held the remedial measures state courts perform on instructions are at least some indicia the prior instructions *were* infirm.  *Mills v. Maryland*, 486 U.S. 367, 382 (1988) ("We can and do infer from these changes at least *some* concern on the part of that court that juries could misunderstand the previous instructions as to unanimity and the consideration of mitigating evidence by individual jurors.") (emphasis in original).  Here, there is also an open admission the instruction was being consistently used to foster improper prosecutorial arguments that constituted "egregious misstatement[s] of the law on mitigating evidence."  *Harris*, 164 P.3d at 1114.

The Supreme Court has recognized similar arguments exacerbate faulty instructions. In *Penry v. Lynaugh*, the Court observed the prosecutor's argument, which stressed that the

127

jurors had taken an oath to follow the law and that they must follow the instructions they were given, could have convinced the jury "there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence." 492 U.S. 302, 325-26 (1989). *See also Smith v. Texas*, 543 U.S. 37, 48 n.5 (2004) (involving prosecutor who cashed in on "follow the law" promises elicited on voir dire).

As noted above, the OCCA has found prosecutors' arguments on this jury instruction improper. *See e.g., Jones v. State*, 201 P.3d 869, 888 (Okla. Crim. App. 2009) ("This argument, just like the one in *Harris*, improperly told jurors not to consider mitigating evidence"). Experienced prosecutors across the State have "misused" the instruction. Presumably, in their experiential view, it was a persuasive and effective argument. *Napue v. Illinois*, 360 U.S. 264, 270 (1959). The OCCA's conclusion it was harmless stands in stark contrast to the implied judgment of a group of prosecutors very successful in obtaining death sentences.

Further, the type of misconduct at issue is one that invades specific constitutional rights. *See e.g. Caldwell v. Mississippi*, 472 U.S. 320 (1985). The rights at issue include the right to have the sentencer consider all mitigating evidence. Prosecutorial misconduct impinging a specific right demands strict scrutiny. *Id*.; *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Paxton v. Ward*, 199 F.3d 1197, 1217-18 (1999). The OCCA's ruling was thus contrary to law as well.

The advent of the subsequent remedial jury instruction underscores the seriousness

128

of the error caused by the improper jury instruction itself, not to mention the prosecution's compounding of the error.  Application of proper scrutiny to this error demands relief.

## III.   Conclusion.

A reasonable likelihood exists that jurors understood the definition of mitigating circumstances contained in OUJI-CR(2d) 4-78 as foreclosing consideration of Mr. Hanson's character and record, thereby depriving him of full consideration of his mitigating evidence in violation of the Eighth Amendment. *Penry v. Johnson,* 532 U.S. 782 (2001) (citing *Boyde v. California,* 494 U.S. 370, 380 (1990)).  *See also Hitchcock v. Dugger*, 481 U.S. 393, (1987) (holding juries cannot be instructed in such a way that precludes them from considering all pertinent mitigation).  This likelihood was heightened by the prosecutors' arguments questioning whether Petitioner's proffered mitigation was "*really"* mitigation evidence at all.

The instruction "create[d] the risk that the death penalty [was] imposed in spite of factors which may call for a less severe penalty" and "[w]hen the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Lockett v. Ohio,* 438 U.S. 586, 605 (1978). Whether for the infirm instruction itself, the prosecutions' exploitation, or the combination of these infirmities, the Writ should issue.

## GROUND NINE

**THE CUMULATIVE EFFECT OF ERRORS AT BOTH PHASES OF TRIAL DEPRIVED MR. HANSON OF HIS CONSTITUTIONAL RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS.**

Even if none of the aforementioned errors viewed in isolation necessitate reversal of Mr. Hanson's conviction and sentence, the combined effect of these errors deprived him of a fair trial and requires his conviction and/or sentence be reversed. *Cargle v. Mullin*, 317 F.3d 1196, 1200 (10th Cir. 2003); *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990). Specifically, the cumulative effect of all the errors and omissions at the guilt phase of Mr. Hanson's original trial resulted in the violation of his federal Constitutional rights and require the granting of a new trial. Further, the cumulative effect of all of the errors and omissions during the re-sentencing trial resulted in a sentence of death, which is unreliable. *See Darks v. Mullin*, 327 F.3d 1001, 1018 (10th Cir. 2003) (finding that when assessing cumulative error, only first stage errors are relevant to the conviction, but all errors are relevant to the ultimate sentence).

It is well established a reviewing court, presented with established errors at trial, must consider the cumulative impact of those errors in light of the totality of the evidence properly presented to the jury. *Gonzales v. McKune*, 247 F.3d 1066, 1077 (10th Cir. 2001) (vacated on grounds of exhaustion); *Rivera*, 900 F.2d at 1471. The purpose of the cumulative error analysis is to evaluate the effect of errors, not the cumulative effect of non-errors. *Cargle*, 317 F.3d at 1196. While non-errors do not count in the cumulative analysis, error plus

130

whatever form of prejudice or harm associated with that particular error obviously need not be established for a violation to count in cumulation.  Where error plus prejudice is present in the case of an individual error, relief would be warranted for that error alone.  *Cargle*, 317 F.3d at 1207.  The Tenth Circuit has explained the "cumulative-error analysis merely aggregates all the errors [] found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Hamilton v. Mullin*, 436 F.3d 1181, 1196, (10th Cir. 2006) (quoting *Workman v. Mullin*, 342 F.3d 1100, 1116 (10th Cir. 2003)).  Controlling authorities permit a reviewing court to apply the cumulative error analysis to such legally diverse claims as ineffective assistance of counsel and prosecutorial misconduct claims. *Cargle*, 317 F.3d at 1206-07.

Here, to name a few, are some of the errors that could have at a minimum cumulated to deprive Mr. Hanson of his Constitutional guarantees to a fair trial and reliable sentencing hearing: trial counsel's deficient performance during both the first and second stage; denial of an adequate opportunity to confront the State's key witness when the trial court admitted testimonial hearsay; the jury's consideration of an invalid aggravating circumstance; lack of sufficient evidence to support the jury's finding beyond a reasonable doubt that the murder was committed for the purpose of avoiding lawful arrest or prosecution; Oklahoma's jury instruction limits consideration of mitigation evidence by the jury; and prosecutorial misconduct.

In disposing of Mr. Hanson's cumulative error claim the OCCA found:

> although his resentencing trial was not error free, any errors and irregularities,
> even when considered in the aggregate, do not require relief because they did
> not render his resentencing trial fundamentally unfair, taint the jury's verdict,
> or render his sentence unreliable. Any errors were harmless beyond a
> reasonable doubt, individually and cumulatively.

*Hanson v. State*. 206 P.3d 1020, 1035 (Okla. Crim. App. 2009). Further, when Mr. Hanson

raised the issue in state post-conviction, the OCCA found:

> We have determined that Hanson is not entitled to a new trial on the basis of
> newly discovered evidence.  We have further find that neither trial nor
> appellate counsel were ineffective.  There is no cumulative error.

*Hanson v. State*, PCD-2006-614 (Okla. Crim. App. 2009) (unpublished) (internal citation

omitted).  The OCCA's decision, when it has made a decision, is contrary to and an

unreasonable application of clearly established law and an unreasonable determination of the

facts as Mr. Hanson has demonstrated in his Petition by showing the violations and their

importance.

If this Court finds none of the errors set forth in this Petition, when considered

individually, necessitates the granting of habeas relief, the Court should find the cumulative

effect of all the errors described herein deprived Mr. Hanson of his Constitutional right to

a fair trial and reliable sentence.  This Court should grant the Writ.

### Preliminary Statement Concerning Procedural Default

Oklahoma's procedural default rule should not be applied. First, Oklahoma's

procedural default rules are not applied even handedly and are not applied independent of

federal law. *See Ake v. Oklahoma*, 470 U.S. 68, 75 (1985) (because Oklahoma's procedural bar depends on an antecedent ruling on federal law, the state-law prong of the court's holding is not independent of federal law); *Valdez v. State of Oklahoma*, 46 P.3d 703 (Okla. Crim. App. 2002) (Oklahoma Courts are not bound by procedural rules but may grant relief for substantial or Constitutional violations notwithstanding the procedural posture of the case).[25] As such, Oklahoma's procedural rules cannot be the basis to bar federal review of these claims. *Andrews v. Deland*, 943 F.2d 1162, 1188, n.40 (10th Cir. 1991) (procedural rules must be applied regularly, consistently, and even handedly to establish a bar to federal review; they must also operate independent of federal law).

Ms. LaFortune's involvement in this case as both an initial, albeit limited, ineffectual evaluation of Mr. Hanson and then as the effective gatekeeper for professional evaluations at all levels of OIDS creates both adequacy deficiencies and cause for overlooking any default and also implicates conflict principles. Ms. LaFortune's ability to stand in the door to proper evaluation of Mr. Hanson and to any incidental critique of her own failures tainted the proceedings throughout.

Second, prior counsels' failure to raise the ineffective assistance of counsel claim with

---

[25] *See also Slaughter v. State of Oklahoma*, 108 P.3d 1052 (Okla. Crim. App. 2005) (Oklahoma Court of Criminal Appeals conducted a merit review on a second post-conviction application); *Malicoat v. State of Oklahoma*, 137 P.3d 1234 (Okla. Crim App. 2006) (Oklahoma Court of Criminal Appeals granted review on third post-conviction application); *Torres v. State*, 120 P.3d 1184 (Okla. Crim. App. 2005) (Oklahoma Court of Criminal Appeals granted evidentiary hearing and reviewed third post-conviction application).

respect to the inadequate mental health investigation should not result in a procedural bar as
there exists cause and prejudice to excuse the default.  *See Moore v. Reynolds*, 153 F.3d
1086, 1104 (10th Cir. 1998). The ineffective assistance of counsel claims presented here have
merit and present a reasonable prospect for relief. *See Neill v. Gibson*, 278 F.3d 1044, 1057
n.5 (10th Cir. 2001);  *Freeman v. Lane*, 962 F.2d 1252, 1258-59 (7th Cir. 1992).

Mr. Hanson has presented compelling grounds for relief  that challenge both his
conviction and sentence and warrant relief by this Court.

## MOTION FOR EVIDENTIARY HEARING
## AND BRIEF IN SUPPORT

Mr. Hanson requests an evidentiary hearing pursuant to Rule 8 of the Rules Governing
Section 2254 Cases in the United States District Courts.  Mr. Hanson requests an evidentiary
hearing in his effort to assist this Court with some of the issues presented in this petition, and
in accordance with the Court's Scheduling Order (Doc. 12).  *See Townsend v. Sain*, 372 U.S.
293, 312 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).

Mr. Hanson believes the claims contained in his petition are matters of law warranting
relief without a hearing, and/or that the undisputed facts before this Court warrant the issue
of a Writ of Habeas Corpus.  Alternatively, he is  requesting an evidentiary hearing on the
following ground and on all related factual contentions because those matters are capable of
proof at such a hearing and would warrant relief.

## AN EVIDENTIARY HEARING IS REQUESTED WITH RESPECT TO
## MR. HANSON'S FOLLOWING GROUND FOR HABEAS RELIEF:

**Ground Two:** An evidentiary hearing is necessary to demonstrate the ineffective assistance of trial, appellate, and ostensibly post-conviction counsel.  Numerous instances of prior counsels' ineffectiveness are detailed in Ground Two of this Petition for Writ of Habeas Corpus.  If granted an evidentiary hearing, Mr. Hanson can demonstrate *inter alia*: multiple omissions of trial counsel were not tactical or borne out of strategy; trial counsel's mitigation presentation was unreasonable in light of the wealth of mitigating evidence available had a Constitutionally adequate investigation been conducted; appellate and ostensibly post conviction counsel rendered ineffective assistance through their failures to conduct a mental health investigation independent of trial counsel's and then raise appropriate legal claims.  Prejudice is apparent from prior counsels' shortcomings, because had they pursued these issues, Mr. Hanson would have had powerful evidence to present in mitigation which may have spared him from receiving the death penalty.  Mr. Hanson respectfully requests an evidentiary hearing to establish prior counsel were ineffective.

### BRIEF IN SUPPORT OF GRANTING AN EVIDENTIARY HEARING

In *Townsend v. Sain*, 372 U.S. 293 (1963), the United States Supreme Court held that an evidentiary hearing is mandatory under conditions which Mr. Hanson has met.  The Court stated:

> We hold that a federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: if (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact finding procedure employed be the state court was not adequate to afford a fair and full hearing; (4) there is substantial allegations of newly discovered

135

evidence; (5)  material facts were not adequately developed at the state court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair hearing.

*Id.* at 312-13.

In Mr. Hanson's case, the grounds identified, if proven, warrant habeas corpus relief. During direct appeal proceeding pursuant Rule 3.11 (B) (3) (b), *Rules of the Oklahoma Court of Criminal Appeals*, Mr. Hanson requested, but was denied, an evidentiary hearing. *Hanson v. State*, 206 P.3d 1020, 1032 (Okla. Crim. App. 2006); *See Barkell v. Crouse*, 468 F.3d 684, 692-94 (10th Cir. 2006) ("Habeas applicants who have not received an evidentiary hearing in state court may be entitled to an evidentiary hearing in federal court.").  There has been no adequate hearing in which these matters have been considered, Mr. Hanson has presented substantial allegations of Constitutional violations, and the Oklahoma Court of Criminal Appeals did not afford Mr. Hanson a full and fair fact determination.

For these reasons, Mr. Hanson respectfully requests this Court conduct an evidentiary hearing so that he may establish these facts.

## MOTION FOR DISCOVERY AND BRIEF IN SUPPORT

Mr. Hanson requests leave of the Court to conduct discovery pursuant Rule 6 of the Rules Governing 2254 Cases in the United States District Courts and the Federal Rules of Civil Procedure, Rules 26-38.

## DEFINITIONS:

The terms "State," "Government," "District Attorney's Office," "Authorities," or

"Police" refer, without limitation to the Tulsa County District Attorney's Office, the Tulsa

Police Department, Muskogee Police Department, the Federal Bureau of Investigation,

United States Attorney's Office for the Northern District of Oklahoma, the Oklahoma State

Bureau of Investigation, as well as any other agencies or entities involved in the investigation

and prosecution of Mr. Hanson's case.

The term "case" refers, without limitation, to Tulsa County Case No. CF-1999-4583,

and all subsequent appeals and collateral proceedings wherein Petitioner and co-defendant

Victor Miller were charged and convicted of the homicides of Mary Bowles and Jerald

Thurman.

The terms "documents," "records," and "things" refer, without limitation, to reports,

writings, drawings, graphs, charts, photographs, photographic negatives, photographic

positives, films, video recordings, audio recordings, records, electronic data, physical items,

and copies or reproductions thereof in the possession, custody, and control of the above

mentioned entities.

## BRIEF IN SUPPORT

Two State's witnesses testified under questionable circumstances.  Phyllis Miller, the

wife of co-defendant Victor Miller, testified at both of Mr. Hanson's trials, but despite her

arguable criminal liability in the various robbery offenses surrounding the subject homicides,

she was never criminally charged with any of those offenses.  Also critical State's witness,

Rashad Barnes, testified at Mr. Hanson's first trial, and then because of his death, Barnes'

transcript testimony was read into the record at Mr. Hanson's second trial.  Co-defendant

Victor Miller's testimony at his own trial, inculpated Barnes in the instant homicides as well

as the string of robbery offenses surrounding the homicides.  Materials in the State's

possession and unknown to petitioner may establish that Phyllis Miller and/or Rashad Barnes

received deals from the State in exchange for or were otherwise pressured for their testimony.

Rule 6(a) of the Rules Governing Federal Habeas Cases expressly permits this Court

to grant discovery for "good cause."  *See* Rules Governing Section 2254 Cases R. 6(a).

"Good cause" is demonstrated "where specific allegations before the court show reason to

believe that the petitioner may, if the facts are fully developed, be able to demonstrate that

he is confined illegally and is therefore entitled to relief...." *Harris v. Nelson*, 394 U.S. 286,

300 (1969) (citing 28 U.S.C. § 1651); *Bracy v. Gramley*, 520 U.S. 899, 908-909 (1997)

("good cause" requirement was met when there was an inference the materials sought might

help establish a petitioner's detention was illegal); *see also LaFevers v. Gibson*, 182 F.3d

705, 723  (10th Cir. 1999).

The need for discovery in capital cases is particularly critical.  Where a person's life

is at stake, the Supreme Court has repeatedly insisted upon higher standards of reliability and

fairness. *See e.g.*, *Beck v. Alabama*, 447 U.S. 625, 637 (1980) (need for heightened

reliability); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (the penalty of death is quantitatively

different from any other sentence and requires a heightened degree of reliability); *Woodson

v. North Carolina*, 428 U.S. 280 (1976); *Banks v. Reynolds*, 54 F.3d 1508, 1521 (10th Cir.

138

1995) ("Our duty to search for constitutional errors with painstaking care is never more exacting than it is in a capital case.").

Petitioner Hanson's discovery requests, detailed below, meets the "good cause" standard within the meaning of Rule 6(a) and *Bracy*.

Rule 6(b) provides that this discovery request be accompanied by a list of requested documents and proposed interrogatories, which follow:

REQUEST FOR PRODUCTION No. 1:

Produce all files relating to this case held or maintained by any government entity.

REQUEST FOR PRODUCTION No. 2:

Produce any documents, recordings, or things related to Phyllis Miller's involvement in this case, to include any documents reflecting promises/deals made or considered to withhold prosecution whether implicit or explicit.

REQUEST FOR PRODUCTION No. 3:

Produce any documents, recordings, or things related to Rashad Barnes' involvement in this case, to include any documents reflecting promises/deals made or considered to withhold prosecution whether implicit or explicit.

INTERROGATORY No. 1:

Provide a description of the substance of all oral communications between law enforcement and Phyllis Miller.

INTERROGATORY No. 2:

139

Provide a description of the substance of all oral communications between law

enforcement and Rashad Barnes.

## CONCLUSION

Mr. Hanson respectfully requests this Court grant discovery to ensure the facts of his

case can be fully developed.

Respectfully submitted,

_s/ Robert S. Jackson_
ROBERT S. JACKSON, OBA #22189
Assistant Federal Public Defender
215 Dean A. McGee, Suite 707
Oklahoma City, Oklahoma  73102
(405) 609-5975 telephone
(405) 609-5976 fax
e-mail: bob_jackson@fd.org

_s/ T. Kenneth Lee_
T. KENNETH LEE, Ohio Bar #65158
Assistant Federal Public Defender
215 Dean A. McGee, Suite 707
Oklahoma City, Oklahoma  73102
(405) 609-5975 telephone
(405) 609-5976 fax
e-mail: ken_lee@fd.org

ATTORNEYS FOR PETITIONER
JOHN FITZGERALD HANSON

140

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 6th day of December, 2010, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant:

Robert L. Whittaker
Assistant Attorney General

*s/Robert  S.  Jackson*
Assistant Federal Public Defender

## INDEX OF ATTACHMENTS

| Attachment No. | Document |
|---|---|
| 1 | Affidavit of Jack E. Gordon, Jr. |
| 2 | Affidavit of Stephen Hanson |
| 3 | Declaration of Marsha Hollingsworth |
| 4 | Affidavit of Marilyn Wright |
| 5 | Declaration of Sylvia Ann Waldon |
| 6 | Psychiatric Evaluation conducted by Dr. Donna Schwartz-Watts |
| 7 | Dr. Donna Schwartz-Watts - Curriculum Vitae |
| 8 | Affidavit of Tremaine Wright |
| 9 | *Social History - Risk Assessment Report* by Dr. Jeanne Russell |
| 10 | Affidavit of Jamie D. Pybas |
| 11 | Affidavit of Robert W. Jackson |
| 12 | Opinion Denying Post Conviction Relief, Hanson v. Oklahoma, PCD-2002-628 |
| 13 | Opinion Denying Post Conviction Relief, Hanson v. Oklahoma, PCD-2006-614 |

# Attachment 1
# Affidavit of Jack E. Gordon, Jr.

## AFFIDAVIT OF JACK E. GORDON, JR.

**STATE OF OKLAHOMA**                    )
                                         )                ss.
**COUNTY OF ROGERS**                     )

       I, Jack E. Gordon, Jr., being of legal age and sound mind, do solemnly swear and state as follows:

1.     I am an attorney in private practice in Claremore, Oklahoma. I was appointed to represent John Hanson in both his 2001 capital murder trial and his re-sentencing trial in 2006, Tulsa County Case No. CF-99-4583.

2.     At the 2001 trial, Mr. Hanson was convicted of the murders of Jerald Thurman and Mary Bowles for which he received life without parole and death sentences, respectively. On direct appeal, the Oklahoma Court of Criminal Appeals reversed the death sentence and ordered a re-sentencing hearing in which a jury could assess punishment for the murder of Mary Bowles.

3.     I retained Dr. Jeanne Russell as an expert at re-sentencing specifically for the purpose of rebutting the continuing threat aggravating circumstance which had been alleged by the State.

4.     Dr. Russell prepared a *Social History - Risk Assessment* report on Dec. 31, 2004, prior to her testifying at Mr. Hanson's re-sentencing trial. Dr. Russell concluded that Mr. Hanson would not pose a continuing threat to society.

5.     I was excited about Dr. Russell's conclusion; however, I failed to recognize that her report contained numerous indicators of mental illness and brain dysfunction.

6.     After receiving Dr. Russell's report, I did not pursue additional testing or retain another expert to conduct a general psychological/psychiatric examination or a neuropsychological examination. I had no strategic reason for not investigating Mr. Hanson's mental illness or brain dysfunction.

7.   I have tried ten (10) capital murder trials and believe in taking the "everything but the kitchen sink" approach in presenting mitigating evidence. In a capital case, my number one priority is to save my client's life. Mental health evidence is extremely important and the type of mitigating evidence that could persuade a jury to impose a non-death sentence.

8.   After receiving Dr. Russell's report, I should have noticed that Mr. Hanson exhibited signs of mental illness. Had I noticed, I would have pursued the issue and retained the appropriate experts. Undoubtedly, I would have presented resulting mental health diagnoses to Mr. Hanson's jury.

9.   One of the hotly contested issues at re-sentencing was whether or not the State would be permitted to introduce Rashad Barnes transcript testimony from the original 2001 murder trial. Mr. Hanson had supposedly confessed his role in the murders to Mr. Barnes, whose testimony was the strongest evidence implicating my client as the shooter of Mary Bowles. Mr. Barnes was unavailable because he had been shot in an unrelated incident outside a Tulsa nightclub and died prior to the 2006 re-sentencing trial.

10.  I vigorously objected to the admission of Mr. Barnes' prior testimony. The basis for my objection was new evidence that became known after Mr. Hanson's original trial for which I had no opportunity to cross-examine Mr. Barnes. The new evidence was a confession to the murder of Mary Bowles by the co-defendant in the case, Victor Miller.

11.  At the time of re-sentencing, there was an additional basis for challenging the admission of Mr. Barnes' testimony. Victor Miller had testified in his own defense at his trial which occurred subsequent to Mr. Hanson's original trial. Co-defendant Miller's testimony refuted many of the facts testified to by Mr. Barnes. In fact, Mr. Miller directly implicated Barnes in the homicides and various other crimes.

12.  I did not inform the trial court of co-defendant Miller's testimony as a basis for objecting to the admission of Mr. Barnes' prior testimony. I had no strategic reason for this omission. I was not aware of the content Mr. Miller's testimony, nor had I reviewed the transcripts of his trial.

13.    Had I been aware that co-defendant Miller's testimony at his own trial called into
serious question the testimony of Mr. Barnes, I would have certainly pointed that
out to the trial court in lodging my objections.


FURTHER  AFFIANT  SAYETH  NOT.

Jack E. Gordon, Jr.


Subscribed and sworn to before me this ___8___ day of ___November___, 2010.

NOTARY PUBLIC


Page 3 of 3

# Attachment 2
# Affidavit of Stephen Hanson

# AFFIDAVIT OF STEPHEN HANSON

STATE OF OKLAHOMA      )
                                   )    ss.

COUNTY OF TULSA        )

---

I, Stephen Hanson, of lawful age and being duly sworn upon oath, depose and state the following:

1. I am the oldest child of Charlotte Hanson (aka Ward) and Elmer Hanson. My parents had two other children: my brother John, and my sister Charmyn.

2. My father, Elmer, was a long haul eighteen wheel truck driver. He was on the road a lot and not around very often. My mother, Charlotte, worked a full time job, so John, Charmyn and I were left on our own at home.

3. Because I was the oldest, my mother put me in charge of taking care of John and Charmyn when she was at work.

4. John was an impatient kid. He always wanted to do or wanted to have the things that I had. John didn't understand that I was two years older and had more experience. For example, my dad taught me how to use a rod and reel, and John had to use a pole to fish. This would upset John because he would not get to use the rod and reel until I taught him how to use it.

5. It think John wanted Dad to look at him the way he looked at me.

6. John and I were devastated by the death of our dad. If Dad had not died, then John wouldn't be on death row today.

7.    I was more of a leader and John was more of a follower.  He wanted to be accepted and liked by me because I am older and not a punk.

8.    Victor Miller and I were cell mates.  Victor is dangerous.  John is the type of guy Victor could get to do anything.


Stephen Hanson


Subscribed and sworn to before me this 5th day of November, 2010.


Notary Public

# Attachment 3
# Declaration of Marsha Hollingsworth

## DECLARATION OF MARSHA HOLLINGSWORTH

Pursuant Section 1746 (2) of Title 28 of the United States Code, I, Marsha Hollingsworth, declare under penalty of perjury that the following is true and correct.

1.  John Hanson is my cousin. John's father, Elmer, and my mother were twins.

2.  I was really close with John and his brother Steve when they were growing up. Our relationship was more like being brothers and sisters than cousins.

3.  I used to babysit John all the time. I remember him coming home from the hospital after he was born.

4.  I first took care of John when he was still in diapers. I was 9 years old at the time. I stopped babysitting John when he was about 10 years old.

5.  I would usually take care of John and Steve in the afternoons when their mom, Charlotte, was at work. I would also watch them in the evenings when Aunt Charlotte was busy with her bowling league. It seemed like Aunt Charlotte was usually bowling 3 or 4 nights a week.

6.  I really loved my Uncle Elmer, he was a kind and generous man. Elmer was on the road a lot because of his work as long-haul truck driver, but when he was around, he spoiled John and Steve rotten.

7.  Elmer bought his sons whatever they wanted - motorcycles, a boat, fancy toys, and electronics. I think Elmer felt bad about always being on the road and his marriage failing, which may be the reasons he spoiled the boys with material things.

8.  Sometimes our grandmother, Flossie Hanson, would be around. Flossie was a strong and smart woman. She seemed to keep the whole family up under her through the family businesses and controlling everyone's finances. Flossie did run everybody's life or at least wanted to.

9.  I knew Victor Miller when he was a little kid. I never liked Victor, and always thought he was a shrewd, rude, and mean person. When John was about 7 years old, Victor brought over some cigarettes, and I caught him, John, and Steve smoking in the garage.

10.     Watching John grow up, I realized he was a follower and not a leader. Others, especially his brother Steve, could get him to do things he wouldn't have done on his own. Sometimes I'd have to tell John not to be listening to Steve - he didn't have any business running anybody.

11.     John was devastated by Uncle Elmer's death. John was never much of a sharer, but his whole personality changed and he became real stand-offish after his dad's passing.

12.     Uncle Elmer took care of everything for John and Steve. When Elmer died, they had no idea how to fend for themselves or even how to put in a day's work. I think John and Steve got caught up in crime because they had no skills or other means of supporting themselves.

13.     Once Elmer had passed away, John had his brother Steve to look to for a role model. This was a bad deal for John, because Steve was caught up in all kinds of criminal stuff. Steve didn't ever teach John anything good.

14.     Steve had gone out to California in the early 1980's and found out about the Crips gang. When Steve came back to Tulsa he had blue bandanna tied around his head, and started the Crips gang there.

15.     I love my cousin John and would have been happy to testify for him at his re-sentencing, but I was never asked by his trial attorneys.


Mrs. Marsha Hollingsworth      Location: Portland, Oregon
Marsha Hollingsworth

Executed on: Nov. 14th 2010

# Attachment 4
# Affidavit of Marilyn Wright

# AFFIDAVIT OF MARILYN WRIGHT

**STATE OF OKLAHOMA**        )
                                   )        **ss.**

**COUNTY OF TULSA**            )

I, Marilyn Wright, being of legal age and sound mind, do solemnly swear and state as follows:

1. Since 1965 Charlotte Ward and I have been good friends. We met while working together as secretaries at a real estate company in Tulsa, Oklahoma.

2. I was around Charlotte all the time when her children were growing up. Charlotte's kids even call me Aunt Marilyn.

3. About the time Charlotte and Elmer got divorced, John's personality seemed to change. I think John was about 10 years old. John became depressed, he also developed some anger for his mother.

4. A big reason for the divorce could have been Charlotte's mother in law, Flossie Hanson. For whatever reason, Flossie just didn't like Charlotte. Flossie would do things to poison Elmer and Charlotte's relationship. Flossie made up a story and told Elmer that John was not his son. She would also buy things for Steve, but not for John.

5. Elmer was a big rig truck driver and was not around the boys much before or after he and Charlotte divorced. Charlotte seemed to be at a loss when it came to everyday interactions with the boys. She was easily overwhelmed over normal things that parents are supposed to do. I can remember her calling me to come over and discipline her boys for ordinary things kids would do. I would go to her house and just talk to John and Steve, firmly and fairly. All they really needed was some direction and guidance. They responded well and would usually go apologize to their mom for whatever had happened to make her feel overwhelmed.

6. John would sometimes confide in me. He didn't like his step-dad, Houston Ward, because John felt like Mr. Ward took Charlotte away from John. John

thought Houston favored his kids over John and Steve. John felt like because Charlotte had allowed these changes, she didn't love him.

7.  I remember going with Charlotte one time to visit John at the prison in Hominy, Oklahoma. When we got there, it turned out John had only put me on his visiting list, so Charlotte had to wait in the car. I asked John why, and he said Charlotte didn't love him.

8.  John stayed with me for a little while in the early '90's when he got out of prison. One time Charlotte came by and John wouldn't pay any attention to her. I had to tell John to go say "Hi" to his mother, which he did. Charlotte told John she loved him and his response was only to shrug his shoulders.

9.  I would have testified for John at either of his trials, but I was never contacted by his attorneys.

FURTHER AFFIANT SAYETH NOT.

Marilyn Wright

Subscribed and sworn to before me this 5th day of November, 2010.

NOTARY PUBLIC

Page 2 of 2

# Attachment 5
# Declaration of Sylvia Ann Waldon

## DECLARATION OF SYLVIA ANN WALTON

Pursuant Section 1746 (2) of Title 28 of the United States Code, I, Sylvia Walton, declare under penalty of perjury that the following is true and correct.

1.     I am John Hanson's paternal cousin. John's father Elmer Hanson was my mother's twin brother. My mother's name is Flossie Jr. Elmer Hanson and Flossie Jr. are the children Flossie Hanson Sr.

2.     Most of my contact with John occurred when he was a teenager. My Uncle Elmer would bring John and his brother Steven to our grandmother's (Flossie Sr.) home.

3.     At this time, John's mother and father were divorced. John mainly lived with his mother and only saw his father about once a month. His father was a cross country truck driver and was gone a lot. John's father stayed with his mother, Flossie Hanson Sr., when he was in town.

4.     I never saw John alone. He was always with his brother, Steven. Steven was more outgoing than John. It was like John was in the background. He was quiet.

5.     There was a family rumor that John was not Elmer's son. My grandmother seemed to favor Steve. I would hear her compliment Steven and say that Steven looked just like Elmer in front of John. I think that hurt John. She only did things like that when Elmer was in another room. I don't think Elmer knew all of this was going on.

6.     I don't know if my grandmother really accepted John. She showed favoritism towards Steven so often, that I confronted her about it. I told her it wasn't right that she treated Steven better. Flossie seemed to ignore John.

7.     My grandmother often complained that Elmer wasted his money on his kids. One time I remember Elmer heard her talking about it. He was upset and asked her why she was talking about him behind his back.

8.     When Elmer died it was a shock to the entire family. I think his death would have been devastating to John and Steven because they were so close to their father.

9.     Sometime around Elmer's funeral, Charlotte, John's mom, confronted our grandmother. Charlotte said "Your not going to cheat my kids out of anything that is owed to them."

10.    After Elmer's funeral, Steven visited our grandmother a few times but not John.

11.    Without Elmer being there to get John and Steven to us, our family lost contact with them.

12.   Looking back, I now see that there was a lot of tension and conflict between John's mother, Charlotte, and our grandmother.  Since getting older I now realize this was going on even when Charlotte and Elmer were married.

13.   When Charlotte and Elmer were together we never had family get togethers. I do not remember an occasion when our grandmother, Charlotte, Elmer and the boys were at the same place together.

14.   Our grandmother was a very controlling person.  She used money to control her family. I experienced this personally and it was very painful.

15.   I do not know what John's life was like when he was at his mother's.

16.   Sometimes I wonder if John feels like no one really cared.

Sylvia Walton

Sylvia Ann Walton

Location: 567 S. 38th St

Executed on: 10-28-2010

# Attachment 6
# Psychiatric Evaluation conducted
# by Dr. Donna Schwartz-Watts

## Psychiatric Evaluation of John Fitzgerald Hanson
## Conducted by Dr. Donna Schwartz-Watts, M.D.

**DOB: 4/8/1964**
**DOE: 10/21/2010**
**POE:  Pollock Federal Prison**
**Date of Report:  11/29/2010**

### Identifying Information:

Mr. John Hanson is a 46-year-old male evaluated pursuant to a request from his attorney, Robert Jackson, Assistant Federal Public Defender, Capital Habeas Unit for the Western District of Oklahoma.

### Purpose of the Evaluation:

Mr. Hanson was convicted of two counts of first-degree murder in Oklahoma in Tulsa County. He was sentenced to the Death Penalty for the murder of Ms. Bowles and life in prison for the murder of Mr. Thurman. This general psychiatric evaluation was conducted for purposes of Mr. Hanson's federal habeas proceedings, because it is not believed he has previously had such an examination.  Mr. Hanson was examined in Pollock, LA at USP Pollock on October 21, 2010.

### Summary:

Mr. Hanson suffers from multiple mental illnesses, Dysthymia, Major Depressive Disorder, Cognitive Disorder, and Post Traumatic Stress Disorder, and a personality disturbance, Paranoid Personality Disorder.  He was genetically predisposed to develop a mood disorder due to his mother's history of depression.  He was a quiet child. Because of his conditions, he does not have any long-term relationships, except for his son and a cousin. He was most attached to his father and began to develop delinquent behavior when his father wasn't around as much due to divorce combined with his father's job as a long distance truck driver.  He became depressed after his father's death.  His attachment was then to his antisocial brother.  He had a period of illegal behavior, which subsided once he became a father and was attached to Ledocia Warrior.  At the time of Mr. Hanson's offenses, he was alone.   Ms. Warrior asked Mr. Hanson to leave when he became unemployed.  He eventually became homeless and was living in a car. Then he became reacquainted with Victor Miller and participated in various

1

criminal offenses which eventually resulted in charges being filed against Mr. Hanson and Miller for the deaths of Mary Bowles and Jerald Thurman.

## Qualifications of Examiner:

Donna Schwartz-Watts, M.D. is a physician licensed to practice medicine. She is a Board Certified General Psychiatrist and has Added Qualifications in Forensic Psychiatry. She has been qualified as an expert in Forensic Psychiatry in US District Courts, South Carolina General Sessions, Mississippi State Court, North Carolina State Court approximately 750 times. See attached Curriculum Vitae.

## Sources of Information:

1. May 17, 2001 letter from Gilda Kessner, Psy.D. re: proposed testimony
2. Affidavit of Gilda Kessner, Psy.D., dated June 28, 2002
3. Social History - Risk Assessment by Jeanne Russell, Ed.D.
4. Transcript of Proceedings dated January 23, 2006 - Dr. Russell testimony
5. Affidavit Stephen Hanson 11/5/2010
6. Declaration Marsha Hollingsworth 11/14/2010
7. Declaration Sylvia Ann Walton 10/28/2010
8. Affidavit of Tremaine Wright 11/5/2010
9. Affidavit of Marilyn Wright 11/5/2010
10. Telephone Interview Charlotte Ward 11/23/2010
11. Telephone Interview Marsha Hollingsworth 11/24/2010
12. Medical records Charlotte Ward St. Johns Medical Center 2003-2007
13. Investigation Memo concerning interviews of Charlotte Ward and Houston Ward, dated June 23, 2010, conducted by Bob Jackson, AFPD, Ken Lee, AFPD and Scott Kenna, Investigator, FPD
14. Investigation Memo concerning second interviews of Charlotte Ward and Houston Ward, dated August 4, 2010, conducted by Bob Jackson, AFPD and Scott Kenna, Investigator, FPD
15. Investigation Memo concerning interview of Houston Ward II, dated September 6, 2010, conducted by Ken Lee, AFPD and Scott Kenna, Investigator, FPD
16. Investigation Memo concerning interview of Charlotte Hanson Ward, dated September 3, 2010, conducted by Anna Wright, Investigator, FPD and Bob Jackson, AFPD
17. Internal Memo concerning interview of Ledocia Annette Warrior interview, dated July 19, 2010, conducted by Bob Jackson, AFPD and

Scott Kenna, Investigator, FPD

18. Internal Memo concerning interview of Marsha Hollingsworth in Portland, Oregon, dated July 28-30, 2010, conducted by Bob Jackson, AFPD and Scott Kenna, Investigator, FPD

19. Internal Memo concerning interview of Tremaine Wright, dated September 22, 2010, conducted by Bob Jackson, AFPD and Scott Kenna, Investigator, FPD

20. Internal Memo concerning interview of Houston Ward III, dated August 23, 2010, conducted by Bob Jackson, AFPD and Scott Kenna, Investigator, FPD

21. Internal Memo concerning interview of Marilyn Wright, dated September 24, 2010, conducted by Bob Jackson, AFPD and Scott Kenna, Investigator, FPD

22. Jon Hanson Life History – CPC memo

23. Memo of Interview of Tremaine Wright 4/21/2003

24. Presentence Investigation Report by Todd Brian Gollihare 4/28/2000

## Developmental History:

According to a telephone interview with Mr. Hanson's mother Charlotte Ward, there were no problems during his pregnancy or delivery. Mrs. Ward states she was 21 years old and carried him to term. She states his achieving developmental milestones as normal. The records and Mr. Hanson report he had a bike wreck as a child that left him "bald mouthed." He got a partial plate when he was 10 years old.

At the age of 8, his mother and father separated. His mother married Houston Ward when he was 15 years old. His father was unfaithful, and Mr. Hanson reports he was aware of his infidelity. Mr. Hanson also reported that he knew his mother dated the Tulsa police chief, who was married. His father died when he was 18 years old in 1982.

His mother, his mother's friend Marilyn Wright, his brother Stephen, and Marilyn Wright's son, Tremaine Wright and his cousin Marsha Hollingsworth all note a change in John's mood after his father died. His cousin, Marsha, describes him as a child "who kept to himself." She also described him as a follower of his brother.

Mr. Hanson had little contact with his father's family after his death. He reports he felt like "Houston's kids and his brother and sister were loved more" than him. Mrs. Ward confirms his paternal grandmother loved Stephen more than John. Marsha confirmed that her grandmother did show favoritism to the first-born grandchildren.

## School History:

Mrs. Ward reports that John was a good student, yet school records indicate he had numerous absences in grades 7 through 9, and his junior high and high school grades were poor, bordering on mediocre. He attended Tulsa Public Schools from 1969-79.  There were no public school records from 1970-72.  Mr. Hanson reports he attended Holy Family Catholic School during that period.  He transferred to Broken Arrow School in October 1979. There was no evidence of any repeats or resource classes in his records. There was no evidence that he had IQ testing.  His grades were not good from seventh grade on. He quit school in the twelfth grade and reports he earned his GED in prison.

## Occupational History:

Mr. Hanson held numerous jobs for short periods of time.  Although various family members and friends described him as intelligent, his jobs consisted primarily of manual labor.  Below is a list of his various jobs. Note that his most consistent employment spanned the four years that he was in a relationship with Ledocia Warrior, from 1994-1998.

Carpentry through Job Corps (early 80's)
Pizza Hut 4/26/1981 to 5/13/1981
Everclean Janitorial 8/1990 to 9/1990
Goldies Patio Grill 9/1990 to 9/1990
Bennigans 1990-1991
Rev. Wright's Air Conditioning Service 6/1992
Sheridan Lanes Bowling 1994-1995
Crest Foods 1995-1996
First Ice 1996-1999
Express Personnel/High Country Utilities 1998
Seal-Rite Construction - 4/1999
Blue-Bell Creameries - 3/1999 - 7/1999
Orderly for prison administration- present

## Family History of Mental Illness:

Review of Charlotte Ward's medical records from St. John's Hospital in Tulsa, Oklahoma reveal she has been diagnosed with Major Depressive Disorder.  She has been treated with antidepressants, anti-anxiety agents and antipsychotic medication.  The record revels she has had complications of psychosis from her depressions. His mother has also been diagnosed with obsessive-compulsive traits, bipolar disorder, panic disorder with

4

agoraphobia, generalized anxiety disorder, and post partum depression. Her symptoms have included ruminations, depression, anxiety, insomnia, mood swings, poor concentration, blank periods, confused thoughts, isolation, fear of snails/slugs, and a fear of going places.

## Medical History:

Mr. Hanson reported a history of two closed head injuries as a child. He states he was in a bicycle wreck which resulted in his front teeth being knocked out.  He describes another head injury with an associated loss of consciousness when he ran into a wall.

He has a history of asthma, and an allergy to penicillin®. He had a tonsillectomy age 13.  He reports he had tuberculosis while incarcerated in Beaumont.  He states he had a fever for 30 days and "tried to sweat it out."

He has a history of migraine headaches, which he reports have improved over time. His roommate and friend, Tremaine Wright noted that prior to his current charges, Mr. Hanson's migraines were debilitating.  He reported that Mr. Hanson "was always taking Tylenol.®"

Mr. Hanson reported eating red clay as a child and adult because he liked the taste and for health reasons.

## Psychiatric History:

Although his family and friends report he became depressed after the death of his father, Mr. Hanson has no history of inpatient or outpatient psychiatric treatment.  His first interaction with mental health specialists occurred when he was charged in this case.  He was evaluated by Dr. Gilda Kessner, Psy. D. on 4/3/01 and 5/16/01.  Her evaluation was specifically limited to performing a risk assessment to be used as mitigation in his capital trial. In her report issued 5/17/2001, she confirmed that Mr. Hanson was treated differently by his paternal grandmother because she did not believe he was her son's child. She also noted that when his mother married Houston Ward, he and Stephen were asked to leave the home.  She also noted that he dropped out of high school in the 12th grade due to racial tension.

He was not seen again until 2004 when he had another social history-risk assessment by Jeanne Russell Ed. D. completed on 12/31/04.  Similar to Dr. Kessner, this evaluation was limited to a risk assessment and social history for Mr. Hanson's sentencing.  Dr. Russell noted that his mother had mental illness during his trial.  She noted he was in a stable relationship with Ledocia Warrior from 1994-98.   When he was unable to maintain

5

employment, Ms. Warrior asked him to leave. He was homeless at the time of his offenses.

As part of her evaluation, Dr. Russell administered an abbreviated IQ test, the Wechsler Abbreviated Scale of Intelligence, which showed a 34-point difference between his Verbal and Performance IQ. This discrepancy in scores is important, given a 15-point difference is considered significant for underlying brain dysfunction/organicity. No follow-up testing was completed. None of Mr. Hanson's medical history, including his history of closed head injuries was listed.

There were significant features of Dr. Russell's mental status examination that were not pursued by Mr. Hanson's trial attorney such as: "he has difficulty staying on tasks with circumstantial speech." Such an observation is consistent with cognitive dysfunction.

Dr. Russell also noted themes of paranoid thinking: "He is guarded and acknowledges he trusts no one, believing most people mean him harm or fail to understand the world as it really is...at the very least he exhibits paranoid thoughts which impair his ability to trust." She additionally noted symptoms consistent with a mood disturbance. "His mood is pessimistic with affect reactive to mood." Dr. Russell administered MMPI testing and noted:

"Although Mr. Hanson agreed to take the MMPI-2, he frequently questioned the content of the items, analyzing what they really meant and expressing suspiciousness regarding what the authors were trying to find out. He refused to accept these were standardized items and that the questions were not intended to trick him."

"Mr. Hanson's MMPI-2 profile indicates some confusion and personality deterioration. Content analysis indicates he is preoccupied with bizarre ideas and abstract thoughts. He tends to project blame onto others and appears to withdraw into fantasy in an attempt to deal with his distress. In an interview, he is likely to be circumstantial, tangential, and disorganized."

"He has endorsed a number of items suggesting that he is experiencing low morale and a depressed mood. He may feel somewhat estranged and alienated from people. He is suspicious of the actions of others, and he may tend to blame them for his negative frame of mind. He reports some antisocial beliefs and attitudes, admits to rule violations, and

acknowledges antisocial behavior in the past. He views the world as a threatening place, sees himself as having been unjustly blamed for others' problems, and feels that he is getting a raw deal out of life."

"He endorsed a number of extreme and bizarre thoughts, suggesting the presence of delusions and/or hallucinations. He apparently believes that he has special mystical powers or a special "mission" in life that others do not understand or accept."

"The defendant feels socially inadequate, has very poor social skills, avoids close relationships, and views others as unfriendly or threatening. He is fearful and suspicious of other people. Many individuals with this profile type are unable to develop loving relationships and never trust anyone enough to marry."

The results of Dr. Russell's testing should have alerted his counsel to obtain a psychiatric consultation.

**Substance Use History:**

Mr. Hanson reports he drank alcohol and smoked marijuana from 1980-1997.  He also reports using PCP, as well as dipping tobacco and marijuana cigarettes in embalming fluid.  He reports an ounce of marijuana would typically last him one week.

**Social History:**

Mr. Hanson has no contact with his mother.  He has refused her visits in the past.  His only attachments are to his former wife, his son, and to his cousin, Marsha Hollingsworth. He did not have any long lasting stable relationships. He was with his wife for four years.

Mr. Hanson did live with Tremaine Wright for a number of years. Mr. Wright reports that Mr. Hanson lived with him until he married, and then he became homeless.  Mr. Wright reports he knew Mr. Hanson was sleeping in a car before his crimes and before his relationship with Victor Miller.

Mr. Hanson's mother reported she was placed in home for unwed mothers, and that Elmer Hanson's mother introduced them.  She retired from Ford after 27 years of employment. Mrs. Ward had a sister Janet who died from AIDs.

Mr. Hanson's older brother Stephen has a history of being incarcerated. Stephen spent some time in Southern California in the mid 1980's, and he was reported to be the originator of the CRIPS gang to Tulsa.

**Trauma History:**

Mr. Hanson denies any childhood trauma, other than the death of his father. He specifically denied being injured while in juvenile custody. However, he did admit to witnessing violence once he was confined. He reports he has seen people beaten in the head with locks. He states he saw an inmate stabbed in the throat.

Mr. Hanson reports that he has been stabbed three times and reports flashbacks whenever he thinks about it. He reports he has had a gun to his head three or four times and shot at four times. He states he deals with his anxiety by acting like "Spock from Star Trek." He states he tries to be logical and unemotional.

**Relationship History:**

Mr. Hanson has not had many long-term friendships outside of his cousin, Marsha Hollingsworth. He reports a high opinion of his son's mother, Ledocia Warrior. He reports she was "the best woman," and that she took care of him. He described her as "compassionate." Tremaine Wright reported Mr. Hanson would "isolate himself" from Ledocia which would cause problems.

Mr. Hanson knew his codefendant, Victor Miller since childhood. His cousin Marsha stated that Victor was older and she caught him giving John and Stephen cigarettes. She states Mr. Miller was around ten and Mr. Hanson was 6. When asked to describe their relationship, Mr. Hanson reported: "I let my guard down. I made the wrong choices."

**Legal History:**

The onset of Mr. Hanson's delinquency coincided with his leaving school in 1980. He was placed in DHS custody on June 3, 1980. He was sent to the Oklahoma Children's Center, went AWOL on June 28, 1980, and was eventually placed in the Boley and Helena juvenile facilities. He denied being abused there but did not deny abuse was happening. He was adjudicated delinquent for using his grandfather's credit cards and stealing his mother's car.

In the same year that his father died, Mr. Hanson committed an Armed Robbery and Aggravated Assault (12/82). He was sentenced to 10 years on 8/29/83. Records indicate another Armed Robbery in 1990,

however this looks to be for a probation violation on the earlier robbery sentence.

He was not charged with any crimes while living with Ledocia or Tremaine Wright. Mr. Hanson's immediate legal troubles occurred when he became homeless:

| | |
|---|---|
| 1/9/99 | Robbery Apache Junction Liquor Store |
| 8/21/99 | Robbery neighborhood liquor store |
| 8/22/99 | Smoke Shop |
| 8/23/99 | Apache Junction |
| 8/24/99 | Fox Run Liquor Store |
| 8/25/99 | Dreamland Video |
| 8/28/99 | Grapevine |
| 8/30/99 | Western |
| 8/31/99 | Promenade mall carjacking resulting in homicides |
| 9/7/99 | Signature loan |
| 9/8/99 | Tulsa Federal Employees Credit Union |
| 9/9/99 | Apprehended at Muskogee, Oklahoma Econolodge |

## Mental Status Examination:

Mr. Hanson was pleasant but guarded. He was pre-occupied with the prison and the "games they play when guests are here all the time." He related to the examiner in a paranoid and hypervigilant manner. His thought processes were circumstantial. He was also grandiose. He referred to the prison as a "nursery school." He stated: "they are the Flintstones and I am the Jetsons."

Mr. Hanson's hypervigilance was evident by his reports of seeing flare guns, machine guns and all of the different cultures of inmates he had to be careful not to offend. He admitted to daily anxiety attacks. He reports his anxiety is situational and he tries "to get out of the situation" before his anxiety overwhelms him. He also admitted chronic insomnia, reporting he sleeps four to five hours at night. He admits to depression, beginning at age 16. He states he is "emotional about things, never felt loved and was never hugged." He described a ruminating thought that he will die while confined in Pollock.

On formal cognitive testing, he was alert and oriented. His performance was above average on tasks of verbal fluency. He performed below average on reproducing visual designs. He had difficulty with serial seven subtractions. He was able to abstract similarities between objects. He

was able to register and recall three items after five minutes. He used visual
cues for recall.

**Diagnoses:**

The fourth edition of the American Psychiatric Association's
Diagnostic and Statistical Manual of Mental Disorders, Text Revision
(DSM-TR) is the official nomenclature used by psychiatrists and other
physicians to diagnose mental disorders.   The DSM uses a multi-axial
system of assessment.   There are five axes, which help clinicians plan
treatments and outcomes.

Axis I Disorders are for major mental illnesses and other conditions
that are the focus of clinical attention.  If an individual has more than one
Axis I disorder, they should be recorded separately.

Axis II Disorders are personality disturbances and mental Retardation.
The listing of personality disorders or Mental retardation prevents these
conditions from being overlooked, especially when patients suffer from Axis
I disorders at the same time.

Axis III is for General Medical Conditions. Medical conditions can
affect the management and course of Axis I and Axis II illnesses.

Axis IV codes psychosocial and environmental problems that can
affect the diagnosis, treatment and prognosis of mental disorders.   A
psychosocial problem can be a negative life event, an environmental
difficulty, familial or interpersonal stress, or an inadequate social support.

Axis V is a global assessment of functioning. The Global Assessment
of Functioning (GAF) is the clinician's judgment of the patient's overall
level of functioning.   The GAF scale is divided into ten ranges of
functioning. The scale has two components: symptom severity and level of
functioning.   A single value is picked that best reflects the individual's
functioning.   The ratings range from 0 to 100, the lower the rating, the
higher the level of danger and inability to function.   The higher the rating,
the less likely one is to suffer any symptoms of mental illness or have
impairment in functioning.   A GAF of 50 represents serious symptoms of
mental illness or serious impairment in functioning.

The following is the DSM-TR multiaxial assessment for Mr. John Hanson:

**Axis I (major mental illnesses):**

1. Dysthymic Disorder, early onset
2. Major Depressive Disorder, recurrent, mild in partial remission

3.   Post Traumatic Stress Disorder, chronic
4.   Cognitive Disorder, Not Otherwise Specified

**Axis II (personality disturbances):**   Paranoid Personality Disorder

**Axis III (general medical conditions):**   Asthma, Headaches, History of
closed head injuries

**Axis IV (psychological and environmental problems):**  Lack of family
support, incarceration

**Axis V (GAF scale):**  50

## Discussion of diagnoses:

**1.**   Dysthymic Disorder is a chronically depressed mood that occurs most
days for at least two years. During the period of depressed mood, at least
two additional symptoms must be present. Mr. Hanson reports a long history
of insomnia and has low self-esteem, although he attempts to appear
grandiose. The onset of Mr. Hanson's depression appears to prior to the
death of his father, at age 16.  His mother, brother, friends, Marilyn and
Tremaine Wright, his cousins Marsha Hollingsworth and Sylvia Waldon
confirm his mood changed.    Major Depressive Disorders may be
superimposed on Dysthymic Disorders.    In such cases, a "double
depression" is diagnosed (p.377, DSM-TR). His disorder is characterized as
early onset since he did report symptoms of depression before age 21.

**2.**   Major Depression is a depressed mood for at least two weeks with at
least four additional symptoms.  His additional symptoms include decreased
appetite, insomnia, fatigue, a sense of worthlessness, and suicidal ideation or
suicide attempts. His friend Tremaine Wright described discrete periods of
time where Mr. Hanson would not function.  He would lie still and not move
even after Tremaine had come home from work. In my interview, Mr.
Hanson admitted to insomnia, morbid thoughts of death. Additionally, his
mother has history of treatment for depression. He had a genetic
predisposition to inherit depression due to his mother's illness.

**3.**   Post Traumatic Stress Disorder is an anxiety disorder.  In order to meet
the diagnostic criteria for Post Traumatic Stress Disorder, six criterions must
be met.  First, the person must have been exposed to a traumatic event that

involved actual threatened death or serious injury, or a threat to his physical integrity and his response to such a threat involved helplessness, horror or intense fear. Mr. Hanson does report witnessing and being the victim of trauma during periods of his confinement.  He also states he has been stabbed three times and shot at three or four times.

The second criterion for Post Traumatic Stress Disorder involves persistently re-experiencing the traumatic event in the form of recurrent, intrusive thoughts, recurrent dreams of the event, feeling as if the traumatic event is reoccurring, intense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event or physiological reactivity when exposed to internal or external cues that symbolize or represent an aspect of the traumatic event. Mr. Hanson reports flashbacks daily.

The third criterion for Post Traumatic Stress Disorder involves persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness by efforts to avoid thoughts, feelings or conversations about the trauma, efforts to avoid activities or places associated with the trauma, inability to recall important aspects of the trauma, markedly diminished interests in activities, feeling detached or estranged from others, restricted range of affect and a sense of foreshortened future. Mr. Hanson is very guarded and gives little detail about the violence he has experienced and witnessed.

The fourth symptom consists of increased arousal as indicated by difficulty sleeping, irritability or outbursts of anger, difficulty concentrating, hypervigilance or exaggerated startle response. Mr. Hanson reports difficulty sleeping and is very hypervigilant as noted in his mental status examination.

The fifth criterion requires the duration of the above symptoms for more than a month. Mr. Hanson has experienced these symptoms for years. He was noted to be guarded at the time of his evaluation with Dr. Russell.

Finally, the disorder must cause significant distress or impairment in social, occupational or other important areas of functioning. Mr. Hanson does not interact with other inmates or maintain relationships with his immediate family.

**4.** Cognitive Disorder Not Otherwise Specified

According to the DSM-TR (p. 179), this category is for disorders characterized by cognitive (brain) dysfunction presumed to be the direct physiologic effect of a general medical condition that does not meet criteria for delirium or dementia, yet does indicate organicity.

Mr. Hanson was tested by Dr. Russell and found to have a significant

split on verbal and performance subscales of IQ testing. He also has other clinical symptoms associated with cognitive dysfunction including migraine headaches, difficulty reproducing visual designs and problems with concentration.

**5.** <u>Paranoid Personality Disorder</u> is a pattern of pervasive distrust and suspiciousness of others such that their motives are interpreted as malevolent. These individuals assume others will exploit, harm or deceive them, even if no evidence exists to support this expectation. They often feel that they have been deeply and irreversibly inured by another person. They are preoccupied with unjustified doubt about the loyalty or trustworthiness of their friends and associates. Individuals with this disorder are reluctant to confide in or become close to others because they fear that the information they share will be used against them. In Mr. Hanson's case, his excessive suspiciousness is apparent by a quiet aloofness. He appears to be cold. He had prior personality testing which confirmed his paranoia. Persons with this disorder can decompensate and have brief bouts of psychotic behavior. His personality testing conducted by Dr. Russell revealed some bizarre and psychotic thought processes. His pre-sentencing report noted he has a tattoo, which states: "Trust no 1 but God," such a statement reinforces the existence of Mr. Hanson's paranoia.

**<u>Opinions:</u>**
1.  Based on my review of Dr. Russell's report, there was evidence that Mr. Hanson suffered from a mood disorder, paranoid personality disorder, and brief periods of psychotic thinking. This information should have prompted the attorney to obtain a psychiatric consult for diagnostic purposes.
2.  It is clear that Mr. Hanson suffers from a chronic and superimposed acute mood disorder and has a maternal history of mood disorder.
3.  It is clear that Mr. Hanson suffers from Paranoid Personality Disorder and that evidence was available to support this finding at the time of his hearing.
4.  Based on review of Dr. Russell's report, there was evidence that Mr. Hanson suffered impaired cognitive function. He had a significant split in the verbal and performance subscales on his intellectual testing. She reported he was confused, distracted, and had difficulty staying on task, all clinical signs of cognitive impairment. This information should have prompted neuropsychological testing to determine the extent of his cognitive dysfunction (organicity).

5. Mr. Hanson has a history of closed head injuries, headaches and further signs of cognitive impairment including difficulty reproducing visual designs which are further evidence of cognitive impairment.

6. These diagnoses were available at the time of the trial had appropriate consultations been ordered.

7. Additionally, Mr. Hanson has been exposed to life threatening trauma and has a resultant anxiety disorder. Unfortunately, he is too paranoid to discuss these traumas in more detail.

8. Mr. Hanson was suffering from depression at the time of his offenses. He was homeless and had no social supports. Persons with depression can be irritable, impulsive, and use poor judgment. His cognitive disorder was also present at the time of his offense and would have contributed to his impulsivity and poor judgment.


_____              Date: 11/29/2010
Donna Schwartz-Watts, M.D.
Consulting Forensic Psychiatrist

14

# Attachment 7
# Dr. Donna Schwartz-Watts-
# Curriculum Vitae

# Curriculum Vitae
## *DONNA MARIE SCHWARTZ-WATTS, M.D.*

**DATE OF BIRTH:**  May 29, 1963
**PLACE OF BIRTH:**  Camp LeJeune, North Carolina

**PRESENT POSITIONS:**

**Senior Psychiatrist (certified)**
**Bryan Psychiatric Hospital**

**DMH Clinical Professor of Psychiatry**
University of South Carolina School of Medicine
Department of Neuropsychiatry and Behavioral Science

**PROFESSIONAL LICENSURE:**

Diplomate, Psychiatry, (Board Certification #40726), January 1995, recertified 7/05
Added Qualifications in Forensic Psychiatry, July 1996 #471, recertified 7/06
South Carolina Medical License # 16574

**EDUCATION:**

1981 - 1985    B.A. Psychology
Furman University
Greenville, South Carolina

1985 - 1989    Doctor of Medicine
University of South Carolina School of Medicine
Columbia, South Carolina

Donna Schwartz-Watts, MD
Curriculum Vitae

## POSTGRADUATE FELLOWSHIPS AND RESIDENCY POSITIONS:

1989 - 1993          Resident in General Psychiatry
                     William S. Hall Psychiatric Institute
                     Columbia, South Carolina

1993 - 1994          Fellowship in Forensic Psychiatry
                     William S. Hall Psychiatric Institute
                     Columbia, South Carolina

## ACADEMIC POSITIONS/EMPLOYMENT/UNIVERSITY APPOINTMENTS:
7/2006-7/2010

                     Professor of Clinical Psychiatry
                     Director, Forensic Psychiatry Services
                     University of South Carolina School of Medicine
                     Department of Neuropsychiatry and Behavioral Science
                     3555 Harden Street Extension, Suite 102
                     Columbia, South Carolina 29203
                     (803) 434-4698          (803) 434-2367 (fax)


                     Consulting and Treating Forensic Psychiatrist
                     South Carolina Department of Juvenile Justice

                     Consulting and Treating Forensic Psychiatrist
                     South Carolina Department of Corrections



11/98-6/2009         Consulting and Treating Forensic Psychiatrist
                     Behavioral Disorders Treatment Program
                     (Sexually Violent Predator Program:  SC 44-48-110)
                     South Carolina Department of Mental Health

6/1997- 7/2006       Associate Professor
                     Director, Forensic Services
                     Department of Neuropsychiatry
                     University of South Carolina School of Medicine

1/2004-7/2004        Acting Assistant Director, Psychiatry Residency Program
                     University of South Carolina School of Medicine
                     Department of Neuropsychiatry and Behavioral Science

7 /1996 – 6/1997     Psychiatrist C   William S. Hall Psychiatric Institute

2

Donna Schwartz-Watts, MD
Curriculum Vitae

Residential Treatment Director of NGRI Unit

| | |
|---|---|
| 1/1995 – 6/1996 | Teaching Psychiatrist II   William S. Hall Psychiatric Institute<br>Out-patient Forensic Psychiatrist |
| 1/1995 – 12/1997 | Assistant Professor University of South Carolina School of Medicine<br>Department of Neuropsychiatry |
| 7/1994 –6/1995 | Instructor University of South Carolina School of Medicine<br>Department of Neuropsychiatry |
| 7/1994 – 12/1994 | Teaching Psychiatrist I   William S. Hall Psychiatric Institute<br>In-patient and Out-patient Forensic Psychiatrist |

## MEDICAL STAFF APPOINTMENTS

Bryan Psychiatric Hospital (current)
South Carolina Department of Corrections (courtesy)
South Carolina Department of Juvenile Justice (inactive 7/2010)
William S. Hall Psychiatric Institute
Palmetto Health Richland Memorial Hospital (courtesy)
Palmetto Health Baptist Medical Center (courtesy)

## UNIVERSITY/ MEDICAL STAFF COMMITTEES:

| | |
|---|---|
| 2007-2010 | Member, Appointments and Promotions Committee |
| 2002- 2009 | Member, Alumni Committee, USC School of Medicine |
| 1996- Present | Member, Residency Selection Committee |
| 1995- Present | Member, Residency Training Committee |
| 2002- 2003 | Member, Search Committee, Chairman of Neuropsychiatry |
| 2000-2001 | Member, Committee on Women USC |
| 1997 | Member, Traditions Committee USCSM |
| 1997 | Member, Search Committee, Director Rehabilitation Counseling |
| 1997 | Physician Advisor, Environment of Care |
| 1996 | Member, Search Committee Chair of Department of Neuropsychiatry and<br>Director of Hall Institute |
| 1996 | Member, Finance Committee, University Specialty Clinics |
| 1994-1996 | Member, Infection Control Committee |
| 1993-1994 | Member, Research Committee |

## HONORS AND AWARDS:

| | |
|---|---|
| 2007 | Outstanding Female Physician Mentor Award |
| 2004-2005 | Outstanding Forensic Teaching Award<br>Presented by the USC SOM Forensic Fellowship Training Program |

3

Donna Schwartz-Watts, MD
Curriculum Vitae

1992          Rappeport Scholarship in Forensic Psychiatry
                  Presented by the American Academy of Psychiatry and the Law
1989          Neurology Award, School of Medicine
1985          Cum Laude Graduate, Furman University
                  Phi Beta Kappa, Furman University
                  Alpha Epsilon Delta, Furman University

## MEMBERSHIPS AND OFFICES IN PROFESSIONAL ORGANIZATIONS:

2002-2009     American Board of Psychiatry and Neurology
                  Forensic Certification Committee

1999-Present  American Board of Psychiatry and Neurology
                  1999-Present   Board Examiner

1997-2003     Group for the Advancement of Psychiatry (GAP), General Member
                  1999             Chair

1992- Present American Academy of Psychiatry and the Law  (AAPL)
                  1995-2000        Rappeport Committee (President appointed)
                  1995-2000        Education Committee (President appointed)
                  1998-2000        Program Committee (President appointed)
                  1999             Program Chair
                  1995-97          Mentor to Rappeport Fellow

1989-1998     American Psychiatric Association, General Member

1989-1998     South Carolina Psychiatric Association
                  1995-1998        Federal Legislative Representative (President appointed)
                  1995-1999        Executive Council
                  1996-1998        Secretary-Treasurer

1997          NAMI Advisory Board Physician Representative

## PUBLICATIONS:

Schwartz-Watts DM: "Commentary: Stalking Risk Profile." The Journal of the American Academy
      of Psychiatry and the Law, 34:455-457, 2006.

Schwartz-Watts DM, Frierson RL: "20: Crisis Stabilization in Correctional Settings." in Clinical
      Practice in Correctional Medicine, Second Edition, edited by Michael Puisis, D.O., S.C.
      Mosby, Inc affiliate of Elsevier, Inc   2005.

Schwartz-Watts DM. "Asperger's Disorder and Murder." Analysis & Commentary  The Journal of
      the American Academy of Psychiatry and the Law 33:390-3, 2005.

4

Donna Schwartz-Watts, MD
Curriculum Vitae

Schwartz-Watts DM, Rowell CN. "Commentary: Update on Assessing Risk for Violence Among Stalkers." The Journal of the American Academy of Psychiatry and the Law 31:440-3, 2003.

Giorgi-Guarnieri D, Zonana HV, Schwartz-Watts DM. "Practice Guideline: Forensic Psychiatric Evaluation of Defendants Raising the Insanity Defense." Supplement to The Journal of the American Academy of Psychiatry and the Law 30:2, 2002.

Frierson R, Schwartz-Watts D, Malone T, Morgan D. "Capital Versus Noncapital Murderers" in revision The Journal of the American Academy of Psychiatry and the Law 1998.

Schwartz-Watts D, Morgan D. "Violent Versus Nonviolent Stakers," accepted, The Journal of the American Academy of Psychiatry and the Law 1998.

Schwartz-Watts D, Morgan D, Barnes C. "Stalkers: The South Carolina Experience," The Journal of the American Academy of Psychiatry and the Law 1997, 24:541-545.

Schwartz-Watts D, Montgomery L, Morgan D. "Seroprevalence of Human Immunodeficiency Virus Among Pre-Trial Detainees," The Bulletin of the American Academy of Psychiatry and the Law, 1995, 23:285-289.

**POSTERS:**
Internet Chat Rooms: Who Solicits Children? R. Gegg Dwyer, MD, EdD, Donna Schwartz-Watts MD, William Burke, PhD, American Academy of Psychiatry and the Law 39th Annual Meeting, Seattle, WA October , 2008


**PRESENTATIONS:**
"Stalking in the New Millennium": Department of Mental Health Day Long CME, Columbia SC, October 2009

"Internet Predators": South Carolina Psychiatric Association Annual Meeting, Myrtle Beach, South Carolina, 1/2009

"Internet Predators": Panel Speaker, South Carolina Bar Association Annual Meeting, Myrtle Beach South Carolina, 1/2009

Internet Predators: ICAC Quarterly Meeting, Columbia, South Carolina  11/21/2008

Project Safe Childhood, Advanced Online Child Exploitation Seminar, National Advocacy Center Columbia, SC, July 29, 2008

"Violent Crimes and the Commitment of Sexually Violent Predators, MUSC Judges and Attorneys Substance Abuse and Ethics Seminar, Charleston, South Carolina, December 7, 2007

5

Donna Schwartz-Watts, MD
Curriculum Vitae

"Autistic Spectrum Disorders and Corrections" South Carolina Department of Corrections Mental Health Seminar, Columbia, South Carolina, December, 2007

"Pitfalls in Sex offender Commitment Hearings" Panel Speaker, American Academy of Psychiatry and the Law 38th Annual meeting, Miami, Florida, October 22, 2007

"Treating the Untreatable" Panel Speaker, American Academy of Psychiatry and the Law 38th Annual Meeting, Miami, Florida,  October 19, 2007

"Risk Assessment in General Psychiatry: Department of Mental Health Annual Day Long CME, Columbia, SC September 21, 2007

"Mitigation in Noncapital Cases" SC Public Defender's Conference, Myrtle Beach, SC October 2007.

"Nuts and Bolts of Sexually Violent Predator Proceedings" SC Bar CLE, Columbia, South Carolina July 27, 2007

University of South Carolina School of Medicine Founder's Day Speaker for Woman in Medicine, Columbia, South Carolina, April 2007.

"Autistic Spectrum Disorders and Mitigation," Washington DC March 2007

"Sex Crimes and their Aftermath II" Panel Discussion and Presentation, Jack Swerling Moderator, South Carolina Bar Association Conference, Charleston, SC, January 25, 2007

"Psychiatry for the Brilliant Fact Finders" Invited Speaker, South Carolina Judges Conference, Greenville, SC,  May 12, 2006.

"Sex Crimes and their Aftermath" Panel Discussion and Presentation, Jack Swerling Moderator, South Carolina Bar Association Conference, Charleston, SC January 27, 2006.

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice National Institute of Trial Advocacy,  Atlanta Georgia , June 45, 2005

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice National Institute of Trial Advocacy,  Atlanta Georgia , June 56, 2004

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice National Institute of Trial Advocacy,  New York, New York, June 2021,2003

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice, New York, New York. June 20-22,2002.

South Carolina Probation, Paroles and Pardons Annual Conference.  "A State of Mind". Myrtle

6

Beach, SC. November 11, 2002.

American Academy of Psychiatry and the Law, "Difficult Case? Consult your Colleagues."
Newport Beach, California. October 26, 2002

South Carolina Public Defender's Conference, "Issues and Concerns Regarding the Sexually Violent
Predator Statue" Litchfield Beach, South Carolina, September 30, 2002

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice, New
York, New York, June 28-30-2002.

American Academy of Psychiatry and the Law, "Death Penalty"   Boston, MA, October 28, 2001

American Academy of Psychiatry and the Law, "Ask the Expert" and "The Difficult Case" Panel
Discussions.  Boston, MA, October 28, 2001

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice, New
York, New York, June 14-17-2001.

Annual Capital Defense Training Seminar, "The Importance of Timing in the Presentation of Your
Client's Story:  Frontloading Mitigation" with John Blume, Attorney,  Jekyll Island, Georgia,
February 9, 2001

University of Texas, Department of Psychiatry Grand Rounds "Profile of a Stalker"  San Antonio,
Texas, December 19, 2000

Willford Hall Medical Center, Lackland Air Force Base, Texas, "Death Penalty Evaluations,"
December 18, 2000.

Willford Hall Medical Center, Lackland Air Force Base, Texas,"Texas Sexually Violent Predator
Statute,"  December 18, 2000

American Academy of Psychiatry and the Law, " Juveniles Who Carry Weapons on School Grounds"
Baltimore, Maryland, October 15, 1999

American Academy of Forensic Science, Workshop Presenter, San Francisco, 1998 "Classification
and Typology of Stalkers."

Kansas City, Western Missouri Forensic Department, 1997 "Evaluation of Stalking."

University of South Carolina School of Medicine Women's Month Featured Presenter, 1997
"Stalkers:  The South Carolina Experience."

American Academy of Psychiatry and the Law, Denver, CO, 1997 "Psychotic versus Nonpsychotic
Stalkers."

7

Donna Schwartz-Watts, MD
Curriculum Vitae

American Academy of Psychiatry and the Law, Denver, CO, 1997 "Harassing Telephone Callers."

American Academy of Psychiatry and the Law, Denver, CO, 1997  Panel on Maintaining Competence sponsored by Education Committee

American Academy of Psychiatry and the Law, Puerto Rico, 1996 "Violent Versus Nonviolent Stalkers",

American Academy of Psychiatry and the Law, Puerto Rico, 1996 "Capital Versus Noncapital Murderers"

American Academy of Psychiatry and the Law, Puerto Rico, 1996  "Treatment of Insanity Acquittees Across the United States."

William S. Hall Psychiatric Institute Forensic Forum, 1996 "Evaluation and Treatment of Sexual Offenders."

Georgia Regional Forensic Forum, 1996 "Evaluation and Treatment of Sexual Offenders."

American Academy of Psychiatry and the Law, Seattle, Washington, 1995  "Stalkers:  The South Carolina Experience"

South Carolina Psychiatric Association, Hilton Head Symposium, 1995 "What General Psychiatrists Need to Know About Forensic Psychiatry."

American Academy of Psychiatry and the Law Annual Conference, San Antonio, Texas   1993 "Seroprevalence of HIV Among Inpatient Pre-trial Detainees"

American Medical Association, North Carolina  1990 "Tertiary Metastases Presenting As Panhypopituitarism"

**Present Research:**

Schwartz-Watts D. "Death Penalty"

Schwartz-Watts D, Barth E, Morgan D. "Harassing Telephone Callers"

Schwartz-Watts D, Morgan D.  "Psychotic Versus Nonpsychotic Stalkers"

Schwartz-Watts D, Morgan D.  "Comparing Stalkers to the Criminally Domestic Violent."

Schwartz-Watts D, Bloom J, Sloan C.  "Psychiatric and Legal Perspectives of Stalking."

**Present Grants:**

8

Donna Schwartz-Watts, MD
Curriculum Vitae

Co-author w R. Gregg Dwyer et al Internet Predators

Co-author w Alicia Hall, PhD, Harry Wright, MD Autistic Spectrum Disorders and Corrections

(Revised 12/1/10)

# Attachment 8
# Affidavit of Tremaine Wright

## AFFIDAVIT OF TREMAINE WRIGHT

| | | |
|---|---|---|
| **STATE OF OKLAHOMA** | ) | |
| | ) | **ss.** |
| **COUNTY OF TULSA** | ) | |

I, Tremaine Wright, being of legal age and sound mind, do solemnly swear and state as follows:

1. John Hanson's mom, Charlotte Ward, and my mother, Marilyn Wright, were best friends. John and I met through our mothers and we became really tight friends. We refer to each other as cousin.

2. When John got out of prison in 1992, he started living with me and my ~~brother Jermaine.~~ We lived together on and off for about 7 years.

3. John was a good roommate. He would give me my space. Some days John was cool and on others he wouldn't talk and just kept to himself. John spent most of his time watching TV, reading, and sleeping.

4. John would get really down on himself for being an ex-felon and having trouble keeping a job.

5. Even though I was 7 years younger than John, I would help him with job applications as well as other day-to-day things. John just didn't have the life skills to get by, because he had spent so much time in prison.

6. John didn't talk about his family much, but he did tell me about some problems. John felt like his mom and step-dad, Houston Ward, didn't treat him as good as Houston's kids. John would have to call and ask permission before he could go to his parents' house, but Houston's kids could go over any time. This really hurt John and made him feel left out.

7. John moved to Oklahoma City for a little while and had a son, Marquelle, with Annette Warrior. Things didn't work out with Annette and John moved back to Tulsa and stayed with me.

8.    John loved Marquelle and would talk about him all the time. John would get so excited on the few occasions that Marquelle came to visit. John would get really down every time Marquelle left.

9.    John got really depressed. He would talk about suicide and how he felt no one cared about him. John slept a lot, sometimes for two days straight. I can remember him getting up, going to the bathroom, taking a shower, then going right back to sleep.

10.   John would be sleeping and I would go to work and he would still be in the same spot when I got home. I had to tap him to make sure he was still alive. John would say he was just thinking.

11.   John complained about his head hurting a lot, and would take Tylenol all the time.

12.   John was always respectful when he stayed with me. I can remember John's brother Steve coming over sometimes. He would be acting like a thug in my house. John somehow got the message to Steve to act right or stop hanging around us. Steve didn't come over much after that.

13.   Not long before John moved out in 1999, he told me his old cell-mate, Victor Miller, had gotten out of jail. I only met Victor one time, and I got a really bad feeling about him. I told John not to be bringing Victor around my house, and John respected my wishes, but continued seeing Victor.

14.   John would go hang out with Victor and then I wouldn't see him for a couple of days.

15.   About the time John started hanging out with Victor, my girlfriend and I asked John to move out, because we were getting married and it just didn't work to have John living with us.

16.   I found out later that John was living in a car behind Rashad Barnes' house. I felt awful about this. It must have been terrible for John who was such a clean person. When I found out, I would let John come over and take a shower or eat when my girlfriend wasn't around.

17.   It is terrible that John got caught up in the murders. I feel like I gave him some structure and rules to live by when he was staying with me. I don't think any of this would have ever happened to John if he had stayed living with me.

18.     I would have testified at John's trial, but I was never asked by his attorneys.


FURTHER  AFFIANT  SAYETH  NOT.

Tremaine Wright

Subscribed and sworn to before me this 5th day of _November_____, 2010.

NOTARY PUBLIC

# Attachment 9
## *Social History-Risk Assessment Report*
## by Dr. Jeanne Russell

Case 4:10-cv-00113-CVE-TLW   Document 13-9   Filed in USDC ND/OK on 12/06/10   Page 2 of 14
01/03/2005  11:17   9185555950                                                           PAGE  02
6:25-cv-00081-RAW-JAR   Document 7-3   Filed in ED/OK on 04/04/25   Page 210 of 244

# SOCIAL HISTORY – RISK ASSESSMENT

**NAME:** Hanson, John (Jon) Fitzgerald
**DATE OF BIRTH:** 4/8/64
**CASE NUMBER:** CF-99-4583
**DATE OF REPORT:** 12/31/2004
**COUNTY:** Tulsa
**DEFENSE ATTORNEY:** Jack Gordon, Jr.
**EXAMINER:** Jeanne Russell, Ed.D.
Licensed Psychologist #632

**REASON FOR REFERRAL:** Mr. John Fitzgerald Hanson was tried by jury and convicted of Count 1, First Degree Malice Murder and sentenced to death. On June 11, 2003 the Oklahoma Court of Criminal Appeals remanded this case for resentencing. Based on this opinion, Mr. Hanson was referred by his defense attorney, Jack Gordon, Jr., for completion of a social history and risk assessment. This report was requested to provide information to the court regarding the defendant's background and potential risk for violence while incarcerated.

**DESCRIPTION OF RISK ASSESSMENT AND SOCIAL HISTORY:** A risk assessment involves a systematic review of past aggressive behavior, looking specifically at the antecedents of the behavior, as well as the degree of harm and context in which the behavior occurred. In completing this assessment, it is important to note that mental health professionals tend to <u>over predict</u> aggression. Whether a person will behave aggressively is a function of a variety of factors that include history, and situational variables that cannot all be known in advance. Despite these limitations, it is possible to consider the available historical and situational data to identify potential risk.

**PROCEDURES:**
*Interviews*

<u>Defendant:</u>

| | | |
|---|---|---|
| July 16, 2004 | Tulsa County Jail | 2.0 hours |
| August 13, 2004 | Tulsa County Jail | 2.5 hours |
| August 27, 2004 | Tulsa County Jail | 2.5 hours |
| September 2, 2004 | Tulsa County Jail | 3 hours |
| September 17, 2004 | Tulsa County Jail | 4.0 hours |
| November 11, 2004 | Tulsa County Jail | 2.0 hours |
| November 20, 2004 | Tulsa County Jail | 2.0 hours |

<u>Defendant's mother and stepfather, Mrs. Charlotte Ward and Houston Ward Jr.:</u>

| | | |
|---|---|---|
| December 17, 2004 | Office | 1 hour |
| December 20, 2004 | Office | 1.5 hours |

<u>Defendant's ex-girlfriend and mother of his son, Ms. Ledocia Warrior:</u>

| | | |
|---|---|---|
| December 20, 2004 | Telephone | 1.0 hour |

JEG2  8262

Hanson, John Fitzgerald
Social History and Risk Assessment
12/31/04
Page 2

*Review of the following records*:

Legal

- Violence Risk Assessment for Capital Sentencing Report completed by Gilda Kessner, Psy.D. on 5/16/01
- Presentence Investigation Report dated May 24, 2000 completed by U.S. Probation Officer, Todd B. Gollihare, Northern District of Oklahoma.
- Oklahoma Department of Corrections Records 1982 – 1992 (Summary of Records Reviewed)
  - o Misconduct Reports
  - o Parole Summaries
  - o Certificates
    - ▪ GED – 11/22/89
    - ▪ Award of Honor – Adult Performance Level Program 11/7/85
    - ▪ Competency Certificate – Masonry – 6/15/90
  - o OSBI 1/10/1991
  - o FBI 4/21/83
  - o Pardon and Parole Investigation Reports
  - o Chronological Records – Probation and Parole/Pre-Parole

Psychological Assessment

- Minnesota Multiphasic Personality Inventory – second edition (MMPI-2) completed 11/20/04
- Weschler Abbreviated Scale of Intelligence (WASI)
- Hare Psychopathy Checklist – Revised PCL-R

**RELEVANT BACKGROUND INFORMATION:**

*Overview:* The information contained in this section is a compilation of official reports, interviews with the defendant and others noted above.

*Family History:*

Childhood: Mr. Hanson was born on April 8, 1964 in Tulsa, OK to Elmer Hanson and Charlotte Ward (current name). He has one older brother and two younger sisters. His parents divorced in 1974 when he was approximately 10 years of age. Mr. Hanson remained with his mother as his father's truck driving profession required a great deal of travel.

JEG2   8263

Hanson, John Fitzgerald
Social History and Risk Assessment
12/31/04
Page 3

Following their divorce, Mrs. Hanson married Houston Ward to whom she remains married at this time. Both Wards are retired and living in Tulsa. Mr. Ward states that he knew the defendant and his father for most of Jon's life. Both Mr. and Mrs. Ward describe Jon as doing well in school until he turned 16. His father became ill with cancer and died when Jon was 17. Both Wards and Jon recall this period as hard on Jon as he idolized his father and resented his mother for divorcing him and marrying Houston Ward.

The Wards described Jon as being treated different from his older brother Stephen by both Jon's father and his paternal grandparents. They believe this had a significant impact on Jon's development as he loved and craved attention from his father. Although Ms. Ward stated she tried to make up the difference, this did little to relieve the emotional pain inflicted by the discrimination between the two boys.

Father:  Mr. Elmer Hanson worked as a professional truck driver prior to his death in 1982. The defendant states he loved his father and believes things would have been different if his father had lived. Mr. Hanson believes he would not have been in trouble but grown into a responsible member of society.

Mother:  Mr. Hanson remembers his mother as stern and distant. He does not believe she cared about him as much as the other children. His mother on the other hand describes Jon as her favorite as she believes he "is most like her." Ms. Ward said she testified for Jon in the first trial but was so traumatized by the proceedings and cross-examination that she had a "nervous breakdown". She recalls being placed in a hospital for two weeks and remains on psychotropic medications at this time. Mr. and Mrs. Ward said her psychiatrist has advised her not to testify during the second trial due to the trauma associated with the first trial.

Both of Mr. Hanson's parents and his stepfather have led productive lives. The Wards state they have maintained employment until retirement and deny any problems with the law. Mr. Ward remains protective of his wife, stating he tries to take care of her as she cannot handle the stress of the trial and possible outcomes.

Adolescence:  Mr. Hanson began getting in trouble as an adolescent. According to his mother he was raised on the north side of Tulsa and both he and his brother began running with the wrong crowd in high school. She moved to Broken Arrow in an effort to break up these associations but states both sons would return to the north side to see their friends. Mr. Hanson recalls being the only African American in many of his classes in the Broken Arrow schools and believes he was discriminated against based on his race.

Substance Abuse History:  Mr. Hanson reports that he tried Marijuana at the age of 16

JEG2  8264

Hanson, John Fitzgerald
Social History and Risk Assessment
12/31/04
Page 4

and smoked it everyday or whenever he could get it for the next 23 years. He recalls
trying alcohol but didn't really like the taste or "effect" it had on him. He admits to trying
other drugs at an early age but reports not liking any drug except Marijuana. He states
he was arrested at the age of 18 for Possession of Controlled Drugs but that these
belonged to his brother and there is no history of a conviction on this charge. He
further reports one misconduct while serving time in the federal penitentiary for
possession of drugs which he reports he was holding as a favor for another inmate. His
parents report he did not use drugs while growing up but admit his brother Stephen
developed a drug problem for which he is presently incarcerated.

*Education:* Mr. Hanson reports completing the 11th grade and earning his GED in
prison. Department of Corrections records verify that he completed his GED and
earned a Masonry Certificate during his incarceration.

*Medical History:* No significant medical problems were reported.

*Relationships:* Mr. Hanson has never been married and reports only one significant
relationship in his life, with Ledocia Warrior, the mother of his son. Ms. Warrior has a
Masters degree in Child Development and maintains contact with Mr. Hanson through
occasional letters. Ms. Warrior reports that their son receives regular letters from Mr.
Hanson (2 or 3 letters a month) and writes back to him at least once a month.

Ms. Warrior was interviewed on 12/20/04 and provided the following information. She
reported she met Mr. Hanson in 1994 and they remained together until 1998 when Mr.
Hanson returned to Tulsa to find work. Ms. Warrior stated several times that she didn't
know the man that was in trouble as he never showed this side to her or her family.
She describes him as a "wonderful, wonderful, father who adored their son." She
recalls he nursed and took total care of both her and her son after he was born. "He
cooked and cleaned, ironed all their clothes and held a job. He never took anything
from me and was never violent. He didn't hang with people after work but always came
home." Ms. Warrior further states "My family loved Jon. Even the nurses at the
hospital where our son was born saw him as an ideal father – they wanted to use him
for a model." Ms. Warrior's family credits him (as does her niece) with saving her
niece's life by counseling and supporting her when she was suicidal. Other family
members wrote affidavits in Jon's support following his first trial.

Ms. Warrior stated Jon left in 1998 because he had been laid off his job and couldn't
find work due to his record. Ms. Warrior initiated the break-up asking Jon to leave until
he found work. She recalls he cried when they broke up as she was the only one he
could talk to. She recalls he was very depressed at that time and returned to Tulsa.
Ms. Warrior believes their relationship would have worked out if he could have
remained employed. Ms. Warrior recalls everyone was laid off at the company where

JEG2   8265

Hanson, John Fitzgerald
Social History and Risk Assessment
12/31/04
Page 5

he was working and she does not fault him for the loss of this job.

*Employment:* Mr. Hanson has spent the majority of his working life in prison. He reports prior to coming to Tulsa to wait re-sentencing, he had an inmate job in the federal prison. Mr. Hanson reports working at the age of 16 in a Pizza Hut for 2 or 3 months. He describes numerous other short term jobs including Job Corps (6 months), Everklean Janitorial in 1990 (3 months), Franks Country Inn, 1992 (3 months), Sheridan Lanes Bowling Alley (3 months), Crest Discount Foods, 1996 (5 months), First Ice Company, 1996 (2.5 years), High Country Utilities, Red River, New Mexico through temporary services, Tulsa, OK, 1998 (4 months), Blue Bell, Coweta, OK, 1999 (4 months). Mr. Hanson reports he was unable to find work in 1999 which he attributes to his prison record and eventually began living on the streets. He reports being on the streets for approximately 5 months, during which time he was unable to bathe regularly, sleep or eat on a routine basis. He describes feeling humiliated when asking agencies for help and betrayed when turned down. It was during this time period that he ran into his co-defendant, Victor Miller, with whom he had previously served time. He states he began committing crimes with Victor which eventually resulted in his arrest and conviction on his current charges.

*Psychological:*

**BEHAVIORAL OBSERVATIONS AND MENTAL STATUS:** Mr. Hanson is a 40 year old African American male who stands 6'0" and weighs approximately 160 pounds. He appears his stated age, neatly groomed with good personal hygiene. Motor behavior is neither increased or decreased with normal mannerisms and posturing

Speech is of low volume. He has difficulty staying on tasks with circumstantial speech. Mr. Hanson's content of thought focuses on global problems rather than those of immediate concern such as his case. He spends a good deal of time testing this examiner to ensure she understands his concerns and point of view in relation to the world. He is guarded and acknowledges he trusts no one, believing most people mean him harm or fail to understand the world as it really is.

His mood is pessimistic with affect reactive to mood. Both recent and remote memory are intact. At the very least he exhibits paranoid thoughts which impair his ability to trust anyone. He denies homicidal or suicidal ideation and there is no evidence of hallucinations. Judgment and insight are poor as evidenced by his unwillingness or difficulty in focusing on his defense in this case.

**TEST RESULTS**

JEG2   8266

Hanson, John Fitzgerald
Social History and Risk Assessment
12/31/04
Page 6

## MMPI-2:

### PROFILE VALIDITY

Although Mr. Hanson agreed to take the MMPI-2, he frequently questioned the content of the items, analyzing what they really meant and expressing suspiciousness regarding what the authors were trying to find out. He refused to accept these were standardized items and that the questions were not intended to trick him. Despite these reservations, Mr. Hanson completed the test and the clinical profile appears valid. The defendant's responses to the MMPI-2 validity items suggest that he cooperated with the evaluation enough to provide useful interpretive information. The resulting clinical profile is an adequate indication of his present personality functioning. However, it is important to remember that these results are only one source of personality assessment.

### SYMPTOMATIC PATTERNS

Mr. Hanson's MMPI-2 profile indicates some confusion and personality deterioration. Content analysis indicates he is preoccupied with bizarre ideas and abstract thoughts. He tends to project blame onto others and appears to withdraw into fantasy in an attempt to deal with his distress. In an interview, he is likely to be circumstantial, tangential, and disorganized.

In addition, the following description is suggested by the content of the defendant's item responses. He has endorsed a number of items suggesting that he is experiencing low morale and a depressed mood. He may feel somewhat estranged and alienated from people. He is suspicious of the actions of others, and he may tend to blame them for his negative frame of mind. He reports some antisocial beliefs and attitudes, admits to rule violations, and acknowledges antisocial behavior in the past. He views the world as a threatening place, sees himself as having been unjustly blamed for others' problems, and feels that he is getting a raw deal out of life.

He endorsed a number of extreme and bizarre thoughts, suggesting the presence of delusions and/or hallucinations. He apparently believes that he has special mystical powers or a special "mission" in life that others do not understand or accept.

**Interpersonal Relations:** Disturbed relationships are characteristic of individuals with this profile type. The defendant feels socially inadequate, has very poor social skills, avoids close relationships, and views others as unfriendly or threatening. He is fearful and suspicious of other people. Many individuals with this profile type are unable to develop loving relationships and never trust anyone enough to marry.

Hanson, John Fitzgerald
Social History and Risk Assessment
12/31/04
Page 7

The content of this defendant's MMPI-2 responses suggests the following additional
information concerning his interpersonal relations. He appears to be an individual who
has rather cynical views about life. Any efforts to initiate new behaviors may be colored
by his negativism. He may view relationships with others as threatening and harmful.

**WASI:** The WASI is an abbreviated reliable measure of intelligence consisting of four
subtests which have a strong association with general cognitive abilities.

Mr. Hanson's Verbal Intelligence Quotient (VIQ) is comprised of the vocabulary and
similarities subtests. The Vocabulary subtest score is a measure of an individual's
verbal knowledge and fund of knowledge and is considered a good measure of
crystallized ability. The Similarities score is a measure of the individual's ability to see
relationships between objects or concepts and to generalize the relationship into a
single concept. It is a measure of verbal concept formation, abstract and verbal
reasoning, and general intellectual ability. Mr. Hanson's score of 119 on the VIQ place
him in the 90th percentile when compared to others taking this test.

Mr. Hanson's Performance Intelligence Quotient (PIQ) is comprised of the Block Design
and Matrix Reasoning subtests of the WASI. The Block Design performance taps
abilities related to spatial visualization, spatial reasoning, and perceptual organization.
Matrix Reasoning performance reflects the individual's ability to mentally manipulate
abstract symbols and to perceive the relationship among them. It is a measure of
nonverbal fluid reasoning and general intellectual ability. Mr. Hanson's PIQ was
substantially lower with a score of 95 and a percentile of 37.

Using all four subtests, Mr. Hanson had a full scale IQ of 108 which places him at the
70th percentile when compared to others completing this test.

**PCL-R:** The PCL-R is a rating scale for the assessment of psychopathy in male and
female forensic populations. Using this scale, persons with psychopathy are described
as grandiose, self-centered and manipulative. When describing their emotions they
are seen as shallow, lacking in empathy, guilt, or remorse. In terms of their behavior
they may exhibit impulsivity and sensation seeking activities. Persons rarely have all
traits associated with psychopathy and scores on this instrument are best understood
by assessing where a person falls along a continuum with scores ranging between 0
and 40.

Low scores on this measure are associated with reduced rates of aggression in the
community where high scores are often associated with violent behavior. Intuitively,
this makes sense. A person lacking in guilt and interested only in meeting their own
needs does not feel badly when acting out toward others. The presence of impulsivity

JEG2  8268

Hanson, John Fitzgerald
Social History and Risk Assessment
12/31/04
Page 8

and sensation seeking behavior places these individuals in high risk situations where they act in self-serving ways without thinking of the consequences. It should be noted that the items on the PCL-R are rated on an individuals' lifetime functioning and not solely on the basis of an individuals' present state. A total score of 40 is possible, with a cut-off of 30 recommended for assessing the presence of psychopathy.

Mr. Hanson's overall score of "20" on the PCL-R falls at the 47th percentile rank with 53% of male offenders scoring equal to or higher than the defendant. In summary Mr. Hanson has some traits associated with psychopathy but fails to meet the suggested cut-off score of 30 associated with a classification of this disorder.

Court and Institutional History:

*Juvenile History:* There is no record of criminal history prior to the age of 16. According to official records, Mr. Hanson was first adjudicated In Need of Supervision by the Tulsa Juvenile Court on May 27, 1980. This was subsequent to his quitting school, taking his mother's car, and using his grandfather's credit card. On June 20, 1980, he received a Delinquent Petition for Breaking and Entering. On June 23, 1980, he was placed in the custody of the Oklahoma Department of Human Services (DHS) and on June 25, 1980, he was placed by DHS in the Oklahoma Children's Center (OCC). On June 28, 1980 he ran away and was listed as Absent Without Leave (AWOL). He was caught but left on three other occasions before being placed in the Boley State School for Boys. On February 23, 1981, he was paroled and returned to his mother. On August 11, 1981, he was adjudicated delinquent after shoplifting merchandise from Safeway. On August 21, 1981, Hanson was placed in the Helena State School for boys.

*Adult History:* On 12/3/82 (Age 18) Mr. Hanson was arrested for Robbery in the First Degree (CRF-82-6248). On 2/7/83 he pled guilty and was sentenced to ten (10) years in the custody of the Oklahoma Department of Corrections to run concurrently with a second charge of Robbery in the First Degree and Assault with a Deadly Weapon with Intent to Kill (CRF-82-6249) which occurred on 12/4/82. Mr. Hanson had two accomplices during each crime and involved Mr. Hanson snatching women's purses after knocking them down. Following the second offense, Mr. Hanson and the accomplices were pursued by a witness in a car and as the witness was closing in, Mr. Hanson was convicted of firing a round from a revolver through the windshield of the pursuer's vehicle.

On 7/3/90, Mr. Hanson was released from Mack Alford Correction Center and placed on Pre-Parole. On 10/8/90, he failed to keep a scheduled appointment with his parole officer and escape charges were filed. He was returned to prison where he served an additional two years. Mr. Hanson discharged to intensive supervision on 4/27/92. He

JEG2   8269

Hanson, John Fitzgerald
Social History and Risk Assessment
12/31/04
Page 9

remained out of trouble successfully discharging the remainder of his parole. On 3/7/96 (Age 31), Mr. Hanson was charged with taking five packages of Q-Tips from Homeland Grocery Store in Tulsa.

There is no record of additional arrests until September 9, 1999. According to a federal presentence investigation, he was charged with 17 counts on case number 99-CR-125-002-C including Conspiracy, Interference with Interstate Commerce and Aiding and Abetting, Possession of a Firearm During a Crime of Violence and Aiding and Abetting, Bank Robbery and Aiding and Abetting, and Possession of Firearm After Conviction of a Felony (1 count). The presentence officer in accordance with federal guidelines recommended 1284 months (107 years) to be served in the federal penitentiary on 12 of the 17 counts. Mr. Hanson reports he is currently serving three 25 year sentences plus 984 months. Based on the federal sentencing guidelines he is not eligible for probation.

Institutional Behavior: Records indicate Mr. Hanson was incarcerated in juvenile and adult facilities from the age of 16 to the age of 28 spending only brief periods in the community. Each of these periods resulted in his getting in trouble again and being returned to incarceration. Mr. Hanson did significantly better in structured settings. Prison records showed numerous misconducts during his early 20's which declined significantly as he aged. He had two battery write-ups when he was 22 and 23 with numerous minor misconducts from age 19 through 23. These decreased significantly with age as is typically seen with male inmates.

Below is a list of misconducts by date, age, and category.

| Year | Age | Total Mis-conducts | Violent | Non-Violent | Accomplices if violent | |
|------|-----|--------------------|---------|-------------|------------------------|---|
| 1983 | 19 | 3 | 0 | 3 | | |
| 1984 | 20 | 8 | 0 | 8 | | |
| 1985 | 21 | 6 | 0 | 6 | | |
| 1986 | 22 | 8 | 1 | 7 | Yes | **Battery - Inmate** |
| 1987 | 23 | 5 | 1 | 4 | No | **Fight with other inmate** |
| 1988 | 24 | 1 | 0 | 1 | | |
| 1989 | 25 | 0 | 0 | 0 | | |
| 1990 | 26 | 1 | 0 | 1 | | **Discharged pre-parole – new charges filed - Escape** |
| 1991 | 27 | 0 | 0 | 0 | | |

JEG2   8270

Hanson, John Fitzgerald
Social History and Risk Assessment
12/31/04
Page 10

| 1992 | 28 | 1 | 0 | 1 | | |
|------|----|----|----|----|----|----|
| 1993 | 29 | Community Setting – No Arrests | | | | |
| 1994 | 30 | Community Setting – No Arrests | | | | |
| 1995 | 31 | Community Setting – No Arrests | | | | |
| 1996 | 32 | Community Setting – Shoplifting Arrest | | | | |
| 1997 | 33 | Community Setting – No Arrests | | | | |
| 1998 | 34 | Community Setting – No Arrests | | | | |
| 1999 | 35 | Arrests for Robberies and Murder (see criminal history) | | | | |
| 2000 | 36 | 0 | 0 | 0 | | |
| 2001 | 37 | 0 | 0 | 0 | | |
| 2002 | 38 | 0 | 0 | 0 | | |
| 2003 | 39 | 0 | 0 | 0 | | |
| 2004 | 40 | 1 | 0 | 1 | | |
| Total | | 34 | 2 | 32 | | |

## SUMMARY:

Mr. Hanson has undergone a number of interviews and psychological tests since being charged and convicted of the shooting death of Mary Bowles. Assessment instruments used have validity scales to assess the veracity of his responses; the result of which have indicated he has responded to these tests in an honest manner. In other words, Mr. Hanson has not tried to fake responses to make his self look better or worse in order to make a more sympathetic defendant. This is important to note in order to determine the weight to give self-report items that could not be verified through other sources.

### Social History:
Mr. Hanson's social history reflects a normal childhood prior to his parent's divorce when he was 10 and the death of his father from cancer when he was 17. The defendant's mother and stepfather (Houston and Charlotte Ward) along with Jon agree these events had a profound effect on Mr. Hanson's life. Mr. Hanson recalls feeling depressed and wanting to die for several years following his father's death. The Wards believe he was mistreated emotionally by his father and his paternal grandmother as they believe his older brother was clearly favored.

The Wards describe Mr. Hanson as intelligent but very sensitive, easily getting his feelings hurt. They also describe him as loyal to peers who paid attention to him past the point that they feel is warranted. Mr. Hanson and his mother recall him doing well in school. He states he liked school, especially art, but became disgruntled when he was forced to leave Central High School and attend school in Broken Arrow. He began

Hanson, John Fitzgerald
Social History and Risk Assessment
12/31/04
Page 11

skipping school and eventually dropped out altogether.  He was first arrested at the age
of 16 and spent the majority of his next 16 years in juvenile and adult institutions.

Mr. Hanson had one period of his life where he lived a pro-social life.  He recalls
meeting Ledocia Annette Warrior in January 1993.  Ms. Warrior has a master's degree
in child development and is a teacher.  She has never married.  During their time
together, Mr. Hanson worked and established a close relationship with her family.  She
recalls his helping her niece to work through her depression when she was
contemplating suicide.  Ms. Warrior states Jon was never violent and recalls he was a
"wonderful, wonderful father." Ms. Warrior recalls feeling shocked as did her family
when they read about Jon's arrest. During our interview she stated several times that
she and her family never knew the man that committed these robberies as it was so
opposite the man they knew.  The relationship developed problems when Mr. Hanson
lost his job even though she does not fault him for the layoff.  He returned to Tulsa to
find work and eventually ended up living on the streets.  After five months, he met up
with Victor Miller and admits to committing a string of robberies.

The couple have a son, Marquelle Hanson who Mr. Hanson describes as smart and
maintains contact with through letters. Ms. Warrior feels it is important for her son to
continue contact with his father if only through letters.  She explained that it was only
recently she told him about his father's charges at which time he cried and asked about
the victim, Mary Bowles.

*Psychological Testing Results*:   Mr. Hanson's overall intelligence is above average with
significant strengths in verbal abilities.  These results suggest he has the ability to use
his intellectual reasoning to problem solve unless impaired by psychological problems.
Psychological testing suggests he is experiencing low morale and a depressed mood. It
further suggests he feels estranged and alienated from people and is suspicious of the
actions of others.  Mr. Hanson admits to some antisocial beliefs and attitudes, rule
violations, and acknowledges antisocial behavior in the past. He views the world as a
threatening place, sees himself as having been unjustly blamed for others' problems,
and feels that he is getting a raw deal out of life.  He endorsed a number of extreme
and bizarre thoughts, suggesting the presence of delusions and/or hallucinations. He
apparently believes that he has special mystical powers or a special "mission" in life
that others do not understand or accept.

It is important to note that Mr. Hanson has not been previously diagnosed with a mental
illness nor does he believe he suffers from any such illness.  This cannot be ruled out at
this time and if present does not rise to the level of impairing his ability to appreciate the
serious nature of his charge or to work with his attorney in mounting a defense.  Mr.

JEG2  8272

Hanson, John Fitzgerald
Social History and Risk Assessment
12/31/04
Page 12

Hanson's score on the PCL-R does not reach the level associated with psychopathy but is equivalent to scores attained by approximately 50% of incarcerated males.

*Risk Summary:* Mr. Hanson's criminal history involves a number of robberies including firearms. He generally has a weapon (gun) and all crimes have been committed with accomplices. Mr. Hanson's current federal sentence is equivalent to life and therefore risk assessment is limited to situational factors which occur in a prison setting.

Age: Mr. Hanson is 40 years of age. Research indicates that the younger inmates tend to be more aggressive in a prison setting with higher rates of serious rule infractions. Significant declines in serious rule infractions occur as the inmate ages (30–40). This pattern is clearly present in Mr. Hanson's history of misconducts. He had one battery at the age of 22 and a fight with another inmate at age 23. He had two incidents of possessing weapons, one at age 20 and 22, however there is no record of his having used a weapon in prison. The following chart shows a decrease in misconducts as he ages.



Nature of Misconducts: There has been no aggression toward juvenile or prison staff during his approximate 16 years of incarceration. The majority of his misconducts

JEG2 8273

Hanson, John Fitzgerald
Social History and Risk Assessment
12/31/04
Page 13

include minor acts such as being late to school and problems at work. Mr. Hanson
reports one misconduct for possession of drugs during his past five years in the federal
penitentiary. He denies any misconducts during his stay in the Tulsa County Jail.

Based on this pattern of prison conduct, Mr. Hanson presents as a low risk for future
violence in a prison setting. Unlike the community, a prison provides rules and
structure which serves to contain Mr. Hanson's antisocial behavior. He has learned to
exist in this environment as opposed to a community setting.

Submitted by,

Jeanne Russell, Ed.D.
Licensed Psychologist # 632

JEG2 8274

# Attachment 10
# Affidavit of Jamie D. Pybas

## AFFIDAVIT OF JAMIE D. PYBAS

**STATE OF OKLAHOMA**              )
                                   )          **ss.**
**COUNTY OF CLEVELAND**            )

---

I, Jamie D. Pybas, being of legal age and sound mind, do solemnly swear and state as follows:

1. I am employed as an Attorney in the Homicide Direct Appeals Unit of the Oklahoma Indigent Defense System (OIDS). I represented John Hanson on direct appeal from both his original trial and re-sentencing, Oklahoma Court of Criminal Appeals Case Nos. D-2001-717 and D-2006-126, respectively.

2. During the course of preparing the appeal in *Hanson I*, I considered retaining a neuropsychologist to examine Mr. Hanson.

3. At the time, the procedure for retaining an expert at OIDS consisted of: (1) submitting a Request for Professional Services to our in-house Head of Psychological Services, Kathy LaFortune, Ph.D.; (2) Ms. LaFortune or an assistant would then conduct a "screening" to determine if the use of an expert was warranted; and (3) Ms. LaFortune would either recommend approval or denial of the Request based on the results of her screening.

4. In my experience, a negative recommendation from Psychological Services generally results in an attorney dropping their Request for Professional Services. Ultimately, however, the Executive Director makes the final decision on whether to expend funds on professional services. If an attorney felt strongly enough about the need for an expert he or she could appeal a negative recommendation by Ms. LaFortune to the Executive Director. I am unaware of any attorney at OIDS successfully disputing a negative recommendation from Ms. LaFortune.

5. The process of retaining an expert has traditionally been one of the most frustrating parts of my job. In fact, during the tenure of the past Executive Director, I am aware of attorneys being terminated from employment with OIDS due in part to disputes over the retention of professional experts.

6.    When preparing *Hanson I*, I contacted Kathy LaFortune about retaining a neuropsychologist.  Prior to the 2001 trial, Ms. LaFortune had conducted a screening examination of Mr. Hanson.  This screening consisted of a basic mental status exam, a Minnesota Multiphasic Personality Inventory (MMPI), and an abbreviated IQ test.  Ms. LaFortune's opinion was that a neuropsychologist should not be retained based upon her recollection of her screening.

7.    Based upon my experiences and OIDS' policy for the retention of experts, I did not pursue the prospect of retaining a neuropsychologist after Ms. LaFortune advised me not to retain one.

8.    After pursuing the issue in *Hanson I*, I did not again request to retain a neuropsychologist in *Hanson II* after already being denied on one occasion.

9.    OIDS should have retained a neuropsychologist in Mr. Hanson's case.  I had no strategic reason for not doing so.  In my approximately 20 years of experience handling capital cases, I have become familiar with mental health issues and their indicators in capital clients; the circumstances of Mr. Hanson's case warranted hiring a mental health professional with expertise in neuropsychology.  I am aware that mental health issues have proven to be winning issues in numerous capital cases and must be diligently pursued.


FURTHER AFFIANT SAYETH NOT.

_____
Jamie D. Pybas


Subscribed and sworn to before me this 3rd day of November, 2010.


LEA ANN ISLEY
Notary Public
State of Oklahoma
Commission # 99010333  Expires 11/10/11

_____
NOTARY PUBLIC


Page 2 of 2

# Attachment 11
# Affidavit of Robert W. Jackson

## AFFIDAVIT OF ROBERT W. JACKSON

**STATE OF OKLAHOMA**          )
                              )          **ss.**
**COUNTY OF CLEVELAND**       )

I, Robert W. Jackson, being of legal age and sound mind, do solemnly swear and state as follows:

1.   I am an attorney employed by the Oklahoma Indigent Defense System. I was assigned to represent John Hanson in the filing of his Application for Post Conviction Relief in case no. PCD-2006-614.

2.   While preparing Mr. Hanson's application, I did not attempt to retain a mental health professional - psychologist, psychiatrist, neuropsychologist, or the like.

3.   By the time I began work on Mr. Hanson's case, it had already been through the process of a trial, direct appeal, post-conviction, re-sentencing hearing, and second direct appeal.

4.   I didn't pursue any mental health investigation while preparing Mr. Hanson's case, because I believed, and my thought process was, that previous defense teams had already investigated those issues, including my colleagues at OIDS.

5.   Only one expert, Dr. Jeanne Russell, was retained at the time of the re-sentencing trial, she only covered one limited aspect, future risk assessment. Mr. Hanson's mental health issues were not appropriately or adequately covered while preparing his Post Conviction case.

6.   I should have attempted to retain a mental health professional to evaluate Mr. Hanson. Had I received mental health and/or cognitive impairment diagnoses, I would have argued related claims in Mr. Hanson's Post Conviction Application.

7.      I had no strategic reason for not attempting to retain a mental health professional or raising a related proposition in Mr. Hanson's Application for Post Conviction Relief. In fact mental health issues are something regularly dealt with during Post Conviction, and something I should have sought to investigate.


FURTHER AFFIANT SAYETH NOT.

_____

Robert W. Jackson


Subscribed and sworn to before me this *17th* day of *NOVEMBER*, 2010.

_____

NOTARY PUBLIC

My Commission Number: 00014061
My Commission Expires: 9-11-12

Page 2 of 2

# Attachment 12
# Opinion Denying Post Conviction Relief,
# Hanson v. Oklahoma, PDC-2002-628

FILED

IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA

JUN 17 2003

# IN THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA

MICHAEL S. RICHIE
CLERK

| | | |
|---|---|---|
| JOHN FITZGERALD HANSON, | ) | |
| | ) | |
| Appellant, | ) | |
| v. | ) | Case No. PCD-02-628 |
| | ) | |
| STATE OF OKLAHOMA, | ) | |
| | ) | |
| Appellee. | ) | |

## ORDER

John Fitzgerald Hanson was tried by jury and convicted of Count I, First Degree Malice Murder in violation of 21 O.S.1991, § 701.7(A), and Count II, First Degree Felony Murder in violation of 21 O.S.1991, § 701.7(B), in the District Court of Tulsa County, Case No. CF-99-4583.[1] As to Count I, the jury found three aggravating circumstances: (1) Hanson was previously convicted of a felony involving the use or threat of force; (2) there existed a probability that Hanson would pose a continuing threat to society, and (3) that Hanson knowingly created a great risk of death to more than one person. As to Count II, the jury found two aggravating circumstances: (1) Hanson was previously convicted of a felony involving the use or threat of force; and (2) there existed a probability that Hanson would pose a continuing threat to society. In accordance with the jury's recommendation the Honorable Linda G. Morrissey sentenced Hanson to death (Count I) and life without the possibility of parole

---

[1] Hanson was charged in the alternative with malice or felony murder in both counts. The jury acquitted him of malice murder on Count II.

1

(Count II). On appeal, this Court remanded the case for a Resentencing hearing on Count I.[2]

On June 9, 2003, Hanson filed an Application for Post-Conviction Relief and a Motion for Evidentiary Hearing. Hansen's Application is mooted by our disposition of his direct appeal and is **DISMISSED**. Hanson may re-file his Application for Post-Conviction Relief, along with any appropriate accompanying motions, after the resentencing hearing is concluded. At that time Hanson may raise all post-conviction issues allowed under the Post-Conviction Procedure Act,[3] including issues resulting from the guilt-innocence, or conviction, phase of trial as well as those raised in the resentencing hearing.

**IT IS SO ORDERED.**

**WITNESS OUR HANDS AND THE SEAL OF THIS COURT** this 17th day of June , 2003.

_____
**CHARLES A. JOHNSON, Presiding Judge**

_____
**STEVE LILE, Vice-Presiding Judge**

_____
**GARY L. LUMPKIN, Judge**

_____
**CHARLES S. CHAPEL, Judge**

---

[2] *Hanson v. State*, 2003 OK CR 12, ___ P.3d ___.
[3] 22 O.S.2002, § 1089.

2

RETA M. STRUBHAR, Judge

ATTEST:

Clerk

# Attachment 13
# Opinion Denying Post Conviction Relief,
# Hanson v. Oklahoma, PCD-2006-614

# IN THE COURT OF CRIMINAL APPEALS FOR THE STATE OF OKLAHOMA

JOHN FITZGERALD HANSON,     )
                                           )
             Petitioner,      )      NOT FOR PUBLICATION
                                           )
        -vs-           )      No. PCD-2006-614
                                         )

STATE OF OKLAHOMA,      )

             Respondent.     )

**FILED
IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA

JUN - 2 2009**

## OPINION DENYING APPLICATION FOR POST-CONVICTION RELIEF

MICHAEL S. RICHIE
CLERK

**A. JOHNSON, VICE-PRESIDING JUDGE:**

Before the Court is Petitioner John Fitzgerald Hanson's original application for post conviction relief. Hanson and his co-defendant Victor Miller were originally charged in the District Court of Tulsa County, Case No. CF-99-4583, with two counts of first degree murder for the deaths of Mary Bowles (Count 1) and Jerald Thurman (Count 2).[1] Their cases were severed for trial and a jury convicted Hanson of First Degree Malice Aforethought Murder for Bowles's death in violation of 21 O.S.Supp.1998, § 701.7(A) (Count 1), and First Degree Felony Murder for Thurman's death in violation of 21 O.S.Supp.1998, § 701.7(B) (Count 2). The jury sentenced Hanson to death for Bowles's murder in Count 1 and fixed punishment of life imprisonment without the possibility of parole for Thurman's murder in Count 2. Judgment and Sentence were imposed by the district court in accordance with the jury's

---

[1] Hanson and Miller were charged in the alternative with malice aforethought murder and felony murder in both counts.

verdict and Hanson appealed.   We affirmed both Hanson's conviction and sentence for Thurman's murder.   We affirmed his conviction for Bowles's murder, but vacated his death sentence and remanded the matter for a new sentencing proceeding in *Hanson v. State,* 2003 OK CR 12, 72 P.3d 40. At Hanson's resentencing jury trial, before the Honorable Caroline E. Wall, a jury again sentenced him to death for Bowles's murder. We affirmed Hanson's death sentence in *Hanson v. State,* 2009 OK CR 13, ___P.3d___.

Hanson raises three propositions of error in his application for post-conviction relief.   None of these claims have merit. Under the Capital Post-Conviction Procedure Act, the only claims that may be raised are those that "[w]ere not and could not have been raised in a direct appeal" and that also "[s]upport a conclusion either that the outcome of the trial would have been different but for the errors or that the defendant is factually innocent."   22 O.S.Supp.2006, § 1089(C)(1) and (2).   "This Court will not consider issues which were raised on direct appeal and are barred by *res judicata,* or issues which have been waived because they could have been, but were not, raised on direct appeal." *Cummings v. State*, 1998 OK CR 60, ¶ 2, 970 P.2d 188, 190. The burden is on the applicant to show that his claim is not procedurally barred. *See* 22 O.S.Supp.2006, § 1089(C).

**1.**

In Proposition I, Hanson claims, as he did on direct appeal, that this Court erred in granting the State a writ of prohibition reversing the district

court's decision overturning his conviction for the death of Mary Bowles and granting him a new trial based on newly discovered evidence.

Five days before Hanson's resentencing trial was scheduled to begin, he learned that his co-defendant, Victor Miller, had made a statement to another inmate taking responsibility for the murder of a woman.[2]   He filed an application for post-conviction relief in the district court based on this newly discovered evidence.   The district court granted Hanson's application for post-conviction relief and ordered a new trial on Hanson's malice aforethought murder conviction for Bowles's death.   The district court stayed the proceedings for the State to appeal its ruling.   The State appealed the district court's ruling in two separate forms: 1) it filed an Emergency Application to Assume Original Jurisdiction and Petition for Writ of Prohibition or in the alternative a Writ of Mandamus (Case No. PR-2005-350); and 2) it filed an appeal from the district court's ruling on Hanson's post-conviction application (Case No. PCD-2005-351). We treated the latter pleading as a motion for extraordinary writ and consolidated the appeals for review. *Hanson v. State,* Case No. PR-2005-350 (April 26, 2005).  We granted the writ and held that the district court did not have jurisdiction to adjudicate Hanson's post-conviction application because only this Court has the power to consider post-conviction

---

[2] The inmate to whom Miller allegedly confessed told a Tulsa police detective that Miller said he was committing robberies with the friend he was arrested with at a hotel and that he (Miller) killed the "bitch."   Miller appeared to be referring to a woman he and Hanson robbed, the implication being it was Bowles.

applications in a capital case. The district court's order granting Hanson a new

trial was vacated and held void and the matter was remanded to the district

court to conduct the resentencing trial ordered by this Court in *Hanson,* 2003

OK CR 12, 72 P.3d at 55.

The issue of whether or not the district court had jurisdiction to

adjudicate Hanson's application for post-conviction relief prior to his

resentencing trial was decided in *Hanson v. State,* Case No. PR-2005-350 (April

26, 2005). On direct appeal we declined to review our ruling in that

extraordinary writ appeal, noting our cases holding this Court will not review a

claim or issue previously decided in an extraordinary writ appeal because of

the doctrine of collateral estoppel. *See, e.g., Brown v. State,* 1998 OK CR 77, ¶

10, 989 P.2d 913, 921; *Wilson v. State,* 1998 OK CR 73, ¶ 11, 983 P.2d 448,

456. We acknowledged, however, that the "law of the case" doctrine, barring

relitigation of the same issue in successive appeals in the same case, was the

more appropriate doctrine and applied it in upholding our prior ruling resolving

the issue.[3]   Likewise because of the settled law-of-the-case doctrine, we will

---

[3] The "law of the case" doctrine prevents relitigation of the same issues within successive stages
of the same suit. In *Dean v. Multiple Injury Trust Fund,* the Oklahoma Supreme Court stated:

> The settled-law-of-the-case doctrine bars relitigation of issues settled by an
> appellate opinion. This doctrine is a rule of judicial economy designed to prevent
> an appellate court from twice having to decide the same issue. Whether the issue
> was wrongfully or rightfully decided is not to be determined; once settled on
> appeal, the appellate court will not review the issue on the second appeal.

> This doctrine does have an exception: it is not applied if the prior decision is
> palpably erroneous and this Court is convinced that failure to reverse it will
> result in a gross or manifest injustice.

2006 OK 78, ¶¶ 6 and 7, 145 P.3d 1097, 1100 (citations omitted).

4

not revisit our previous decision here.  The issue was fully considered in the extraordinary writ appeal and we are not convinced that our decision there, finding the district court to be without jurisdiction to decide Hanson's post-conviction application, was clearly erroneous or will result in gross or manifest injustice.

We must now consider on the merits whether Hanson is entitled to a new trial based on newly discovered evidence that Miller told another inmate that he killed a woman.[4]   We review this claim *de novo* without deference to the district court's ruling because the district court was without jurisdiction to adjudicate the issue and its decision has been held void.

To determine if a defendant is entitled to a new trial on the basis of newly discovered evidence, we consider: (1) whether the evidence is material; (2) whether the evidence could have been discovered before trial with reasonable diligence; (3) whether the evidence is cumulative; and (4) whether the evidence creates a reasonable probability that, had it been introduced at trial, it would have changed the outcome. *Ellis v. State,* 1992 OK CR 45, ¶ 50, 867 P.2d 1289, 1303.   Miller's statement was not presented during Hanson's original trial and the parties agreed it was not discoverable through reasonable diligence before defense counsel raised the issue days before Hanson's resentencing trial was to begin.  (M.Tr.03/02/05 at 12)

---

[4] We found in Hanson's direct appeal that his claim that newly discovered evidence required a new trial was the proper subject of a post-conviction appeal.   *Hanson,* 2009 OK CR 13, ___P.3d___.

Our decision here is limited to whether the statement is material and, if so, whether there is a reasonable probability that had the statement been admitted the outcome of Hanson's original trial would have been different.

Hanson contends that under Oklahoma law, a defendant in a malice murder case must be shown beyond a reasonable doubt to have either killed the victim or personally intended the death of the victim and aided and abetted with full knowledge of the intent of the perpetrator. *See Johnson v. State,* 1996 OK CR 36, ¶ 20, 928 P.2d 309, 315. Hanson argues that, based on Miller's statement, a jury could find first that he was not the triggerman who shot Bowles, and second that he did not share Miller's intent to kill. Thus, he concludes a jury, with Miller's statement before it, could find him not guilty of malice aforethought murder for the death of Mary Bowles. We disagree.

We recently overruled the language in *Johnson v. State, supra,* requiring proof that one who aids and abets a murder must personally intend the death of the victim and aid and abet with full knowledge of the intent of the perpetrator to be guilty of malice aforethought murder. *See Williams v. State,* 2008 OK CR 19, ¶ 85 n. 18, 188 P.3d 208, 225 n. 18. To prove that a defendant aided and betted an intentional murder, and so is guilty as a principal, the State need prove only that the defendant procured the crime to be done or aided, assisted, abetted, advised or encouraged the commission of the crime. *Id.* at ¶ 87, 188 P.2d 226.

6

Evidence at trial showed that Hanson and Miller kidnapped Bowles, stole her car, restrained her in the back seat, and drove her to an Owasso dirt pit in an isolated area.  When Jerald Thurman, the dirt pit owner, happened to see them circling through the dirt pit, Miller used the gun he routinely carried to shoot him, eliminating him as a witness.  The pair then drove a short distance away.  According to Rashad Barnes, the person to whom Hanson confessed, Miller told Hanson he knew what he had to do and in response Hanson shot Bowles.   A finding that Hanson intentionally shot and killed Bowles is well supported by the evidence.

The State argues that Miller's jailhouse confession to a fellow inmate is inherently unreliable and is inadmissible.  For our purpose here, however, we will assume the fellow inmate's account of Miller's confession that he shot "a woman" was admissible to show that Miller, not Hanson, was the trigger man in the murder of Mary Bowles, and with that assumption consider whether there is a reasonable probability that the admission of the confession, through the testimony of a fellow inmate would have changed the outcome of the first stage of trial.

The evidence showed Mary Bowles was shot and killed with Hanson's gun, one that he had routinely carried and used during the time he and Miller were partners in the commission of multiple crimes.  That evidence supports the conclusion that even if Hanson had not actually pulled the trigger, he had given Miller his gun to use, knowing Miller would kill Bowles, as he had killed

the dirt pit owner moments before.  Such evidence would support a finding that Hanson assisted Miller in committing murder with malice aforethought, and that he did so with the intention of causing the death, and, further aided and abetted Miller fully aware of his intention.  The evidence satisfies both the *Johnson* and *Williams* test of necessary evidence of aiding and abetting for First Degree Malice Aforethought murder and we are convinced that no reasonable jury would find Hanson guilty of anything other than First Degree Malice Aforethought murder for the death of Mary Bowles.  And we find no reasonable probability that, had Miller's statement been introduced in the first stage of Hanson's trial, the outcome would have been any different.

We now consider the impact of Miller's statement on punishment. The statement was admitted at Hanson's resentencing trial through the testimony of Detective Nance.  Hanson was consequently allowed to argue that he was not the triggerman as a mitigating circumstance.     The district court submitted OUJI-CR2d 4-71 that provides:

> In determining whether a person found guilty of murder in the first degree shall be punished by death, imprisonment for life without the possibility of parole, or imprisonment for life with the possibility of parole, you are required to give individualized consideration to the defendant's degree of participation and focus on the defendant's individual culpability in the killing.

> You are further instructed that you may not impose the death penalty unless you determine beyond a reasonable doubt that the defendant either: 1) killed a person, 2) attempted to kill a person, 3) intended a killing to take place, 4) intended the use of deadly force, or 5) was a major participant in the felony committed and was recklessly indifferent to human life.

Hanson's resentencing jury was properly instructed and in fact was allowed to consider the newly discovered evidence in deciding punishment. For these reasons, Hanson's claim that he is entitled to a new trial based on newly discovered evidence is denied.

**2.**

In Proposition II, Hanson argues trial and appellate counsel were ineffective. He maintains his attorneys should have challenged the aggravating circumstance that he murdered Bowles to avoid a lawful arrest or prosecution on the basis that his jury was not required to unanimously agree on the particular predicate crime which led him to kill Bowles to avoid arrest. Prior to Hanson's original trial, the State filed a Notice of Evidence in Support of Aggravating Circumstances, detailing the evidence it believed supported the alleged aggravating circumstances. (O.R. 340) That notice included evidence supporting the aggravating circumstance that Bowles and Thurman were murdered so that Hanson and Miller could avoid a lawful arrest or prosecution. At Hanson's resentencing trial, the State argued that Hanson murdered Bowles to avoid a lawful arrest or prosecution for his involvement in the murder of the dirt pit owner only. Therefore, contrary to Hanson's claim, the State did not rely on more than one predicate crime to support this aggravating circumstance. For this reason, he can show that neither trial nor appellate counsel were ineffective for failing to challenge the aggravator on this basis. This claim is denied.

**3.**

Hanson claims in his final proposition that the accumulation of error on appeal and in post-conviction requires relief. "No authority allows this Court to consider, on post-conviction, errors raised on direct appeal which were not also raised as error in the post-conviction claim." *Harris v. State,* 2007 OK CR 32, ¶ 20, 167 P.3d 438, 445. We have determined that Hanson is not entitled to a new trial on the basis of newly discovered evidence. We have further found that neither trial nor appellate counsel were ineffective. There is no cumulative error to consider.

## DECISION

Having reviewed Hanson's application for post-conviction relief, we conclude: (1) there exist no controverted, previously unresolved factual issues material to the legality of Hanson's confinement; (2) Hanson's grounds for review have no merit or are barred from review; and (3) the Capital Post-Conviction Procedure Act warrants no relief in this case. Accordingly, Hanson's Application for Post-Conviction Relief is **DENIED**. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2009), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

**ATTORNEYS FOR PETITIONER:**

ROBERT W. JACKSON
ANASTASIA CESARIO
CAPITAL POST-CONVICTION DIV.
OKLAHOMA INDIGENT
DEFENSE SYSTEM
P.O. BOX 926
NORMAN, OK 73070

**ATTORNEYS FOR THE STATE:**

W. A. DREW EDMONDSON
ATTORNEY GENERAL OF OKLAHOMA
ROBERT WHITTAKER
ASSISTANT ATTORNEY GENERAL
313 N.E. 21st STREET
OKLAHOMA CITY, OK  73105

**OPINION BY**:  A. JOHNSON, V.P.J.
C. JOHNSON, P.J.:  Concur
LUMPKIN, J.:  Concur
CHAPEL, J.:  Concur in Result
LEWIS, J.:   Concur

RA